Joseph N. Casas [CSB No. 225800]
**THE CASAS LAW FIRM, P.C.**
402 West Broadway Street, Suite 400
San Diego, California 92101
Telephone No.: (855) 267-4457
Facsimile No.: (855) 220-9626
E-Mail: joseph@talentrights.law

Dennis Postiglione (*Admitted Pro Hac Vice*)
Texas Bar No. 24041711
**THE CASAS LAW FIRM, P.C.**
3801 N. Capital of Texas Highway
Suite E240 Box 446
Austin, Texas 78746
Telephone No.: (512) 806-7699
Facsimile No.: (855) 220-9626
E-Mail: dennis@talentrights.law
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| BARRY TUBB, an individual, | ) Case No.: 2:24-cv-01417-GW-BFM |
| | ) |
| Plaintiff, | ) **PLAINTIFF'S RESPONSE AND** |
| | ) **BRIEF IN OPPOSITION TO** |
| v. | ) **DEFENDANT PARAMOUNT** |
| | ) **PICTURES CORPORATION'S** |
| PARAMOUNT PICTURES | ) **SPECIAL MOTION TO STRIKE** |
| CORPORATION, a Delaware | ) **PLAINTIFF'S THIRD, FOURTH,** |
| Corporation, | ) **FIFTH, SIXTH, AND SEVENTH** |
| | ) **CAUSES OF ACTION [C.C.P. §** |
| Defendant. | ) **425.16]** |
| | ) |
| | ) Hearing Date: June 24, 2024 |
| | ) Time: 8:30 a.m. |
| | ) Courtroom: 9D |
| | ) Action Filed: February 21, 2024 |

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................- 1 -

II.   ANTI-SLAPP LEGAL STANDARDS APPLICABLE TO THE MOVIE INDISTURY ........................................................................- 2 -

III.  STATEMENT OF FACTS ..........................................................- 3 -

IV.  PLAINTIFFS THIRD AND FOURTH CAUSE OF ACTIONS DO NOT RUN AFOUL OF THE ANTI-SLAPP STATUTE: *TOP GUN: MAVERICK* DOES NOT INVOLVE A MATTER OF PUBLIC INTEREST ...............................- 4 -

   A.  Dyer and Sarver Are The Benchmarks For What Is and What Is Not A Matter of Public Interest In The Movie Industry. ......................- 6 -

   B.  *Top-Gun: Maverick* Does Not Involve Matters of Public Interest Simply Because It Involves Amorphous Concepts Of "Undisclosed Military Conflicts" and "Honor and Duty." ..........................................- 10 -

   C.  Plaintiff's Depiction In The Subject Photograph & The Character He Portrays Is Not A Matter of Public Interest:  Plaintiff Did Nothing To Insert Himself Into A Public Debate. ................................................- 13 -

   D.  Plaintiff's Claims Arise Out Of Commercial Transaction (Not A Protected Activity) Between Plaintiff And Paramount. ...........................- 16 -

V.   EVEN IF THE FILM INVOLVES A MATTER OF PUBLIC INTEREST PLAINTIFF CAN ESTABLISH A REASONABLE PROBABILITY THAT HE WILL PREVAIL ON HIS CLAIMS ................................................- 17 -

   A.  The First Amendment Does Not Bar Plaintiff's Misappropriation Claims Because Paramount Appropriated The Economic Value That The Plaintiff Has Built In His Identify. ........................................................- 18 -

   B.  Paramount's Transformative Use Defense Is Meritless And Not Dispositive At This Stage Of Litigation. ..................................................- 21 -

C.  The Copyright Act Does Not Preempt Plaintiff's Misappropriation Claims. . - 22 -

D.  Plaintiff Can Establish A Reasonable Probability of Success On His Breach of Contract Claim ......................................................................- 24 -

E.  Plaintiff Can Establish A Reasonable Probability of Success On His Negligence Claim. ......................................................................- 25 -

VI.   CONCLUSION……………………………………………………….-26 -

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3
<u>Briggs v. Eden Council for Hope & Opportunity</u> 19 Cal.4th 1106, 112 .... - 5 -, - 11 -

4
<u>Brobeck, Phleger & Harrison v. Telex Corp.</u>, 602 F.2d 866, 871 (9th Cir.) ......- 24 -

5
<u>Brodeur v. Atlas Entertainment, Inc.</u>, 248 Cal.App 4th, 665, 675  (2016) - 13 -, - 16 -

6

7
<u>Comedy III Productions, Inc. v. Gary Saderup, Inc.</u>, 25 Cal. 4th 387, 406 (2001)... - 21 -

8
<u>Commonwealth Energy Corp. v. Investor Data Exchange, Inc.</u>, 110 Cal.App.4th 26, 34 (2003)........................................................................................- 1-

9
<u>Doe v. Gangland Productions, Inc.</u> 730 F.3d 946, 951(9th Cir. 2013) ......- 10 -, - 17 -

10
<u>Downing v. Abercrombie & Fitch</u>, 265 F.3d 994, 1003 (9th Cir.2001).............- 23 -

11
<u>Duncan v. Cohen</u> (N.D. Cal., July 22, 2008, No. C 08-2243 BZ) 2008 WL 2891065, at *2……………………………………………………....- 17 -, - 21 -

12

13
<u>Dyer v. Childress</u>, 147 Cal.App.4th 1273, 1279 (2007) .................................. passim

14
<u>Hilton v. Hallmark Cards,</u> 599 F.3d. 894, 906 (9th Cir. 2010)- 5 -, - 18 -, - 19 -,-22-

15
<u>In re NCAA Student-Athlete Name & Likeness Licensing Litigation</u> 724 F.3d 1268, 1270–1271 (9th Cir. 2013) ..................................................................- 19 -

16

17
<u>J'Aire Corp. v. Gregory</u>, 24 Cal.3d 799, 803, (1979). ........................................- 25 -

18
<u>Jewett v. Capital One Bank</u> 113 Cal.App.4th 805, 814, (2003) ........................- 15 -

19
<u>KNB Enterprises v. Matthews</u>, 78 Cal.App.4th 362, 366 (2000).......................- 23 -

20
<u>M.G. v. Time Warner, Inc</u>. 89 Cal.App.4th 623 (2001) .......................................- 9 -

21

Matson v. Dvorak, 40 Cal.App.4th 539, 548 (1995) ........................................- 18 -

Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 599 (9th Cir. 2010) ...............- 18 -

Mintz v. Blue Cross of California, 172 Cal.App.4th 1594, 1610 (2009) ...........- 25 -

Navellier v. Sletten, 29 Cal.4th 82, 95 (2002) ...................................................- 18 -

Newcombe v. Adolf Coors Co., 157 F.3d 686, 691–94 (9th Cir.1998) .............- 19 -

Peredia v. HR Mobile Services, Inc., 25 Cal.App.5th 680, 687 (2018) .............- 25 -

Rivero v. American Federation of State, County, and Municipal Employees, AFL-
    CIO 105 Cal.App.4th 913 (2003) ........................................................ - 5 -, - 11 -

Sarver v. Chartier, 813 F.3d 891, 901-02 (9th Cir. 2016) .............................. passim

Terry v. Davis Community Church 131 Cal.App.4th 1534, 1538 (2005)..........- 10 -

Timed Out, LLC v. Youabian, Inc. ....................................................................- 23 -

Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp., 617 F.2d 936,
    940 (2d Cir.1980) .......................................................................................- 24 -

Weinberg v. Feisel, 110 Cal.App.4th 1122, 1132 (2003).....................................- 6 -

Wilson v. Parker, Covert & Chidester, 28 Cal.4th 811, 821 (2002)...................- 18 -

Zacchini v. Scripps–Howard Broadcasting Co. 433 U.S. 562, 563-364 - 18 -, - 20 -,
    - 21 -, - 22 -

**Statutes**

Cal. Civ. Code § 3344 ............................................................... - 17 -, - 21 -

California Code of Civil Procedure § 425.16 .......................................- 1 -

**Treatises**

1 Nimmer on Copyright (2013) § 1.01 [B][1][c]................................................- 24 -

## I.      INTRODUCTION

Defendant Paramount Picture Corporations ("Paramount") has filed a Special Motion to Strike under California Code of Civil Procedure § 425.16 (the "anti-SLAPP statute") attempting to insulate itself from liability arising out of its unlawful use of Plaintiff's image and likeness in Paramount's 2022 film "*Top Gun: Maverick*." While it is axiomatic that movies are protected by the right to free speech, that is not the end-all-be all.

Despite Paramount's wishful interpretation of caselaw regarding the application of the anti-SLAPP statute to the movie industry, the law is not as draconian as Paramount hopes it to be. While the 1986 *Top Gun* film and its sequel *Top Gun: Maverick* are indeed successful, top selling, widely disseminated films, this fact alone does not make *Top Gun* or *Top Gun: Maverick* a matter of public interest. Instead, the issue turns on the specific nature of the speech in films rather than generalities abstracted from it. Dyer v. Childress, 147 Cal.App.4th 1273, 1279 (2007). Paramount fails to show that Plaintiff's claims regarding the use of his persona goes beyond "the parochial particulars" of this case. *Id.* citing Commonwealth Energy Corp. v. Investor Data Exchange, Inc., 110 Cal.App.4th 26, 34 (2003). Because Paramount's entire anti-SLAPP argument boils down to "a broad and amorphous public interest" based solely on *Top Gun: Maverick*'s fame and general, amorphous concepts of "undeclared military conflicts" and notions of "duty" and "honor", the Court should deny Paramount's Special Motion to Strike

in its entirety.  But even if Paramount can overcome its prima facie showing that Plaintiff's suit arises from an act by Paramount made in connection with a public issue in furtherance of its right to free speech, Plaintiff can establish a *reasonable probability* that he will prevail on his claims.  <u>Sarver v. Chartier</u>, 813 F.3d 891, 901-02 (9th Cir. 2016) (Emphasis added.)

## II. ANTI-SLAPP LEGAL STANDARDS APPLICABLE TO THE MOVIE INDISTURY

An Anti-SLAPP motion is evaluated in two steps: First, "[t]he defendant must first 'make a prima facie showing that the plaintiff's suit arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech under the United States or California Constitution.'"; and second, "if the defendant has made such showing, [the Court should] evaluate whether the plaintiff has 'establish[ed] a reasonable probability that the plaintiff will prevail on his or her ... claim.'" <u>Sarver</u>, 813 F.3d at 901-02.

"It is beyond dispute that movies involve free speech."  <u>Dyer</u>, 147 Cal.App.4th at 1273.  "However, not all speech in a movie is of public significance and therefore entitled to protection under the anti-SLAPP statute. The issue turns on the specific nature of the speech rather than generalities abstracted from it." <u>Id.</u> Moreover, regardless of the extensive scope of a film's publication, "protection under the anti-SLAPP statute turns on whether the activity of the defendant involves the right of petition or free speech *in connection with a public issue." <u>Id.</u>

(Emphasis added).  Thus, motion picture defendants do not enjoy automatic anti-SLAPP protection "in every context."  Id. at 1284.

### III.   STATEMENT OF FACTS

In 1985, Plaintiff entered into a Memorandum of Agreement with Paramount to portray "Wolfman" a Naval RIO (Radar Intercept Officer) in the hit movie *Top Gun.* Doc. 1 para. 113; Doc. 1, Ex. A ("The Agreement").  The Agreement limited the use of his image and likeness to *Top Gun*, **and only** *Top Gun.*  Doc. 1 para. 1, 36, 40, 45, 117, 123; Ex. A at 7 para. A (emphasis added).  *Top Gun-Maverick* was released in 2022.  In the sequel, Maverick is called back to Top Gun (Naval jet warfighter school) to teach a group of top Naval aviators to fly a top-secret dangerous and seemingly impossible mission.  *Top Gun-Maverick* focal point of the storyline is on Maverick's strained relationship with a young pilot trainee nicknamed Rooster, the son of the iconic "Goose" (Maverick's wingman) that suffered a fatal accident in *Top Gun*.  Rooster's rival, "Hangman", and another classmate, "Coyote", learn about this history when they see a photograph of the 1986 Top Gun class and realize Goose and Rooster have the same last name. (See Doc. 1, Ex. C, Ex. D the "Subject Photo"). Defendant knowingly featured Plaintiff's Image in this key *twenty-four second scene depicting Plaintiff four (4) times* without seeking his permission or providing compensation. In this key scene, the camera zooms into a four-shot close-up featuring Val Kilmer (Iceman), Anthony Edwards (Goose), Tom Cruise (Maverick), and plaintiff Barry Tubb

(Wolfman) in his signature cowboy hat.   The Subject Photo clearly depicts Plaintiff.   The Image of Plaintiff depicts him standing next to Maverick's right with Goose, and Iceman on Maverick's left.   Doc. 24, Ex. B at 44:15-45:28; Doc. 1, Ex. D. This use of Plaintiff's image was in violation of his contract with Paramount, done without his permission or compensation, and violative his rights of publicity.

