# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 24-1417-GW-BFMx | Date | June 28, 2024 |
|---|---|---|---|
| Title | *Barry Tubb v. Paramount Pictures Corporation* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

None Present

Attorneys Present for Defendants:

None Present

**PROCEEDINGS:**   **IN CHAMBERS - TENTATIVE RULING ON DEFENDANT'S SPECIAL MOTION TO STRIKE PLAINTIFF'S THIRD, FOURTH, FIFTH, SIXTH, AND SEVENTH CAUSES OF ACTION [C.C.P. § 425.16] [23]; DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)] [24]; and DEFENDANT'S MOTION FOR SECURITY FOR COSTS AND FEES [25]**

Attached hereto is the Court's Tentative Ruling on Plaintiff's Motions [23, 24, 25], set for hearing on July 1, 2024 at 8:30 a.m.

| | : |
|---|---|
| Initials of Preparer | JG |

**_Tubb v. Paramount Pictures Corp._**, Case No. 2:24-cv-01417-GW-(BFMx)
Tentative Rulings on: 1) Special Motion to Strike Plaintiff's Third, Fourth, Fifth, Sixth, and Seventh Causes of Action; 2) Motion to Dismiss Plaintiff's Complaint, and 3) Motion for Security for Costs and Fees

   Barry Tubb ("Plaintiff"), a resident of Texas, sued Paramount Pictures Corporation ("Defendant") on February 21, 2024. His Complaint contains seven causes of action: 1) declaratory relief (brought under Federal law, *see* Complaint ¶ 67); 2) violation of § 43 of the Lanham Act, 15 U.S.C. § 1125 et seq.: False Association; 3) statutory misappropriation of publicity, in violation of California Civil Code § 3344; 4) common law misappropriation of publicity; 5) negligent hiring, supervision, and or retention of employees and agents; 6) breach of contract; and 7) injunctive relief.

   According to the allegations in the Complaint, Plaintiff is "an accomplished actor and performer who was top billed as Lieutenant Junior Grade Henry "Wolfman" Ruth in the movie *Top Gun*, a film Defendant released in 1986. *See id.* ¶ 1; *see also id.* ¶¶ 24-30, 46 (alleging that Plaintiff "is a well-known professional actor, director, and entertainer" and recounting a sampling of his entertainment-industry career achievements). Plaintiff asserts that, in a Memorandum of Agreement he entered into with Defendant on June 5, 1985 (attached to the Complaint as Exhibit A), he "contractually limited use of his Image for various purposes related <u>to only</u> the original *Top Gun* movie, released in 1986." *Id.* ¶¶ 1, 33; *see also id.* ¶¶ 8, 34. However, without permission and without compensation, Defendant featured Plaintiff's image – in a photograph that Plaintiff asserts had been modified or altered from its original format[1] – in "key scenes" or "the most pivotal scene" of a sequel, *Top Gun: Maverick*, "which was released in May 2022 to a worldwide audience and became one of the highest grossing movies that year and its cumulative take will make it one of the highest grossing movies of all time." *Id.* ¶¶ 1-2, 4-5, 9, 37-39, 58-59. In doing so, Plaintiff asserts that Defendant deprived him "of the right and ability to

---

[1] Specifically, the photograph was allegedly a "behind-the-scenes photograph taken of the original *Top Gun* actors and the actual U.S. Navy, non-actor, military pilots and consultants who trained the actors and consulted on the original movie." Complaint ¶ 39. In the photograph, Plaintiff was wearing "Wolfman's signature cowboy hat," but also a red bandanna around his neck and his personal watch that were "not part of the 'costume' he wore as Wolfman in *Top Gun*." *Id.* ¶ 40.

negotiate the price of using his image or, ultimately, to say 'no' to its use" and "the ability to protect his image, brand, and reputation."  *Id.* ¶¶ 11-12.

Defendant has now filed three motions in response to the Complaint:  an "anti-SLAPP" motion brought pursuant to California Code of Civil Procedure § 425.16; a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6); and a "motion for security for costs and fees" pursuant to California Code of Civil Procedure § 1030. The Court will address the motions in that order.

### A. **Anti-SLAPP**

Defendant's anti-SLAPP motion targets Plaintiff's third, fourth, fifth, sixth and seventh causes of action.  As noted above, those claims are for, respectively, 3) statutory misappropriation of publicity, in violation of California Civil Code § 3344; 4) common law misappropriation of publicity; 5) negligent hiring, supervision, and or retention of employees and agents; 6) breach of contract; and 7) injunctive relief.

California's[2] anti-SLAPP procedure – which applies, at least in part,[3] in federal court – is designed to prevent presentation of a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue," at least where those claims are meritless.  Cal. Civ. Proc. Code § 425.16(b)(1).  To meet that end, it provides for a "special motion to strike." *Id.*

In a motion to strike brought under section 425.16, a court is to engage in a two-part analysis:  (1) the court decides whether the moving party has made a threshold showing that the challenged causes of action arise from one or more categories of protected activity (all of which are in furtherance of the defendant's right to petition or free speech); and (2) if such a showing has been made, the burden then shifts to the opposing party to demonstrate a reasonable probability of prevailing on the merits of

---

[2] Plaintiff has not argued that the law of some state other than California should apply to this case.

[3] It does not apply, for instance, to claims brought under Federal law.  *See Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 955 n.3 (9th Cir. 2013); *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010); *see also* Stevenson & Fitzgerald, *Rutter Group Prac. Guide:  Federal Civ. Pro. Before Trial* (The Rutter Group 2024) ¶ 1:443, at 1-64.  As such, Defendant does not seek to strike Plaintiff's first two causes of action via the anti-SLAPP procedure (though it does move to *dismiss* them pursuant to Federal Rule of Civil Procedure 12(b)(6), addressed *infra*).

their claims.  *See Equilon Enters., LLC v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (2002); *see also Langer v. Kiser*, 57 F.4th 1085, 1105 (9th Cir. 2023); *Safari Club Int'l v. Rudolph*, 862 F.3d 1113, 1119-20 (9th Cir. 2017); *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1190 (9th Cir. 2017); *Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016); *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 953 (9th Cir. 2013) ("*Gangland Prods.*").  The Court's analysis will follow that structure.  However, a court need not address both steps of the anti-SLAPP test if a moving defendant's argument fails on one of them.  *See, e.g.*, *Serova v. Sony Music Entm't*, 13 Cal.5th 859, 872 (2022).[4]

    1.  <u>Anti-SLAPP Step One</u>

Defendant bears the initial burden of establishing a *prima facie* showing that Plaintiff's causes of action arise from Defendant's free speech or petition activity.  *See Jordan-Benel*, 859 F.3d at 1188; *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013); *Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007).  "'The first prong of the anti-SLAPP analysis involves two related inquiries:  (1) whether the Complaint alleges activity protected by section 425.16 and (2) whether the cause or causes of action alleged arise from those activities.'"  *Gunn v. Drage*, 65 F.4th 1109, 1120-21 (9th Cir. 2023) (quoting *Contreras v. Dowling*, 5 Cal.App.5th 394, 408 (2016)).

California's anti-SLAPP statute includes four categories of protected conduct in subparagraph (e), giving definition to subparagraph (b)(1)'s earlier use of the phrase "act

---

[4] Before the Court proceeds any further, it must note that the Ninth Circuit recently called for an *en banc* hearing in connection with a decision it issued last year in a case involving an anti-SLAPP motion directed at a complaint asserting, among other things, claims for violation of California Civil Code § 3344 and common law "privacy rights" concerning the right to control one's name and likeness.  *See Martinez v. ZoomInfo Techs., Inc.*, 82 F.4th 785 (9th Cir. 2023), *reh'g en banc granted, vacated by*, 90 F.4th 1042 (2024).  Given the Ninth Circuit's decision to order an *en banc* hearing in that case, the Court questions whether it would be a better practice to delay a decision on the anti-SLAPP motion in this case until that *en banc* proceeding is completed.  However, at this time, according to the Ninth Circuit's website, *see* https://www.ca9.uscourts.gov/en-banc/ (last visited June 24, 2024), it appears that *Martinez* may be resolved via a settlement between the parties prior to the *en banc* hearing, so this concern may end up being short-lived.  If, however, there is a possibility that the *en banc* proceeding may continue, the Court may ask the parties here to look into what particular issues the Ninth Circuit is being asked to decide by way of any *en banc* proceeding in *Martinez*.  If, for instance, there is a possibility that the *en banc* court would be asked to decide whether anti-SLAPP motions are even appropriately heard in Federal court at all, a stay of decision as to at least this motion would almost certainly be a wise course.  *See, e.g.*, *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) (concluding that California's anti-SLAPP statute cannot apply in federal court); *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018) (concluding that Georgia's anti-SLAPP statute did not apply in federal court); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015) (Kavanaugh, J.) (concluding that District of Columbia's Anti-SLAPP Act did not apply in federal court).

. . . in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue":

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Civ. Proc. Code § 425.16(e).  Here, only the third and fourth of these categories are at issue, according to Defendant's argument.  *See* Docket No. 23, at 5:4-6.  As defined, those categories encompass, respectively, statements made or conduct-in-furtherance in connection with, respectively, "an issue of public interest" or "a public issue or an issue of public interest."  A leading practice guide has advised that although "public issue" and "issue of public interest" are used disjunctively in Section 425.16(e)(4), "there appears to be no substantive difference between them."  Weil & Brown et al., *Cal. Prac. Guide: Civ. Pro. Before Trial* (The Rutter Group 2023) ("Weil & Brown"), ¶ 7:696, at 7(II)-32.

There are certain groundrules applicable to a determination of whether protected activity is at issue in a litigant's claims.  For one thing, "[t]he anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to its asserted liability – and whether that activity constitutes protected speech or petitioning."  *Navellier v. Sletten*, 29 Cal.4th 82, 92 (2002) (emphasis in original); *see also Jordan-Benel*, 859 F.3d at 1190.  Thus, the critical question is whether Plaintiff's claim is *based on* an act or acts in furtherance of the right of petition or free speech.  *See Jordan-Benel*, 859 F.3d at 1190; *Safari Club*, 862 F.3d at 1119-20; *City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002) (stating that simply because "a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such").

As such, "[t]o determine whether a defendant has met its initial burden, a court must focus on the 'defendant's *activity* that gives rise to [its] asserted liability.'"  *Gangland Prods.*, 730 F.3d at 953 (quoting *Navellier*, 29 Cal.4th at 92; emphasis in

*Navellier*).   To assist with this, "[i]n making a *prima facie* showing, the 'moving defendant bears the burden of identifying all allegations of protected activity[] and the [plaintiffs'] claims for relief supported by them.'"   *Gunn*, 65 F.4th at 1118 (quoting *Baral v. Schnitt*, 1 Cal.5th 376, 396 (2016)).   "A defendant meets [its burden under section 425.16(b)(1)] by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)…."   *City of Cotati*, 29 Cal.4th at 78 (quotation marks omitted).

Here, as an initial matter, Defendant takes the position that "Plaintiff's claims *all* arise solely from the inclusion of his image in the 'Class of 1986' photograph, as depicted briefly in that one scene" in *Top Gun: Maverick*.   Docket No. 23, at 4:9-10 (emphasis added).   Except potentially in one particular regard addressed briefly, *infra*, Plaintiff does not appear to contend otherwise.   Even then, Plaintiff appears to be focused on the *legal effect* of Defendant's activity, not a dispute as to what that particular *activity* involved.