## IV.   PLAINTIFFS THIRD AND FOURTH CAUSE OF ACTIONS DO NOT RUN AFOUL OF THE ANTI-SLAPP STATUTE: *TOP GUN: MAVERICK* DOES NOT INVOLVE A MATTER OF PUBLIC INTEREST

The crux of Paramount's anti-SLAPP defense can be summarized as follows: because *Top Gun* and its sequel *Top Gun: Maverick* are top-selling, widely disseminated movies, they should automatically enjoy anti-SLAPP protection from all lawsuits.   To support its position, Paramount offers a strained interpretation of case law to support its proposed maxim that "courts regularly have found that the creation of expressive works is a matter of public interest." (Doc. 23, at p.6 lines 8-9.)   Second, Paramount offers an *ipse dixit* argument:   *Top Gun: Maverick* "is a popular work of widespread public interest as demonstrated by extensive press coverage" and likely to be "one of the highest grossing movies of 2022" the "SLAPP statute's requirements are met."   Id. at lines 14-22.   Next, Paramount asks the court to adopt two broad conclusions: (1) Top Gun: Maverick involves issues of "manifest" public interest because it "addresses undeclared

1  military conflicts between the U.S. and foreign adversaries seeking nuclear

2  capabilities," as well as "concepts of duty, honor, and the role of individuals in an

3  increasingly technology-dependent military."; and (2) "Plaintiff, and the character

4  he portrays," are a "subject of public interest." Id. at p. 6 lines 23-28 through p. 7

5  lines 1-2.

6        There is no "one-size-fits-all" approach to the question of what constitutes a

7  "public issue or an issue of public interest" in the context of films and/or

8  television.  See Rivero v. American Federation of State, County, and Municipal

9  Employees, AFL-CIO 105 Cal.App.4th 913 (2003).  While there is plenty of

10 examples of what is (or is not) a "public issue or an issue of public interest" in case

11 law (see infra), ultimately the inquiry "amounts to little more than a message to

12 judges and attorneys that no standards are necessary because they will, or should

13 know a public concern when they see it."  Id. at 929 citing, Briggs v. Eden Council

14 for Hope & Opportunity 19 Cal.4th 1106, 112.

15       "The California Court of Appeal for the First District has identified 'three

16 categories of public issues: (1) statements 'concern[ing] a person or entity in the

17 public eye'; (2) 'conduct that could directly affect a large number of people beyond

18 the direct participants'; (3) 'or a topic of widespread, public interest.'" Sarver, 813

19 F.3d 891 at 901-2, citing Hilton v. Hallmark Cards, 599 F.3d. 894, 906 (9th Cir.

20 2010) (alteration in original) "California's Court of Appeal for the Third District

21 has explained that ''public interest' does not equate with mere curiosity,' but

1  instead 'a matter of public interest should be something of concern to a substantial

2  number of people.'" <u>Id.</u> citing <u>Weinberg v. Feisel</u>, 110 Cal.App.4th 1122, 1132

3  (2003).   Further, "there should be some degree of closeness between the

4  challenged statements and the asserted public interest," and the "focus of the

5  speaker's conduct should be the public interest." <u>Id.</u> And of utmost significance to

6  the case at bar, a "person cannot turn otherwise private information into a matter of

7  public interest simply by communicating it to a large number of people." <u>Id.</u>

8  **A.** <u>**Dyer**</u> **and** <u>**Sarver**</u> **Are The Benchmarks For What Is and What Is Not A Matter of Public Interest In The Movie Industry.**

   Plaintiff invites the court to consider two key cases involving the contours of

10  California's anti-SLAPP statute as to establish the outer boundaries of what is or is

11  not a matter of public interest in the context of the film industry: <u>Dyer</u>, 147

12  Cal.App.4th 1273 and <u>Sarver</u>, 813 F.3d 891.

13  In <u>Sarver</u>, the Ninth Circuit considered the district court's applicability of

14  the anti-SLAPP statute against claims brought by an Army sergeant against a

15  screenwriter, director and producer of an award-winning motion picture (*The Hurt*

16  *Locker*) asserting claims of, *inter alia*, misappropriation of his right of publicity.

17  <u>Sarver</u>, 813 F.3d 891.  Sergeant Sarver was a soldier deployed to Iraq during the

18  Iraq War where he served as an Explosive Ordinance Disposal (EOD) technician

19  "whose principal duty was to identify, make safe, and dispose of improvised

20  explosive devices." <u>Sarver</u>, 813 F.3d at 896.  During Sergeant Sarver's tour in

21  Iraq, Mark Boal, a journalist for *Playboy* magazine was embedded with Sergeant

Sarver's unit (the 788th) during which time he followed Sergeant Sarver and took photographs and videos of him.  Id.  Boal also conducted interviews of Sergeant Sarver after he returned from Iraq.  Id.  "Boal wrote an article focused on Sarver's life and experiences in Iraq, which was published in the August/September 2005 issue of Playboy."  Id.  The *Playboy* article contained photographs of Sergeant Sarver and other personal information about him.  Id.  Boal later wrote a screenplay for the film that became *The Hurt Locker* which was ultimately released in June 2009.  Id.  Sergeant Sarver sued *Playboy* and Boal (among other defendants) contending that he did not consent to the use of his image and likeness in the *Playboy* article or the use of "his life and experiences" as portrayed by an actor in *The Hurt Locker*.  Id.  The district court ultimately dismissed all of Sergeant Sarver's claims as violative of the anti-SLAPP statute "because the defendants were engaged in the exercise of free speech in connection with a public issue." Id.  The Ninth Circuit upheld the district court's ruling concluding that "the Iraq War was a matter of significant and sustained public attention, as was the use of improvised explosive devices (IEDs) by insurgents during the war" and that "*The Hurt Locker's* portrayal of those issues necessarily presents a matter of public concern."  Id. at 902.  Further, the Sarver court reasoned that "Sarver's work while deployed in Iraq was an issue of public concern significant attention devoted to the war and to the role of IEDs in it. Id.  Importantly, *the film's alleged portrayal of Sarver's persona specifically centers around that work.*" Id.  In arriving at its

conclusion, the court juxtaposed and analyzed Sarver's claims and *The Hurt Locker's* portrayal of him against the claims of Troy Dyer and his portrayal in the movie *Reality Bites* (which denied defendant's anti-SLAPP attack). <u>Id.</u> at 902 (analyzing <u>Dyer</u>, 147 Cal.App.4th 1273).