Therefore, having identified the "arising-from" activity in question, Defendant next must demonstrate that such activity fits within one of the categories in subparagraph 425.16(e) upon which it has relied.   Defendant begins its efforts in that respect broadly, asserting that "[c]ourts consistently have held that claims arising from the content and/or creation of a constitutionally-protected expressive work are protected by the SLAPP statute," Docket No. 23, at 5:15-23, citing *Sarver*, *Tamkin v. CBS Broadcasting, Inc.*, 193 Cal.App.4th 133 (2011), *De Havilland v. FX Networks, LLC*, 21 Cal.App.5th 845 (2018), *Brodeur v. Atlas Entertainment, Inc.*, 248 Cal.App.4th 665 (2016)*,* and *Daniel v. Wayans*, 8 Cal.App.5th 367 (2017)[5].   As for satisfying the "public interest" requirement in particular, Defendant argues that the mere "creation of expressive works," such as films, "is a matter of public interest."   *Id.* at 6:8-9.   Defendant supports the contention that *Top Gun: Maverick* is specifically of "public interest" because of extensive press coverage,

---

[5] The California Supreme Court granted review of the California Court of Appeal's decision in the *Daniel* litigation, *see* 393 P.3d 916 (2017), and in 2019 "transferred" the matter back to the Court of Appeal for reconsideration in light of two other 2019 California Supreme Court decisions, pursuant to California Rule of Court 8.528(d), *see* 449 P.3d 690 (2019).   Upon reconsideration, the California Court of Appeal disposed of the *Daniel* appeal in an unpublished decision, *see* 2020 WL 502623 (Cal. Ct. App. Jan. 31, 2020), meaning that it may not be cited or relied upon, *see* Cal. R. Ct. 8.1115(a).   As such, the original Court of Appeal decision in the matter – the opinion Defendant cites – is effectively a nullity.   Consequently, the Court will not consider that decision (or the later unpublished decision in the case) in connection with this motion.

including concerning the film's success.  Beyond that, it also argues that the film's subject matter satisfies this requirement, characterizing it as addressing "undeclared military conflicts between the U.S. and foreign adversaries seeking nuclear capabilities, as well as concepts of duty, honor, and the role of individuals in an increasingly technology-dependent military."  *Id.* at 6:26-7:1.  Finally, it takes the position that Plaintiff himself, and the characters he portrays, are a subject of public interest, referencing Plaintiff's own allegations about his career in his Complaint.

So far as film cases are concerned, Plaintiff's Opposition on this point centers on *Dyer v. Childress*, 147 Cal.App.4th 1273 (2007), *Sarver* and *Gangland Productions*. Plaintiff does not deny that movies involve free speech, *see, e.g.*, *Dyer*, 147 Cal.App.4th at 1280, but contends that whether or not a film is covered by the anti-SLAPP statute – *i.e.*, is of "public significance" (though this is a term used in subparagraph 425.16(a), *not* in subparagraph 425.16(e)) – "turns on the specific nature of the speech in films rather than generalities abstracted from it."  Docket No. 36, at 1:13-14, 2:16-18; *see Dyer*, 147 Cal.App.4th at 1280.  He emphasizes his position that the activity still must be in connection with a public issue.  *See, e.g.*, *Gangland Prods.*, 730 F.3d at 955; *see also Sarver*, 813 F.3d at 902 ("'[T]here should be some degree of closeness between the challenged statements and the asserted public interest,' and the 'focus of the speaker's conduct should be the public interest.'") (quoting *Weinberg v. Feisel*, 110 Cal.App.4th 1122, 1132 (2003)).

Plaintiff also takes issue with Defendant's characterization of the "public issue" addressed by the substance of *Top Gun: Maverick*.  In his view, "*the primary focus and gravamen of the movie* is about Maverick (played by Tom Cruise) confronting his past while training a group of younger Top Gun graduates, including the son ('Rooster') of his deceased best friend ('Goose')."  Docket No. 36, at 11:6-9 (emphasis in original).  He notes that the film did what it could to make as abstract as possible the topic that Defendant asserts the movie covered, with Defendant going "out of its way to avoid making the movie about a real American conflict or threat (i.e. a public interest)" and instead fixating on "the emotional struggle, conflict and eventual denouement" between Maverick and Rooster, "a struggle that happens to be played out as Naval fighter pilots involved in a fictitious dangerous mission."  *Id.* at 12:8-13.  He regards Defendant's film

as comparing, unfavorably (at least in this "public interest" regard), with the movie at issue in *Sarver*, *The Hurt Locker*.

Plaintiff then drills down to an even more-granular level by arguing that the photograph used in *Top Gun: Maverick*, and the character of Wolfman (that he agreed to play in the original *Top Gun*), are not themselves a matter of public interest. As to at least the topic of Wolfman, Plaintiff contrasts that character with the plaintiff involved in the *Brodeur* litigation, who had "inserted himself" into the public topic reflected in the scene in question from the movie *American Hustle*. He also argues that "[t]he representation of Plaintiff in the Subject Photo (wearing his signature cowboy hat) is not a matter of public interest (either standing alone or tied to an overarching public interest theme)." Docket No. 36, at 16:2-5.

As referenced earlier, Plaintiff does make one additional argument that he relies upon in an attempt to neuter any application of the anti-SLAPP statute at all. He has made an abbreviated argument that his claims – or at least his misappropriation claims – arise out of a commercial transaction between himself and Defendant, not out of protected activity, because he had been "specifically contracted to portray Wolfman in *Top Gun*." Docket No. 36, at 16:21-17:3. He argues that "even assuming arguendo that [Defendant] was attempting to spread some message of public interest/concern by and through *Top Gun: Maverick* or the Subject Photo, Plaintiff's suit in no way seeks to limit Paramount's ability to do so because Plaintiff's claims center on contract claims, not some amorphous protected activity." *Id.* at 17:6-10. This of course ignores the fact that Plaintiff has sought – indeed, has attempted to assert a standalone cause of action for – injunctive relief, in which he asks the Court to enjoin Defendant, both preliminarily and permanently, "from producing, reproducing, distributing, exploiting, or authorizing the production, reproduction, distribution, or exploitation of his Image in *Top Gun: Maverick* or any other PARAMOUNT movie, promotion, or advertisement." Complaint ¶ 126; *see also* Docket No. 37, at 30:9-15. As such, it is far from true that he "in no way seeks to limit Plaintiff's ability" to spread its proffered "message of public interest/concern by and through *Top Gun: Maverick* or the Subject Photo." *Compare Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 579 (1977) ("Petitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it.").

In addition, his contention that the misappropriation claims "arise out of a commercial transaction" because "but for the photoshoot during the filming of *Top Gun* that resulted in the creation of [the] Subject Photograph, Plaintiff could not bring his misappropriation claims against [Defendant]," Docket No. 36, at 1-6 (emphasis omitted), does not fairly reflect the events underlying Plaintiff's Complaint.  Plaintiff does not sue Defendant because of "the photoshoot during the filming of *Top Gun*."  He sues because of the use, in *Top Gun: Maverick*, of the photograph taken during the filming of *Top Gun*. If that photograph simply remained in the dusty files of the original film's production, Plaintiff could have no claim whatsoever.

Beyond that observation, there is also no daylight between Defendant's alleged breach of contract and its use of Plaintiff's image in *Top Gun: Maverick* – they are one and the same.  *Compare Jordan-Benel*, 859 F.3d at 1189 (agreeing with district court that it was *failure to pay for screenplay idea* that gave rise to breach of implied-in-fact contract claim, *not* the creation, production, distribution, or content of created films, and that failure to pay is not act in furtherance of free speech); *id.* at 1191 ("Jordan-Benel's claim does not challenge the activity of filmmaking at all.  In fact, he desperately wanted the film to be made.  Because the 'overall thrust of the complaint' challenges Defendants' failure to pay for the use of his idea, we hold that the failure to pay is the conduct from which the claim arises."); *id.* at 1193 ("Jordan-Benel does not allege that any activity involved in creating the films was a breach of his implied contract for compensation with Defendants."); *Friedman v. DirecTV*, 262 F.Supp.3d 1000, 1004 (C.D. Cal. 2015) (rejecting argument that "the public has no interest in DirecTV's failure to pay and failure to disclose" because "[i]t is DirecTV's use and disclosure of Plaintiffs' ideas in its Fantasy Zone channel that satisfies the public interest requirement").  It is the use of Plaintiff's image that is the "activity" at issue here.  That must be the Court's focus, not the nature of the legal claims that might be used to address the alleged wrongfulness of that activity, such as Plaintiff's belief that the activity gives rise to any contract-based claim(s).  That Defendant did not pay Plaintiff makes this case no different than any other entertainment-industry case that courts determined satisfied the first anti-SLAPP step. That Plaintiff can point to *a* contract really does not change the impact of that

observation.[6]

In the Court's assessment of the parties' competing arguments, Plaintiff's emphasis on the requirement of a "public issue," even where films/television are concerned, is fine so far as it goes. The difficulty for him, however, lies in the breadth courts have afforded to that concept in this context.

To begin, the California Court of Appeal has summarized the case law bearing on a "public issue" and, while noting that the "precise boundaries" had not been defined, the statements at issue in each of the cases it reviewed that had found a "public issue" to be involved had "either concerned a person or entity in the public eye, conduct that could directly affect a large number of people beyond the direct participants or a topic of widespread public interest." *Rivero v. Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO*, 105 Cal.App.4th 913, 924 (2003); *see also FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 149 (2019) ("Our courts have ably distilled the characteristics of 'a public issue or an issue of public interest.'") (citing *Rivero*). As the parties here recognize, however, there is a particular subset of cases dealing with popular entertainment such as films and television shows that have attempted to color-in these broad-brush categories in that particular context.

Before diving into those cases, however, the Court feels the need to take a step back here to contemplate the impact of this strain of precedent. In assessing the "public interest"/"public issue" question here, the Court struggles with any suggestion (without supporting legislative history) that the California legislature actually intended that virtually anyone working on, or perhaps even affiliated with – or even simply depicted in – an expressive project (such as many, if not all, individuals working in this State's robust entertainment industry), could be faced with the threat of an adverse attorney's fee

---

[6] In any event, Plaintiff himself contends that the contract was *not one* for *Top Gun: Maverick*, but was instead only for *Top Gun*. But the unpaid use of Plaintiff's (or his character's) likeness occurred in *Top Gun: Maverick*, not *Top Gun*.

The problem for Plaintiff here may have arisen from the way in which he has decided to litigate this action. Had he simply chosen to emphasize the breach of contract aspects – *i.e.* not challenging the making/distribution of *Top Gun: Maverick* or the use of a photograph with his image in it, but merely seeking to be paid pursuant to the contractual arrangements from the first film and/or pursuant to the practices within the industry – he might have brought his lawsuit within the scope of the decision in *Jordan-Benel* (that a failure to pay even in the context of filmmaking is not inherently an act in furtherance of free speech).

award under California Civil Procedure Code § 425.16(c)(1), for just about any claim arising out of their work unless they were prepared to demonstrate a probability of prevailing on such claim(s) in the opening moments of their lawsuit.

That being said, there is at least some case law in this State that appears to be trending in the direction of that conclusion.[7]  Even beyond that specific case law – addressed below – the Court must acknowledge the general rule that the anti-SLAPP statute in general, and the concept of "public interest," are to be construed "broadly."  *See* Cal. Civ. Proc. Code § 425.16(a) ("[T]his section shall be construed broadly."); *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021) ("[C]ourts are directed to 'construe[]' the anti-SLAPP statute 'broadly.'") (quoting Cal. Civ. Proc. Code § 425.16(a)); *Dyer*, 147 Cal.App.4th at 1278 ("The statute is to 'be construed broadly.'"); *Browne v. McCain*, 611 F.Supp.2d 1062, 1068 (C.D. Cal. 2009); *see also Safari Club*, 862 F.3d at 1122 (recognizing that "public interest" has been broadly construed to include statements that "'either concerned a person or entity in the public eye, conduct that could directly affect a large number of people beyond the direct participant[s], or a topic of widespread, public interest'") (quoting *Rivero*, 105 Cal.App.4th at 924); *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 n.3 (9th Cir. 2017) ("California defines 'an issue of public interest' broadly."); *Sarver*, 813 F.3d at 901.  The case law and the general principle of a "broad" construction hem in the Court in terms of how much flexibility it has in determining the answer as to whether or not Defendant is able to satisfy its anti-SLAPP step-one burden.