In <u>Dyer</u>, Troy Dyer sued the makers of the film Reality Bites, for what he claimed to be an unflattering representation of his younger self.  Just like Paramount, the <u>Dyer</u> defendants contended that "publication of…*Reality Bites*…constitutes 'conduct in furtherance of the exercise of the constitution right of…free speech in connection with…an issue of public interest…because the film raised issues of genuine widespread interest about the challenges facing Generation X in the early 1990's." <u>Dyer</u> 147 Cal.App.4th at 545.  Dyer attended USC film school with defendant Helen Childress who ultimately left school to work on a screenplay that became the move *Reality Bites.* <u>Id.</u>  "In the movie, Ethan Hawke portrays a rebellious slacker named Troy Dyer." <u>Id.</u> The film "addressed the issues facing Generation X in the 1990's" and "was seen by more than 3 million people in theatres." <u>Id.</u>  In a commentary on the film in its Tenth Anniversary Edition, Childress admitted the film was based on "her friends at USC film school." <u>Id.</u> Defendants filed an anti-SLAPP motion against Dyer.  <u>Id.</u>  While the court acknowledged that all "movies involve free speech," it held that "not all speech in a movie is of public significance and therefore entitled to protection under the anti-SLAPP statute." <u>Id.</u> at 548.  Instead, the "issue turns on the specific nature of the

speech rather than generalities abstracted from it." Id.  The court identified that "the specific dispute concerns the asserted misuse of Dyer's persona…[however]…the representation of Troy Dyer as a rebellious slacker is not a matter of public interest and there is no discernable public interest in Dyer's persona. Id.  Moreover, the court held that while *Reality Bites* "may address topics of widespread public interest, the defendants are unable to draw any connection between those topics and Dyer's defamation and false light claims." Id.  The court further ruled that "the fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not sufficient to meet the [anti-SLAPP] statutory requirements." Id.  The court further held that "[i]t does not follow…that a more extensively published statement…is in the public interest." Id. at 550. Ultimately, the court ruled in favor of Dyer (denying defendant's anti-SLAPP motion) holding that "…assuming the issues facing Generation X at the start of the 1990's are of significant interest to the public, Dyer, a financial consultant living in Wisconsin…was not connected to these issues in anyway." Id.

Other California cases offer further insight on what courts consider to be matters of public interest, *inter alia*:

- M.G. v. Time Warner, Inc. 89 Cal.App.4th 623 (2001): plaintiff's claims arising from a Sports Illustrated cover story on incidents of child molestation in youth sports failed because the topic of the article was about the general topic of child molestation in youth sports "an issue which, like domestic violence, is significant and of public interest."

- <u>Doe v. Gangland Productions, Inc.</u> 730 F.3d 946, 951(9th Cir. 2013): Plaintiff's claims against a documentary producer were based on defendant's acts of interviewing plaintiff for a documentary television show whose 'general topics of gang violence and…murder' are issues of public interest.  In contrasting the <u>Dyer</u> case, the court held "Unlike <u>Dyer</u>, Plaintiff is directly connected to the issues of public interest, gang violence and Miller's murder…and Plaintiff agreed to do the interview for *Gangland* because of his personal knowledge on these topics."

- <u>Terry v. Davis Community Church</u> 131 Cal.App.4th 1534, 1538 (2005): the court found "that defendants' reports and meetings regarding an inappropriate relationship between plaintiff husband and plaintiff wife, church youth group leaders, and a girl in their youth group involved an issue of public interest…" holding that "the broad topic of the report and the meetings was the protection of children in church youth programs, which was an issue of public interest."

**B. *Top-Gun: Maverick* Does Not Involve Matters of Public Interest Simply Because It Involves Amorphous Concepts Of "Undisclosed Military Conflicts" and "Honor and Duty."**

Paramount proffers a two-pronged conclusory argument for the proposition that *Top Gun: Maverick* involves matters of public interest.  First, Paramount posits that the movie is "a popular work of widespread public interest as demonstrated by extensive press coverage."  Second, Paramount believes that the movie's "subject matter" involves issues of public interest, to wit, "undeclared military conflicts between the U.S. and foreign adversaries seeking nuclear capabilities" and "concepts of duty, honor, and the role of individuals in an increasingly technology-dependent military."

Plaintiff submits that Paramount's conclusory arguments cannot pass even the most basic public interest "smell test" outlined in <u>Rivero</u> (the inquiry "amounts

1   to little more than a message to judges and attorneys that no standards are

2   necessary because they will, or should know a public concern when they see it."

3   <u>Rivero</u>, 105 Cal.App.4th at 929 citing, <u>Briggs</u> 19 Cal.4th 1106, 112. Even the

4   average layman can deduce that while *Top Gun: Maverick* does involve a plot

5   about a dangerous military mission against a fictional and unidentified "foreign

6   adversary", *the primary focus and gravamen of the movie* is about Maverick

7   (played by Tom Cruise) confronting his past while training a group of younger Top

8   Gun graduates, including the son ("Rooster") of his deceased best friend

9   ("Goose").  The conflict and history between Maverick and Rooster hit its climax

10  at 1:14:24 of the movie when Rooster confronts Maverick about Maverick's

11  interference with Rooster's Naval career (holding back his papers while at the

12  Naval Academy) and blames Maverick for the death of his father "Goose."

13       *Top Gun: Maverick*, unlike *The Hurt Locker*, does <u>not</u> address issues of

14  widespread public concern.  In *The Hurt Locker* there was no doubt that the movie

15  was about American soldiers in Iraq and specifically about the use of IEDs by

16  insurgents during the Iraq War.  Indeed, the movie was based on the exploits of an

17  Army IED technician while deployed in Iraq.  *Top Gun: Maverick*, on the other

18  hand, does not so much as identify the supposed "foreign enemy."  Other than to