Again, as noted, certain case law suggests that a movie's mere status as distributed expressive content/entertainment would be enough to satisfy step one of the anti-SLAPP analysis.  For instance, in *Davis v. Electronic Arts Inc.*, 775 F.3d 1172 (9th Cir. 2015), the Ninth Circuit observed that the plaintiffs had correctly conceded that the

---

[7] In addition, at least one California Court of Appeal decision and one Ninth Circuit decision appear to have dispensed with any concern in this regard by emphasizing a plaintiff's opportunity to prevail at the second anti-SLAPP process.  *See Tamkin v. CBS Broadcasting, Inc.*, 193 Cal.App.4th 133, 144 (2011) (rejecting argument that ruling "would 'effectively negate' defamation and privacy actions with respect to popular entertainment defendants" because claims that satisfy second part of anti-SLAPP statute would still proceed); *Gangland Prods.*, 730 F.3d at 955 n.3.  Of course, again, this does not address the fact that such a plaintiff is necessarily exposed to the threat of an adverse fee award by the filing of an anti-SLAPP motion, a roadblock that likely does not almost-of-necessity apply to almost any other segment of our State's populace.

suit arose from an act in furtherance of the right of free speech because video games, *like movies*, are entitled to the full protections of the First Amendment because they communicate ideas and even social messages, leading the court to proceed directly to considering the plaintiff's probability-of-prevailing.  *See id.* at 1176.  In addition, in *Gangland Productions* the Ninth Circuit *rejected* the argument that a conclusion that "conduct in furtherance of [a] right of free speech" is present where the underlying activity involves the broadcast of a television show would mean that "every copyright or contract claim involving television [would be] subject to dismissal under the anti-SLAPP statute."  *Gangland Prods.*, 730 F.3d at 955 n.3.  However, it did so only by observing that the statute does not apply to federal law causes of action and by citing the "minimal merit" standard for anti-SLAPP survival (*i.e.*, it did *not* emphasize the additional public issue/issue of public interest requirement in making this point).  *See id.*  In other words, the Ninth Circuit at least *suggested* that it would *agree* that state-law claims "involving television" – or, presumably, movies – would satisfy the first step of the anti-SLAPP analysis/test.

In this case, however, the Court need not go as far as *Davis* and *Gangland Productions* suggest might be possible.  The California Courts of Appeal have also determined a "public issue"/"issue of public interest" is present, not simply because a movie or television show is involved, but because of the relative level of interest in the particular television show or movie.[8]  *See Tamkin*, 193 Cal.App.4th at 143 (concluding that "public interest" requirement was satisfied in case involving creation and dissemination of script for episode of "popular television show" because public was "demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode"); *Sarver*, 813 F.3d at 902 (offering that the fact that *The Hurt Locker* had "won several Oscars and reached widespread audiences" "buttresse[d]" court's conclusion that the first

---

[8] Indeed, even the media reaction to a television show can turn that television show, and an individual's appearance in it, into an issue of public interest.  *See Seelig v. Infinity Broad. Corp.*, 97 Cal.App.4th 798, 807-08 (2002).

anti-SLAPP test/requirement had been satisfied).[9]  *Tamkin* has not been ignored in this regard.  *See Brodeur*, 248 Cal.App.4th at 675 (noting that "case precedent confirms there is a public interest 'in the writing, casting and broadcasting' of an episode of a popular television program") (quoting *Tamkin*, 193 Cal.App.4th at 144).  Yet, Plaintiff does so in his Opposition brief, never mentioning or citing the decision once (though Defendant twice cites it in its opening anti-SLAPP brief).[10]  It is only by completely ignoring that decision that Plaintiff has even the slightest hope of prevailing on his argument that Defendant cannot satisfy its anti-SLAPP step-one burden.

Still, as detailed below, none of the *citable* cases the parties emphasize in their briefs involve an *actor's* involvement in a production (though *Gangland Productions* involved, by analogy, a willing interviewee's participation in what would become a documentary series), let alone a case where an actor knowingly and willingly participated in an earlier film in a series, but denied doing so with respect to a sequel.  The Court has therefore found it necessary to retreat to a more-general principle(s), such as the one(s) discussed above that were recognized in *Tamkin*, *Sarver* and *Brodeur*.  As expressed

---

[9] The wide *dissemination* of *Top Gun: Maverick* certainly qualifies that activity as having occurred in a "place open to the public or a public forum" within the meaning of Section 425.16(e)(3).  *See Belen v. Ryan Seacrest Prods., LLC*, 65 Cal.App.5th 1145, 1157-58 (2021) (concluding that filming, production and broadcast of episode of reality show was protected activity under anti-SLAPP statute in part because it was broadcast on cable-TV network to potentially millions of viewers and thus qualified as "dissemination in a place open to the public or in a public forum"); *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 n.3 (9th Cir. 2017) (concluding that publication and distribution of expressive photographs over the Internet satisfied Section 425.16(e)(3) because it involved posting photographs on web site accessible to the public, which is a "public forum" for purposes of anti-SLAPP statute); *see also Wong v. Jing*, 189 Cal.App.4th 1354, 1366 (2010).  Production and release of the film also obviously meets the requirement that Defendant's actions be in furtherance of its right of free speech.  *See Tamkin*, 193 Cal.App.4th at 137-38, 143 (concluding that use of particular names in early draft of script was in furtherance of right of free speech because "creation of a television show is an exercise of free speech" and the charged acts "helped to advance or assist in the creation, casting, and broadcasting of an episode of a popular television show"); *See Gangland Prods.*, 730 F.3d at 954-55; *cf. Symmonds v. Mahoney*, 31 Cal.App.5th 1096, 1106 (2019) (holding singer's selection of musicians that play with him is act in furtherance of his exercise of right of free speech).  Still, an "issue of public interest" must be involved; otherwise, Plaintiff would be correct – films would automatically satisfy the anti-SLAPP step one test.  *See* Weil & Brown et al., *Cal. Prac. Guide:  Civ. Pro. Before Trial* (The Rutter Group 2023) ("Weil & Brown"), ¶ 7:906, at 7(II)-64.

[10] The closest Plaintiff might be perceived as having come to this issue in his Opposition brief is his comment that "[t]o support its [anti-SLAPP] position, Paramount offers a strained interpretation of case law to support its proposed maxim that 'courts regularly have found that the creation of expressive works is a matter of public interest.'"  Docket No. 36, at 4:13-15 (quoting Docket No. 23, at 6:8-9)).  Plaintiff appears to focus on *Dyer* and *Sarver* because both of those cases involve *movies*, seemingly suggesting – without saying – that *television* is simply too different, somehow, from films, to consider cases (such as *Tamkin*) considering that particular context.

above and below, those cases unquestionably support the conclusion that Defendant has met its burden at step one of the anti-SLAPP analysis.

Plaintiff attempts to avoid this conclusion by focusing on *Dyer*. The Court can understand Plaintiff's reliance on *Dyer*. However, it is undeniable that Plaintiff cannot claim the exact same level of non-involvement as the plaintiff in *Dyer*.

*Dyer* involved a private citizen plaintiff who was allegedly falsely-portrayed in the film *Reality Bites*, not an actor plaintiff like we have here. The court determined that there was "no discernable public interest" in the plaintiff's "persona" and that he had not "interject[ed] himself" into any public debate. *Dyer*, 147 Cal.App.4th at 1280-81. The defendants in the case asserted that section 425.16(e)(4) was implicated in the case because the film "raised issues of genuine widespread interest about the challenges facing Generation X in the early 1990's." *Dyer*, 147 Cal.App.4th at 1278. But the court observed that, even assuming the asserted issues were of interest to the public, the defendants had been "unable to draw any connection between" the supposed topics of widespread public interest and the plaintiff's defamation and false light claims. *See id.* at 1280; *id.* at 1284 ("[A]ssuming the issues facing Generation X at the start of the 1990's are of significant interest to the public, Dyer, a financial consultant living in Wisconsin who happened to have gone to school with [the author of the screenplay that became the film], was not connected to these issues in any way.").

*Sarver* involved a claim for misappropriation of right of publicity based on lack of consent for use of the plaintiff's name/likeness in a film – *The Hurt Locker* – but, like *Dyer*, the plaintiff was a private individual, not an actor. As with *Dyer* and *Sarver*, the plaintiff in *Brodeur v. Atlas Entertainment, Inc.*, 248 Cal.App.4th 665 (2016), was a non-actor who, unlike those cases, was not "portrayed" in the movie in-question – *American Hustle* – but who was still, nonetheless, referenced by name in that film. The California Court of Appeal described the plaintiff as "a well-known author in the environmental field," *id.* at 669, and distinguished him from the private figure plaintiff in *Dyer* on that basis, *see id.* at 676.

Meanwhile, *De Havilland* involved claims for violation of the statutory right of publicity and common law tort of misappropriation brought by an actress whose life was purportedly depicted – but she herself did not act in – a television miniseries, *Feud:*

*Bette and Joan*. *See* 21 Cal.App.5th at 850. However, that case tells us nothing about the *first* anti-SLAPP prong because the plaintiff therein conceded that the defendant had satisfied it. *See id.* at 856-57.

Beyond these factual distinctions in the types of plaintiffs involved, *Tamkin* specifically criticized the approach taken in *Dyer*, for instance, because that earlier decision "did not address whether there was any public interest in the creative process underlying the production of the film." *Tamkin*, 193 Cal.App.4th at 144.[11] *Tamkin* unquestionably supports the conclusion that Defendant's decisions in creating *Top Gun: Maverick*, including the decision to include a photograph containing Plaintiff's image, meets the public issue/public interest requirement.

Defendant's decision to include Plaintiff's image in the scene in question indisputably is related to the creative process that went into producing, completing and publicly distributing and displaying *Top Gun: Maverick*. Flashbacks, and the use of photographs for effectively that same purpose, were a frequent storytelling tool used in *Top Gun: Maverick*. There was a clear connection between displaying the group of pilots "Maverick" and "Goose" were part of in the original film and two of the characters – Maverick and Goose's son, "Rooster" – portrayed in the sequel. *See Tamkin*, 193 Cal.App.4th at 144 ("[D]efendants here asserted and showed that there was a public interest in the writing, casting and broadcasting of *CSI* episode 913. Defendants also demonstrated a connection between the use of plaintiffs' names and the creative process underlying episode 913 – plaintiffs' full names were used as placeholders for guest characters who would appear on the show."). Far from constituting a "strained interpretation of case law," *see* Footnote 10, *supra*, *Tamkin* recognizes (and *Brodeur*

---

[11] *Tamkin* also rejected *Dyer*'s suggestion that the anti-SLAPP statute requires that a plaintiff's persona must "be a matter of public interest." 193 Cal.App.4th at 144. *Sarver* likewise distinguished *Dyer* in this regard. Having already concluded that *The Hurt Locker*'s portrayal of the Iraq War and the use of improvised explosive devices by insurgents during the war necessarily presented a matter of public concern, the Ninth Circuit rejected the plaintiff's contention that the question should be "whether the defendants' alleged misappropriation of his *private persona* is of public interest." *Sarver*, 813 F.3d at 902. *Sarver* ultimately came out differently than *Dyer* on anti-SLAPP applicability because the portrayal of the plaintiff in *The Hurt Locker* was directly connected to the issues of public concern the court had identified in that movie. *See id.*; *see also Gangland Prods.*, 730 F.3d at 957 (rejecting attempted reliance on *Dyer* by noting that, unlike in that case, "Plaintiff is directly connected to the issues of public interest, gang violence and Miller's murder," and had "agreed to do the interview for *Gangland* because of his personal knowledge on these topics.").

repeats) that, at least with respect to works that are as widely-distributed and popular as *Top Gun: Maverick*, *see also Sarver*, 813 F.3d at 902, this fact, by itself, is enough to satisfy the "public issue"/"issue of public interest" requirement that Defendant must satisfy at step one of the anti-SLAPP process.

One might also conclude – though the Court has no reason to do so here, given *Tamkin* – that Plaintiff's involvement as an actor in a number of productions, including the original *Top Gun*, could be enough to satisfy Defendant's burden. Even the use of the face of a "reality show" cast member (in the context of a Section 3344 claim) has been deemed a "public issue" because, among other things, such an individual was "in the public eye." *See Young v. NeoCortext, Inc.*, _ F.Supp.3d _, 2023 WL 6166975, *1, 4-5 (C.D. Cal. Sept. 5, 2023); *see also Seelig v. Infinity Broad. Corp.*, 97 Cal.App.4th 798, 808 (2002) (concluding that reality show participant had "voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media"); *Belen*, 65 Cal.App.5th at 1149-50 (involving case brought by "well-known" model/winner of earlier model-based reality show with "celebrity status" who – having never signed a release authorizing or agreeing to be filmed – participated in fashion show that was filmed and aired as part of episode of different reality show). Purposeful involvement in distributed-entertainment exceeds the roles taken on by others who have been found to meet this standard. *See Eliott v. Lions Gate Entm't Corp.*, 639 F.Supp.3d 1012, 1019-20, 1023-24 (C.D. Cal. 2022) (concluding that former member of NXIVM "cult" bringing claim for appropriation of name/likeness met "public issue/issue of public interest" standard where he was "portrayed only briefly" in documentary series addressing NXIVM because, among other things, he was connected to controversy surrounding NXIVM and "consistently and voluntarily made himself part of the NXIVM story," including when acting as "assistant producer" and "prominent subject" of different documentary documenting his use of NXIVM's techniques). However, the obvious counter-argument to this conclusion would be that, according to his allegations, Plaintiff only willingly participated in the original *Top Gun*, not *Top Gun: Maverick*.