19  describe a general "uranium enrichment plant in a valley" and vague references to

20  "enemy capabilities" not once in the entire movie is the enemy identified (*e.g.* as

21  Russian, Chinese, North Koreans, or Iranian).  In fact, not even when Maverick

and Rooster are behind enemy lines (both planes are shot down) is there any indication of who the enemies are – in fact the enemies' faces, if any, are never visible.   Moreover, in the final dog-fight scenes between Maverick and the unidentified "enemies", the enemy jet fighter's visors are completely blacked out. In other words, the viewer cannot surmise the ethnicity/nationality of the enemy fighter pilots. Similarly, there is no flag or insignia on the enemy jets to identify the country they represent.   The absence of a clearly defined enemy is critical and intentional: Paramount clearly went out of its way to avoid making the movie about a real American conflict or threat (i.e. a public interest).   Instead, Paramount fixated on the emotional struggle, conflict, and eventual denouement between the hero Maverick and his estranged former navigator's son Rooster – a struggle that happens to be played out as Naval fighter pilots involved in a fictitious dangerous mission.

Paramount's desire to make the movie about a "broader issue of public concern" simply because the movie is about U.S. Naval fighter pilots involving a fictional "dangerous mission" is unavailing and unpersuasive.  As the Dyer court noted: "the fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not sufficient to meet the [anti-SLAPP] statutory requirements." Dyer 147 Cal.App.4th at 545.

1  **C. Plaintiff's Depiction In The Subject Photograph & The Character He**
2  **Portrays Is Not A Matter of Public Interest:  Plaintiff Did Nothing To**
   **Insert Himself Into A Public Debate.**

3      Paramount proposes a final Hail Mary argument: "the Complaint's

4  allegations show that Plaintiff, and the characters *[sic]* he portrays, are a subject of

5  public interest…detailing Plaintiff's prominence in the entertainment field."

6  Paramount cites <u>Brodeur v. Atlas Entertainment, Inc.</u>, 248 Cal.App 4th, 665, 675

7  (2016) for the proposition that "plaintiff's allegations about his own prominence

8  [satisfy the] public interest test."  But that is not the accurate holding/application of

9  <u>Brodeur</u> case.

10      In <u>Brodeur</u>, the principal issue was whether a statement made by a "slightly

11 unhinged" character in a motion picture, American Hustle (Columbia Pictures

12 2013), was made "in connection with a public issue or an issue of public interest"

13 within the meaning of the anti-SLAPP.  <u>Brodeur</u> 248 Cal.App.4th at 668.  The

14 plaintiff, Brodeur, was "a well-known author in the environmental field, pointing

15 out health dangers of the use of various electrical devices and other household

16 items." <u>Id.</u>  In one scene of the film, the main character is given a microwave oven

17 that his wife causes to blow up by putting in it a container food with tin foil.  <u>Id.</u> at

18 669.  In the ensuing argument about the microwave, the wife says "that she read, in

19 a magazine article by plaintiff, that a microwave oven 'takes all of the nutrition out

20 of our food. It's empty, just like your deals.'"  <u>Id.</u>  Based on this statement by the

21 wife in the movie, about plaintiff's book, plaintiff sued defendants alleging, libel,

defamation, slander, and false light "asserting that he had never made the quoted statement, and that by misquoting him, defendants 'have suggested to the movie audience that Mr. Brodeur made a scientifically unsupportable statement,' damaging his reputation." Id.  Defendants filed an anti-SLAPP motion.  Id. Defendants contended that the movie American Hustle's "uncontroverted critical success was evidence of its public interest." Id.  But in support of their motion, defendants filed a declaration which focused their public interest argument on the topic of microwave oven safety in US culture stating that "[t]he safety of microwave ovens has been a matter of public controversy since at least the early 1970's, in large part because of the writings of the plaintiff, Paul Brodeur." Id. Based on this nexus between plaintiff's self-aggrandized career as "a prolific, 'well-known author in the environmental field' and the "farcical scene about microwave ovens—clearly emanating from matters in which the public was interested during the relevant decade", the Court concluded that the statement about plaintiff's article was indeed protected activity within the meaning of the anti-SLAPP statute.  Id.

The Brodeur opinion highlights the importance of the Dyer holding.  In Brodeur, the plaintiff attempted to relate his lawsuit to that of the plaintiff in the Dyer case by "insist[ing] that [the wife's] statement in the microwave oven scene [like Dyer] is in 'no way related to any public purpose that may exist in the film's other scenes.' Id. at 676. The court disagreed and held that Dyer was "inapt" to

1    plaintiff's case and nothing like <u>Dyer</u> because unlike the plaintiff who put himself

2    in the public eye with his injection into the safety arguments surrounding

3    microwaves, "Dyer did nothing to insert himself into the discussion of any public

4    topic or debate." <u>Id.</u> citing <u>Jewett v. Capital One Bank</u> 113 Cal.App.4th 805, 814,

5    (2003) ("[a] public issue is implicated if the subject of the statement or activity

6    underlying the claim ... was a person or entity in the public eye".)

7          Plaintiff's lawsuit against Paramount is about the unlawful of his image and

8    likeness in a closeup scene of a photograph taken during the shoot of the original

9    *Top Gun*. Contrary to Paramount's cherry-picked comparison to <u>Brodeur</u>,

10   Plaintiff's lawsuit is more akin to <u>Dyer</u> not <u>Brodeur</u>.  As in <u>Dyer</u>, and unlike

11   <u>Brodeur</u>, Plaintiff did nothing to insert himself into any public debate (assuming

12   there even is a "public debate" in *Top Gun: Maverick*).  While the Complaint

13   describes Plaintiff's prominence and lifelong history in the entertainment field, at

14   no time does the Complaint allege a nexus between a statement, for example, made

15   by Plaintiff and the propertied protected content (the Subject Photograph).