Although, given *Tamkin*, it has no real need to, the Court will also address Plaintiff's argument that, even accepting Defendant's characterization of the "public issue"/"issue of public interest" addressed by *Top Gun: Maverick*, there is still an

insufficient *connection* with that issue. Under Section 425.16(e)(4), at least, a court first decides what "public issue" or "issue of public interest" the speech in question implicates and, second, what the "functional relationship" is between the speech in question and that issue of public interest. *See FilmOn.com*, 7 Cal.5th at 149-50. But this process begs the additional question in the context of this case – is the speech in question the film *Top Gun: Maverick* as a whole, or just the scene in the film in which the photograph and Plaintiff appear?

Focusing only on the scene in which the photograph containing Plaintiff is displayed does not appear to be the proper method of answering this question. Part of this conclusion is again informed by the emphasis on construing the anti-SLAPP statute broadly. *See Browne*, 611 F.Supp.2d at 1068 ("[S]ince Section 425.16 states that it must be construed broadly, the Court declines Browne's invitation to construe the statute narrowly, so as to focus solely on Defendants' use of his identity and Composition, without considering the context in which it was used (i.e., a political campaign).").

This lesson can also be distilled from the manner of analysis presented in at least two decisions. For instance, where claims – including a claim for "appropriation of likeness" – were based on a documentary television series's failure to conceal the identity of an individual interviewed for the series during the broadcast of the series, the Ninth Circuit concluded that the "matter of public interest" requirement was satisfied by the general topics of the episode in question, and that the defendants were *not* also "required to show an independent public interest in Plaintiff's identity" (which, of course, was revealed only in the scenes in which he appeared). *Gangland Prods.*, 730 F.3d at 955; *see also id.* at 956 (noting that several California Court of Appeal decisions had "instructed that the proper inquiry is whether the broad topic of defendant's conduct, not the plaintiff, is connected to a public issue or an issue of public interest").

In addition, the defendants in *Brodeur* advanced a number of different arguments for why they could satisfy the first step of the anti-SLAPP test, including arguments based on *American Hustle* as a whole *and* based on the topic addressed in the particular scene in the film where the plaintiff had been referenced by name. *See Brodeur*, 248 Cal.App.4th at 670-71. The plaintiff took a different approach, contrasting the particular topic referenced in the particular scene with the supposed "public-interest topic" that he

asserted was made-relevant by the film as a whole.  *See id.* at 672.

To begin with, *Brodeur* noted that the California Court of Appeal had already determined that "there is a public interest 'in the writing, casting and broadcasting' of an episode of a popular television program."  *Brodeur*, 248 Cal.App.4th at 675 (quoting *Tamkin*, 193 Cal.App.4th at 144).  It concluded that the "protected activity" prong of the analysis had been satisfied both because Plaintiff was a public figure whose views on health hazards from microwave radiation were "plainly a matter of public interest" and also because the topics addressed by the film *as a whole* met that test.  *Id.* at 675-76.  It rejected the plaintiff's contention that the subject addressed in the particular scene was unrelated to the public issues/purposes otherwise covered by the film (because it concluded that the topic in the scene *was* connected to the other topics of the film as a whole and because it "decline[d] to dissect the creative process," while not necessarily rejecting a scene-specific focus as an appropriate rubric[12]), *see id.* at 676-77 (omitting internal quotation marks; quoting *Tamkin*, 193 Cal.App.4th at 144), before further concluding that *Dyer* was distinguishable because that case "'did not address whether there was any public interest in the creative process underlying the production of the film,'" *id.* at 676 (quoting *Tamkin*, 193 Cal.App.4th at 144).

The beauty, or at least the simplicity, in *Tamkin*'s approach, is that courts are not tasked with isolating or critiquing the supposed, or proffered, "public interest" purposes behind expressive works of art.[13]  Plaintiff may think that the Court has to engage in this exercise, but not according to *Tamkin* (notwithstanding the discussions to that end in cases such as *Sarver* and *Brodeur*, neither of which involved plaintiffs who had willingly involved themselves in the works in question – or at least their prequel(s)).  In the end, *Tamkin* is enough by itself for the Court to conclude that Defendant's activity giving rise to Plaintiff's claims – its use, in *Top Gun: Maverick*, of a photograph depicting Plaintiff –

---

[12] Specifically, the Court of Appeal offered that "[w]hether we consider the public interest in the movie as a whole – which is conceded and undeniable – or the public interest in the particular topic being discussed in the scene at issue – which likewise existed during the era being depicted – our conclusion remains the same."  *Brodeur v. Atlas Entm't, Inc.*, 248 Cal.App.4th 665, 677-78 (2016).

[13] Or, as, Defendant puts it in its Reply brief (citing *Tamkin* as one supporting example), "[c]ourts repeatedly have held that claims arising from the creation and content of a popular expressive work, like Plaintiff's claims here, meet the public interest test *without any further parsing of a particular work's plot*."  Docket No. 40, at 2:1-4 (emphasis added).

is activity that is protected by California's anti-SLAPP statute.  Plaintiff's arguments do not sway the Court from that conclusion.

### 2.    Anti-SLAPP Step Two

Having concluded that Defendant has satisfied its burden at step one of the anti-SLAPP process, the Court must now assess whether Plaintiff can demonstrate a reasonable probability of prevailing on the merits of his claims.  *See, e.g.*, *Equilon Enters.*, 29 Cal.4th at 67; *Langer*, 57 F.4th at 1105; *Makaeff*, 715 F.3d at 261.

The Ninth Circuit has stated that, at the second step of the anti-SLAPP process, a plaintiff must demonstrate that the complaint is "both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."  *Hilton v. Hallmark Cards*, 599 F.3d 894, 902 (9th Cir. 2009); *see also Gunn*, 65 F.4th at 1118; *Langer*, 57 F.4th at 1105; *Safari Club*, 862 F.3d at 1122; *Sarver*, 813 F.3d at 901; *Makaeff*, 715 F.3d at 261.  Under this approach to the second step, the required probability of prevailing "need not be high."  *Hilton*, 599 F.3d at 908.  In fact, the California Supreme Court has repeatedly indicated that a plaintiff merely needs to show his claim has "minimal merit."  *See, e.g.*, *Olson v. Doe*, 12 Cal.5th 669, 679 (2022); *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598-99 (9th Cir. 2010) ("To establish 'minimal merit,' the plaintiff need only 'state and substantiate a legally sufficient claim.'  'Put another way, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'") (omitting internal citation) (quoting *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal.4th 728, 741 (2003) and *Wilson v. Parker, Covert & Chidester*, 28 Cal.4th 811, 821 (2002)).

However, the Court also notes that, relatively early in the course of its consideration of anti-SLAPP motions, the Ninth Circuit also stated that "a defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or 'when no evidence of sufficient substantiality exists to support a judgment for the plaintiff.'"  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001); *see also Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010).  In recent years, however, it has turned to the "minimal merit" standard, suggesting that "sufficient

substantiality" meant – or at least now means – nothing different.  *See Safari Club*, 862 F.3d at 1130; *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887, 889, 892-93 (9th Cir. 2016); *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 427-28, 430-33 (9th Cir. 2014); *Gangland Prods.*, 730 F.3d at 955 n.3; *Mindys Cosmetics*, 611 F.3d at 598; *Hilton*, 599 F.3d at 908, 910.  *Manzari* is the best evidence for that conclusion, citing *Metabolife* – with a parenthetical quoting that earlier decision's "sufficient substantiality" formulation – immediately after noting that the second step of the anti-SLAPP inquiry "'is often called the minimal merit prong.'"  *Manzari*, 830 F.3d at 887 (quoting *Mindys Cosmetics*, 611 F.3d at 598).

More-recently, the Ninth Circuit has instructed courts to take a closer look at the *nature* of a moving party's anti-SLAPP motion in conducting its step-two analysis.  This is because the Circuit has concluded that (in order to avoid a "collision of California state procedural rules with federal procedural rules") where a defendant's anti-SLAPP motion is directed at the legal viability of a claim, as opposed to the factual/evidentiary sufficiency of a claim, a responding plaintiff need not provide evidence – the question is only the sufficiency of the plaintiff's claim under a Rule 12(b)(6) standard (addressed *infra* in connection with Defendant's Rule 12(b)(6) motion).  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833-35 (9th Cir. 2018); *see also CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1140 (9th Cir. 2022); *Herring Networks*, 8 F.4th at 1155-56 ("A defendant may move to strike 'on purely legal arguments,' in which case we analyze the motion pursuant to Rules 8 and 12.  Or a defendant may assert 'a factual challenge,' which invokes the same treatment as 'a motion for summary judgment,' triggering discovery.") (omitting internal citations; quoting *Planned Parenthood*, 890 F.3d at 833).  Consistent with that distinction, the "minimal merit" standard does *not* apply when a defendant challenges only the "legal deficiencies" of a plaintiff's pleadings, not the claims' factual sufficiency.  *See Herring Networks*, 8 F.4th at 1156; *Planned Parenthood*, 890 F.3d at 834-35.

However, the Ninth Circuit has been inconsistent in its attempts to define just what material a court can or should consider when a moving party makes only a "legal sufficiency"-type argument at step two of the anti-SLAPP analysis.  It first indicated that a party facing a "legal sufficiency" anti-SLAPP challenge was not *required* to submit

evidence in response.  After citing the terms of the anti-SLAPP statute itself as support for the rule that "[t]he district court, in making its decision, considers the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based," *Planned Parenthood*, 890 F.3d at 833 (citing Cal. Civ. Proc. Code § 425.16(b)(2)), the Ninth Circuit concluded that a plaintiff could not be "required" to present evidence where an anti-SLAPP motion "was based on legal deficiencies," *id.  See also id.* at 834 ("In defending against an anti-SLAPP motion, if the defendants have urged only insufficiency of pleadings, then the plaintiff can properly respond merely by showing sufficiency of pleadings, and there's no requirement for a plaintiff to submit evidence to oppose contrary evidence that was never presented by defendants.").  Soon thereafter, however, the Circuit indicated that a plaintiff would not be *allowed* to submit evidence in opposition to such a motion.  *See Herring Networks*, 8 F.4th at 1156 ("The defendant determines which motions she files, not the plaintiff.  Given that the parties do not dispute that Maddow's motion challenged the legal sufficiency of Herring's complaint, we conclude that Herring's reliance on evidence outside of its complaint in defending against the motion was improper and inconsistent with the Federal Rules.").  To make matters potentially even more-confusing, a different panel seemed to at least suggest that a court must consider, or is "entitled to rely on," evidence outside the pleadings.  *See Gunn*, 65 F.4th at 1118 ("California's anti-SLAPP statute *requires* courts to consider evidence outside the pleadings at both steps of the analysis."); *id.* at 1120 (indicating that the rules recognized in *Planned Parenthood* regarding anti-SLAPP motions "apply in federal court regardless of whether a plaintiff challenges the first or second step of the anti-SLAPP analysis.  And courts are entitled to rely on extrinsic evidence whether the challenge is as to the first step, the second step, or both steps.").  The Court is unaware of any attempt by the Ninth Circuit to clear up this issue since its publication of *Gunn* in April 2023.