16         In fact, Plaintiff's entire lawsuit against Paramount arises out of Plaintiff's

17   breach of contract claim against Paramount – *i.e.* that Paramount used Plaintiff's

18   image in the Top Gun sequel without his consent and in contravention of the

19   Agreement. Put another way, this case has nothing to do with any statement made

20   by Plaintiff (or his prominence in the entertainment field) that can be tied to any

21   topic of public interest.  While Plaintiff is arguably not as private a person as Troy

1    Dyer, the use of his image and likeness standing alone does not insert him "into the

2    discussion of any public topic or debate."  Brodeur, 248 Cal.App.4th at 676. The

3    representation of Plaintiff in the Subject Photo (wearing his signature cowboy hat)

4    is not a matter of public interest (either standing alone or tied to an overarching

5    public interest theme) and, like Dyer, there is no discernable public interest in

6    Plaintiff's persona.  Dyer, 147 Cal.App.4th at 550.  Even if this court were to find

7    that *Top Gun: Maverick* "may address topics of widespread public interest,"

8    paramount is unable to draw any connection between those topics and the specific

9    use of Plaintiff's persona or his claims against Paramount.  Id.

10   In summary, Paramount's use of Plaintiff's persona (by and through the

11   Subject Photograph showed four (4) times amounting to eleven (11) seconds of a

12   twenty-four (24) revelatory scene) is not speech that is fully protected by the First

13   Amendment.  However, even if this court were to find that Paramount can establish

14   their threshold burden that *Top Gun: Maverick* somehow involves issues of public

15   interest to bring it within the ambit of the anti-SLAPP statute, Plaintiff can

16   establish a reasonable probability that he will prevail on his claims as discussed

17   below.

18   **D. Plaintiff's Claims Arise Out Of Commercial Transaction (Not A Protected Activity) Between Plaintiff And Paramount.**

19   Plaintiff's claims arise out of Paramount's misappropriation of the Subject

20   Photo taken during the filming of the original *Top Gun* movie. In contrast to

21   Sarver, Plaintiff was specifically contracted to portray Wolfman in *Top Gun* (see

Agreement.) Thus, Plaintiff's misappropriation claims (under Cal. Civ. Code § 3344 and common law) *arise out of* a commercial transaction (the *Top Gun* Agreement, Doc. 1, Ex. A.) between Paramount and Plaintiff. In other words, but for the photoshoot during the filming of *Top Gun* that resulted in the creation of Subject Photograph, Plaintiff could not bring his misappropriation claims against Paramount. Thus, even assuming *arguendo* that Paramount was attempting to spread some message of public interest/concern by and through *Top Gun: Maverick* or the Subject Photo, Plaintiff's suit in no way seeks to limit Paramount's ability to do so because Plaintiff's claims center on contract claims, not some amorphous protected activity. See Duncan v. Cohen (N.D. Cal., July 22, 2008, No. C 08-2243 BZ) 2008 WL 2891065, at *2 (state law claims for relief are not subject to an anti-SLAPP motion to dismiss when they do not arise out of protected activity).

## V. EVEN IF THE FILM INVOLVES A MATTER OF PUBLIC INTEREST PLAINTIFF CAN ESTABLISH A REASONABLE PROBABILITY THAT HE WILL PREVAIL ON HIS CLAIMS

If the defendant has met its threshold burden, the court must next evaluate whether the plaintiff has "establish[ed] a reasonable probability that the plaintiff will prevail on his or her ... claim." Sarver, 813 F.3d at 901. "[A] plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " Doe v. Gangland Productions,

1    Inc. 730 F.3d at 957, citing <u>Wilson v. Parker, Covert & Chidester</u>, 28 Cal.4th 811,

2    821 (2002) (quoting <u>Matson v. Dvorak</u>, 40 Cal.App.4th 539, 548 (1995)). "The

3    applicable burden 'is much like that used in determining a motion for nonsuit or

4    directed verdict, which mandates dismissal when no reasonable jury could find for

5    the plaintiff.'" <u>Id.</u> citing <u>Mindys Cosmetics, Inc. v. Dakar</u>, 611 F.3d 590, 599 (9th

6    Cir. 2010). This means that in ruling on an anti-SLAPP motion, a court cannot

7    "weigh the credibility or comparative probative strength of competing evidence."

8    <u>Wilson</u>, 28 Cal.4th at 821.

9        "At this second step of the anti-SLAPP inquiry, the required probability that

10   Hilton will prevail need not be high. The California Supreme Court has sometimes

11   suggested that suits subject to being stricken at step two are those that "lack [ ]

12   *even minimal merit*." <u>Hilton</u>, 599 F.3d at 905, citing <u>Navellier v. Sletten</u>, 29

13   Cal.4th 82, 95 (2002) (Emphasis added.)

14   **A. The First Amendment Does Not Bar Plaintiff's Misappropriation
     Claims Because Paramount Appropriated The Economic Value That**
15   **The Plaintiff Has Built In His Identify.**

16    "[S]peech which either appropriates the economic value of a performance or

17   persona or seeks to capitalize off a celebrity's image in commercial advertisements

18   is unprotected by the First Amendment against a California right-of-publicity

19   claim." <u>Sarver</u>, 813 F.3d at 905.  "No social purpose is served by having the

20   defendant get free some aspect of the plaintiff that would have market value and

21

1   for which he would normally pay."  Zacchini v. Scripps–Howard Broadcasting Co.

2   433 U.S. 562, 563-364.

3        In Zacchini, the Supreme Court rejected a televisions station's First

4   Amendment defense, the Court first considered the nature of Ohio's interest in

5   enforcing the law. Id. at 537, 576.  "According to the Court, the state's right of

6   publicity law was aimed at protecting 'the proprietary interest of the individual in

7   his act' and 'prevent[ing] unjust enrichment by the theft of good will,' in order to

8   provide 'an economic incentive for [the individual] to make the investment

9   required to produce a performance of interest to the public."  Sarver, 813 F.3d at

10  904, 905 citing Zacchini 433 U.S. at 573, 576.

11       The Ninth Circuit has "interpreted Zacchini to uphold the right of publicity

12  in a variety of contexts where the defendant appropriates the economic value that

13  the plaintiff has built in an identify or performance."  Sarver, 813 F.3d at 904,

14  citing as examples: Hilton, 599 F.3d  at 910 (merely merchandising a celebrity's

15  image without that person's consent, the prevention of which is the core of the right

16  of publicity, is not protected by the First Amendment); In re NCAA Student-

17  Athlete Name & Likeness Licensing Litigation 724 F.3d 1268, 1270–1271 (9th

18  Cir. 2013) (upholding right of publicity action challenging EA's use of professional

19  football player likenesses in a video game); Newcombe v. Adolf Coors Co., 157

20  F.3d 686, 691–94 (9th Cir.1998) (California's right of publicity law applied to use

21  of Dodgers pitcher Don Newcombe's image in printed beer advertisement).