In any event, in making its assessment where a moving party has presented a *factual* challenge, a court does not weigh credibility or comparative probative strength of competing evidence, but grants the motion only if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for his claim(s).  *See Safari Club*, 862 F.3d at 1123; *see also Planet Aid, Inc. v.*

*Reveal*, 44 F.4th 918, 923 (9th Cir. 2022) ("Because the motion challenges the factual sufficiency of Planet Aid and Thomsen's defamation claim, 'the motion must be treated as though it were a motion for summary judgment.'") (quoting *Planned Parenthood*, 890 F.3d at 833).  At least with respect to factual challenges, "[i]f there is a conflict in the evidence (the existence of a disputed material fact), the anti-SLAPP motion should be denied." *Citizens of Humanity, LLC v. Hass*, 46 Cal.App.5th 589, 598 (2020).[14]

At the step-two stage, courts are to take into account not just "'the substantive merits of the plaintiff's complaint, [but also] all available defenses to it, including, but not limited to, constitutional defenses." *De Havilland*, 21 Cal.App.5th at 855.  If a defendant raises a legal defense to a plaintiff's claim, some case law indicates that the burden is on the plaintiff to overcome that defense.  *See* Weil & Brown, ¶ 7:823, at 7(II)-52.  Others support a conclusion that a defendant advancing an affirmative defense properly bears the burden of proof on the defense.  *See, e.g.*, *Dickinson v. Cosby*, 17 Cal.App.5th 655, 683 (2017).  The Ninth Circuit appears to have adopted the latter approach (and has explained that, as to some defenses – including the transformative use defense – the defendant must establish them "as a matter of law," whereas as to others the defendant merely must establish "a probability of prevailing").  *See Davis*, 775 F.3d at 1177.

As the foregoing discussion makes clear, the first task the Court must undertake at "step two" is to determine what *type* of step-two argument Defendant has presented for why it believes Plaintiff cannot demonstrate a reasonable probability of prevailing on the five claims subject to this motion.  Conceivably, the answer could be different for each claim.  As a reminder, Plaintiff's claims are for:  statutory misappropriation of publicity,

---

[14] Admissibility is at least some measure of a concern here.  *See De Havilland v. FX Networks, LLC*, 21 Cal.App.5th 845, 855 (2018) ("If the defendant satisfies [the first] prong, the burden shifts to the plaintiff to prove she has a legally sufficient claim and to prove with admissible evidence a probability that she will prevail on the claim."); *Brodeur*, 248 Cal.App.4th at 679 ("'The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'") (quoting *Paiva v. Nichols*, 168 Cal.App.4th 1007, 1017 (2008)); *see also Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*, 6 Cal.5th 931, 947-48 & n.12 (2019) (holding evidence is admissible for anti-SLAPP purposes "if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial"); Weil & Brown, ¶ 7:1005, at 7(II)-71 (indicating that "burden is on plaintiff to produce evidence that would be *admissible at trial*").  *But see Sanchez v. Bezos*, 80 Cal.App.5th 750, 758-59 (2022) (drawing distinctions between "curable" and "incurable" hearsay).

in violation of California Civil Code § 3344; common law misappropriation of publicity; negligent hiring, supervision, and or retention of employees and agents; breach of contract; and injunctive relief.

At least in Defendant's opinion, it advances only "purely legal arguments."[15] Docket No. 23, at 7:10-13; *see also* Docket No. 41, at 5:4-6  With one possible exception that the Court might conceivably infer from his argument in his Opposition regarding Defendant's "transformative use" defense, Plaintiff does not appear to even take a position on this question, though he does cite case law and recite principles primarily-applicable to fact-based challenges.  The Court might also have anticipated an argument that Defendant's arguments as to Plaintiff's breach of contract claim would have to be measured according to an evidentiary/factual test, but, as noted *infra*, Plaintiff made no such contention in his Opposition brief.  As a result, all (or almost all) of the step-two arguments considered here will be examined under Rule 8/Rule 12 standards.  *Compare Gunn*, 65 F.4th at 1120 ("[T]he district court correctly evaluated Drage's challenge as a factual one based on her own statements in her anti-SLAPP motion and her reliance on extrinsic evidence at both steps.  The court was therefore entitled to consider evidence at both prongs.") (omitting internal citation).

In any event, in reaching its step-two determination, the Court concludes there is *likely* no need to rely on any material outside of the Complaint's four corners.  *But see* Footnote 25, *infra*.

    a.   <u>Statutory and Common Law Misappropriation of Publicity</u>

The Court will first consider Plaintiff's two "misappropriation" claims together. A claim for misappropriation of the right of publicity (sometimes referred to as a "right of privacy"[16]) under California common law requires a plaintiff to prove:   1) the

---

[15] Defendant makes this assertion despite the fact that it has relied on at least a limited amount of evidence that is outside the four corners of Plaintiff's Complaint (and not within any obvious exception for limiting Rule 12(b)(6)-type analyses thereto).  *See*, *e.g.*, Docket Nos. 27, 27-1 (declaration introducing agreement, and agreement itself, between Defendant and photographer on-scene during filming of *Top Gun*); Docket No. 28, ¶ 5 & Exh. F (declaration introducing various "media publications," and publications themselves). Defendant requests judicial notice as to at least some of that material.  *See* Docket No. 26, at 4:11-5:18.

[16] "[T]he courts have now come to recognize that the two rights are clearly separable and rest on quite different legal policies:  the right to privacy protects against intrusion upon an individual's private self-esteem and dignity, while the right of publicity protects against commercial loss caused by appropriation of

defendant's use of the plaintiff's identity; 2) the appropriation of the plaintiff's name or likeness to the defendant's advantage, commercially or otherwise; 3) lack of consent; and 4) resulting injury.  *See Sarver*, 813 F.3d at 903; *Hilton*, 599 F.3d at 908-09; *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1138 (9th Cir. 2006); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 413-14 (9th Cir. 1996); *Newton v. Thomason*, 22 F.3d 1455, 1460 n.4 (9th Cir. 1994); *Belen*, 65 Cal.App.5th at 1163; *Cross v. Facebook, Inc.*, 14 Cal.App.5th 190, 208 (2017); *Orthopedic Sys., Inc. v. Schlein*, 202 Cal.App.4th 529, 544 (2011).

In addition to the common law claim, the California legislature has enacted a relevant statute.  California Civil Code § 3344(a) provides, in part, that:

> [a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.

Cal. Civ. Code § 3344(a).  "Photograph" means "any photograph or photographic reproduction, still or moving, or any videotape or live television transmission, of any person, such that the person is readily identifiable."  *Id.* § 3344(b).

The elements of the common law claim are also included in a claim based upon Section 3344.  *See Laws*, 448 F.3d at 1138-39.  But the statutory claim also requires a plaintiff to prove "knowing use" and "a direct connection between the alleged use and the commercial purpose."  *Downing*, 265 F.3d at 1001; *Abdul-Jabbar*, 85 F.3d at 414; *Cross*, 14 Cal.App.5th at 208; *Orthopedic Sys.*, 202 Cal.App.4th at 544; *see also No Doubt v. Activision Publ'g, Inc.*, 192 Cal.App.4th 1018, 1028 (2011) ("The common law claim for misappropriation of the right of publicity is similar [to the statutory claim under Civil Code section 3344], except there is no requirement that the misappropriation have been

---

an individual's personality for commercial exploitation."  J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> (Fourth ed. 2015) ("<u>McCarthy</u>"), § 28:6.

done knowingly.").  In addition, "unlike the common law cause of action, section 3344 is apparently limited to commercial appropriations."  *Abdul-Jabbar*, 85 F.3d at 414.

Defendant's arguments for why Plaintiff may not demonstrate a reasonable probability of prevailing on these claims appear to be a mixed-bag of attempts to demonstrate Plaintiff's inability to state a claim and application of a variety of defenses to the claims.  Specifically, Defendant argues that both of Plaintiff's misappropriation claims are barred:  by application of the First Amendment; by application of the "transformative use" defense; by application of Copyright Act preemption; because Plaintiff's contract permitted Defendant's use (*i.e.*, no "lack of consent"); because Plaintiff *has not* alleged a "use" within the meaning of Civil Code Section 3344; and because Plaintiff *has* alleged conduct falling within a "definable group" exemption to operation of Civil Code Section 3344.  The Court ultimately concludes that it *almost certainly* has no need to consider any more than one of these arguments, but before reaching that likely-dispositive argument it will address another that the Court believes is of some importance because of its potential implications.

i.    First Amendment

"[T]he state law interest [in the right of publicity] and the interest in free expression must be balanced, according to the relative importance of the interests at stake."  *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 401 (2001).  The right of publicity can survive a First Amendment defense "where the defendant appropriates the economic value that the plaintiff has built in an identity or performance," such as by merchandising a celebrity's image or using that image in commercial advertising.  *Sarver*, 813 F.3d at 904-05.  It is hard to see how Defendant has "merchandised" Plaintiff's image, and there is no contention – at least in the claims subject to Defendant's anti-SLAPP motion[17] – that it used his image in "commercial advertising."[18]

---

[17] Merchandising and advertising is at issue in Plaintiff's structuring of his declaratory relief claim.  That issue will be discussed *infra* in connection with Defendant's motion to dismiss.

[18] The Ninth Circuit concluded that this situation was not present in *Sarver*, opining that "*The Hurt Locker* is not speech proposing a commercial transaction."  *Id.* at 905.  If this is true of *The Hurt Locker*, then *Top Gun: Maverick* must likewise qualify as "not speech proposing a commercial transaction."  Plaintiff attempts to distinguish *Sarver* by asserting that his misappropriation claims "arise out of a commercial

In making its First Amendment argument, Defendant has again relied on no case examining such a defense where the individual plaintiff was *an actor playing a role* – consensually or otherwise – in the work of art in question.  It has directed the Court to *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860 (1979), and *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal.App.4th 318 (1997).  *Guglielmi*, like *De Havilland*, involved the use of a celebrity's name and likeness, but not his performance as an actor, in a televised film about the celebrity.  *See Guglielmi*, 25 Cal.3d at 861. *Polydoros* is the same, except with respect to the type of plaintiff:  a schoolmate of the individual who wrote and directed the film in question, who alleged that his name and likeness had been appropriated for use in the film.  *See Polydoros*, 67 Cal.App.4th at 320-21.

*Sarver*, like *Polydoros*, involved a private-person plaintiff.  *Sarver* rested its conclusion that the First Amendment barred a right-of-publicity claim, at least in part, on the fact that the private-person plaintiff in that case had not made "the investment required to produce a performance of interest to the public," did not have his "entire act" stolen, and did not have "the economic value of any performance or persona he had worked to develop [otherwise exploited]."   813 F.3d at 905.   This is clearly-distinguishable – except, perhaps, as to the "entire act" point – from the present Plaintiff, an actor who willingly contributed his performance to the <u>first</u> *Top Gun* movie, only to have that "performance" displayed again – according to his view, without his consent – in *Top Gun: Maverick*.

Whereas the plaintiff in *Sarver* was a private person, *De Havilland* – like *Guglielmi* – involved a well-known actress.  Still, the First Amendment was found to protect against statutory and common law publicity/misappropriation claims involving use of her name or likeness, notwithstanding a failure to purchase or otherwise procure the plaintiff's rights to her name and likeness.  *See De Havilland*, 21 Cal.App.5th at 859-62.  Perhaps crucially, however, like *Sarver* (and *Guglielmi* and *Polydoros)*, the plaintiff in *De Havilland* did *not* herself perform in the television miniseries in question.  Instead,

---

transaction," *i.e.* his agreement to appear in *Top Gun*.  However, this lawsuit does not "arise out of" Defendant's display of Plaintiff in *Top Gun*; Plaintiff filed the case only because of what Defendant did in *Top Gun: Maverick*, not *Top Gun*.

she was simply portrayed by another actress in the prodcuction.  *See id.* at 849.

Plaintiff has responded to Defendant's First Amendment-based contentions by directing the Court to, among other cases,[19] *Zacchini*, which pre-dated all of the other cases just-discussed.  At the outset, it must be noted that *Zacchini* involved a claim the plaintiff described as "unlawful appropriation of plaintiff's professional property,"[20] concerning the defendant's display, on a news program, of the *entirety* – approximately 15 seconds long – of the plaintiff's "human cannonball" act at the county fair.  *See id.* at 563-64.  While it is not a statutory misappropriation of publicity claim – and is not a California law claim at all – it is certainly seemingly analogous to Plaintiff's common law misappropriation claim.