1    In <u>Sarver</u>, the court held that Sergeant Sarver's right of publicity claims were

2    curtailed by the First Amendment.   Specifically, <u>Sarver</u> held that 'unlike the

3    plaintiffs in *Zacchini*, *Hilton*, and *Keller*, Sarver did not 'make the investment

4    required to produce a performance of interest to the public,'…or invest time and

5    money to build up economic value in a marketable performance or identify."

6    <u>Sarver</u>, 813 F.3d at 905.   The court focused on the fact that "Sarver is a private

7    person who lived his life and worked his job…and expressly disavowed the notion

8    that he sought to attract public attention to himself."   <u>Id</u>.

9    Plaintiff's case is different than <u>Sarver</u>.   First, Plaintiff's misappropriation

10   claims (under Cal. Civ. Code § 3344 and common law) *arise out of* a commercial

11   transaction (the *Top Gun* Agreement, Doc. 1, Ex. A.) between Paramount and

12   Plaintiff.   In other words, the very nature of the subject photograph was born out of

13   a commercial transaction between the parties.   Put another way, the Agreement is

14   the proverbial "Exhibit A" to Plaintiff's "investment required to produce a

15   performance of interest to the public." <u>Sarver</u>, 813 F.3d at 905.

16   Second, Plaintiff is in a completely different category than Sergeant Sarver:

17   Plaintiff has spent his life in the entertainment industry commercializing his image,

18   likeness, reputation – indeed, he was originally hired by Paramount to portray

19   Wolfman – one of the key figures in *Top Gun.* Thus, while California's right of

20   publicity law may be "presumptively unconstitutional" in certain contexts, Plaintiff

21   overcomes that presumption due to: (a) the commercial nature of how the

photograph was created, and how it was used in *Top Gun: Maverick* (the photograph was a pivotal point in the movie the tied the history of the original to the sequel, thereby adding economic value to the commercial purpose of the film). See <u>Duncan</u> (N.D. Cal., July 22, 2008, No. C 08-2243 BZ) 2008 WL 2891065, at \*2; (b)) (the fact that Plaintiff has made "the investment required to produce a performance of interest to the public") <u>citing</u> <u>Zacchini</u> 433 U.S. at 576); and (c) the entire basis of *Top Gun: Maverick* is for a commercial purpose (see *supra* no issues public concern in the movie – as opposed the issues present in *The Hurt Locker*). Thus, Plaintiff's case is distinguishable from <u>Sarver</u> and his claims do not run afoul of the First Amendment.

**B. Paramount's Transformative Use Defense Is Meritless And Not Dispositive At This Stage Of Litigation.**

Essentially, by invoking the transformative use defense, courts decide "whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question." <u>Comedy III Productions, Inc. v. Gary Saderup, Inc.</u>, 25 Cal. 4th 387, 406 (2001) (depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment). "When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding

1    significant expression beyond that trespass, the state law interest in protecting the

2    fruits of artistic labor outweighs the expressive interests of the imitative artist." <u>Id.</u>

3    at 405, citing <u>Zacchini</u>, *supra*, 433 U.S. at 575-576.  In other words, in analyzing

4    the applicability of the transformative use defense, courts should determine

5    "whether a product containing a celebrity's likeness is so transformed that it has

6    become primarily the defendant's own expression rather than the celebrity's

7    likeness." <u>Hilton</u>, 599 F.3d at 909.

8         Here, Paramount's use of Plaintiff's image and likeness as used in *Top Gun:*

9    *Maverick* is identical to the photograph taken for the original *Top Gun* movie.  The

10   fact Plaintiff was zoomed in on and/or cropped is not a sufficient transformation

11   (compare Exhibit C to Exhibit D in Complaint). Thus, Plaintiff's misappropriated

12   image and likeness is the very "sum and substance of the work in question"

13   because it was not "so transformed that it has become primarily the defendant's

14   own expression.  Moreover, the transformative use defense is a question of *fact* and

15   as such the applicability of the defense does not preclude Plaintiff from showing

16   "minimal merit" needed to defeat Paramount's motion to strike.

17   **C. The Copyright Act Does Not Preempt Plaintiff's Misappropriation
       Claims.**

18        "To establish preemption under the Copyright Act (17 U.S.C. § 301), two

19   conditions must be met: " 'first, the subject of the claim must be a work fixed in a

20   tangible medium of expression and come within the subject matter or scope of

21   copyright protection as described in sections 102 and 103 of 17 United States

Code, and second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106. [Citations.]'" <u>Timed Out, LLC v. Youabian, Inc.</u>, 229 Cal.App.4th 1001, 1012–1013 (2014) citing (<u>KNB Enterprises v. Matthews</u>, 78 Cal.App.4th 362, 366 (2000); <u>Downing v. Abercrombie & Fitch</u>, 265 F.3d 994, 1003 (9th Cir.2001). Plaintiff's claims in the instant case do not satisfy either condition.

While the Subject Photograph depicting Maverick, Goose, Iceman, and Wolfman (Plaintiff) as a pictorial work of authorship, can be protected by the Copyright Act of 1976, "it is not the publication of the photograph [] [itself] that is the basis for Plaintiff's claims. Rather, it is Defendant['s] use of [Plaintiff's] likenesses pictured in the photograph[]. . .that constitutes the alleged misappropriation." <u>Id.</u> "The 'work' that is the subject of the right of publicity is the persona, i.e., the name and likeness of a celebrity or other individual. A persona can hardly be said to constitute a 'writing' of an 'author' within the meaning of the Copyright Clause of the Constitution. A fortiori, it is not a 'work of authorship' under the Act. Such name and likeness do not become a work of authorship simply because they are embodied in a copyrightable work such as a photograph." (1 Nimmer on Copyright (2013) § 1.01 [B][1][c]; <u>Timed Out</u>, 229 Cal.App.4th at 1012–1013. Thus, Plaintiff has rights in his persona *independent* of any purported copyright holder and those claims can be fully adjudicated without those third

1  parties. As such, the Copyright Act does not preempt his state misappropriation

2  claims.

3  **D. Plaintiff Can Establish A Reasonable Probability of Success On His Breach of Contract Claim**

4  Plaintiff respectfully incorporates by reference its argument and authority in

5  his Response and Brief In Opposition To Paramount's Motion to Dismiss

6  Plaintiff's Complaint under F.R.C.P. 12(b)(6), Section F, pg. 26 ("12(b)(6)

7  Opposition") (filed concurrently herewith) in support of Plaintiff's position that he

8  can establish a reasonable probability of success on his breach of contract claim.