In *Zacchini*, the Supreme Court repeatedly emphasized that the news program had broadcast the plaintiff's entire act, and noted that it was a case involving an act of entertainment "for which the performer ordinarily gets paid."  *Id.* at 574.  It concluded that "[t]he Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner"  *Id.* at 575.  It reasoned that the broadcast of a petitioner's entire act posed "a substantial threat to the economic value of that performance" which was "the product of petitioner's own talents and energy, the end result of much time, effort, and expense" *id.*, likening Ohio's protection of the plaintiff's rights to the nation's patent and copyright laws, *see id.* at 576.  The Supreme Court also specifically contrasted this situation with the one that would arise in later cases such as *Sarver*, *Guglielmi*, *Polydoros* and *De Havilland*: "the broadcast of petitioner's entire performance, unlike the

---

[19] Plaintiff's reliance on *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, 724 F.3d 1268 (9th Cir. 2013) and *Newcombe v. Adolf Coors Co.*, 157 F.3d 686 (9th Cir. 1998), is not convincing, especially considering his recognition that, in *Hilton*, the Ninth Circuit limited an exception to application of the First Amendment to *merchandising* an image without consent.  Given the facts of those cases, it is clear that merchandising is just what was at issue in *NCAA Student-Athlete* and *Newcombe* (though the opinions did not use that terminology).  It is not the issue here.

[20] At the state court appellate level, the majority understood the complaint to present "a cause of action for conversion and for infringement of a common-law copyright," while a concurring judge recognized it as a "cause of action for appropriation of petitioner's 'right of publicity' in the film of his act."  *Zacchini*, 433 U.S. at 564.  The Supreme Court of Ohio adopted the plaintiff's characterization of the claim.  *See id.* at 565.

unauthorized use of another's name for purposes of trade or the incidental use of a name or picture by the press, goes to the heart of petitioner's ability to earn a living as an entertainer."  *Id.*; *see also Comedy III Prods.*, 25 Cal.4th at 400 (following cases that, in "reconciling the right of publicity and the First Amendment," have concluded "that depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment").

The Ninth Circuit has respected the boundaries *Zacchini* attempted to delineate. *Sarver* summed up Ninth Circuit case law in the wake of *Zacchini* by concluding that the Circuit's "precedents have held that speech which either appropriates the economic value of a performance or persona or seeks to capitalize off a celebrity's image in commercial advertisements is unprotected by the First Amendment against a California right-of-publicity claim." *Sarver*, 813 F.3d at 905.  However, it then immediately transitioned to noting that "[s]uch line of cases [were] not applicable" to the situation before it in that case.  *Id.*

*De Havilland* also distinguished *Zacchini*:  "The [Supreme] Court concluded the First Amendment interests in broadcasting Zacchini's *entire* act – rather than, for example, his name or *picture* – was minimal."  *De Havilland*, 21 Cal.App.5th at 858 (emphasis added).  Of course, here, it is not Plaintiff's "entire act" in *Top Gun* that is displayed in *Top Gun: Maverick* but, in fact, *literally a picture* – though it is not a picture of Plaintiff as a private person or a picture of Plaintiff as a celebrity-in-whom-the-public-is-interested.  Instead, it is a picture of Plaintiff "in character" as *Wolfman* in *Top Gun* (though the specific picture was not taken during *filming* of that movie).

On the one hand, we have a situation here where Defendant has displayed Plaintiff's performance, an act for which, as an actor, he "ordinarily gets paid," threatening "the economic value of [his] performance."  On the other hand, it is not a display of Plaintiff's *entire* performance.  Indeed, it is the display of a photograph of him, at least arguably in character, taken while the cameras were *not* rolling during the production of *Top Gun*.  Attempting to determine how the First Amendment would operate in such a situation is not a simple task.

The Court's efforts in this regard are not aided by the fact that Defendant does not cite to or address *Zacchini* in its moving papers, waiting (arguably understandably, given

Plaintiff's reliance on the case in his Opposition) instead until its Reply to address the case.[21]  Still, in its own research the Court has discovered two district court decisions that might favor Defendant even on these facts.

First, in *Daly v. Viacom, Inc.*, 238 F.Supp.2d 1118 (N.D. Cal. 2002), the court began by announcing a rule that Defendant would like to have applied here:  "Under the First Amendment, a cause of action for appropriation of another's 'name and likeness may not be maintained' against 'expressive works, whether factual or fictional.'"  *Id.* at 1123 (quoting *Guglielmi*, 25 Cal.3d at 871-72 (Bird, J., concurring)).  What makes that recitation of the rule potentially powerful here is that, although *Daly* – like *Guglielmi*, *Polydoros*, *Sarver*, and *De Havilland* – did *not* involve a plaintiff who was an *actor* whose performance was included in the television program in question, it *was* the plaintiff herself who was displayed in the television program, without her consent.  Rejecting the argument that noncelebrities are treated any differently than celebrities for purposes of the First Amendment analysis, the court dismissed the plaintiff's misappropriation claims.

Second, in *Page v. Something Weird Video*, 960 F.Supp. 1438 (C.D. Cal. 1996), the district court granted summary judgment in favor of a defendant who had bought or was otherwise assigned the rights to films in which the plaintiff actress had appeared, concluding that the First Amendment precluded her statutory and common law publicity claims.  The claim centered on the defendant's use of the plaintiff's likeness in advertising videocassettes of the films.  Of note, however, the likeness was conveyed by way of a drawing, not a still image from the films.  Still, the court concluded that the use in the advertisements of a drawing of the actress, "as seen in the films," would be no different from a use of a still image from the films.  *See id.* at 1444.  At least by implication (or *dicta*), therefore, *Page* also arguably favors Defendant's position.

---

[21] In its Reply brief, Defendant emphasizes *Zacchini*'s "entire act" reasoning and also points to *Sarver*'s indication that the plaintiff's use of right of publicity law as a "content-based speech restriction" would not be able to stand unless he could "show a compelling state interest in preventing the defendants' speech." *Sarver*, 813 F.3d at 905-06.  Given that, unlike the situation in *Sarver*, Plaintiff here is an actor whose performance in *Top Gun* – or at least part of it – was incorporated into *Top Gun: Maverick*, it is not entirely clear, at least without further briefing, how that "compelling state interest" question would be resolved on these facts.

Neither party has addressed *Daly* or *Page* in their papers, at least not in any potentially-meaningful way.[22]

At the same time, in addition to *Zucchini*, two other comments or passages in two other non-binding cases suggest to the Court that its instincts are correct that the First Amendment could not serve as a defense to what Defendant is alleged to have done here with respect to the work of a performing actor. First, Defendant correctly traces one source of its First Amendment argument to Justice Bird's concurrence in *Guglielmi*. However, two days before she wrote that concurrence, she wrote a dissent in a similar case, *Lugosi v. Universal Pictures*, 25 Cal.3d 813 (1979). In that dissent, she seemingly predicted the argument that Defendant makes here, but not in a way that would please Defendant: "This unauthorized exploitation of plaintiffs' proprietary interest in these commercial merchandising products [such as plastic toy pencil sharpeners, soap products, target games, candy dispensers and beverage stirring rods] is no more insulated from suit by the constitutional guarantees of freedom of expression than Universal's refusal to pay Lugosi for his services in portraying Count Dracula in Dracula would be." *Id.* at 851 (Bird, J., dissenting); *see also Grant v. Esquire, Inc.*, 367 F.Supp. 876, 883 (S.D.N.Y. 1973) ("[N]obody would seriously contend that artistic need would authorize a painter to walk into a supply store and help himself to whatever he might require."); *id.* at 884 (interpreting *Taggart v. Wadleigh-Maurice, Ltd.*, 489 F.2d 434 (3d Cir. 1973), concerning production of the *Woodstock* documentary, to support the conclusion that "the First Amendment does not absolve movie companies – or publishers – from the obligation of paying their help."). Plaintiff's case here is for a "refusal to pay . . . for . . . services," the relevant consideration in Justice Bird's hypothetical.

Second, although Plaintiff has directed the Court's attention to the Ninth Circuit's 2013 decision in the *NCAA Student-Athlete Name & Likeness Licensing Litigation*, *see* Footnote 19, *supra*, a subsequent ruling from the district court handling that case appears to have much to say on the topic now before this Court (though in the context of athletes, not actors). There, the court explained its view that "[t]he Court's reasoning in *Zacchini*

---

[22] Defendant does cite *Page*, but only for a proposition relevant to whether the applicable First Amendment analysis should be any different for advertisements of expressive works, as opposed to the expressive works themselves. *See* Docket No. 23, at 10 n.11. In its Reply, Defendant cites a decision which quotes *Daly*. *See* Docket No. 40, at 8:6-10.

strongly suggests that the First Amendment does not guarantee media organizations an unfettered right to broadcast entire sporting events without regard for the participating athletes' rights of publicity." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F.Supp.3d 1126, 1140 (N.D. Cal. 2014). Coloring-in that statement further, it continued by remarking that "the First Amendment would not empower broadcasters to undermine the student-athletes' economic interests by televising their games without group licenses any more than it allowed the television station in *Zacchini* to broadcast the county fair performer's 'human cannonball' act without his consent." *Id.* at 1141. Finally, it concluded that, "taken together, *Zacchini* and [the Seventh Circuit's decision in *Wisconsin Interscholastic Athletic Association v. Gannett Co., Inc.*, 658 F.3d 614, 615 (7th Cir. 2011)] make clear that the First Amendment does not create a right to broadcast an entire athletic performance without first obtaining a license or consent from all of the parties who hold valid ownership rights in that performance. Whether Division I student-athletes hold any ownership rights in their athletic performances does not depend on the scope of broadcasters' First Amendment rights but, rather, on whether the student-athletes validly transferred their rights of publicity to another party." *Id.* at 1142.

The parties have not addressed Justice Bird's comment in her dissent in *Lugosi*, nor the district court's comments in the *NCAA Student-Athlete Name & Likeness Licensing Litigation*.

Does the fact that the "entirety" of Plaintiff's performance was not displayed in *Top Gun: Maverick* make a difference? Or does it simply matter that Defendant made uncompensated use of (perhaps only a small portion of) "the product of petitioner's own talents and energy, the end result of much time, effort, and expense," causing "a substantial threat to the economic value of that performance"?

Ordinarily, the Court might order further briefing on this defense considering the unexamined decisions the Court has been able to unearth and the somewhat-late discussion of *Zacchini* occurring in the existing papers. Stepping back, however, we are dealing with a *defense* to claims in the context of the second step of analyzing an anti-SLAPP motion. At least in the context of considering a "transformative use" defense, the Ninth Circuit has offered that even where such a defense is "applicable," this does not prevent a plaintiff from showing the "minimal merit" necessary to defeat an anti-SLAPP

motion, and it is thus only where a defendant can show that it "is entitled to the defense as a matter of law can it prevail on its motion to strike." *Hilton*, 599 F.3d at 910; *see also Birkner v. Lam*, 156 Cal.App.4th 275, 285 (2007) (indicating that a plaintiff can meet second-step burden where defenses are at issue by showing defenses are not applicable to case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses).   Of course, it is possible that this approach is limited to that defense (and others like it, in this regard) because the California Supreme Court had "envisioned the application of the defense as a question of fact." *Hilton*, 599 F.3d at 910; *see also Dickinson*, 17 Cal.App.5th at 684 n.13.   That may not be true with respect to this more-general First Amendment defense (another question that the parties have not addressed).

In any event, the necessity of further briefing is almost-certainly obviated by the Court's consideration of another of Defendant's arguments, to which this analysis now turns.

ii.   <u>Effect of Plaintiff's Contract</u>

Although Plaintiff might be able to survive the First Amendment-based defense described above because of considerations touched upon in *Zacchini*, Plaintiff appears to have a serious problem when it comes to his contract.

Plaintiff's agreement with Defendant concerning his services for *Top Gun* – a "Memorandum of Agreement" – includes "Additional Terms and Conditions."[23]   *See* Docket No. 1-1, at pg. 4 of 13, ¶ 10.   Paragraph A of those Additional Terms and Conditions is titled "<u>Rights</u>."   Within that paragraph are the following two sentences:

> Employer shall be the sole and exclusive owner of all results and proceeds of Artist's services, including, without limitation, all literary and musical material, designs and inventions of Artist hereunder, for all purposes in connection with the distribution, advertising and exploitation of *the Picture* or any part thereof.   Artist acknowledges and agrees that Employer will be the sole and exclusive owner of *all rights in the role or character portrayed by Artist, including* name, *likeness* and distinctive characterizations thereof, *and the right to* merchandise and *exploit* such

---

[23] Plaintiff attached this contract to his Complaint.   *See* Docket No. 1-1.   There is therefore no concern as to whether the Court can appropriately consider it in connection with this anti-SLAPP motion, whether the analysis is conducted under either Rule 12 or Rule 56 standards.