9  In essence, the Agreement by and between Plaintiff and Paramount is clear

10  an unambiguous as to the scope and effect of the contract: Plaintiff agreed to

11  appear in the "Picture" named "Top Gun" in the role of "Wolfman" (See Doc. 1,

12  para. 33; Doc. 1, Ex. A.). The Agreement makes NO mention whatsoever of the

13  use of Plaintiff's image and likeness in any sequels. Id. The Agreement is "the

14  entire agreement" and any modifications must be in writing. Id. at para. 10. It is a

15  question of law whether a contract is ambiguous. See Brobeck, Phleger & Harrison

16  v. Telex Corp., 602 F.2d 866, 871 (9th Cir.) (applying California law, which

17  governs the interpretation of the 1964 agreement), *cert. denied,* 444 U.S. 981

18  (1979); Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp., 617 F.2d

19  936, 940 (2d Cir.1980). In this case, the Agreement is clear that Plaintiff's image

20  and likeness could only be used in *Top Gun*, and not *Top Gun: Maverick.* Thus, a

21

1   plain reading of the Agreement makes it clear that Paramount's subsequent use of

2   the Subject Photo in *Top Gun: Maverick* is a breach of the Agreement.

3   **E. Plaintiff Can Establish A Reasonable Probability of Success On His Negligence Claim.**

4   Plaintiff respectfully incorporates by reference its argument and authority in

5   his 12(b)(6) Opposition, Section E, pg. 25 (filed concurrently herewith) in support

6   of Plaintiff's position that he can establish a reasonable probability of success on

7   his negligence claim.

8   The elements of any negligence cause of action are duty, breach of duty,

9   proximate cause, and damages. <u>Peredia v. HR Mobile Services, Inc.</u>, 25

10  Cal.App.5th 680, 687 (2018). "Liability for negligent conduct may only be

11  imposed where there is a duty of care owed by the defendant to the plaintiff or to a

12  class of which the plaintiff is a member. [Citation.] A duty of care may arise

13  through statute or by contract. Alternatively, a duty may be premised upon the

14  general character of the activity in which the defendant engaged, the relationship

15  between the parties or even the interdependent nature of human society.

16  [Citation.]" <u>Mintz v. Blue Cross of California,</u> 172 Cal.App.4th 1594, 1610 (2009),

17  citing <u>J'Aire Corp. v. Gregory</u>, 24 Cal.3d 799, 803, (1979).       Here, Plaintiff and

18  Paramount entered into a contract - the Agreement.   Under the terms of the

19  Agreement, the parties agreed that Plaintiff would appear in the

20  "PICTURE/ROLE" known as "TOP GUN"/"WOLFMAN" (See Exhibit A to

21  Cmplt., Agreement, pg 1, Para. 1). The "Rider To Additional Terms and

1    Conditions" of the Agreement further defines the motion picture "TOP GUN" as

2    the "Picture".  Id. at p. i.  Under the "RIGHTS" section, Paramount's "ownership"

3    of Plaintiff's image and likeness are specifically limited *"in connection with,*

4    *advertising and exploitation of the Picture or any part thereof."*  Id.

5        There is no other party to the Agreement other than Paramount or Plaintiff.

6    Thus, under the Agreement, Paramount owed a duty of care to Plaintiff to ensure

7    the use of his image and likeness was in accordance with the Agreement.

8    Paramount breached that duty of care by failing to ensure that it had Plaintiff's

9    permission to use his image and likeness in *Top Gun: Maverick*.  Plaintiff can

10   demonstrate he was not compensated for the use of his image and likeness and as

11   such has damages.  Thus, all elements of Plaintiff's negligence claim are met.

12   **VI.   CONCLUSION**

13       Plaintiff's claims arise out of Paramount's breach of contract and

14   misappropriation of Plaintiff's image and likeness in the Subject Photo in the *Top*

15   *Gun: Maverick*.  As such, Plaintiff's entire action arises out of a commercial

16   transaction that is not protected by the First Amendment.  Even if it is,

17   Paramount's anti-SLAPP motion to strike should be denied in its entirety because

18   *Top Gun: Maverick* does not involve issues of public interest/concern.  The

19   movie's core theme and focus are undoubtedly about the emotional conflict

20   between Maverick and Rooster – and not about an amorphous concept of public

21   interest.  But even if the court finds that the movie triggers an issue of public

1   interest/concern, Plaintiff has established (both through this brief and his 12(b)(6)

2   Opposition) a reasonable probability and certainly more than "minimal merit" that

3   he can prevail on his claims.    Plaintiff respectfully asks this court to deny

4   Paramount's Special Motion to Strike.

5   Dated: May 16, 2024                    Respectfully submitted,

6                                          */s/ Joseph N. Casas*

    _____

7                                          Joseph N. Casas [CSB No. 225800]
                                           **THE CASAS LAW FIRM, P.C.**
8                                          402 West Broadway Street, Suite 400
                                           San Diego, California 92101
9                                          Telephone No.: (855) 267-4457
                                           Facsimile No.: (855) 220-9626
10                                         E-Mail: joseph@talentrights.law

11                                         Dennis Postiglione (Pro Hac Vice)
                                           Texas Bar No. 24041711
12                                         **THE CASAS LAW FIRM, P.C.**
                                           3801 N. Capital of Texas Highway
13                                         Suite E240 Box 446
                                           Austin, Texas 78746
14                                         Telephone No.: (512) 806-7699
                                           Facsimile No.: (855) 220-9626
15                                         E-Mail: dennis@talentrights.law

16                                         *Attorneys for Plaintiff*

17

18

19

20

21

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff Barry Tubb, certifies that this brief contains 6,678 words, which complies with the word limit of L.R. 11-6.1.

DATED: May 16, 2024

*/s/Joseph N. Casas*

_____

Joseph N. Casas

1

## **<u>CERTIFICATE OF SERVICE</u>**

2   The undersigned, counsel of record for Plaintiff Barry Tubb, certifies that a

3 copy of this Response was served on all Counsel via ECF on May 16, 2024.

4 DATED: May 16, 2024

5         */s/Joseph N. Casas*

6         _____

          Joseph N. Casas

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21