> role or character, and the right to use *Artist's* name and *likeness* in connection therewith, and Artist shall have no right at any time to portray, exploit, merchandise or make any use of such role or character portrayed by Artist.

Docket No. 1-1, at pg. 7 of 13, ¶ A (emphases added).  The parties take differing views of which of these two sentences has import here.

Plaintiff, understandably, focuses on the first of the two.  That sentence specifically references "the Picture," and there can be no reasonable debate, from a review of the agreement as a whole, that this term refers to *Top Gun*.  *See id.*, at pg. 2 of 13, ¶ 1.  Defendant, on the other hand, looks to the second of the two sentences.  That sentence makes Defendant the "sole and exclusive owner of *all rights* in the role or character" Plaintiff portrayed in *Top Gun*, rights which include that role or character's "likeness" and the right to "exploit" that role or character, along with "the right to use [Plaintiff's] . . . likeness in connection therewith."  The "Picture" is not mentioned in this sentence.

Defendant asserts that "the parties' Agreement gave Paramount the right to use Plaintiff's likeness in connection with the 'Wolfman' character" (and thus there was both no breach of any obligation and, in fact, actual authorization for what Defendant did).[24]  Docket No. 23, at 17:4-6.  In fact, the provision gave Defendant "*all rights*" in the Wolfman role/character.  Defendant also points out that nothing in the sentence in question limited those "all rights," or the specified right to "exploit" the role/character, to *Top Gun*.

Plaintiff's Opposition brief on this motion devotes only two paragraphs, and 19 lines of text, to his belief in his probability of prevailing on his contract claim (though he also references his Opposition to Defendant's Rule 12(b)(6) motion therein).  *See* Docket No. 36, at 24:4-25:2.  His argument is simply that the agreement is limited to his appearance in *Top Gun* and that it makes "NO mention whatsoever of the use of Plaintiff's image and likeness in any sequels."  *Id.* at 24:9-13.  He asserts that "a plain reading" of the agreement makes clear that Defendant's actions here constituted a breach.  In other words, he does not appear to believe there is any ambiguity in the agreement at

---

[24] Consent can be either oral or written.  *See* McCarthy, § 28:26.

all (a position he repeats in his Rule 12(b)(6) Opposition), and therefore posits no need or request for the Court to rely on material outside the four-corners of the contract. *See* Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title."). Thus, what might – with different argument(s) – have become an issue that necessitated an evidentiary examination, turns out to be a question that can be resolved under a Rule 12(b)(6) standard.

In his anti-SLAPP Opposition, Plaintiff does not address at all the second sentence of the block-quotation reproduced above. He does address it in his Rule 12(b)(6) Opposition, which he incorporates into his anti-SLAPP Opposition (in at least certain respects), *see* Docket No. 36, at 24:4-8, 25:4-7, 26:21-27:2, but only to direct the Court back to his favored sentence, which specifically mentions "the Picture." *See* Docket No. 37, at 27:26-28:13; *see also id.* at 29:16-20 ("[E]ven if Plaintiff released every conceivable legal right he could assert with respect to his identity, Image, or the Wolfman character, he released it only '*in connection with the distribution, advertising and exploitation of the Picture*' and not a sequel released decades later.").[25]

The agreement's plain terms gives Defendant "all rights" in the "Wolfman" role or character, including the right to the role's/character's "likeness," and an un-cabined

---

[25] Otherwise, Plaintiff includes little in his Opposition to Defendant's Rule 12(b)(6) motion that is not present in his anti-SLAPP Opposition. He adds that the term "Picture" "is never used in its plural form throughout the Agreement and no reasonable interpretation of the Agreement leads to the conclusion that Plaintiff was signing away his Image rights into perpetuity much less for a sequel released in 2022." Docket No. 37, at 27:8-12. He also asserts that provisions of the applicable Screen Actors Guild Collective Bargaining Agreement – which is *not* attached to the Complaint, meaning that the Court's consideration of it under a Rule 12(b)(6) standard is at least *questionable* (and Plaintiff has made no attempt to explain how it is proper here) – indicate that, as to any *reuse* of their image, performers were required to bargain separately after their agreement for original employment. *See id.* at 27:13-20; *see also* Docket No. 1-1, at pg. 11 of 13, ¶ L ("The parties acknowledge that this Agreement is subject to applicable provisions of . . . the provisions of any Collective Bargaining Agreement covering the services of Artist hereunder, and that the provisions thereof shall supersede the provisions of this Agreement to the extent that they are inconsistent therewith."). Defendant describes this contention as a "newly-minted argument" which is nowhere to be found in Plaintiff's Complaint. *See* Docket No. 40, at 19-20 n.22. Even if the Court were theoretically permitted to consider the Collective Bargaining Agreement here, Plaintiff has not actually provided it to the Court. The Court thus has no appropriate basis to conclude that Plaintiff has accurately characterized that document's contents or provisions. Plaintiff has not requested an opportunity to amend his Complaint. *See Verizon Del. Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004); *see also Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1160 (9th Cir. 2021). Defendant's motion seeks to strike the five causes of action with prejudice.

right to "exploit" that role or character, including by way of using Plaintiff's own "likeness." If the Court is correct in its reading/understanding of the *Top Gun* agreement and, in particular, Paragraph A of the Additional Terms and Conditions, Plaintiff has no reasonable probability of prevailing on his two right-of-publicity claims or his breach of contract claim. *See Olson*, 12 Cal.5th at 679 (citing *People v. Doolin*, 45 Cal.4th 390, 413 n.17 (2009) – in context of examining second step of anti-SLAPP test – for proposition that "[w]here . . . the meaning of [the] agreement does not turn on the credibility of extrinsic evidence, interpretation is a question of law"). He will not be able to demonstrate a lack of consent, required for the publicity claims. *See Sarver*, 813 F.3d at 903; *Laws*, 448 F.3d at 1138-39; *see also No Doubt*, 192 Cal.App.4th at 1028-29 ("Because one of the elements of both the statutory and common law claim for violation of the right of publicity is a lack of prior consent on No Doubt's part, No Doubt's claim would fail if Activision were found to hold a valid license to use No Doubt's likenesses in the manner in which they are used in *Band Hero*."). He also will not be able to demonstrate a breach of the agreement on Defendant's part.

Before closing its thoughts on the effect of Defendant's contractual defense, the Court notes a brief reference in one additional sentence in Paragraph K of the Additional Terms and Conditions that the parties have not contemplated in their briefing: "Artist agrees that Artist will not at any time (either during or after *the term of this Agreement*) make any use of the name of the role played by Artist in the Picture . . . ." *See* Docket No. 1-1, at pg. 11 of 13, ¶ K. This, of course, implies that there *is* a "term" to the agreement. What is that term?[26] Does it temporally limit the rights enunciated in the sentence from Paragraph A that Defendant wishes to emphasize?

Absent any change in its approach as a result of oral argument, for the foregoing reasons it would appear that Plaintiff's common law and statutory right-of-publicity claims, and his breach of contract claim, cannot survive the actual language of Plaintiff's agreement with Defendant that he signed before providing his services principally

---

[26] Is it, for instance, "from and after the times set forth under the heading 'START DATE' above and for the period necessary to complete all continuous services required by Employer"? Docket No. 1-1, at pg. 7 of 13, ¶ A; *see also id.*, at pg. 2 of 13, ¶¶ 2-3 (reflecting both an "INITIAL START DATE" and a "SECOND START DATE").

concerning his appearance in *Top Gun*.   The Court considered Defendant's First Amendment defense before addressing this contractual issue because of the profound impact such an argument, if correct, might have had on a significant industry of considerable importance in the geographical area encompassed by this District.[27]   Now, however, having concluded that the contract issue is one which Plaintiff will not be able to overcome, the Court sees no need to address – at least as part of this tentative ruling – any of the other remaining arguments Defendant has advanced for why Plaintiff would not be able to sustain his burden at the second anti-SLAPP stage.

### b.   Negligent Hiring/Supervision/Retention

As to Plaintiff's negligence-based claim, Defendant argues that this claim is entirely reliant on Plaintiff's right-of-publicity claims, and fails for the same reasons.   In addition, it argues that Plaintiff has not pled a cognizable duty Defendant owed.   Plaintiff has not responded to Defendant's "entirely-reliant" argument and, with respect to the existence of a duty, Plaintiff looks only to his *Top Gun* contract.   *See* Docket No. 36, at 25:12-26:7.   He does not suggest any additional evidentiary material that might make a difference on this topic.

Because the Court has concluded that Plaintiff cannot demonstrate a reasonable probability of prevailing on either of his right-of-publicity claims or his breach of contract claim, Plaintiff has given it no reason to conclude that the resolution should be any different with respect to his negligence-based claim.

### c.   Injunctive Relief

Lastly, Defendant notes that "injunctive relief" is a remedy, not a cause of action, and additionally argues that the injunctive relief Plaintiff requests would constitute an unlawful "prior restraint."   Plaintiff does not even address his seventh claim for relief in his anti-SLAPP Opposition.   As a result, he has made no effort to sustain his burden at step two of the anti-SLAPP process as to that claim.   Although he does address the claim in his Rule 12(b)(6) Opposition, he does not so much as mention the particular arguments Defendant advances, referenced above.   Consequently, the Court clearly must rule in Defendant's favor on this motion at least with respect to that claim.   *See, e.g.*, *Santa Rita*

---

[27] In the end, if Defendant is correct about its First Amendment position here, alarm bells might be quelled, realistically:  not being required to pay your performers does not a workable-industry make.

*Union Sch. Dist. v. City of Salinas*, 94 Cal.App.5th 298, 318 (2023) (noting that injunctive relief "is not a cause of action but a remedy" under California law).

### 3. Anti-SLAPP Conclusion

Under the foregoing analysis, each of the five claims that are the subject of Defendant's anti-SLAPP motion cannot survive such a motion. Defendant's anti-SLAPP motion is therefore granted in its entirety.

### B. Rule 12(b)(6)

With the Court having granted Defendant's motion with respect to Plaintiff's third through seventh claims, that leaves only his first two claims for consideration in connection with Defendant's Rule 12(b)(6) motion. As a reminder, those claims are for declaratory relief and violation of § 43 of the Lanham Act (for False Association), respectively.

Under Rule 12(b)(6), a court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Dismissal pursuant to Rule 12(b)(6) is ordinarily proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007) (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). However, in that respect, a plaintiff must also "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Johnson*, 534 F.3d at 1122 (quoting *Twombly*, 550 U.S. at 570); *see also William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (confirming that *Twombly* pleading requirements "apply in all

civil cases"). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In its consideration of a Rule 12(b)(6) motion, the Court is generally limited to the allegations on the face of a complaint (including documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruling on other grounds recognized in Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Nonetheless, "while a court must generally refrain from considering extrinsic evidence in deciding a 12(b)(6) motion, it may [also] consider documents on which the complaint 'necessarily relies' and whose 'authenticity . . . is not contested.'" *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003); *see Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."); *see also Steinle v. City & Cty. of S.F.*, 919 F.3d 1154, 1162-63 (9th Cir. 2019); *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1042 (9th Cir. 2015) ("'[W]e may consider materials incorporated into the complaint . . . .'") (quoting *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).

With respect to Plaintiff's claim for declaratory relief, Defendant's primary argument is that the claim is derivative, and therefore fails for the same reasons as do the others. Plaintiff does not contend to the contrary in his Opposition brief, and acknowledges that if the underlying claims are dismissed, there is no basis for a declaratory relief claim. *See* Docket No. 37, at 5:2-5. Specifically, Plaintiff's claim asserts there is an actual and justiciable controversy "regarding whether, pursuant to the Memorandum of Agreement, [Defendant] has the right to merchandise and exploit such

role or character, and the right to use PLAINTIFF's Image in connection with *Top Gun: Maverick*" and "regarding whether, pursuant to the Memorandum of Agreement, [Defendant] has the right to use and permit others to use PLAINTIFF's name, photograph, likeness, or voice (or simulation thereof) in connection with advertising, publicizing, and exploiting *Top Gun: Maverick*."  Complaint ¶¶ 61-62.  He asserts that the Memorandum of Agreement applies only to *Top Gun* and that Defendant's use of his image was not a "protected First Amendment usage."  *Id.* ¶¶ 63-64.

The issue of whether Plaintiff's agreement with Defendant allowed Defendant to include his image in *Top Gun: Maverick* has already been decided above.  The issue of any other use beyond that point is – as Defendant also argues in its motion, *see* Docket No. 24, at 21 n.19 – not ripe, as the only indication of any use is that which occurred in *Top Gun: Maverick*.  Therefore, the Court will grant Defendant's Rule 12(b)(6) motion as to Plaintiff's claim for declaratory relief without leave to amend (Plaintiff not having offered any explanation of how he might amend in the face of Defendant's request to dismiss his Complaint *with prejudice*), and limits its substantive discussion here to Plaintiff's Lanham Act claim.

Plaintiff's Lanham Act claim is founded upon the allegation that Defendant used Plaintiff's image, *inter alia*, "to create the false impression with the public that PLAINTIFF either worked for or was associated with [Defendant] or endorsed [Defendant's] movie *Top Gun: Maverick*" in order to "promote and attract moviegoers, and thereby generate revenue for [Defendant]."  Complaint ¶ 69.  He asserts that this caused consumer confusion as to his sponsorship and/or employment with Defendant. *See id.* ¶ 72.[28]

With respect to Plaintiff's Lanham Act claim, Defendant again returns to the First Amendment.  Here, however, the argument is slightly different than it was with respect to his misappropriation claims.

In the context of Lanham Act claims involving expressive works, Plaintiff must

---

[28] *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239, 1245-46 (9th Cir. 2013) ("Although claims under § 43(a) generally relate to the use of trademarks or trade dress to cause consumer confusion over affiliation or endorsement, we have held that claims can also be brought under § 43(a) relating to the use of a public figure's persona, likeness, or other uniquely distinguishing characteristic to cause such confusion.").

satisfy the "*Rogers* test," referring to *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989).  *See Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 461-62 (9th Cir. 2020); *Brown v. Elec. Arts*, 724 F.3d 1235, 1239 (9th Cir. 2013); *see also Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1027-30 (9th Cir. 2024)[29].  In order to have a Lanham Act claim in that context, the use must be "either (1) not artistically relevant to the underlying work or (2) explicitly mislead[] consumers as to the source or content of the work."  *Dr. Seuss Enters.*, 983 F.3d at 462 (omitting internal quotation marks; quoting *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1174 (9th Cir. 2020)).  Plaintiff cannot make either showing here.

The use of the photograph reflecting, in part, Plaintiff as "Wolfman" is unquestionably "artistically relevant" to *Top Gun: Maverick*.  *See Twentieth Century Fox v. Empire Distrib.*, 875 F.3d 1192, 1198 (9th Cir. 2017) ("Because we cannot say that Fox's use of the 'Empire' mark 'has no artistic relevance to the underlying work whatsoever,' the first prong of the *Rogers* test is satisfied.").  As Plaintiff himself alleges, the scene depicting the photograph is "pivotal," helping to explain to the other characters the source of tension between Tom Cruise's "Maverick" character and the "Rooster" character portrayed by Miles Teller.  The story of those two characters, their history, and their interactions, pervades the film.

Nor is there anything "explicitly misleading" to consumers about "the source or content" of the work by way of use of the photograph.  Plaintiff cites to paragraphs 10, 37, 38, and 75 of his Complaint to assert that the use of his image was explicitly misleading.  But those paragraphs only refer to alleged misrepresentations that Plaintiff was "somehow affiliated" with *Top Gun: Maverick*, "contracted to perform" in the film,

---

[29] The Ninth Circuit's 2024 *Punchbowl* decision indicates the *Rogers* test is alive-and-well in this Circuit in situations where trademarks are not "used as a mark":

> To the point that our precedents previously held that *Rogers* applies when an expressive mark is used as a mark – and that the only threshold for applying *Rogers* was an attempt to apply the Lanham Act to something expressive – the Supreme Court has now made clear that this is incorrect.  In that specific respect, our prior precedents are no longer good law.  At the same time, however, because the Supreme Court's decision in *Jack Daniel's* [*Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023)] was confined to a "narrow" point of law, that *Rogers* does not apply when a mark is used as a mark, preexisting Ninth Circuit precedent adopting and applying *Rogers* otherwise remains intact and binding on three-judge panels.

*Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1031 (9th Cir. 2024).

or "was hired to promote, advertise, market, or endorse" the film on behalf of Defendant. The allegations are conclusory, and there is nothing in them amounting to an "explicit" attempt to mislead in this respect.  Moreover, if sufficient, the same assertion/argument would have succeeded in *Brown* (where the plaintiff relied not only on the mere use of his likeness, but additional evidence bearing on this point, *see* 724 F.3d at 1245-47).  It did not.

Implicit endorsement/sponsorship is insufficient.  *See Brown*, 724 F.3d at 1245. Even a case of implicit endorsement could not reasonably be made.  Having reviewed *Top Gun: Maverick* for itself, the Court concludes that Defendant has accurately summarized Plaintiff's "participation" in the film:  "Plaintiff is not the focus of the scene [in which his image appears] and is not specifically mentioned; he is not otherwise depicted in the Film; and he is not listed in its credits."  Docket No. 24, at 8:9-11.

Plaintiff simply disputes that the "*Rogers* test" applies here at all, because that case "dealt with the title of an artistic work, not the misappropriation of a celebrity's likeness."  Docket No. 37, at 6:19-21.  That distinction is not viable in the Ninth Circuit. *See E.S.S. Entm't 2000 v. Rock Star Videos*, 547 F.3d 1095, 1099 (9th Cir. 2008) ("Although [the *Rogers*] test traditionally applies to uses of a trademark in the title of an artistic work, there is no principled reason why it ought not also apply to the use of a trademark in the body of the work.");  *see also Brown*, 724 F.3d 1235.   After also asserting – citing *California Courts of Appeal decisions* for the quotation – that "'[w]here the federal circuits are in conflict, the decisions of the Ninth Circuit are entitled to no greater weight than those of other circuits,'" *id.* at 6:22-7:5 (quoting *Winchester Mystery House, LLC v. Glob. Asylum, Inc.*, 210 Cal.App.4th 579, 590 (2012) and *Governor Gray Davis Comm. v. Am. Taxpayers Alliance*, 102 Cal.App.4th 449, 468 (2002) – an exceedingly-odd position to take in front of a federal district court within the Ninth Circuit, the Court might note – he then points to the California Court of Appeal decision in *No Doubt* as a basis for rejecting application of the *Rogers* test.  A creative attempt to avoid the Ninth Circuit's clear indication that the *Rogers* test is still applicable in the Ninth Circuit in at least some – including this – contexts, but it does not work.  *E.S.S. Entertainment* and *Brown*, at the very least, establish – in the Ninth Circuit – that the *Rogers* test is not limited to the use of marks in titles.

Plaintiff then looks to decisions *outside the Ninth Circuit* – particularly *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) – as support for an argument that, even under the *Rogers* test, Defendant cannot prevail in its argument.   But, in *Parks*, as Plaintiff himself notes, the issue was whether the use of Rosa Parks's name in the title of a song (and on the cover of an album) was a Lanham Act problem where the song's lyrics did not mention her by name and the only arguable connection to her therein was the use of the phrase "move to the back of the bus."   In other words, even if Parks were a Ninth Circuit decision (it is not), that is quite clearly not this case.   There is no question – in fact, Plaintiff's entire case is founded upon the fact – that Plaintiff's image/likeness is present in *Top Gun: Maverick*.

Plaintiff has presented the Court with no objection to its consideration of *Top Gun: Maverick* in connection with this motion.   Even if he had, as Defendant points out Plaintiff himself has described the scene containing Plaintiff as "pivotal."   *See, e.g.*, Complaint ¶ 38.   He apparently attempts to distance himself from that characterization by citing to *Parks*, asserting that the movie is not "about" him or his character, and that this therefore "call[s] into question [the] artistic relevance" of the use of his image.   Docket No. 37, at 8:17-24.   But his/Wolfman's image is contained *within a photograph* that unquestionably has artistic relevance to the film, for the reasons explained above.   If the situation were such that a photograph of *only* Plaintiff/Wolfman were displayed in *Top Gun: Maverick*, the result on the "artistic relevance" question might very well be different.   That is clearly not what occurred here.

Plaintiff also attempts to sidestep a First Amendment defense to his Lanham Act claim by emphasizing that Defendant has relied upon the parties' *contract* as giving it the right to use Plaintiff's image.   But Defendant's motion does not rely upon the First Amendment as the source of its *right*; instead, it is identified as the basis for a *defense* to Plaintiff's Lanham Act claim.   Plaintiff's argument is a red herring.

Finally, with respect to this claim, Plaintiff enters into a discussion of factors relevant to "likelihood of confusion."   *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395 (9th Cir. 1992).   *White* is an advertising case concerning a likelihood of confusion regarding endorsement.   *See id.* at 1396.   Other than in the context of a "parody defense," it does not enter into a First Amendment-related discussion.   In any event, no

consideration of the typical likelihood-of-confusion factors is necessary where a plaintiff cannot survive the *Rogers* test. *See Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018) (indicating that, where *Rogers* test applies, a plaintiff "must satisfy not only the likelihood-of-confusion test but also at least one of *Rogers*'s two prongs"). The Court therefore does not assess either parties' arguments concerning likelihood-of-confusion factors.

Because of its resolution of Defendant's anti-SLAPP motion, the Court has no need to consider Plaintiff's third through seventh claims in connection with Defendant's Rule 12(b)(6) motion. However, for the reasons explained above, Plaintiff's first two claims cannot survive that Rule 12(b)(6) motion. Those claims are dismissed, without leave to amend (Plaintiff having not offered a way in which the claims could be viably amended).

### C. <u>Security for Costs and Fees</u>

Defendant's final motion asks the Court to require Plaintiff to post a bond of at least $250,000 to secure the payment of Defendant's attorneys' fees and costs. California Code of Civil Procedure § 1030 allows a defendant to apply to a court "for an order requiring the plaintiff to file an undertaking to secure an award of costs and attorney's fees which may be awarded in the action" where the plaintiff in the action resides outside California and there "is a reasonable possibility that the moving defendant will obtain judgment in the action." *See* Cal. Civ. Proc. Code § 1030(a)-(b). Plaintiff resides in Texas, *see* Complaint ¶ 23, and – as the Court's analysis above should make clear – there is at least a "reasonable possibility" that Defendant will obtain a judgment in its favor here.

However, before the Court would be willing to accede to Defendant's request – at least in nature, if not in amount – further briefing would be required. The Court acknowledges that there is Ninth Circuit precedent apparently permitting the Court to do what Plaintiff asks. *See Simulnet E. Assocs. v. Ramada Hotel Operating Co.*, 37 F.3d 573, 574 (9th Cir. 1994) (noting that "[t]here is no specific provision in the Federal Rules of Civil Procedure relating to security for costs," but that "federal district courts have inherent power to require plaintiffs to post security for costs," and that "'[t]ypically federal courts, either by rule or by case-to-case determination, follow the forum state's

practice with regard to security for costs,'" a practice that is "'especially common when a non-resident party is involved'") (quoting 10 Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2nd § 2671)). Yet, that decision does not appear to contemplate or address how such an approach is consistent with the *Erie* doctrine.

The Court has serious concerns about whether Section 1030 can be applied here under the *Erie* doctrine. *See, e.g.*, *Wu v. Doucette*, No. EDCV 07-1584-VAP (OPx), 2009 WL 10698257, *1 (C.D. Cal. May 14, 2009) (listing *Erie* as one reason defense argument for undertaking pursuant to Section 1030 failed); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). *But see C & SM Int'l v. San Pedro Apparel, Inc.*, 2:19-cv-00634 VAP (FFMx), 2019 WL 13289496, *1 (C.D. Cal. May 7, 2019) (same judge as in *Wu* rejecting *Erie*-based argument against security bond under California procedural statute based solely on observation that Ninth Circuit "has repeatedly held that federal district courts may do so"). If Defendant insists on continuing with this request, the Court would require supplemental briefing from the parties as to how such a request would or would not be consistent with *Erie*, notwithstanding *Simulnet*.

### D. <u>Overall Conclusion</u>

The Court is very likely to grant Defendant's anti-SLAPP motion in its entirety, will grant Defendant's Rule 12(b)(6) motion in its entirety, and would require supplemental briefing before it would reach any conclusion about whether to grant Defendant's motion seeking a bond/security (if Defendant continues to pursue that relief).