# EXHIBIT A

PRODUCER

SCREEN ACTORS GUILD

CODIFIED

BASIC AGREEMENT

OF 1983

PAR000001

## GENERAL PROVISIONS

### Table of Contents

Section
No.

1. Recognition and Scope of Agreement
2. Union Security
3. Strikes
4. Television Exhibition Post '60 Pictures
5.1 Television Exhibition Post '66 Pictures; Supplemental Markets Post '71 Pictures
5.2 Television Exhibition of Theatrical Motion Pictures, the Principal Photography of Which Commenced After October 6, 1980
5.3 Supplemental Markets Exhibition of Theatrical Motion Pictures, the Principal Photography of which commenced after Oct. 6,1980
6. Responsibility for Television and Supplemental Markets Payments
7. Television Exhibition Pre '60 Pictures
8. Original Employment - Pay Television, Video Disc/Video Cassette Markets
9. Arbitration
10. Newsreels, Travelogues, Narrations, Etc.
11. Agreement and Schedules Incorporated in Performer's Contract - Waivers
12. Better Terms and Conditions
13. Undirected Scenes - Public Events
14. Preference of Employment
15. Application to Existing Contracts
16. Contracts Delivered on Set
17. Cooperative Committee
18. Trailers and Promotional Films
19. Furnishing Reports
20. Prohibition Against Crediting
21. Dressing Rooms
22. Reuse of Photography or Sound Track

Section
No.

23. Flight Insurance
24. Independent Production
25. Screen Credits
25B. Feature Motion Pictures
25C. Billing
26. Non-Discrimination
27. Tours and Personal Appearances
28A. Injuries to Persons or Property During Performance
28B. Protection of Performers - Safety
29. Loanouts
30. Production Staff
31. Production Time Reports, Late Payments and Overwithholding
32. New York Extra Players
33. Subcontracting
34. Pension and Health Plans
35. Additional Provisions
36. Term and Effective Date
37. Union's Articles and By-Laws
38. Separate Agreement as to Each Producer
39. Other Producers May Become Parties
40. Purposes of Codification - Saving Clause - Title
41. Rules of Construction
42. Service of Notices
43. Nudity
44. Humane Treatment of Animals
45. Video Tape
46. Verification of Television Runs - Coding
47. Casting
48. Favored Nations Clause
49. Photography of Stage Performances (Instant Movies)
50. Employment of Minors
51. Alcoholism and Drug Abuse Program
52. Translation
53. Dancers

* * * *

EXHIBIT A - Companies In Multi-employer Unit
EXHIBIT B - Casting Data

SAG 1983                    (i)

## GENERAL PROVISIONS

### Index

|  | Section No. | Page No. |
|---|---|---|
| Acceptance of Members by Union | 2B | 2 |
| Access of Union to Sets | 2B | 2 |
| Agreement May Be Executed in Counterparts | 38B | 98 |
| Agreement Separate as to Each Producer | 38 | 98 |
| Airplane Pilot, Individual Dispute with Producer | 9C(1) | 57 |
| Alcoholism and Drug Abuse Program | 51 | 107 |
| Allocation - TV and Other Rights | 4A | 7 |
| Application to Existing Contracts | 15 | 67 |
| Arbitrator, Expenses of | 9E(5) | 60 |
| Arbitration | 9 | 57 |
| Articles and By-Laws of Union | 37 | 97 |
| Assessments by Union | 2G | 4 |
| Authority of Arbitrator | 9E(7) | 60 |
| Award of Arbitrator | 9E(6) | 60 |
|  |  |  |
| Better Terms May Be Negotiated by Performer | 12 | 63 |
| Bona Fide Theatrical Release | 4B, 5.1D | 9,20 |
|  |  |  |
| Call Sheets | 19 | 71 |
| Casting | 47 | 101 |
| Checking Performance | 2B | 2 |
| Children | 2-I | 4 |
| Codification, Purpose of | 40 | 98 |
| Collective Bargaining Agent | 1A | 1 |
| Commentators, News and Sports | 10 | 61 |
| Construction, Rules of | 41 | 99 |
| Contract Performers, Individual Dispute | 9B, 9C(2)(3)(4) | 57 57,58 |
| Contracts on Sets | 16 | 67 |
| Cooperative Committee | 17 | 68 |
| Crediting, Prohibition Against | 20 | 71 |
| Credits | 25 | 76 |
| Cruelty to Animals | 44 | 100 |
|  |  |  |
| Damages for Employment of Performer in Violation of Union Security | 2F | 4 |
| Dancers | 53 | 108 |
| Day Performers - Individual Dispute | 9B, 9C(1) | 57 |
| Date of Agreement | 36 | 97 |
| Delivery of Contracts | 16 | 67 |
| Discipline, Union's Right of | 2B, 2G | 2,4 |
| Disputes Between Performer and Producer | 9B, 9C | 57 |
| Disputes Between Union and Producer | 9D | 58 |
| Discrimination, Policy Regarding | 26 | 78 |
| Distributor's Gross Receipts | 5.1C | 17 |
| Dressing Rooms | 21 | 71 |

PAR000003

|  | Section No. | Page No. |
|---|---|---|
| Dues Imposed by Union | 2G | 4 |
| Duties of Union Members and Producers re Strikes | 3B | 5 |
| | | |
| Educational, Religious and Industrial Pictures | 10 | 61 |
| Effective Date of Agreement | 36 | 97 |
| Employment of Minors | 50 | 102 |
| Exclusive Collective Bargaining Agent | 1 | 1 |
| Execution of Agreement in Counterpart | 38 | 98 |
| Existing Employment Contracts | 15 | 67 |
| Expelled Union Member - Minimum Salary and Working Conditions | 2B | 2 |
| Expulsion, Effect on Performer's Obligation Under Existing Contract | 2B | 2 |
| Expulsion, Union's Right of | 2B, 2G | 2,4 |
| Extra Players, New York | 32 | 90 |
| Extra Work | 2H | 4 |
| | | |
| Favored Nations Clause | 48 | 101 |
| Feature Motion Pictures (Screen Credits) | 25B | 77 |
| First-Class Transportation | 35D | 97 |
| First Employment, Definition of | 2C | 3 |
| First Employment - Producer's Obligation to Report | 2D | 3 |
| Flight Insurance and Air Travel | 23 | 76 |
| Free-Lance Performer - Individual Dispute with Producer | 9B, 9C | 57 |
| Free-Lance Performer - Starting Date | 9D(1) | 58 |
| "Free Television," Definition of | 4B | 9 |
| | | |
| Gross Receipts TV Exhibition | 5.1C | 17 |
| Union's Articles and By-Laws | 37 | 97 |
| Union Membership | 2B | 2 |
| | | |
| Headings Not Part of Agreement | 41B | 99 |
| Health Plan | 34 | 90 |
| Humane Treatment of Animals | 44 | 100 |
| | | |
| Illegality of Portion of Agreement | 41C | 99 |
| Incorporation of Schedules, Etc | 11 | 61 |
| Independent Production | 24 | 76 |
| Individual Disputes Between Performer and Producer | 9C | 57 |
| Individual Disputes - Union Represents Performer | 9E(4) | 59 |
| Injunctive Relief Not Arbitrable | 9A | 57 |
| Injuries to Persons or Property During Performance | 28 | 82 |
| Insurance | 23 | 76 |
| Instant Movies | 49 | 101 |

SAG 1983                    (iii)

|  | Section No. | Page No. |
|---|---|---|

Labor Management Act of 1947 - Provisions re
  Repeal, Modification, Unconstitutionality.......2C    3
Late Payments...................................31B    88
Limitation on Liability - Strikes..................3C    6
Loanouts.........................................29    87

Minimum Salary of Non-Member of Union.............2B    2
Multiple Picture Performer - Individual Dispute
  with Producer...................................9C    57

Newsreels, Travelogues, Etc.......................10    61
NLRB Interpretation re Thirty-Day Provision........2C, 2E    3,4
Non-Discrimination................................26    78
Non-Member of Union - Minimum Salary and
  Working Conditions.............................2B    2
Non-Member of Union - Producer's Right to
  Employ.........................................2C    3
No-Strike Clause..................................3A    5
Notices, Service of...............................42    99
Nudity............................................43    99

Other Producers May Become Parties to Agreement....39    98
Overnight Locations, Notice of....................35B    96
Overwithholding...................................31C    89

Parties to Agreement, Others May Become...........39    98
Pay Television.....................................8    50
Payment Formula Post '60 Pictures.................4A    7
Payment Formula Post '66 Pictures................5.1A    13
Payment Formula Post '71 Pictures................5.1A    13
Payment Formula Post '77 Pictures................5.1A    13
Payment Formula Post '80 Pictures................5.2A    24
Pension and Health Plans.......................5.1H, 34    23,90
Personal Appearances..............................27    82
Phantom Stages..................................9D(2)    58
Post '60 Pictures..................................4    7
Post '66 Pictures................................5.1    13
Post '71 Pictures................................5.1    13
Post '77 Pictures................................5.1    13
Post '80 Pictures................................5.2    24
Power of Arbitrator............................9E(7)    60
Preference of Employment..........................14    64
Procedure - Arbitration...........................9E    59
Production Reports................................19    71
Production Staff..................................30    87
Production Time Report............................31    88
Production Time Reports...........................31A    88
Protection of Performers - Safety................28B    84
Public Events.....................................13    63
Purposes of Codification..........................40    98

PAR000005

|                                                                                  | Section No. | Page No. |
| -------------------------------------------------------------------------------- | ----------- | -------- |
| Re-admission to Union Membership, Right of Union to Refuse                        | 2B, 2G      | 2,4      |
| Recognition of Agreement                                                         | 1           | 1        |
| Reopenings                                                                       | 5.1I, 36A   | 24,97    |
| Report to Union re First Employment                                              | 2D          | 3        |
| Reports - TV Grosses                                                             | 4C, 5.1G    | 9,22     |
| Reports, Production, Call Sheets                                                 | 19          | 71       |
| Resignation - Effect on Performer's Obligation under Existing Contract            | 2B          | 2        |
| Reuse of Photography or Sound Track                                              | 22          | 72       |
| Reuse of Stunts                                                                  | 22          | 72       |
| Rights of Union Members and Producers re Strikes                                 | 3B          | 5        |
| Rules of Construction                                                           | 41          | 99       |
| Safety                                                                           | 28B         | 84       |
| Saving Clause                                                                    | 40          | 98       |
| Scope of Agreement                                                              | 1           | 1        |
| Screen Credits                                                                  | 25          | 76       |
| Separate Agreement as to Each Producer                                          | 38          | 98       |
| Service of Notices                                                             | 42          | 99       |
| Short Subjects                                                                 | 10          | 61       |
| Singers - Individual Dispute with Producer                                      | 9C          | 57       |
| Stage Plays, Photography of                                                    | 49          | 101      |
| Starting Date - Free-Lance Performers                                           | 9D(1)       | 58       |
| Strikes                                                                        | 3           | 5        |
| Stunt Performers - Individual Dispute with Producer                             | 9C          | 57       |
| Subcontracting                                                                 | 33          | 90       |
| Supplemental Markets - Definition                                              | 5.1B        | 16       |
| Supplemental Markets - Post 1971 Pictures                                       | 5.1         | 13       |
| Supplemental Markets - Post 1977 Pictures                                       | 5.1         | 13       |
| Supplemental Markets - Post 1980 Pictures                                       | 5.3         | 32       |
| Suspended Union Member - Minimum Salary and Working Conditions                  | 2B          | 2        |
| Suspension - Effect on Performer's Obligation Under Existing Contract            | 2B          | 2        |
| Suspension - Right of Union                                                     | 2B, 2G      | 2,4      |
| Telephones                                                                      | 35C         | 97       |
| Television                                                                      | 4, 5.1, 6   | 7,13,40  |
|     Acquisition of Title                                    | 6D          | 48       |
|     Bona Fide Theatrical Release                            | 4B, 5.1D    | 9,20     |
|     Buyer's Assumption Agreement                            | 6B          | 43       |
|     Distributor's Assumption Agreement                      | 6A          | 40       |
|     Distributor's Gross Receipts                            | 5.1C        | 17       |
|     Distributor's Liability                                 | 6C          | 46       |
|     Failure to Deliver Assumption Agreement                 | 6G          | 49       |
|     Favored Union Clause                                    | 5.1J        | 24       |
|     Financing and Distribution                              | 6E          | 48       |
|     Formula for Payment                                     | 4A, 5.1A    | 7,13     |
|     Individual Performer's Contracts                        | 4F, 5.1F    | 11,22    |

SAG 1983                                          (v)

PAR000006

|  | Section No. | Page No. |
|---|---|---|
| **Television (continued)** | | |
| Networks and Stations | 6I | 49 |
| Notices Required | 6J | 50 |
| Pay Television - Original Employment | 8 | 50 |
| Pictures Made Out of U.S. | 4G | 12 |
| Prime Time Network Exhibition | 5.1A(2)b | 15 |
| Producer's Dissolution | 6H | 49 |
| Producer's Liability | 6F | 49 |
| Release Without Exhibition | 5.1K | 24 |
| Reporting Required | 4C, 5.1G | 9,22 |
| Responsibility for Payments | 6 | 40 |
| Time and Method of Payment | 4C, 5.1E | 9,21 |
| TV Exhibition Post '60 Pictures | 4 | 7 |
| TV Exhibition Post '66 Pictures | 5.1 | 13 |
| TV Exhibition Pre '60 Pictures | 7 | 50 |
| TV Exhibition Post '71 Pictures | 5.1 | 13 |
| TV Exhibition Post '80 Pictures | 5.2 | 24 |
| Term of Agreement | 36 | 97 |
| Termination of Performer's Individual Contract Not Arbitrable | 9B | 57 |
| Thirty-Day Provision re Union Membership | 2C | 3 |
| Time Reports | 31A | 88 |
| Title of Agreement | 40D | 99 |
| Tours and Personal Appearances | 27 | 82 |
| Trailers and Promotional Films | 18 | 69 |
| Translation | 52 | 108 |
| Travelogues | 10 | 61 |
| Undirected Scenes | 13 | 63 |
| Union Security | 2 | 2 |
| Verification of Television Rerun Coding | 46 | 101 |
| Video Disc/Video Cassette Original Employment | 8 | 50 |
| Video Tape | 45 | 101 |
| Waivers | 11D | 63 |
| Waivers by Performer Must Have Consent of Union | 11C | 62 |
| Waivers - Union Security | 2J | 4 |
| Waivers - Weather Permitting Calls | 9D(2) | 58 |
| Weather Permitting Calls on Phantom Stages | 9D(2) | 58 |

PRODUCER-SCREEN ACTORS GUILD
CODIFIED BASIC AGREEMENT OF 1983

THIS AGREEMENT made by and between SCREEN ACTORS GUILD, INC., a California non-profit corporation, hereinafter called the "Union" or "SAG", and the ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS, hereinafter also referred to as the "AMPTP" or "Alliance", acting on behalf of producers who have authorized said Alliance to act on their behalf, a list of which is attached hereto as Exhibit A, all of which constitute a multi-employer bargaining unit, each hereinafter called "Producer" and collectively referred to as "Producers."

WITNESSETH:
in consideration of the mutual agreements hereinafter contained, it is agreed as follows:

GENERAL PROVISIONS

1.  RECOGNITION AND SCOPE OF AGREEMENT

    A.   Recognition

        The Union is recognized by Producer as the exclusive collective bargaining agent for performers in the production of motion pictures in the motion picture industry within the territorial limits of the United States of America.  The term "performer" means those persons covered by the terms of this Agreement and includes performers, professional singers, stunt performers, airplane and helicopter pilots, and puppeteers.

        The term "motion pictures" as used herein and in all prior agreements between the parties means and includes, and has always meant and included, motion pictures whether made on or by film, tape or otherwise, and whether produced by means of motion picture cameras, electronic cameras or devices, tapes devices or any combination of the foregoing or any other means, methods or devices now used or which may hereafter be adopted.

SAG 1983                            1

PAR000008

B.   Scope

(1)   When Producer has its base of production in the United States or any commonwealth, territory or possession of the United States, the Basic Contract shall apply; excluding shop provisions in Alaska, Hawaii or any commonwealth, territory or possession of the United States until the Union establishes a Branch in such area.

(2)   When Producer has its base of production as provided in (1) above and goes on location in Canada, the Basic Contract, excluding Union shop provisions, shall apply to all performers hired by Producer at such location.

(3)   When Producer employs a performer in the United States and transports him anywhere outside of the United States for a motion picture, the terms of the Basic Contract shall apply.


2.   Union Security

A.   Every performer hereafter employed by any Producer, whether by contract or otherwise, or who acts before the camera, or who makes sound track within the Union's jurisdiction, for any Producer, shall be a member of the Union in good standing.

B.   Each Producer shall give the Union full opportunity to check performance by such Producer of its agreement under this Section including access to sets, but the Union's checking shall be done in such a manner as not to interfere with production. The Union agrees that it will accept as a member of the Union any performer the Producer wishes to employ, but the Union may refuse such admission or, if it sees fit, admit on terms, performers suspended or expelled by the Union or by any branch of the Associated Actors and Artistes of America or by any other performers' union.   Nothing herein shall limit the right of the Union to discipline, suspend, or expel a member or to refuse to re-admit him.   The Union agrees, however, that if it suspends or expels a member who is under contract to a Producer, or if a member resigns, the suspension, expulsion, or resignation shall not affect the performer's obligation to perform any existing contract or contracts with such Producer or such Producer's right to demand performance, unless the Producer otherwise consents. Subject to the qualifications hereinafter set forth, the Producer agrees that in every future contract it enters into with a performer, the performer shall agree that the performer shall be a member of the Union in good standing and shall remain so for the duration of the contract.   Any non-member of the Union and any suspended or expelled member whom the Producer may be lawfully entitled to employ under this Agreement shall be paid the same minimum salary and shall be given the same working conditions as are provided in this Agreement.   No breach by a member of the Union of his obligation to the Union shall give

SAG 1983                                  2

such member a defense to any Producer's right to enforce an existing contract against such member.

C.   The foregoing subsections A and B, requiring as a condition of employment membership in the Union, shall not apply until on or after the thirtieth day following the beginning of such employment or the effective date of this Agreement, whichever is the later; the Union and the Producers interpret this sentence to mean that membership in the Union cannot be required of any performer by a Producer as a condition of employment until thirty days after his first employment as a performer in the motion picture Industry; "first employment" meaning the first employment as a performer in the motion picture Industry on or after August 10, 1948.   The foregoing sentence shall be deemed inoperative if any of the following events shall occur: (a) if the Labor Management Act of 1947 is repealed; or (b) if the provision of such Act to which the foregoing sentence has reference is repealed or modified so the foregoing sentence is unnecessary to comply with such Act; or (c) if such Act or such provision is held unconstitutional by the Supreme Court of the United States.   The Producer shall not be held to have violated this paragraph if it employs a performer who is not a member of the Union in good standing, if the Producer has reasonable grounds for believing that membership in the Union was not available to such performer on the same terms and conditions generally applicable to other members, or if the Producer has reasonable grounds for believing that membership in the Union was denied to such performer or such performer's membership in the Union was terminated for reasons other than the failure of the performer to tender the periodic dues and the initiation fee uniformly required as a condition of acquiring or retaining membership in the Union; provided, however, the Producer shall not be deemed to have such reasonable grounds for believing until he has made inquiry of the Union as to the facts.   The preceding sentence shall be deemed inoperative if any of the following events shall occur: (a) if the Labor Management Act of 1947 is repealed; or (b) if the provision of such Act to which the preceding sentence has reference is repealed or modified so the preceding sentence is unnecessary to comply with such Act; or (c) if such Act or such provision is held unconstitutional by the Supreme Court of the United States.

D.   The Producer agrees to report to the Union in writing within fifteen days of the first employment of a non-member of the Union, (or within twenty-five days of the first employment of a non-member of the Union on an overnight location), giving the non-member's name, Social Security Number, and his first date of employment.   An inquiry by any Producer to the Union as to the first date on which a performer has been employed in the Industry shall be answered by the Union, and its answer shall bind the Union, and the Producer, if it acts in good faith, shall not be liable for acting on such answer, but the Producer who failed to report shall be liable to the Union for such failure to report.

SAG 1983                                   3

The inquiry provided for in the preceding sentence may be made before, on, or one business day after the date of employment.

E.   The interpretation contained in the first sentence of subsection C of this Section 2 has been approved by an advisory opinion of the general counsel of the National Labor Relations Board.  If such approval of such sentence is changed by a ruling of such general counsel, then the new ruling of such general counsel shall prevail, until the same is overruled by the Board or a court of competent jurisdiction.  If the Board or a court of competent jurisdiction shall change said ruling in a proceeding in which the Union is a party, then the new ruling or opinion shall prevail, until the same is reversed by a court of competent jurisdiction.

F.   The Producer shall pay to the Union as liquidated damages for each employment of a performer in violation of the provisions of this Section 2 the sum of $500, it being agreed that the actual damages suffered by the Union for such breach would be incapable of ascertainment.

G.   The Union agrees that it will not impose unreasonable dues or assessments.  If Producer claims a violation by the Union of the provisions of this subsection G, such question shall be handled by conciliation and, if necessary, by arbitration in accordance with the provisions of Section 9 hereof.  It is the intention of the parties to prevent the Union from closing its books so as to prevent any person who wishes to act in motion pictures from joining the Union.  Nothing in the preceding sentence shall limit the right of the Union to discipline or suspend or expel a member or to refuse to re-admit him.

H.   The Union recognizes the fact that it no longer has jurisdiction over Extra work performed in and around the County of Los Angeles, State of California.  The jurisdiction of Screen Actors Guild, Inc., over Extras in the City of New York is the subject matter of a separate agreement.  Nothing herein contained shall prevent any member of Screen Actors Guild, Inc., from joining and maintaining membership in any union representing Extras.

I.   It is agreed that children under four years of age are not subject to the Union Security Provisions of this Agreement.

J.   Whenever any Producer is entitled hereunder to a permit or waiver from the Union, the Union agrees to issue the same without cost.

K.   Any breach of the provisions of this Section shall be subject to arbitration between the Union and the Producer under Section 9 of these General Provisions.

PAR000011

3.  Strikes

   A. No-Strike Clause

      The Union agrees that during the effective term hereof it
will not call or engage in a strike affecting motion picture
production against any Producer signatory hereto.

   B.  Rights and Duties of Union Members and Producers

      (1)  If, after the expiration or other termination of the
effective term of this Agreement, the Union shall call a strike
against any Producer, then each respective contract of members of
the Union with such Producer shall be deemed automatically
suspended, both as to service and compensation, while such strike
is in effect, and each such member of the Union shall incur no
liability for breach of his respective contract by respecting
such strike call, provided such member shall promptly, upon the
termination of such strike, and on the demand of the Producer,
perform as hereinafter in this paragraph provided, and the member
shall be deemed to have agreed as follows:

         (a)  That as to any motion picture which is in
      production at the time any such strike is commenced, if he
      has a contract to do such motion picture, or if he is under
      a contract which permits him to be assigned to act in such
      motion picture and has been so assigned, he will, after the
      termination of such strike and upon the request of the
      Producer, report to the Producer and perform his services in
      such photoplay at the same salary and upon the same terms
      and conditions as were agreed upon prior to the commencement
      of said strike;

         (b)  That he will immediately, after the termination of
      such strike and upon the request of the Producer, execute a
      new contract on the same terms and conditions, and at the
      same salary as provided in the contract which was in effect
      at the time the strike commenced, except that such new
      contract shall be for a period or periods, including
      options, equivalent to the unexpired term of the contract
      which was in effect when such strike was commenced;

         (c)  That he will, in lieu of (b), after the
      termination of such strike, at the option of the Producer,
      and upon its demand, execute an agreement in writing with
      the Producer extending the term or period of such personal
      service contract in effect when such strike was commenced
      for a period of time equal to the period of any suspension
      by such strike.

      If the member shall fail to perform the foregoing, or if he
shall fail actually to finish his services in the motion picture
mentioned in (a), as provided in (a) (except by reason of his

PAR000012

death, physical disability, or default by the Producer), then the waiver of liability by the Producer heretofore given shall be null and void.

The member further agrees that the statute of limitations as a defense to any action by the Producer against the member for his failure to perform during such strike is extended by a period equivalent to the duration of such strike.  If the member asserts any claim or defense by reason of the expiration of time during which he can be required to perform services by virtue of any statute (such as the seven-year statute) which claim or defense is based in whole or in part on the lapse of time during such strike, the waiver by the Producer is ineffective thereupon, and the statute of limitations as to the Producer's rights is waived by the member automatically.

(2)   The automatic suspension provisions of this Section 3 shall not affect the Producer's right to sue any individual performer for breach of contract arising during the period of such strike, unless such performer shall have complied with his obligations under the provisions of this Section 3.

(3)   The provisions of this Section 3 shall be deemed included in all contracts between performers and Producer which are now in effect and all such contracts which shall be entered into during the effective term of this collective bargaining Agreement.

(4)   The Union agrees that it will take such affirmative action as may be necessary and lawful in order to require its members to perform their respective obligations under the provisions of this Section 3.

(5)   Notwithstanding the expiration or other termination of the effective term of this collective bargaining Agreement, by termination or otherwise, the provisions of this Section 3 shall be and remain in full force and effect for a period of seven (7) years following the termination of any such strike, unless this covenant be sooner terminated by the written consent of Producer and Union.

C.   <u>Limitation on Liability</u>

The Union is a corporation.  Nothing in this Section shall enlarge the liability of its officers, directors, agents, and members, this Section being an additional limitation thereon. The Union will not be held liable for unauthorized acts of its officers, directors, agents, or members; neither the Union, nor its officers, directors, agents, or members not participating in the actions hereinafter mentioned, shall be liable for any strike, slowdown, or work stoppage, unless the same be authorized by the Union in accordance with its By-Laws, but the foregoing exemption of this sentence shall not apply unless the Union upon request from the Producer affected thereby shall proclaim

SAG 1983                              6

PAR000013

promptly and publicly that such strike, slow-down, or work stoppage is unauthorized, and follows such pronouncement within a reasonable time thereafter, if requested so to do by the Producer affected, with disciplinary proceedings in accordance with its By-Laws against the participants in such unauthorized action.

4.    THEATRICAL MOTION PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED BETWEEN JANUARY 31, 1960 AND JANUARY 31, 1966 RELEASED TO FREE TELEVISION

A.    With respect to theatrical motion pictures the principal photography of which commenced between January 31, 1960 and January 31, 1966 and released to free television, Producer agrees to pay to SAG a deferred compensation for rateable distribution to the performers appearing in such pictures, an amount equal to six percent (6%) of the world-wide total gross receipts from the distribution of such pictures on free television, after deducting a flat amount of forty percent (40%) of such total gross receipts for distribution fees and expenses. Where the Producer does not itself so distribute such picture but effects its distribution through another distributor, the percentage paid shall be based on such distributor's gross receipts from such distribution of such picture on free television, after deducting said flat amount of forty percent (40%) from such total gross receipts, payable only after they are received by the Producer, and after such forty percent (40%) deduction. Where Producer is paid advances by a distributor, the above percentage shall likewise be payable on the amount of such advances. Where Producer sells outright the right to exhibit on free television, SAG shall be paid promptly the above percentage on the gross amounts actually received by Producer for such free television exhibition rights, after deducting a flat amount of ten percent (10%) of such gross amounts so received by Producer from such outright sale of free television exhibition rights, for sales commission and expenses of sale.

If any such outright sale shall include both free television exhibition rights and other rights with respect to one or more pictures, the Producer shall allocate to the free television exhibition rights covered by such sale, a fair and reasonable portion of the sale price (but only for the purpose of determining the percentage payment due hereunder) based on the sale of free television exhibition rights in comparable pictures. If SAG shall contend that the amount so allocated in any such outright sale for free television exhibition rights was not fair and reasonable as aforesaid, then such claim shall be submitted to arbitration as herein provided. In the event the arbitrator shall find that such allocation was not reasonable and fair as aforesaid, he/she shall determine the fair and reasonable amount to be so allocated. Where the sale is of the free television exhibition rights only in a group of pictures, Producer shall likewise make an allocation of a portion of the sale price to each picture. If SAG contends that such allocation is not fair

PAR000014

and reasonable, the matter may be similarly submitted to arbitration, as above provided.  In the event the arbitrator shall find that such allocation was not reasonable and fair, as aforesaid, he/she shall determine the fair and reasonable amount to be so allocated.

The provisions of the preceding paragraph shall not apply to any sale of free television exhibition rights only, in a single picture.

SAG shall not be entitled to any percentage payments provided above from any Producer with respect to any picture for which, under an agreement with SAG, any other party has theretofore made or theretofore become obligated to SAG to make any such percentage payment, except that as to pictures the principal photography of which commenced after August 1, 1965, the provisions of Section 6 hereof shall apply.

With respect to the monies payable under this Section 4 for the telecasting of a motion picture the principal photography of which commenced between February 1, 1960, and January 31, 1966, both dates inclusive, which is initially exhibited on television after August 1, 1965, the following definition of "rateable distribution" shall apply:

With respect to performers whose compensation is based, in whole or in part, upon a percentage of Producer's gross receipts from such picture, the rateable distribution as to such performers shall be based upon and computed under provisions of subsection F of this Section.  The monies so due shall be deducted from the total monies payable under this Section 4A with respect to such motion picture. The remaining monies shall be rateably apportioned among the cast entitled to participate, on a unit system, and each performer will receive that proportion of the monies to be distributed which his number of units bears to the total number of cast units.

PAR000015

Units will be assigned to performers entitled to participate as follows:

Performers employed by the day:
Number of Days Worked or Guaranteed,
Whichever is Longer                                              Units

One (1) day ........................................      1
Two (2) days .......................................      1½
Three (3) days .....................................      2
Four (4) days ......................................      2½
Five or more days shall be covered by the schedule below for all other performers.


All other performers:
Number of Weeks Worked or Guaranteed,
Whichever is Longer                                              Units

One (1) week* ......................................      3
Two (2) weeks* .....................................      4
Three (3) weeks or more ............................      5

* In applying the foregoing schedule a performer who works or is guaranteed a fractional week in excess of one or two weeks shall be deemed to have worked a full additional week.


B.  It is understood that the provisions of this Section 4 apply only to such theatrical motion pictures which are exhibited on free television after they have had a bona fide theatrical release.  Such motion pictures exhibited on free television that have not had a bona fide theatrical release, shall be governed by the Television Agreement then in effect but only with respect to the provisions relating to additional compensation for reruns, or as may otherwise be agreed upon by SAG.

This Section 4 shall not apply to the televising of trailers or advertising a motion picture by shots, etc., substantially in the nature of a trailer subject to the limitations provided in Section 18 hereof.

C.  Producer shall furnish to SAG, written reports showing the gross receipts from the sale, lease, license and distribution of such picture on free television (whether distributed by the Producer or through another distributor) with respect to which the Producer is required to make payments hereunder.  Such reports shall be furnished at least quarterly during each calendar year, except in the case of an outright sale.  No such report need be furnished by Producer as to any such picture until such Producer shall have first exhibited such picture on free television.  Concurrently with the furnishing of such report, the Producer shall pay the percentages due.  Producer shall also make available for inspection by SAG all distributors' statements delivered to Producer, insofar as they relate to such gross

SAG 1983                                    9

receipts.  SAG shall have the right at reasonable times, to examine the books and records of Producer as to such gross receipts pertaining to such distribution of such pictures. Producer also agrees that any agreement entered into by it for the lease, license or distribution of any such pictures on free television shall contain a provision made expressly for the benefit of SAG and the performers involved in such pictures, by which such lessee, licensee or distributor agrees to assume and pay the percentage amounts payable hereunder to SAG when and as the same become due; and copies of all such provisions contained in such agreements, with a statement of the name and address of the Producer and the lessee, licensee or distributor and the date of execution, shall be delivered to SAG promptly upon the execution thereof.  In the event any lessee, licensee or distributor executes such assumption agreement and a copy thereof is delivered to SAG as above provided, Producer shall be relieved of any further obligation or liability with respect to such payment on condition that SAG has approved, in writing, the financial responsibility of such lessee, licensee or distributor.

D.  With respect to motion pictures the principal photography of which commenced between January 31, 1960 and August 1, 1965, if Producer was not the actual producer of such picture which was produced by a signatory to the Producer-SAG Basic Agreement, but acquired title thereto by purchase, assignment, transfer, voluntary or involuntary, or by foreclosure of a chattel mortgage or a pledgee's sale, Producer shall nevertheless be obligated to make the payments herein provided when such picture is exhibited on free television by Producer unless such other Producer has theretofore made or theretofore become obligated to SAG to make the percentage payment hereunder. With respect to pictures the principal photography of which commenced after August 1, 1965, see Section 6 hereof.

E.  With respect to all such pictures, the principal photography of which commenced between January 31, 1960, and August 1, 1965 Producer agrees to either:

(1)  Include in any chattel mortgage, pledge, or other lien or security agreement covering such picture a provision made expressly for the benefit of SAG and the performers appearing in such picture, to the effect that the chattel mortgagee, pledgee, lien or security holder agrees that if such mortgage, pledge, lien or security is foreclosed and such mortgagee, pledgee, lien or security holder thereby obtains title to such picture and subsequently exhibits such picture on free television, then in such event, after such mortgagee, pledgee, lien or security holder has recouped its loan so secured, plus interest, such mortgagee, pledgee, or lien or security holder will be bound by the provisions of this Agreement with respect to the payments thereafter due when such picture is exhibited on free television; provided, however, that nothing therein

SAG 1983                              10

PAR000017

provided shall prevent such mortgagee, or pledgee, who has acquired title for such picture from thereafter making a sale of such picture to a third party free and clear of any limitations, whatsoever.  Except as otherwise provided in this Subparagraph (1), the rights of SAG hereunder shall be subordinate to the rights of any such mortgagee, pledgee, lien or security holder;

(2) Or, in the alternative to be bound by the provisions of this Agreement with respect to payments due after such foreclosure shall have been made when such pictures are exhibited on free television.  In the event Producer elects this alternative, the provisions of subparagraph (1) above shall be inapplicable.  If the provisions referred to in (1) above are not included in any such chattel mortgage, pledge, lien or security agreement, the Producer shall be deemed to have elected the alternative provided for in this subparagraph (2);

(3) In the event of such a foreclosure, should the Producer distribute any such picture for such mortgagee, pledgee, lien or security holder, Producer shall be bound during the period of such distribution by the provisions of this Agreement with respect to payments due hereunder when such picture is exhibited on free television by Producer.  Any amounts paid by the Producer under this subparagraph (3) shall be credited against any obligation of the mortgagee, pledgee, lien or security holder that may be due or become due to SAG under subparagraph (1) above; it being understood that under no circumstances shall SAG be entitled to more than one payment of such obligation;

(4) With respect to pictures which commenced after August 1, 1965, see Section 6 hereof.

F.  Where compensation is payable to any performer in connection with any such picture released to free television, pursuant to an individual contract between such performer and Producer, and such compensation is based in whole or in part upon a percentage of Producer's gross receipts, then such percentage compensation may be credited against such performer's share of the monies payable by Producer to SAG hereunder, or on the other hand, such performer's share of the monies payable hereunder may be credited against the percentage compensation due under the performer's personal service contract, depending upon which such payment was made first.  Notwithstanding the foregoing, any compensation payable to such performer under an individual contract where such compensation is a specified sum of money commonly known as a "deferment," as distinguished from a participation in the gross of a picture, may not be credited against the monies payable by Producer to SAG hereunder.

G.  With respect to such pictures made outside the United States, where part of the cast is composed of performers subject to this Agreement and part of the cast of performers is not subject to this Agreement, then sums payable hereunder shall be prorated based on the proportion which the salaries payable to the performers subject to this Agreement bears to the total performers' salaries for the picture.

H.  SAG shall not be entitled to payments hereunder with respect to blocked foreign revenue except by transfer of blocked funds and then only if permission for such transfer can be obtained by SAG from local fiscal authorities.  Blocked funds shall be deemed to be unblocked on the basis of "first in, first out," unless allocated to specific periods by local fiscal authorities.  Allocation of unblocked funds as between the revenue due hereunder, and other revenue, shall be on a proportional basis subject to different earmarking by local fiscal authorities.  Accounting shall be on the basis of net funds remitted or converted to exportable properties.  Producer shall not be responsible for losses of blocked revenue resulting from matters beyond its control.

I.  The obligation of the Producer with respect to the percentage payments herein provided for shall apply only to the free television exhibition by the Producer of pictures made between January 1, 1960 and August 1, 1965 in which performers are employed within the scope of this Agreement as provided in Section 1 hereof, a) which are produced by the Producer, or b) which are produced by an independent producer under a contract between the Producer and such independent producer for the production, financing and distribution thereof by the Producer (such contracts being hereinafter referred to as "independent contracts").  In all such independent contracts, there shall be included, expressly for the benefit of SAG, an agreement on the part of such independent producer, that such independent producer will pay to SAG percentage payments as herein provided with respect to any free television exhibition by such independent producer of any such picture or pictures covered by such independent contract.  If such agreement on the part of such independent producer be not included in such independent contract prior to the free television exhibition by such independent producer of any such picture or pictures, then the Producer shall be liable to SAG for such percentage payments as provided herein with respect to such free television exhibition by such independent producer of any such picture or pictures.  The Producer will notify SAG of any and all such independent contracts which it enters into.

J.  The references herein to payment to SAG shall mean payments to SAG for rateable distribution to the performers involved.

PAR000019

PAGES 13 THROUGH 39, RELATING TO SECTIONS 5.1, 5.2 AND 5.3 ("POST-60's and "POST-80's" PICTURES AND SUPPLEMENTAL MARKETS), ARE NOT INCLUDED IN THIS DRAFT AS THEY ARE CURRENTLY UNDER DISCUSSION BETWEEN THE PARTIES.

PAR000020

6.  Responsibility for Payments

   With respect to all theatrical motion pictures produced hereunder, and released to free television and/or supplemental markets, the following provisions shall be applicable:

   A.  Distributor's Assumption Agreement -- Television and
       Supplemental Markets

   Prior to the commencement of principal photography of each such motion picture in which one or more performers covered by this Agreement renders services, if the Producer is not also the Distributor on free television and (if applicable) in Supplemental Markets of such motion picture, Producer shall obtain from the Distributor having such free television distribution rights or (if applicable) Supplemental Markets distribution rights, and deliver to Union, a separate written agreement, herein called "Distributor's Assumption Agreement," made expressly for the benefit of Union as representative of the performers involved, by which such Distributor agrees to assume and pay the amounts payable hereunder by reason of the exhibition of such motion picture on free television or (if applicable) the distribution of such motion picture in Supplemental Markets, when and as the same become due.

   In the event such Distributor is a signatory Producer, he shall be deemed automatically bound to such Distributor's Assumption Agreement and delivery and execution of said assumption agreement shall not be necessary.

   Such agreement shall be substantially in the following form:

DISTRIBUTOR'S ASSUMPTION AGREEMENT

   In consideration of the execution of a DISTRIBUTION AGREEMENT between _____ Producer, and the undersigned Distributor, Distributor agrees that the motion picture presently entitled _____, is subject to the Producer-Screen Actors Guild Codified Basic Agreement of 1983, covering theatrical motion pictures and particularly to the provisions of (strike whichever of the following clauses (i), (ii), and (iii) are not applicable)

   (i)  Section 4 A thereof, pertaining to additional compensation payable to performers when theatrical motion

SAG 1983                          40

pictures, principal photography of which commenced on or after August 1, 1965, but prior to February 1, 1966, and which are covered by said Section, are released to free television;

(ii)   Section 5.1 thereof, pertaining to additional compensation payable to performers when theatrical motion pictures, principal photography of which commenced after January 31, 1966, but prior to July 1, 1971, and which are covered by said Section, are released to free television, and pertaining to pension and health contributions with reference to Distributor's gross receipts from the release of such motion pictures to free television and Supplemental Markets;

(iii)   Sections 5.1, 5.2 and 5.3 thereof, pertaining to additional compensation payable to performers when theatrical motion pictures, principal photography of which commenced after June 30, 1971, and which are covered by said Section are released to free television and Supplemental Markets, and pertaining to applicable pension and health contributions if any are required.

Distributor hereby agrees expressly for the benefit of the Screen Actors Guild, herein called SAG, as representative of the performers whose services are included in the respective motion picture when telecast, or (if applicable) when exhibited in Supplemental Markets, to make the additional compensation payment required thereby, if any, and the pension and health contribution required thereby, if any, as provided in the applicable Sections hereinabove referred to.  Distributor for and on behalf of the Producer shall make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to the additional compensation referred to in the preceding sentence.

It is expressly understood that the right of Distributor to license such motion picture for exhibition on free television, or (if applicable) in Supplemental Markets, or to exhibit or cause or permit such motion picture to be exhibited on free television, or (if applicable) in Supplemental Markets, shall be subject to and conditioned upon the prompt payment of such additional compensation, and of said pension and health contributions, if any, in accordance with said applicable Sections.  It is agreed that SAG, in addition to all other remedies, shall be entitled to injunctive relief against Distributor in the event such payments are not made.

Within a reasonable time after the expiration of each calendar quarter, but not exceeding sixty (60) days, Distributor will furnish or cause to be furnished to the Union a written report showing the gross receipts during the preceding quarter from the distribution of such picture by Distributor on free television or (if applicable) in Supplemental Markets, with

PAR000022

respect to which Distributor is required to make payments hereunder (whether distributed by the Distributor or through another Distributor) and showing the date of the first exhibition on television or (if applicable) in Supplemental Markets, and whether such exhibition was on network television and if so, whether in prime time.

Distributor shall also make available for inspection by SAG all Distributor's statements delivered to Producer insofar as they relate to such gross receipts.  SAG shall have the right at reasonable times and on reasonable notice to examine the books and records of Distributor as to such gross receipts pertaining to such distribution on free television or (if applicable) in Supplemental Markets of such motion picture.  If Distributor shall fail to make such payments as and when due and payable, Distributor shall pay a late-payment penalty as specified in Section 5.1., 5.2 or 5.3 of the Producer-SAG Codified Basic Agreement, whichever is applicable.

This DISTRIBUTOR'S ASSUMPTION AGREEMENT shall remain effective and binding upon Distributor as long as it remains the Distributor of such motion picture on free television or (if applicable) in Supplemental Markets, and thereafter in perpetuity only if it has provided or guaranteed any of the financing for the production of such motion picture, in accordance with and subject to the provisions of Section 6 C(1) of the Producer-SAG Codified Basic Agreement of 1983.

Where there is more than one Distributor, the provisions of Section 6 C(3) of the Producer-SAG Codified Basic Agreement of 1983 shall apply to each Distributor which neither provides nor guarantees any of the financing for the production of such motion picture.

The Distributor has, has not (strike whichever is inapplicable) provided or guaranteed financing for production of such motion picture.

DATE_____     DISTRIBUTOR_____

ADDRESS_____

_____     BY_____

An inadvertent failure on the part of any such Distributor to comply with any of the reporting provisions of this subsection A shall in no event constitute a default by the Producer or such Distributor or a breach of this Agreement, provided that such failure is cured promptly after notice in writing thereof from the Screen Actors Guild.

In the event of the expiration or termination of any distribution agreement, the obligation of Producer to obtain and

PAR000023

deliver to SAG such Distributor's Assumption Agreement shall apply as well to any subsequent distribution agreement entered into by Producer, and Producer shall obtain and deliver an executed Distributor's Assumption Agreement within ten (10) days after the execution of each such subsequent distribution agreement.

If, with respect to any such motion picture produced hereunder, the principal photography of which commenced on or after August 1, 1965, Distributor is not liable in perpetuity to pay the television fees or (if applicable) the Supplemental Markets use payments or (if applicable) the pension and health contributions provided for hereunder, or if there is no distribution agreement made by Producer with respect to any such motion picture granting television distribution rights or (if applicable) Supplemental Markets rights to the Distributor, then the Union, prior to the commencement of principal photography of such motion picture, may require such further financial assurances from Producer as it deems advisable to insure performance of Producer's obligations to pay the television fees, Supplemental Markets use payments (if applicable), and pension and health contributions (if applicable), provided for herein, including without limitation the execution of security agreements, guarantees, or other protective agreements.  If any member company of the Alliance of Motion Picture & Television Producers becomes liable in perpetuity under the Distributor's Assumption Agreement to pay the television fees, Supplemental Markets use payments or pension and health contributions provided for hereunder with respect to such motion picture, the Union will release and cause to be discharged of record all such security agreements, guarantees, or other protective agreements entered into or obtained by or from such Producer; provided, however, the Producer's primary liability as a Producer shall not be released thereby.

B.  **Buyer's Assumption Agreement**

If the Producer shall sell, transfer or assign its rights to exhibit on free television any of the motion pictures produced hereunder, the principal photography of which commenced on or after August 1, 1965, or its rights to distribute in Supplemental Markets any of the motion pictures produced hereunder, the principal photography of which commenced on or after January 31, 1966, and in which one or more performers covered by the Basic Agreement render services, it shall obtain from such buyer, transferee or assignee, a separate agreement made expressly for the benefit of the Screen Actors Guild as representative of the performers involved, requiring such buyer, transferee or assignee to comply with the provisions of this Agreement with respect to additional compensation to performers and pension and health contributions (if applicable) by reason of the exhibition of such motion pictures on free television or (if applicable) the distribution of such motion pictures in Supplemental Markets when and as the same become due.  Such agreement shall be substantially in the following form:

PAR000024

## BUYER'S ASSUMPTION AGREEMENT

For a valuable consideration, the undersigned
_____ (hereinafter
(insert name of buyer, transferee or assignee)

referred to as Buyer) hereby agrees with _____
(insert name of Producer)

that all motion pictures covered by this agreement, a list of
which is appended hereto, are subject to the Producer-Screen
Actors Guild Codified Basic Agreement of 1983 covering theatrical
motion pictures and particularly to the provisions of (strike
whichever of the following clauses (i), (ii), and (iii) are not
applicable)

     (i)   Section 4 A thereof, pertaining to additional
compensation payable to performers when theatrical motion
pictures, principal photography of which commenced on or
after August 1, 1965, but prior to February 1, 1966, and
which are covered by said Section, are released to free
television;

     (ii)   Section 5.1 thereof, pertaining to additional
compensation payable to performers when theatrical motion
pictures, principal photography of which commenced after
January 31, 1966, but prior to July 1, 1971, and which are
covered by said Section are released to free television, and
pertaining to pension and health contributions with
reference to Distributor's gross receipts from the release
of such motion pictures to free television and Supplemental
Markets;

     (iii)   Sections 5.1, 5.2 and 5.3 thereof, pertaining to
additional compensation payable to performers when
theatrical motion pictures, principal photography of which
commenced after June 30, 1971, and which are covered by said
Section are released to free television and Supplemental
Markets, and pertaining to applicable pension and health
contributions if any are required.

Buyer hereby agrees expressly for the benefit of the Screen
Actors Guild, hereinafter called SAG, as representative of the
performers whose services are included in the respective motion
picture when telecast, or (if applicable) when exhibited in
Supplemental Markets, to assume and be bound by Producer's
obligation thereunder to make the additional compensation
payments required thereby, if any, and the pension and health
contribution required thereby, if any, as provided in the
applicable Section hereinabove referred to.  Buyer for and on
behalf of the Producer shall make all Social Security,
withholding, unemployment insurance and disability insurance
payments required by law with respect to the additional
compensation referred to in the preceding sentence.

SAG 1983                                    44

PAR000025

It is expressly understood that the right of Buyer to license each such motion picture for exhibition on free television or (if applicable) in Supplemental Markets, or to exhibit or cause or permit such motion picture to be exhibited on free television or (if applicable) in Supplemental Markets, shall be subject to and conditioned upon the prompt payment of such additional compensation and of said pension and health contributions, if any, in accordance with said applicable Section.  It is agreed that SAG, in addition to all other remedies, shall be entitled to injunctive relief against Buyer in event such payments are not made.

Within a reasonable time after the expiration of each calendar quarter, but not exceeding sixty (60) days, Buyer will furnish or cause to be furnished to SAG a written report showing the gross receipts during the preceding quarter from the distribution of such motion pictures by Buyer on free television or (if applicable) in Supplemental Markets with respect to which Buyer is required to make payments hereunder (whether distributed by Buyer or through another Distributor) and showing the date of the first exhibition on television or (if applicable) in Supplemental Markets, and whether such exhibition was on network television and if so whether in prime time.

Buyer shall also make available for inspection by SAG all Distributor's statements delivered to Buyer insofar as they relate to such gross receipts.  SAG shall have the right at reasonable times to examine the books and records of Buyer as to such gross receipts pertaining to such distribution on free television or (if applicable) in Supplemental Markets of each such motion picture.  If Buyer shall fail to make such payments as and when due and payable.  Buyer shall pay a late-payment penalty as specified in Section 5.1, 5.2 or 5.3 of the Producer-SAG Codified Basic Agreement, whichever is applicable.

DATE_____     BUYER_____

ADDRESS_____

_____     BY_____

The Producer agrees to deliver to the Union an executed copy of the above-referred-to Buyer's Assumption Agreement within thirty (30) days after the sale, assignment or transfer of such motion picture, with the name and address of the purchaser or assignee.

Any inadvertent failure on the part of the Buyer to comply with any of the reporting provisions of this subsection B shall in no event constitute a default by the Producer or such Buyer or a breach of this Agreement, provided that such failure is cured promptly after notice in writing thereof from the Screen Actors Guild.

PAR000026

Upon delivery of such Buyer's Assumption Agreement and on condition that the Union approves in writing the financial responsibility of the purchaser, assignee, or transferee, Producer shall not be further liable for the keeping of any such records, or for the payment of such additional compensation for the exhibition of such motion pictures on free television or (if applicable) in Supplemental Markets, or (if applicable) for said pension and health contributions, it being agreed that the purchaser, assignee, or transferee shall solely be liable therefor.

The Union agrees that it will not unreasonably withhold its approval of the financial responsibility of any such purchaser, assignee or transferee, it being further agreed that if the Union, within twenty-one (21) days of receipt of written notice of any such sale, assignment or transfer has not advised the Producer that it disapproves the financial responsibility of such purchaser, assignee or transferee, the Union will be deemed to have approved the financial responsibility thereof.  In the event the Union advises the Producer within such twenty-one (21) day period that it disapproves the financial responsibility of any such purchaser, assignee or transferee and the Producer disputes such disapproval, the Producer shall have the right, at its election, to cause to be immediately submitted to arbitration pursuant to the provisions of Section 9 hereof, the issue of whether the Union has unreasonably withheld the approval of the financial responsibility of such purchaser, assignee or transferee for payments due hereunder.

C.  <u>Distributor's Liability</u>

With respect to any such motion picture the principal photography of which commenced on or after August 1, 1965, and in which one or more performers covered by the Basic Agreement renders services, the following provisions shall be applicable to the Distributor of such motion picture for telecasting on free television or (if applicable) for distribution in Supplemental Markets:

(1)  Where the Distributor has provided or guaranteed any of the financing for the production of such motion picture the obligations of the Distributor under Section 4 A or Sections 5.1, 5.2 and 5.3, as the case may be, shall continue in perpetuity notwithstanding the expiration or termination of such distribution agreement, or any foreclosure of a chattel mortgage, security agreement, pledge, or lien on such motion picture.  In the case of foreclosure, should such mortgagee, pledgee or security holder or a third party, who is neither the Producer nor Distributor, acquire title to such motion picture and execute the Buyer's Assumption Agreement, and upon condition that the Union, in its discretion, approves such purchaser's financial responsibility, then when the Distributor

PAR000027

ceases to be the Distributor of such motion picture for telecasting on free television, or (if applicable) for distribution in Supplemental Markets, the Distributor shall thereupon be released from any and all further obligations under said Section 4 A or 5.1, 5.2 or 5.3, as the case may be, with respect to such motion picture.  Should any third party (other than in connection with any such foreclosure) acquire the rights of such Distributor to the distribution of such motion picture on free television or (if applicable) in Supplemental Markets and execute a Distributor's Assumption Agreement pursuant to which it is liable in perpetuity to make the payments under said Section 4 A or 5.1, 5.2 or 5.3, as the case may be, then upon condition that the Union in its discretion approves such third party's financial responsibility, such Distributor shall thereupon be released from any and all further obligations under said Section 4 A or 5.1, 5.2 or 5.3, as the case may be, with respect to such motion picture.  However, such Distributor shall not be liable for the payment of any television fees or Supplemental Markets use payments or pension and health contributions based on monies received by a foreign distributor under a "foreign production deal," as defined in Section 5.1 C, 5.2 D and 5.3 E, whichever is applicable, with respect to which such foreign distributor or independent producer is not obligated to account to such Distributor.

(2)  Where the Distributor of such motion picture does not provide or guarantee any of the financing of such motion picture, the Distributor's Assumption Agreement shall be binding upon the Distributor only as long as it is the Distributor of such motion picture on free television or (if applicable) in Supplemental Markets.

(3)  Where there is more than one Distributor of such motion picture on free television or (if applicable) in Supplemental Markets, the liability of any such Distributor, which neither provides nor guarantees any of the financing for the production of such motion picture, for the payment of television fees or (if applicable) Supplemental Markets use payments under said Sections 5.1, 5.2 and 5.3, whichever is applicable, shall not exceed the lesser of the following two amounts:

(a)  The amount which would be payable to the performer under Section 5.1 A (2), 5.2 A or 5.3 A, whichever is applicable, and/or the applicable pension and health contributions, if the gross income received by such Distributor involved from telecasting such motion picture on free television and (if applicable) from distributing such motion picture in Supplemental Markets constituted all worldwide total gross receipts,

PAR000028

as defined in Section 5.1 C, 5.2 D or 5.3 E, whichever is applicable; or

(b)  The difference between the amounts which would be payable to the performer under Section 5 A (2), 5.2 A or 5.3 A, whichever is applicable, and/or the applicable pension and health contributions, based on all of such worldwide total gross receipts at the time such payments are due by such Distributor and the total of all payments made to the performer and as pension and health contributions if any are required under Sections 5.1, 5.2 and 5.3, to and including such time.

The Distributor as used in this paragraph (3) refers to a Distributor under any distribution agreement with Producer as distinguished from an agreement between such Distributor and its subdistributor.

(4)  Not withstanding anything to the contrary contained in Section 6 A, with respect only to motion pictures the principal photography of which commenced between August 1, 1965, and January 31, 1966, both dates inclusive, under an agreement in existence on August 1, 1965, with an independent producer for the financing and distribution thereof, neither any such Distributor nor a signatory Producer acting as the Distributor of such motion picture shall be liable for the payment of television fees which become payable after such Distributor or signatory Producer, as the case may be, ceases to be a Distributor of such motion picture for telecasting on free television.

D.  Acquisition of Title by Producer

If Producer was not the actual producer of such picture which was produced by a Union signatory but acquired title thereto by purchase, assignment, transfer, voluntary or involuntary, or by foreclosure of a chattel mortgage or security agreement or a pledgee's sale, Producer shall nevertheless be obligated to make the payments herein provided when such picture is exhibited on free television or (if applicable) in Supplemental Markets, unless such payment required hereunder has already been paid.

E.  Financing-Distribution Agreement by Producer

The obligation of the signatory Producer hereunder with respect to the payments provided for in Sections 4 A or 5.1, 5.2 or 5.3, as the case may be, shall also apply to motion pictures the principal photography of which commenced on or after August 1, 1965, and in which performers covered by the Basic Agreement render services, produced by an independent producer under a

PAR000029

contract between the signatory Producer and such independent
producer for the production of such motion picture, and for the
financing and distribution thereof by the signatory Producer.
However, such signatory Producer shall not be liable for the
payment of any television fees, Supplemental Markets use pay-
ments, or pension and health contributions, if any are required,
based on monies received by a foreign distributor under a foreign
production deal, as defined in Section 5.1 C, 5.2 D or 5.3 E,
whichever is applicable, with respect to which such foreign
distributor or such independent producer is not obligated to
account to such signatory Producer; nor shall such signatory
Producer be obligated to obtain any Distributor's Assumption
Agreement from any foreign distributor referred to in said
Section 5.1 C, 5.2 D or 5.3 E, whichever is applicable, except if
such foreign distributor is obligated to account to such signa-
tory Producer pursuant to Section 5.1 C, 5.2 D or 5.3 E, which-
ever is applicable, with respect to monies as therein provided.

F.   Producer Liability

It is expressly understood and agreed that Producer shall in
all events remain bound hereunder to make the payments due by
reason of the exhibition of each picture on free television or
(if applicable) in Supplemental Markets, irrespective of the
assumption of such liability by any other person, firm or company
as hereinabove provided, except as otherwise expressly provided
in this Agreement.

G.   Failure to Deliver Assumption Agreement

The failure of Producer to obtain and deliver an executed
assumption agreement as provided in Sections 6 A and 6 B hereof
shall be deemed a substantial breach of this Agreement.

H.   Producer's Dissolution

If Producer dissolves and is no longer in the business of
producing motion pictures and if a Distributor assumes all of the
obligations of the Producer under Section 5.1, 5.2 or 5.3,
whichever is applicable, and the financial responsibility of the
Distributor is approved by the Union in its discretion, then
Producer shall thereupon be released of any obligation with
respect to any payments due hereunder.

I.   Network and Television Stations

No television network, station, sponsor or advertising
agency shall be required to execute any Distributor's Assumption
Agreement under Section 6 A hereof or Buyer's Assumption
Agreement under Section 6 B, except if it is the distributor of
such motion picture on free television or (if applicable) in
Supplemental Markets or the buyer of the Producer's free
television rights or (if applicable) Supplemental Markets rights
in such motion picture.

PAR000030

### J. Notice to Union

On written request by the Union, Producer shall promptly notify the Union, in writing, whether it has entered into a distribution or a financing and distribution agreement with an independent producer with respect to a particular motion picture or pictures.

7.   THEATRICAL MOTION PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED PRIOR TO FEBRUARY 1, 1960.

As to all theatrical motion pictures, the principal photography of which commenced prior to February 1, 1960, the Union does not and will not make any claim for compensation for the exhibition of such motion pictures on television.

8.   ORIGINAL EMPLOYMENT - PAY TELEVISION, VIDEO DISCS/VIDEO CASSETTE MARKETS

### A.   Introduction and Scope

(1)   These provisions shall apply to the employment of performers on entertainment programs of the type historically produced under the SAG Agreement when produced primarily for the Pay Television and/or the video disc/video cassette markets.

(2)   The term "video disc/video cassette" as used in this Agreement means program material produced primarily for disc, cassette, cartridge, and the like, which is sold or rented for play on home-type television screens in the home.

(3)   The term "Pay Television" as used in this Agreement shall mean exhibition on a television screen in the home by means of telecast, cable, closed circuit or CATV where substantially all systems to which the program is licensed meet the following tests:

(A)   Where a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel; and/or

(B)   Where the subscriber pays for each program he selects (except that a program he selects, for which only a token charge is made, shall not be considered a Pay Television program); and/or

(C)   Where the subscriber pays a fee for an encoded telecast, which fee is a major charge relative to other fees paid for encoded telecasts.

B.     Initial Compensation and Working Conditions

(1)     The minimum initial compensation and working
conditions applicable to entertainment programs of the type
historically produced under the SAG Agreement when produced
primarily for the Pay Television and/or video disc/video cassette
market shall be the same as:

(A)   The minimum applicable rates and working
conditions contained in the SAG Television Agreement for programs
of the following types:

1)   Drama (including situation comedy) of
the type produced for prime-time television;

2)   Drama of the type produced for
theatrical motion pictures; and

3)   Book musicals.

(B)   The minimum applicable rates and working
conditions contained in the AFTRA Code of Fair Practice for
Network Television Broadcasting may be utilized by the Producer
for programs of the type listed below:

1)   Variety programs in the format
historically produced for network prime time television; e.g.,
"The Carol Burnett Show," "The Ed Sullivan Show;"

2)   Television game shows; and

3)   Television quiz shows.

(C)   The minimum applicable rates and working
conditions contained in the AFTRA Code of Fair Practice for
Television Network Broadcasting may apply to programs of the
multiple times per week tape television drama type done for
non-prime time television, except, however, that premiums for
Saturday, Sunday and holiday work shall be those provided in the
SAG Television Agreement.

(D)   Producer agrees that prior to the employment
of any performer in an entertainment program of the type
historically produced under the SAG Agreement when intended
primarily for exhibition on Pay Television which is not described
in subparagraphs (A) through (C) above, Producer will give at
least sixty (60) days' advance notice to the Screen Actors Guild
of such proposed employment.  Producer and Screen Actors Guild
agree to meet within thirty (30) days from receipt of such notice
for the purpose of negotiating with respect to the terms and
conditions for such employment.  If no agreement is reached with
respect thereto within such sixty-day period, Screen Actors Guild

PAR000032

may, upon a thirty-day written notice to Producer, instruct its
members to withhold services with respect to the production of
such program.  Any dispute between Screen Actors Guild and the
Producer as to whether such program is included in one of the
categories described in subparagraphs (A) through (C) above shall
be subject to arbitration under the provisions of this Agreement.

(2)   The initial compensation set forth in this Section
B. shall constitute payment in full for 10 exhibition days for a
program (with no limit on the number of broadcasts commenced in
any calendar day) over each system to which the program is
licensed world wide in the Pay Television Market within a period
of one year from the initial exhibition on each such system.
However, with respect to programs produced primarily for play
specifically relating to the holidays set forth in subparagraph
(A) of this Paragraph (2), the period shall be ten exhibition
days in three consecutive holiday seasons:

(A)   New Year's, Valentine's Day, St. Patrick's
Day, Easter, Passover, Independence Day (July 4th), Halloween,
Thanksgiving, Chanukah, and Christmas.

If a performer is engaged for a holiday program,
it shall be so stated in his booking slip, if applicable, and in
his contract.

The initial compensation shall also include
payment for the first 100,000 net unit sales in the aggregate, in
the video disc/video cassette world wide market.

An exhibition day shall commence at one second
after midnight and end at midnight, unless any exhibition of a
program shall commence prior to midnight and continue past
midnight, in which case the exhibition day shall be deemed to
begin when the program commenced.

(3)   The parties recognize that the March 25, 1982
Supplement to the 1980-1983 AFTRA Code of Fair Practice for
Phonograph Recordings may cover categories of programs not
described in Section B.(1) above and that nothing herein shall
preclude any signatory hereof from producing such programs
pursuant to such Code.

C.   Additional Compensation

(1)   Pay Television - For covered programs released in
the Pay Television Market:

(A)   For exhibition days on any system anywhere in
the world either in excess of ten or subsequent to one year from
the date of the initial exhibition on such system, Producer shall
pay 6% (plus Pension and Health payments in accordance with the
SAG Television Agreement) of the Distributor's gross as defined

SAG 1983                          52

in Section 5.3.E. of the Basic Agreement, <u>from such excess exhibition days on such system</u>, except that in the case of covered programs the cast of which (exclusive of those members of the cast who would not be entitled to residuals if the program had been produced for free television) is four performers or less, the total percentage shall be computed on the basis of 1% per performer.  The computation of the number of performers in the cast, for purposes of determining the percentage payable, shall exclude off-camera announcers, provided however, that where the only performer(s) on a program is an off-camera announcer(s), the percentage shall be 1/2 of 1% plus pension and health. However, off-camera announcers shall not be excluded for purposes of determining the rateable distribution provided in Section 8.E. hereof.

(B)  If any license, whether an initial or subsequent license, for a program on any system covers exhibition days in excess of ten, each such day shall be given equal monetary weight in determining the sums subject to the payment described in subparagraph (A) hereof.  As an example, if the initial license encompasses seventeen exhibition days, 7/17th of the sums actually received from such license shall be subject to the appropriate payment under this Section C.  For further example, if a second or subsequent license is for ten days and covers the 9th through 18th day, 8/10th of the sum actually received from such license shall be subject to the appropriate payment under this Section C.

(C)  Where a license covers exhibition days both within and outside the one year limitation set forth in Paragraph B.(2) above, all days shall be given equal monetary weight.  For example, if a license is for fourteen days use in eighteen months, and five exhibition days occur after the one year period, each day of exhibition which actually occurs after the one year period shall be given equal monetary weight, and 5/14th of the license fee shall be subject to the appropriate payment under this Section 8.C.

(D)  The provisions of Section 18(d) and Section 20(e) of the SAG Television Agreement relating to the application of contingent compensation against the payments to any individual performer shall be applicable also to the payments required herein.

(E)  1)  The provisions of Section 5.3.C, E, H and I of this Agreement relating to foreign proration, definition of distributor's gross receipts, effect of individual contracts, and reporting, and Section 6 of this Agreement relating to responsibility for payments, are incorporated herein.

2)  Payment shall be made quarterly and each such payment shall be accompanied by the reports required under Section 5.3.I. of this Agreement.

PAR000034

(2)   Video Disc/Video Cassette Market

(A)   For sales of a covered program in the video disc/video cassette market, the Producer shall pay 6% (plus Pension and Health payments in accordance with the SAG Television Agreement) of the fee or other payment actually received by the Producer from net unit sales in excess of 100,000 units in the aggregate, except that in the case of covered programs the cast of which (exclusive of those members of the cast who would not be entitled to residuals if the program had been produced for network television) is four performers or less, the total percentage shall be computed on the basis of 1% per performer. The computation of the number of performers in the cast, for purposes of this paragraph only (but not for the purpose of determining rateable distribution provided in Paragraph E. hereof), shall exclude off-camera announcer(s), provided however, that where the only performer(s) on a program is an off-camera announcer(s), the percentage shall be 1/2 of 1%, plus pension and health.

(B)   The term "disc" as used in this paragraph shall refer to both video discs and video cassettes.   The term "unit" shall refer to the disc or aggregate discs in each package released by the Producer for sale or rental.   "Net Unit Sales" shall mean sales of units which are released by the Producer or its distributor for sale and are not returned, or are released by the Producer or its distributor for rental purposes.

(C)   It is recognized that some companies hereunder may act both as producers and as distributors of disc units in covered sales.   In such a case, the payments set forth above shall be based on either (i) the fee or other payment received by the subsidiary, division or other department of the company which serves as the production branch from the subsidiary, division or other department of the company which serves as the distribution branch, or (ii) where no separate subsidiary, division, or other department serves as the production branch, a reasonable allocation of the gross receipts of the company from covered sales attributable solely to fees or other payments which would be made to a production subsidiary, division or other department of the company if one existed, or would be made to an outside producer.   The reasonableness of such allocation in (ii) above, or of the fee or other payment received by the production subsidiary, division or other department in (i) above, shall be determined in its license fee payments to outside producers for comparable disc units, or in the absence of such practice, by generally prevailing trade practice in the video disc industry.

(D)   The provisions of Section 18(d) and 20(e) of the SAG Television Agreement relating to application of

SAG 1983                              54

PAR000035

contingent compensation against the payments to any individual performer shall be applicable also to the payments required herein.

### D.   Release in Other Media

(1)   If and when a program produced hereunder, for which the minimum initial compensation is governed by Section B.(1)(A) hereof, is broadcast in free television, Producer shall be obligated to pay to the performers the applicable additional compensation for reruns (e.g., if network prime time, network non-prime time, or syndication, as the case may be) provided under the SAG Television Agreement.

(2)   If and when a program produced hereunder, for which the minimum initial compensation is governed by Section B.(1)(B) or B.(1)(C) herein, is broadcast in free television, Producer shall be obligated to pay to the performers, for the first such broadcast, the applicable first replay fee set forth in the AFTRA Code of Fair Practice for Network Television Broadcasting for such broadcast, and any subsequent broadcasts of such program shall comply with such replay formula.

(3)   If a program produced hereunder is released in theatrical exhibition, Producer shall be obligated to pay to the performers the additional compensation provided in Section 19 of the Television Agreement.

(4)   If a program hereunder is licensed for exhibition on domestic basic cable (other than as a relay of a domestic free television broadcast) the Producer shall pay to the Union for rateable distribution to the performers in the cast 6% (plus pension and health contributions) of distributor's gross receipts from such exhibition, subject to the 1% limitation where four or fewer performers are involved, and subject to the compensation limits set forth in the last two sentences of Paragraph C.(1)(A) hereof.

(5)   If a program produced hereunder is licensed for exhibition in other supplemental markets (such as "in-flight"), the Producer shall pay in accordance with the SAG or AFTRA Supplemental Markets formula, whichever is applicable.

### E.   Distribution Formula

Sums received by the Union hereunder shall be distributed as follows:

Units will be assigned to performers entitled to participate as follows:

PAR000036

(1)   <u>Time Units</u>

With respect to each performer, units for time worked shall be computed as follows:

Each day        =    1/5 unit

Each week       =    1 unit

No more than 5 time units may be credited to any performer.

(2)   <u>Salary Units</u>

With respect to each performer, units for total compensation received from the film shall be credited with units as follows:

(A)   <u>Day Performer</u>

Each multiple of daily scale equals 1/5 unit. A fraction of daily scale when more than 1/2 shall be credited as another 1/5 unit.

(B)   <u>All Other Performers</u>

Each multiple of weekly scale equals 1 unit. A fraction of a multiple when more than 1/2 of weekly scale shall be credited as another weekly unit.

(C)   No more than 10 salary units may be credited to any performer.

(3)   <u>Computation</u>

Each performer shall be credited with the sum of time and salary units as computed above. All performers' salary units shall be totaled and each performer will receive that rateable proportion of the monies as the performers' number of units bears to the total number of units for the entire cast.

(4)   <u>Allocation</u>

With respect to such pictures made outside of the United States, where part of the cast is composed of performers subject to this Agreement and part of the cast of performers is not subject to this Agreement, then sums payable hereunder shall be prorated based on the proportion which the salaries and the time worked payable to the performers subject to this Agreement bears to the total performers' salaries and time worked for the picture. If records reflecting time worked are not reasonably available, then the aforementioned proration may be based on salaries alone.

SAG 1983                             56

E.   The parties agree that the working conditions, including compensation, applicable to entertainment programs under the Union's jurisdiction produced for the basic cable market will be negotiated in good faith upon request of either party.

9.   ARBITRATION

Disputes shall be arbitrable only as hereinafter in this Section set forth.

A.   Disputes involving or relating to injunctive relief are not arbitrable.

B.   Disputes involving or relating to the right of termination of a performer's individual employment contract are not arbitrable (a) except with respect to day performers, stunt performers, airplane pilots, singers, and free-lance performers whose guaranteed compensation is less than $20,000 per picture, and (b) except as provided in subsection C(4)(a) below.

C.   Individual Disputes between Performer and Producer

Subject to the provisions of subsections A and B above, only the following disputes between a performer and Producer are arbitrable:

(1)   As to a day performer, stunt performer, airplane pilot, singer, or either a free-lance performer or a multiple-picture performer whose guaranteed compensation is less than $30,000 per picture, the issue of whether a contract was entered into and any dispute involving the interpretation, performance, non-performance or an alleged breach of a term or condition of the performer's contract including claims for compensation at scale or overscale and all disputes arising under the applicable terms of the collective bargaining agreement relating to such performer;

(2)   As to a contract performer receiving a weekly rate of compensation up to and including $1,750 per week, any dispute arising under the applicable terms of the collective bargaining agreement relating to such performer and any dispute arising under the performer's individual employment contract concerning the payment of compensation at scale or overscale;

(3)   As to all performers not expressly covered in (1) and (2) above, and except as provided in paragraph 4(a) of this subsection C, only disputes arising under the applicable terms of the collective bargaining agreement shall be arbitrable.  Except as provided in said paragraph 4(a), disputes arising under the individual employment

PAR000038

contract of such performers including claims for compensation therein provided, shall not be arbitrable;

(4)  With respect to contract performers receiving $1750 per week or less, multiple-picture performers guaranteed less than $30,000 per picture, and free-lance performers guaranteed $20,000 or more but less than $30,000 for the picture, the following provisions shall apply where a dispute as to any such performer arising under his individual employment contract or the collective bargaining agreement, involves both a claim of compensation and the issue of termination:

(a)  Where the Producer claims to have terminated or seeks a termination of the performer's individual employment contract: (i)  if the total amount of money claimed by the performer is under $30,000 the entire dispute shall be arbitrable, it being agreed that the performer's entire claim shall be presented in a single arbitration; (ii) if the total amount of money claimed by the performer is $30,000 or over, the dispute shall not be arbitrable, in whole or in part.

(b)  Where the performer claims to have terminated or seeks a termination of his individual employment contract, the dispute shall not be arbitrable, in whole or in part.

(c)  If either party claims to have terminated or seeks a termination of the performer's individual employment contract, such party shall so notify the other, in writing, at any time prior to the expiration of the ten (10) days following delivery of the written statement of grievance provided for in subsection E(3) of this Section.

D.   Disputes between Union and Producer

(1)   Starting Date - Free-Lance Performers

Any dispute between the Union and any Producer with respect to the issuance of any waiver referred to in the provisions of Paragraph 4C of Schedules B and C of this collective bargaining Agreement, shall be determined, at the request of either party, by arbitration.

(2)   "Phantom Stages"

The Union has heretofore upon request issued waivers permitting the giving of weather-permitting calls for work on certain stages, such as the so-called "Phantom Stage" at Universal City Studios where rain, wind or hail rendered sound recording unusable.  Similarly, waivers have been granted authorizing weather-permitting calls when caused by fog, wind,

PAR000039

rain or hail on uncovered, tarpaulin-covered, or open structures. It is agreed that weather-permitting calls within the limits provided by the Agreement may be given to performers on such or similar stages and on open or uncovered structures where the making of usable sound track is rendered impossible because of rain, wind or hail, or where usable photography on an uncovered structure is rendered impossible by fog, wind, rain or hail. Disputes which may arise hereunder are subject to arbitration.

(3)   All disputes between the Union and a Producer as to the interpretation of this collective bargaining Agreement, shall be arbitrable.

E.   Procedure

(1)   Whenever any dispute arises which is arbitrable under the provisions of this Agreement, a representative of the Union and a representative of the Producer involved shall meet within ten (10) days after a request is made for conciliation by either party and endeavor to conciliate such dispute.

The filing of a formal claim by the Union shall be deemed an automatic request for conciliation.

(2)   In the event Producer has authorized an employer association to represent Producer, Producer shall have the right to have a representative of the appropriate employer association present at such conciliation.

(3)   In the event of a failure to settle the dispute under the applicable procedure provided above, or if a party fails or refuses to meet after a request for conciliation, then, in either of such events, the Union or Producer, whichever may be the aggrieved party, shall deliver to the other a written demand for arbitration setting forth the material facts concerning the dispute.   The other party may file a written reply if it so elects within ten (10) days following the delivery of the demand for arbitration.

The parties shall agree to the use of a predetermined list of single arbitrators in sequential order.   If an arbitrator is not available for more than 21 days, the next available arbitrator shall be used.

Until such time as the parties have agreed upon a panel of single arbitrators for use in any area in which the Union maintains a branch or office, the provisions of Section 9E of the 1977 Basic Agreement shall be applicable.

Nothing herein contained shall be deemed to deprive any Producer of the right to assert at any time and in any proceeding, or otherwise, that the matter in question was not arbitrable hereunder.

(4)   All arbitrations hereunder, which are not instituted by Producer, shall be brought by and in the name of the Screen Actors Guild, Inc., whether such arbitration is on its own behalf or on behalf of a performer and in the latter case the

PAR000040

Union may, but shall not be required to, represent the performer. The Union may, however, in its discretion, permit a performer to bring an arbitration in the name of the performer.  It shall, however, be solely within the discretion of the Union whether or not the claim of a performer shall be brought to arbitration.

(5)  The cost and expenses of the arbitrator shall be shared equally by the Union and the Producer involved.

(6)  In any arbitration hereunder the decision and award of the arbitrator shall be in writing and shall be final and binding on the parties, and the performer or performers involved.

(7)  The arbitrator shall only have authority to determine the dispute presented by the written demand for arbitration, and then only to the extent and in the manner as expressly provided by the applicable provisions of this collective bargaining Agreement as limited by the provisions of this Section 9.  The arbitrator shall have no power or authority to make a finding or an award relating to the termination or right of termination of an individual employment contract of a performer, except as otherwise expressly provided in this Section 9.  Nor shall the arbitrator have any power or authority to make a finding or award for or against injunctive relief.  Nor shall the arbitrator have any power or authority to reform any contract involved in the arbitration.

(8)  Termination or expiration of this collective bargaining Agreement shall not affect the application of the arbitration provisions of this Agreement to arbitrable disputes arising during the term of this Agreement.

(9)  It is the policy of SAG not to process any unduly late claims.

F.   Recognizing that in some cases, a dispute may involve one or more matters which are arbitrable hereunder, and one or more matters which are not arbitrable hereunder, it is agreed that no award in an arbitration hereunder shall affect, be used or be admissible in any other action or proceeding relating to matters which are not arbitrable hereunder; and no judgment or order in any other action or proceeding shall affect, be used or be admissible in any arbitration hereunder, but it is expressly agreed that an arbitration award made in accordance with the provisions of this Section 9 shall not be affected by any Court action or proceeding; but, nothing herein shall preclude any Court of competent jurisdiction from confirming, setting aside, or modifying any arbitration award hereunder, in any proceeding brought for any such purpose, in accordance with applicable law.

G.   Where disputes are subject to arbitration under this Section, the same shall be settled by arbitration in accordance with the laws of the State of California (Sections 1280, et. seq., California Code of Civil Procedure).

SAG 1983                           60

H.   In no case may any arbitration hereunder or any award therein affect any rights of the Producer or performer in or to or with respect to the results and proceeds of the performer's services or in or to or with respect to the use of the performer's name, voice or likeness.

I.   All reference in this Section to the termination of an individual employment contract shall include a termination of the performer's employment under such contract or with respect to one or more pictures thereunder.

10.   NEWSREELS, TRAVELOGUES, NARRATIONS, ETC.

Newsreels, travelogues, news and sports commentators, and persons rendering similar services in short subjects, are exempt from the operation of this Agreement.  However, narrators rendering services in travelogues and persons rendering similar services in short subjects shall be deemed within the coverage of this collective bargaining Agreement.  Educational, religious and industrial motion pictures are not covered by this Agreement.

11.   AGREEMENT AND SCHEDULES INCORPORATED IN PERFORMER'S CONTRACT -- WAIVERS

A.   There are attached hereto and made a part of this collective bargaining Agreement the following Schedules of wage scales and working conditions:

Schedule A -- Day Performers

Schedule B -- Free-Lance Performers Whose Weekly Guaranteed Salary Is $3500 or Less per Week and Who Are Guaranteed Less Than $30,000 per Theatrical Picture or $25,000 per Television Picture.

Schedule C -- Free-lance Performers Whose Weekly Guaranteed Salary Is More Than $3500 per Week and Who Are Guaranteed Less Than $30,000 per Theatrical Picture or $25,000 per Television Picture.

Schedule D -- Multiple-Picture Performers Receiving $3500 or Less per Week and Guaranteed Less Than $30,000 per Theatrical Picture or $25,000 per Television Picture

Schedule E -- Contract Performers Whose Weekly Guaranteed Salary Is $3500 or Less per Week

PAR000042

Schedule F -- Contract Performers Whose Weekly
Guaranteed Salary Is in Excess of $3500 per Week;
Multiple-Picture Performers Receiving More Than $3500
per Week or Who Are Guaranteed $30,000 or More per
Theatrical Picture or $25,000 or more per
Television Picture; Performers Employed Under "Deal
Contracts" or Otherwise, Who are Guaranteed $30,000 or
More per Theatrical Picture or $25,000 or more per
Television Picture.

Schedule G-I -- Professional Singers Employed by
the Day.

Schedule G-II -- Professional Singers Employed by
the Week at $3500 or Less Per Week.

Schedule H-I -- Stunt Performers Employed by the Day

Schedule H-II -- Stunt Performers Employed by the
Week at $3500 or Less per Week.

Schedule H-III -- Stunt Performers Employed by the Week
at More Than $3500 per Week.

Schedule H-IV -- Stunt Performers Employed Under Term
contracts.

Schedule I -- Airplane Pilots.

Individual employment contracts, entered into under a
preceding collective bargaining agreement, which continue during
the term of this Agreement shall be subject to the Schedules of
Wage Scales under said preceding collective bargaining agreement.

B.   The applicable provisions of this Agreement and the
provisions contained in the appropriate Schedule shall be deemed
incorporated in the individual contract of employment between
Producer and each performer; the Producer, the Union, and the
individual performer shall each be bound thereby.  Each class of
performer is intended to be covered by the appropriate Schedule;
if the classification of any performer is not expressly included
in one of such Schedules, he shall receive the working conditions
and minimums most nearly applicable to him.

C.   Producer agrees that no waiver by any performer of any
term of this Agreement, including the appropriate Schedule, shall
be requested of the performer or effective unless the consent of
the Union is first had and obtained.  Such consent may be oral,
but the Union agrees that all oral waivers will be confirmed by
it in writing.  The Union further agrees that, upon being
notified by any Producer that a company is going on location, it
will appoint a deputy to be with the company on location, with
full power to grant waivers.  The Union further agrees that it
will maintain a twenty-four hour service at Los Angeles,
California, for the giving of waivers in accordance with the
provisions of this subsection.

PAR000043

D.   Whenever the Producer is entitled to a permit or a
waiver from the Union, the Union agrees to issue the same without
cost.

## 12.   BETTER TERMS AND CONDITIONS

Nothing contained in this Agreement shall prevent any
individual from negotiating and obtaining from Producer better
conditions and terms of employment than those herein contained.
This Agreement shall not affect any of the terms or conditions of
employment contained in any individual personal service contract
which are better than those herein contained.

## 13.   UNDIRECTED SCENES - PUBLIC EVENTS

A.   The Agreement between the Union and Producer covering
New York Extras, and the contract between Producer and Screen
Extras Guild, Inc., covering the employment of Extras in and
around Hollywood, provide for the photographing of undirected
scenes and public events without violating the preference or
union security clauses of such collective bargaining agreements.
The parties recognize the production value of such public events
and that in practice the photography of such scenes and events
produces work for persons to be later hired to appear in the
motion picture in which such photography will be used.

It is agreed:

(1)  That where the participants in the event are
not professional entertainers,  Producer may freely
photograph such scenes, including the event; for
example, an automobile race, including particularly the
drivers and vehicles participating therein;

(2)  That where the participants in such event are
professional entertainers, Producer may photograph the
same, provided the approval of the Union is first obtained;
provided, however, that such approval of the Union shall not
be required when such professional entertainers do not take
part in the public event by arrangement with the Producer,
are not under the direction and control of the Producer, and
are not performing in their capacity as professional
performers;

(3)  It is expressly agreed that no photograph of
stunt performers at a rodeo will be made and used under
the provisions of this Section without first applying
to and receiving from the Union a waiver therefor.

B.   To qualify under the terms of this Section, the public
event shall be open to the general public with or without payment

SAG 1983                         63

PAR000044

of an admission fee; the crowd in attendance must number at least one thousand or more persons; the event must be publicized or advertised and not staged for motion picture purposes; and the event must not be directed by or be under the control of Producer.

## 14.  PREFERENCE OF EMPLOYMENT

A.    In recognition of the services performed by professional performers, Producer agrees that in the hiring of

(i) day performers, stunt performers, singers, puppeteers, and airplane and helicopter pilots employed by the day for work to be performed within the 300 mile, 100 mile, or 50 mile zone, as the case may be, referred to in subsection C of this Section; and

(ii) free-lance performers and three-day performers (in each case, other than those whose guaranteed compensation for the engagement at a salary rate which is equal to at least double the minimum scale salary rate for the applicable type of employment) employed for work to be performed within the 300 mile, 100 mile or 50 mile zone, as the case may be, referred to in subsection C of this Section,

preference will be given to qualified professional performers in each such zone who are reasonably and readily available in such zone.

A "qualified professional performer" for the purpose of this Section is a person who has had prior employment as a motion picture performer at least once during the period of three years prior to the date of the proposed employment.

B.    The obligation of the Producer to give preference to qualified professional performers as defined in this Section shall require the employment of a qualified professional performer as so defined in every hiring of such a performer employed by the day and in every hiring of free-lance and three-day performers (other than those excluded pursuant to subparagraph (ii) of subsection A of this Section) unless no qualified professional performer of the type required is reasonably and readily available to the Producer through the use of the present hiring practices generally and customarily followed by the motion picture Industry in the employment of such performers.  If a qualified professional performer is reasonably and readily available to the Producer for employment in the locality where the Producer's studio is based, he shall be deemed available regardless of the place within the 300 mile, 100 mile or 50 mile zone, as the case may be, at which the services are to be performed.

PAR000045

C.   For purposes of this Section, the preference zones shall be as follows:

| | | |
|---|---|---|
| (i) | Albuquerque | 100 miles |
| (ii) | Boston | 100 miles |
| (iii) | Chicago | 100 miles |
| (iv) | Dallas | 100 miles |
| (v) | Denver | 100 miles |
| (vi) | Detroit | 100 miles |
| (vii) | Los Angeles | 300 miles |
| (viii) | Miami | 100 miles |
| (ix) | New York | 300 miles |
| (x) | Phoenix | 150 miles* |
| (xi) | San Francisco | 100 miles |
| (xii) | Tucson | 150 miles* |
| (xiii) | Washington, D.C. | 100 miles |
| (xiv) | Houston | 100 miles |

(xv)   One hundred (100) miles from any new Union Branch office.

(xvi)   Fifty (50) miles from any production location site utilized by Producer in the United States.

For purposes of this Section, the above Los Angeles 300 mile zone is the area within the radius of 300 miles from the intersection of Beverly Boulevard and La Cienega Boulevard in Los Angeles, California; the above New York 300 mile zone is the area within a radius of 300 miles from the center of Columbus Circle in New York; the above 150 mile zones are the areas within the radius of 150 miles from the center of the designated city; the above 100 mile zones are the areas within the radius of 100 miles from the center of the designated city or the location of the Union Branch office, whichever the case may be; and the 50 mile zone is the area within the radius of 50 miles from such applicable production location site.

*During the 1983 negotiations the parties agreed to increase the Phoenix and Tucson zones from 100 miles to 150 miles, with the understanding that no transportation or lodging will thereby be required.

D.   There shall be automatically excluded from the provisions of this Section the following:

(i)   Members of a group which is recognized in the trade or by a significant segment of the public as a "name" specialty group;

(ii)   A person portraying himself, or persons portraying themselves; the exception will apply in effect to important, famous, well-known, or unique persons or persons of special skills or abilities, who portray themselves;

(iii)   Extras who are adjusted for nonscript lines;

PAR000046

(iv)     Military or other governmental
personnel, where governmental restrictions prevent use of
nonmilitary or nongovernmental personnel, as the case may be, in
restricted areas or in the handling of governmental property or
equipment; however, the use of military or other governmental
pilots or aircraft shall not be the subject of an automatic
waiver, but the facts shall be presented to the Union and
the waivers will be granted in accordance with the
previously established custom in the motion picture
Industry;

(v)     Persons having special skills or
abilities, or special or unusual physical appearance, where
such skills, abilities, or appearance are required by and
are used in the production of the motion picture, if
professional performers having such required skills or
abilities or physical appearance are not reasonably or
readily available to the Producer through the use of hiring
practices generally and customarily followed by the motion
picture Industry in the employment of such performers;

(vi)     The first employment within the studio
zone of a person with respect to whom the Producer presents
in writing to the Union facts showing that the employee (1)
has had sufficient training and/or experience so as to
qualify for a career as a professional motion picture
performer, and (2) that such employee intends currently to
pursue the career of a motion picture performer and intends
to be currently available for employment in the motion
picture Industry;

(vii)     Children under the age of eighteen;

(viii)     The owner of special or unique vehicles
or equipment, or an operator appointed by the owner, if such
vehicle or equipment is not available to the Producer
without employing the owner or such operator.

If a performer is employed under one or more of the
exceptions provided for in subparagraphs (i), (ii), (iii), (iv)
and (v) of this subsection D, the obligation of the Producer to
give preference to qualified professional performers in the cases
provided in subsection A of this Section shall nevertheless be
applicable to any subsequent employment of such performer by
Producer.

Producer agrees to promptly report to the Union each hiring
under the provisions of this subsection D together with the
reasons why the person so employed comes within the provisions of
this subsection.

A joint Producer-Union Committee shall be appointed to
resolve claims arising under this Section between Producers who
are members of the Alliance of Motion Picture & Television

SAG 1983                        66

Producers and the Union.  If such Committee cannot agree, the claim shall be subject to arbitration pursuant to Section 9 hereof.

E.  It is expressly understood and agreed that nothing in this Section contained shall alter or modify Producer's exclusive right to cast any and all performers performing services for Producer.

F.  It is understood that it would be impossible to accurately fix the actual damages suffered by the Union by reason of a breach by the Producer of the provisions of this Section. It is therefore agreed that the Producer will pay to the Union as liquidated damages the sum of $400 for each breach by the Producer of any of the provisions of this Section in the case of performers employed by the day; $500 for each breach by the Producer of any of the provisions of this Section in the case of employment of three-day performers; and $700 for each breach by the Producer of any of the provisions of this Section in the case of employment of freelance performers.  The applicable liquidated damages shall be doubled in any case of willful misrepresentation or falsification of facts by the Producer.  The hiring by a Producer of a person other than a qualified professional performer as herein defined in violation of the provisions hereof shall be deemed a single breach, regardless of the number of days of employment involved in the hiring; but each separate hiring of the same person in violation hereof shall be deemed a separate breach.

The liquidated damages provided for in this subsection F shall not be compounded with the liquidated damages provided for in Section 2F hereof.

G.  All disputes under this Section shall be determined by arbitration in accordance with Section 9 hereof.


15.  APPLICATION TO EXISTING CONTRACTS

The provisions of this Agreement with respect to, and only to, services rendered on or after the effective date hereof, shall be deemed incorporated in all contracts of employment now in effect or hereafter entered into to which such provisions are applicable.


16.  CONTRACTS DELIVERED ON SET

Employment contracts may be delivered to any performer while such performer is on the set not later than during the first day of employment.  Performers may not be required to sign such contracts on the set.  Delivery of a contract to the performer's agent constitutes delivery to the performer.


SAG 1983                    67

## 17.   INDUSTRY-UNION COOPERATIVE COMMITTEE

A committee is hereby established to be known as the
"Industry-Union Cooperative Committee."  The Cooperative
Committee shall consist of 5 Producer representatives, and two
alternates, and 5 Union representatives, and two alternates, to
be named.  The names of the initial members of the Cooperative
Committee shall be provided by the Producers above named and the
Union, respectively, by written notice to the other, as soon as
practicable following the execution of this Agreement.  Upon
written notice by the Alliance of Motion Picture & Television
Producers or the Union respectively, any such Producer committee
member or alternate may be replaced at any time by the Alliance
of Motion Picture & Television Producers and any Union committee
member or alternate may be replaced at any time by the Union.

The Committee shall meet from time to time upon request of
either party and may establish such regular meetings as it may
deem proper.  In order for the Committee to act, a quorum must be
present.  A quorum shall consist of at least four Industry and
four Union representatives.  The Committee shall have the
following functions:

(a)  To discuss, investigate and make recommendations
as to the solution of problems arising in the construction,
interpretation and administration of this Agreement, and as to
any abuses or grievances, which arise during the term hereof
affecting performer-producer relationships generally and for
which no remedy is provided for hereunder;

(b)  To make every effort to prevent and remedy abuses
arising under this Agreement; to eliminate tensions; to
promote cooperation and to assist in a mutual understanding of
the problems of employer and employee;

(c)  To discuss, investigate and make recommendations
with respect to any and all other matters affecting the
operation and application of this Agreement and which will
aid in promoting harmonious performer-producer
relationships;

(d)  To review and make recommendations with respect to
revisions and standardization of Production Time Reports and
other appropriate records subject to this Agreement;

(e)  To act pursuant to the authority provided in
Section 34A with respect to an allocation of prospective
pension and health contributions;

(f)  To act as a committee on Fair Employment Practices
as set forth herein;

(g)  To establish a Safety Education Program and Safety
Standards at all studios with respect to the employment of
performers;

SAG 1983                              68

PAR000049

(h)  It shall act pursuant to the provisions herein with respect to coding;

(i)  It shall study and review the appropriateness of the Section relating to Per Diem rates;

(j)  If either the Producer or the Union claims a case of deliberate misconduct of any individual, such claim may be brought before the Cooperative Committee.  Such Committee shall endeavor to resolve the matter and use every effort to persuade the parties to immediately correct such conduct. Nothing herein shall affect the legal rights of any party;

(k)  The assurance of compliance with General Provisions, Section 44, and to hear complaints of any violations; however, referral of any complaint to the Cooperative Committee by the Union or any individual performer shall not constitute a waiver of any other available remedy.

18.   TRAILERS AND PROMOTIONAL FILMS

A.   Trailers

(1)  Full day-performer rates shall be paid to performers employed in each trailer, with right of Producer to use on television and in theatres.  Producer shall have the right to make a "teaser" trailer in addition to the full-length trailer for theatrical use only.

(2)  The foregoing shall not apply to a performer who appears as a star or featured performer in a theatrical motion picture, or to a term contract performer who during his employment period performs in a trailer or trailers for such motion picture.  The forgoing provisions as to term contract performers shall not be used to willfully subvert the provisions of this Section.

(3)  No additional compensation shall be payable for the use of any portion of a motion picture, or for the use of scenes photographed simultaneously with a separate camera (behind the scenes shots), utilized as a trailer.

(4)  The above provisions refer to trailers to be used for theatrical exhibition, television exhibition or a combination of both.

(5)  Any trailer when exhibited over television shall be limited to either 400 feet of 35mm film containing not less than two scenes or 200 feet of 35mm film containing only one scene.

PAR000050

(6)  Editing

Changes may be made only in the tag ending of a trailer to show time and place of exhibition of the advertised picture, and performer shall be paid a premium rate of 25% for each tag made beyond the first.

(7)  A performer employed to perform services in connection with the production of a television trailer for advertising a theatrical motion picture made outside of the geographic scope of this Agreement, or by a party who was not a signatory hereto, shall be paid for such services in accordance with the provisions of the current applicable Screen Actors Guild Commercials Contract.

The foregoing shall not apply to a star, featured performer or term contract performer who was employed under the Basic Agreement to perform services in the motion picture, in which case the foregoing provisions of this Section 18A shall apply.

B.    Thirty (30) Minute (or less) Promotional Films for
      Theatrical and Television Motion Pictures

(1)  Performers receiving $25,000 or more for the motion picture:  Compensation to such performers for appearing in such promotional films shall be a matter of individual bargaining.  The performer may agree to make such promotional films, or to permit the use of any portion of the motion picture or of behind-the-scenes shots in such promotional films, without compensation.

(2)  Term contract performers acting in such promotional films during their employment under such contracts, or appearing in any portion of the motion picture or in behind-the-scenes shots used in such promotional films made during the term of such contracts:  Compensation for such services, or for such use of film clips or of behind-the-scenes shots, shall be a matter of individual bargaining.  The performer may agree to make such promotional films during the term contract employment, or to permit the use of such film clips and behind-the-scenes shots in such promotional films made during the term of such employment without compensation.

(3)  All other performers appearing in such promotional films, or who appear in any portion of the motion picture or in behind-the-scenes shots used in such promotional films: At the time of employment, Producer may bargain with performer for such services or behind-the-scenes shots in such promotional films but the minimum compensation payable shall be day performer minimum scale.  For the use of film clips from the motion picture being promoted, Producer shall

SAG 1983                          70

pay the day performer minimum scale to performers appearing in such clips without the need for individual bargaining, provided the length of such clips are either 400 feet of 35mm. film containing not less than two (2) scenes or 200 feet of 35mm. film containing only one (1) scene.  As to film clips which exceed such limits, Producer shall bargain with performer at the time of use and the minimum compensation payable shall be the day performer minimum scale.

(4)  Such promotional films may not be combined to make "specials."

(5)  If the Producer does not obtain permission of the performer where required by the provisions of this subsection B, or if more than one (1) performer is involved and one of them does not agree, the provisions of subsections B and C of Section 22 hereof shall apply.

## 19.  FURNISHING REPORTS

Producer shall furnish to the Union, upon request, copies of Call Sheets.  In cases of grievances, disputes or alleged disputes, Producer shall make available to the Union for inspection, upon demand, all production reports and performers' contracts.

## 20.  PROHIBITION AGAINST CREDITING

No compensation paid to a performer for his services in excess of the minimum may be credited against overtime, penalties or any other compensation otherwise due the performer.

## 21.  DRESSING ROOMS AND OTHER FACILITIES

A.   (1)  Producer shall provide dressing room and toilet facilities which are clean, in repair, and accessible in studios and on locations.

(2)  Seats shall be available for all performers in the dressing rooms and on the stage.

(3)  There shall be no more than one performer to a dressing room in a studio.  On location with 10 or less performers, there shall be no more than one performer to a dressing room.  On a location where there are more than 10 performers, there shall be no more than two performers to a dressing room.

(4)  The foregoing provisions shall not apply to Schedule H performers.

SAG 1983                              71

PAR000052

B.   Producer shall provide to stunt performers dressing room facilities which are clean, in repair and accessible in studios and on locations.  The Producer shall take into consideration the type of work involved for the stunt performer and the location of the production in order to insure that such dressing room facilities provide the stunt performers with reasonable comfort and privacy.

By way of example, on location no more than two stunt performers per room in Teardrop trailers, campers, rooms in honeywagon units; nor more than four stunt performers in Winnebagos or motor homes.

C.   Producer shall designate a person responsible to implement the foregoing.

Effective October 7, 1983, such dressing rooms shall be provided with adequate locks and Producer shall provide facilities for checking normal personal belongings.

In the studio, the dressing room obligation may be met by permanent studio facilities or temporary mobile quarters such as trailers if permanent facilities are not available.  On locations, the requirements may be met by temporary or mobile quarters, such as trailers.  Heaters or fans shall be provided as needed, in all dressing rooms.

In the event compliance with the foregoing is not feasible because of space, physical, or legal limitations or location practicalities, the matter shall be discussed with the Union.  Waivers shall not be unreasonably withheld under such circumstances.

Whenever a performer is required by Producer to make a change of wardrobe on the set, Producer shall provide suitable facilities affording privacy for such purpose.  A private canvas dressing room will be deemed a "suitable facility" for this purpose.


22.   <u>REUSE OF PHOTOGRAPHY OR SOUND TRACK</u>

A.   No part of the photography or sound track of a performer shall be used other than in the picture for which he was employed, without separately bargaining with the performer and reaching an agreement regarding such use.  The foregoing requirement of separate bargaining hereafter applies to reuse of photography or sound track in other pictures, television, theatrical or other, or the use in any other field or medium. Bargaining shall occur prior to the time such reuse is made, but performer may not agree to such reuse at the time of original employment.  The foregoing shall apply only if the performer is recognizable and, as to stunts, only if the stunt is identifiable.  See F of this Section.

SAG 1983                          72

PAR000053

The day performer rate shall be the minimum for purposes of the bargaining referred to above with respect to such use of such material in any motion picture other than the one for which performer was employed.  As to any other use of photography or sound track referred to above, the bargaining shall be subject to the minimum wages and residuals provided for in the collective bargaining agreement, if any, applicable in the field in which the photography or sound track is used, unless compensation for such other use is already provided by this Agreement.

The provisions of this subsection A shall not limit Producer's right to use photography or sound track in exploiting the picture, or in trailers, promotional films thirty minutes (or less) in length for theatrical and television motion pictures, or in advertising, as provided in this Agreement.

The Union may, in its discretion, grant waivers of the requirements of this Section with respect to the reuse of photography and sound track in public service, educational and like programs and will follow a liberal policy in granting such waivers.

B.  If Producer fails to separately negotiate as provided in subsection A hereof, the performer shall be entitled to damages for such unauthorized use, equivalent to three times the amount originally paid the performer for the number of days of work covered by the material used.  If the Producer is unable to find the performer, it shall notify SAG, and if SAG is unable to find the performer within a reasonable time, the Producer may use the photography or sound track without penalty.

C.  If Producer and the performer negotiate for such use and are unable to reach an agreement, and all performers involved have agreed to compensation for such use except a single performer who, Producer claims, is unreasonably refusing to accept an equitable sum, Producer may submit the matter to SAG's Board of Directors for determination and both Producer and performer shall be bound by the determination so made, if the material is used.  In all other cases where Producer and the performer are unable to reach an agreement, Producer shall be prohibited from making such reuse of the material, and in case of violation, the performer shall be entitled, at his option, to either accept damages as provided in B hereof, or to arbitrate his claim hereunder, or to take legal proceedings in a court of competent jurisdiction.

D.  If the performer is employed under a term contract and the use occurs during the time he is still under contract with Producer, the performer shall not be entitled to additional compensation; but if such reuse occurs at a time when the performer is no longer under contract with Producer, the provisions of subsections A, B, and C hereof shall apply.

SAG 1983                          73

E.   Neither Producer nor SAG waive their respective claims
with respect to the reuse of photography of performers employed
under "deal contracts."

F.   Notwithstanding the foregoing, the reuse of stunt work
is subject to the following:

(1)  With respect to any stunt which was contained in any
theatrical motion picture, the production of which commenced
prior to February 1, 1956, the Producer may reuse the photography
containing such stunts in other theatrical motion pictures
without limitation or any liability for additional compensation.

(2)  With respect to any stunt which was contained in any
theatrical motion picture, the production of which commenced
prior to August 1, 1948, the Producer may reuse the photography
containing such stunts in any television motion picture without
limitation or additional compensation.

(3)  With respect to any stunt which was photographed but
not used in the motion picture for which it was made, the
Producer may use such stunt once in another theatrical motion
picture without limitation or additional compensation.

(4)  If a stunt performer, hired as such, performs a stunt
used in a theatrical motion picture, the production of which
commenced on or after February 1, 1956, up to and including
January 31, 1960, the Producer may reuse such stunt in another
theatrical motion picture, and the Producer and the stunt
performer who performed such stunt shall agree upon the
compensation to be paid for the reuse of the stunt, which amount
shall be equal to not less than one day's pay at the stunt
performer daily minimum rate.  In the event that Producer and the
stunt performer cannot agree upon the compensation for such
reuse, Producer may nevertheless reuse such stunt and the dispute
over the amount of compensation shall be subject to conciliation
and arbitration.

If a stunt performer, hired as such, performs a stunt
contained in a theatrical motion picture, the production of which
commenced on or after August 1, 1948, up to and including January
31, 1960, the Producer may reuse such stunt in a television
motion picture and the Producer and the stunt performer who
performed such stunt shall agree upon the compensation to be paid
for the reuse thereof, which amount shall be not less than one
day's pay at the stunt performer minimum daily rate.  In the
event that the Producer and the stunt performer cannot agree upon
the compensation, the Producer may nevertheless reuse such film
and the dispute over the amount shall be subject to conciliation
and arbitration.  In addition, the stunt performer shall be paid
for any subsequent reruns of such television motion picture,
containing such stunt, on the basis of the stunt performer's
daily minimum, as provided in the Television Agreement, which
amounts shall be paid on or before the respective rerun involved.

PAR000055

The foregoing shall not apply to any stunt which was included in a television motion picture released prior to February 1, 1956.

However, where Producer is obliged to bargain under the provisions of this paragraph (4) and fails to do so, subsection B above shall apply.

At the time of employment covered by this paragraph (4), the stunt performer could have agreed with Producer upon the amount of compensation to be paid for the reuse in another motion picture of the stunt for which the stunt performer was being employed, provided such amount is not less than the stunt performer's daily minimum rate.

Payments for reruns shall be based on not less than one day's pay at the stunt performer's daily minimum rate as provided in the Television Agreement.

The provisions of this paragraph (4) do not apply to Extras who are adjusted for non-script stunts.

G.   The above provision for payments for reuse of stunts shall only apply to stunt performers the Union can identify and establish as having performed the stunt in question.   The Producer may rely upon the Union's designation of any stunt performer as the person who performed such stunt and payment by the Producer to such stunt performer shall be final and conclusive and shall relieve the Producer of any further obligations for the reuse or rerun of such stunt as herein provided.

H.   Producer will not publicly exhibit nor license for public exhibition blooper reels without the appropriate consent of the recognizable performer(s) involved, including individual voice-overs.

I.   Effective October 7, 1983, the late payment provisions of Paragraph 31.B.(2) herein, shall apply to reuse of photography payments, except that the time for payment shall be thirty (30) business days from exhibition.

J.   The provisions of this Section shall not limit the Producer's right to use or authorize the use of clips from theatrical pictures, without bargaining or making additional payment:   (1) within regularly-scheduled news programs; and in connection with other news and review purposes under the same circumstances as in the past; and (2) in Oscar Award programs.

With respect to uses which would otherwise require payment pursuant to this Section 22, a star performer may at the time of use waive payment for the use of theatrical film clips containing such performer's voice or likeness, it being understood that such waiver shall not affect other performers entitled to payment hereunder.

PAR000056

23.  AIR TRAVEL AND FLIGHT INSURANCE

A.  Producer shall provide accidental death and dismemberment insurance in a principal sum not less than $100,000.00 to the Performer or the Performer's designated beneficiary where Performer is required to travel by plane at the request of Producer, or $250,000.00 where Performer is required to travel by helicopter at the request of Producer.

B.  In the event Producer is unable to provide the coverage stated above through Producer's insurance carrier, Performer shall be informed of this fact no later than his arrival at the airport of departure.  Producer shall reimburse the Performer with the cost of the premium paid by Performer in order to obtain such coverage, when Performer presents proper receipts at the location production office.

C.  Where air travel is required by the Producer, Producer shall use commercial flights when practical, available and feasible.

D.  Producer acknowledges the right of performer to refuse to fly on a charter flight, except, however, prior to employment Producer may obtain the consent of the performer to fly on a charter flight.


24.  INDEPENDENT PRODUCTION

With respect to a motion picture produced by an independent producer under a contract with Producer for the financing, production and distribution of such motion picture, if Producer gives the Union ten (10) days' advance notice before principal photography commences that such motion picture is not to be covered by this Agreement, then Producer shall not be obligated hereunder with respect to such picture except as otherwise provided in Sections 4, 5 and 6 hereof.

If Producer does not give the Union such notice then Producer shall be obligated hereunder with respect to such motion picture.

This provision applies only to motion pictures produced within the geographical jurisdiction of the Union hereunder.

This provision applies to signatory or non-signatory independent companies.


25.  SCREEN CREDITS

A.  Producer agrees that a cast of characters on at least one card will be placed at the end of each theatrical feature motion picture, naming the performer and the role portrayed.  All credits on this card shall be in the same size and style of type,

SAG 1983                          76

with the arrangement, number and selection of performers listed to be at the sole discretion of the Producer. All such credits shall be in a readily readable color, size and speed. The Union will not unreasonably withhold waivers in connection with the foregoing. Any performer identified by name and role elsewhere in the picture need not be listed in the cast of characters at the end of the picture. This agreement regarding screen credits applies only to motion pictures on which principal photography commenced July 1, 1983, or thereafter.

### B.   Feature Motion Pictures

In all feature motion pictures with a cast of fifty or less, all performers shall receive credit. In all other feature motion pictures not less than fifty shall be listed in the cast of characters required at the end of each feature motion picture in connection with theatrical exhibition, excluding performers identified elsewhere in the picture. Stunt performers need not be identified by role. The Union, and only the Union, may seek to arbitrate an alleged violation of this subsection B pursuant to the arbitration procedures set forth in this Section 25C(3).

### C.   Billing

(1) Producer shall honor individually-negotiated billing for the screen as to placement, size and description as agreed upon in performer's individual contract.

(2) In its distribution and licensing agreements with exhibitors, distributors, broadcasters, etc., Producer will include a provision prohibiting the licensee from eliminating or changing the billing as it appears on the positive prints of the motion picture.

(3) Disputes as to whether agreed-upon screen credit has been accorded shall be arbitrable. A panel of sole arbitrators for this purpose shall be agreed upon. The cost of such arbitrator shall be shared equally by the Union and Producer. The decision and award shall be in writing and shall be final and binding on the parties and performers involved.

(4) The provisions hereof shall not apply to Schedule F performers or when termination of a contract is involved as provided by Section 9C(4)(b) of the Arbitration provisions.

(5) Liquidated Damages - as to Schedule A and B performers, if a breach occurs and the facts are not in dispute or if breach is found by an arbitrator, damages in the following amounts shall be payable:

(a) In the case of a day performer his daily rate but not in excess of the amount payable under (c) hereof.

PAR000058

      (b)   In the case of a three-day performer in television, his three-day rate but not in excess of the amount payable under (c) of this subparagraph 5.

      (c)   In the case of a weekly free-lance performer, his weekly rate (not exceeding the limits of Schedule B).   Such liquidated damages shall be the exclusive remedy for such performers.

    (6)   As to all other performers subject to the provisions hereof, the arbitrator shall have the authority to award appropriate relief consisting of damages, correction of prints subject to (7) below, or both.

    (7)   Correction of Prints

      (a)   Theatrical Motion Pictures.   Correction of prints may be awarded by the arbitrator in his discretion if Producer received notice of the claimed breach in sufficient time to make such correction before release.   If correction is awarded, Producer shall be obligated to make such corrections as soon as is practical consistent with existing distribution commitments and in any event before any reissue.   For this purpose television release of the film shall be considered a reissue.

      (b)   Television Motion Pictures.   Correction of television prints with respect to the first broadcast or first rerun may be awarded by the arbitrator if Producer received notice of the alleged breach in sufficient time to make the necessary correction for the applicable run.

    (8)   Inadvertent oversight by Producer shall not be a defense to any claim of breach hereunder, but may be considered with respect to the issue of appropriate relief.

    (9)   All claims must be filed within one year after the first theatrical release of a theatrical film or within one year of the first television broadcast of a television film.

26.   <u>NON-DISCRIMINATION</u>

    The following non-discrimination provisions shall be effective October 7, 1983:

    A.   <u>Policy</u>

    1.   The parties hereto reaffirm their commitment to a policy of non-discrimination and fair employment in connection with the engagement and treatment of performers on the basis of sex, race, color, creed, national origin, age, marital status, physical disability, or sexual preference, in accordance with applicable state and federal law.

SAG 1983                     78

PAR000059

2.    In accordance with the foregoing policy, the Union
reaffirms its policy of non-discrimination with respect to
admission to membership and rights of membership.

3.    Producer shall make every effort to cast performers in
accordance with the above policy in all types of roles, having
due regard for the requirements of, and suitability for, the role
so that, for example, the American scene shall be portrayed
realistically.

4.    Consistent with the foregoing, every effort shall be
made to include minorities and women in the casting of each
motion picture, thereby creating fair and equal employment
opportunity and eliminating stereotyping in casting.

5.    When applicable, and with due regard to the safety of
the individuals, cast and crew, women and minorities shall be
considered for doubling roles and for descript and non-descript
stunts on a functional non-discriminatory basis.   In furtherance
of this policy, Producer shall furnish a copy of the following
policy statement to each stunt coordinator engaged by Producer:

(a)  Stunt coordinators shall endeavor to
cast performers with physical disabilities for descript and
non-descript stunts for which they are qualified and with
due regard to safety, in roles portraying their particular
disability such as wheel chair stunts or stunts involving
the use of other adaptive devices, e.g., crutches,
prostheses, etc.   The Union's skills and talent bank, and
the Media Office of the California Foundation on Employment
and Disability, Inc., are among the resources that can be
utilized in ascertaining the availability of such
performers.

(b)  Where the stunt performer doubles
for a role which is identifiable as female and/or Black,
Hispanic, Asian Pacific or Native American and the race
and/or sex of the double are also so identifiable, stunt
coordinators shall endeavor to cast qualified persons of the
same sex and/or race involved.   Where the stuntperson is not
identifiable, stunt coordinators shall endeavor to increase
the employment of qualified women and minorities for such
stunts.   To achieve the objectives set forth in this
paragraph, stunt coordinators should endeavor to identify
and recruit qualified minority and female stuntpersons prior
to the commencement of production.

6.  In furtherance of the policies expressed in this
Section:

(a)  There will be no preemployment inquiries as to the
national origin or ancestry of the performer except where
the same is a bona fide occupational qualification for a
role.

SAG 1983                              79

PAR000060

(b)   Representation by an agent or other performer's representative shall not be required as a condition for an audition.

(c)   Producer shall include the following statement in script breakdowns circulated by Producer to agents:

"Submissions for non-descript roles will be accepted for all performers, regardless of age, sex, ethnicity or physical disability."

Producer will make good faith efforts to insure that outside casting services, breakdown services and agents with whom it does business, include the same statement in breakdowns circulated by them.  It is understood that inclusion of such statement on a breakdown is intended to encourage the implementation of the policies expressed in this Section throughout the community, but it is recognized that Producer may have legitimate casting objectives, dictated by such matters as the script, historic or geographic setting, creative concepts, etc., which may limit the appropriateness of certain submissions for particular roles and/or productions.

7.   It is understood that the provisions of this Agreement dealing with dressing rooms, transportation, lodging and access to the casting process apply to performers with physical disabilities so that with respect to facilities under the control of the Producer, reasonable accommodation under all the circumstances will be made when applying such provisions to performers with physical disabilities.

B.   Data

1.   Within twenty (20) days after the end of each calendar quarter, Producer will submit to the Union a report of the sex, ethnicity and age of performers employed by Producer under this Agreement on each motion picture produced by producer on which principal photography was completed during such quarter.  The report will be submitted on the form attached hereto as Exhibit B, it being understood that a report produced by Producer's data processing system which furnishes the same information as required in this form shall be acceptable.  Such reporting form shall be revised to provide separate data on the sex and category of stunt performers, effective with employment in the fourth quarter of 1983.  In the event the reporting form cannot practically be revised to accomodate such data, a separate reporting form shall be devised for submission of such data to the Union.  The parties will cooperate in devising a method for compiling employment data as to performers with physical disabilities, which may include data from the Media Office of the California Foundation on Employment and Disability, Inc., the Union's skills and talent

SAG 1983                              80

bank, and SAG pension and health records.  When a method for
compiling employment data with respect to performers with
physical disabilities has been agreed upon, Producer shall report
such employment data in one of the reporting forms provided
above.

2.   In the event that Producer fails to submit the report
within the time specified in paragraph 1. above, the Union may
send a written notice of delinquency to the Producer requesting
submission of the report within ten (10) working days of receipt
of the notice.

If there is a substantial breach of the foregoing
reporting requirements with respect to any individual quarterly
report, liquidated damages in the amount of $600 shall be payable
to the Union; in the event there is a dispute as to whether or
not a substantial breach has occurred, the matter may be referred
to arbitration.  With respect to the data furnished on age and
ethnicity and any data furnished on performers with physical
disabilities, it is recognized that, while Producers shall be
obligated to make reasonable efforts to ascertain such
information, subject to any legal restriction applicable thereto,
there may be individual circumstances where Producer will be
unable to secure the data or vouch for its accuracy.  It is
understood that as to employment data on performers with physical
disabilities, such liquidated damages shall apply only to the
extent that the parties have devised a method for compiling
employment data for performers with physical disabilities.

3.   The data which is furnished by Producer in accordance
with this Section shall be for the purpose of facilitating the
meeting which the Union may request pursuant to Paragraph C
below, and is in no way intended to abridge the Producer's
creative rights in the production of films.

C.   Meetings With Producer Representatives

1.   On ten (10) days notice, the Union or Producer may
request a meeting to discuss any matter relating to
discrimination, fair employment, the policy expressed herein, its
further implementation, the data submitted or any other matter
relevant to equal employment opportunity for performers.  If
particular scripts or script breakdowns are relevant to the
subject matter of the requested meeting, the Union may request
the Producer to furnish such scripts and/or breakdowns to a
designated Union official for review prior to the meeting.  Where
the Producer utilizes market research data to support its
contention that in a particular production the American scene has
been portrayed realistically, the Union may request to review
such data at the meeting.

2.   If the Union has information which is the basis for a
genuine concern that the policies expressed in this Section are
being violated, and the matter is of such a nature that the

PAR000062

procedures outlined in paragraph (1) above are not adequate to
handle the immediacy of the situation, the Union may request the
type of meeting specified in paragraph (1) above on three (3)
working days notice.  Such request may be made before, during, or
after the casting of the production.

    3.   The script breakdowns referred to in paragraph (1) are
those that are prepared and circulated by outside services for
casting purposes or those prepared by Producer and circulated to
agents, and it is understood that such services or procedures
might not be utilized by all Producers.  Scripts and breakdowns
will be treated as confidential, will not be copied while in the
possession of the Union official and will be returned to the
Producer at the conclusion of the meeting.  Consistent with
Paragraph B.3. above, nothing in this Paragraph C will require a
Producer to furnish scripts or breakdowns prior to the completion
of casting for any particular production.

    4.   If the Producer has an official with responsibilities
for matters involving equal opportunity, the Union's request for
a meeting shall be referred to such person who shall then be
responsible for arranging the meeting with the appropriate
Producer representatives.  If the Producer has no such person on
staff, the Producer will designate such a person for the purpose
of arranging the requested meeting, and the Union will be
notified in writing of the person so designated.

    D.   Arbitration

    Except as provided in Paragraph B above with respect to the
submission of data, the matters covered in this Section are not
subject to the provisions of Section 9 herein.  It is understood
that as to data on performers with physical disabilities, the
provisions with respect to arbitration shall only apply when a
method for compiling such data has been devised by the parties.

27.   TOURS AND PERSONAL APPEARANCES

    First-class transportation and reasonable expenses shall be
paid to all performers on tours and personal appearances.

    Producer shall cooperate to insure that performers on tour
and personal appearances are allowed adequate rest periods.

28.   INJURIES TO PERSONS OR PROPERTY DURING PERFORMANCE;
    SAFETY

    A.   Injuries

    (1)   Subject to the provisions of (2), (3) and (4) hereof,
in the event any other member of the cast, production staff, crew
or any other person, firm or corporation shall suffer injury to

SAG 1983                           82

his or her person and/or property, of any kind whatsoever by reason of or as a result of, the performance by any performer or stunt performer (hereinafter in this Section called "performer") of a stunt or act in the course and scope of his or her employment under this collective bargaining Agreement, under the direction and control of the Producer, Producer shall at all times indemnify and save the performer harmless from and against all liability, loss, damages and costs, including counsel fees, which the performer may for any cause at any time sustain or incur by reason of such performance.  In the event legal action is taken against the performer, either jointly with the Producer or alone, the Producer shall at its own cost and expense and without undue delay, provide the defense of the performer in all such litigations.

In the event of such an injury in the course of employment which results in medical attention, Producer will prepare and send to the Union as soon as practicable a report setting forth the date, time, place, circumstances and nature of the injury claimed.

(2)  The performer shall notify the Producer promptly in writing in case knowledge shall come to the performer of any claim or litigation arising out of such performance and thereafter deliver to the Producer every demand, notice, summons, complaint or other process received by him or his representative relating thereto.

(3)  The performer shall cooperate fully in the defense so provided by Producer of such claim or action and, upon the Producer's request, shall attend hearings and trials and, whenever possible assist in (i) securing and giving evidence; and (ii) obtaining the attendance of witnesses at such hearings and trials.

(4)  The performer shall not make any settlement or compromise of any such claim or litigation without the prior written consent of the Producer.  Any settlement or compromise by the performer without Producer's prior written consent of any such claim or litigation shall nullify Producer's obligation under (1) above.

(5)  The Producer shall obtain and keep in force during the term of employment of the performer a policy of comprehensive public liability insurance insuring the performer against any liability arising out of the performance by the performer in the course and scope of his employment under this collective bargaining Agreement, under the direction and control of the Producer.  Such insurance shall be in the amount of not less than $1,000,000 for injury to or death of one person in any one accident or occurrence and in an amount not less than $2,000,000 for injury to or death of more than one person in any one accident or occurrence.  Such insurance shall further insure performer against liability for property damage of at least

SAG 1983                              83

PAR000064

$250,000.  Upon request of the performer, Producer shall provide evidence of such insurance coverage before performer shall be required to perform any stunt or act.  Upon request of the Producer, the Union shall waive the requirements of this subparagraph (5) upon a showing satisfactory to the Union of adequate financial responsibility of the Producer.  Producer will extend this insurance coverage to stunt performers whether or not performing a stunt, if such coverage is obtainable.

(6)   Nothing herein contained shall be construed to: (i) deprive Producer of any lawful defense to such claim or action including the defense that such claim arose by reason of performer's acts outside the scope of his or her employment; or (ii) expand Producer's liability to any person under the applicable workmen's compensation law.

(7)   As to performers under this Agreement, legible accident reports and production reports shall be supplied promptly to SAG with information as to the name of the Producer, director, first assistant director, unit production manager, stunt coordinator, studio, show title and episode, production number, and a full description of the accident involved.

B.   Protection of Performers; Safety

It shall be the policy of the parties to this Agreement that performers employed hereunder shall, to the extent possible, not be placed in circumstances hazardous or dangerous to the individual.  In furtherance of this policy, it is agreed:

(1)   Where Producer requires script or non-script stunts or stunt-related activity of a performer, an individual qualified by training and/or experience in the planning, setting up and/or performance of the type of stunt involved shall be engaged and present on the set.  No performer without such requisite training and/or experience shall be required to perform a stunt or stunt-related activity without an opportunity for prior consultation by the performer with such individual.  The foregoing provisions of this paragraph (1) shall not apply to a stunt performer who both plans and performs a stunt which does not involve other performers.

(2)   No performer shall be required to work with an animal which a reasonable person would regard as dangerous in the circumstances, unless an animal handler or trainer qualified by training and/or experience is present.

(3)   No performer shall be rigged with any type of explosive charge of any nature whatsoever without the use of a qualified special effects person.

(4)   The performer's consent shall be a requisite precondition to performing stunts or other hazardous activity. The performer's consent shall be limited to the stunt or activity

SAG 1983                          84

PAR000065

described to the performer at the time consent was given.  In the case of a minor, written consent to perform a stunt must be given by the minor's parent or guardian.

Violation of this provision shall be subject to liquidated damages in the amount of $900.

C.   Protection of Stunt Performer; Safety

(1)  All reasonable requests and requirements for safety equipment in connection with the performance of stunts shall be complied with by Producer or Producer's representatives on the set or location.

(2)  Equipment provided by Producer, for example, autos, cycles, wagons, etc., shall be in suitable repair for the safe and proper performance of the stunt.

D.   Protection of Performers and Stunt Performers; Safety

Effective September 17, 1983, a person qualified under the circumstances to administer medical assistance on an emergency basis shall be present or readily available at all rehearsals and all performances during which hazardous actions or work under hazardous conditions is planned.  Such person will have visible identification.  The Producer will provide readily accessible first aid equipment necessary to administer such medical assistance.  In such circumstances, transportation to the nearest medical facility providing emergency services shall be readily available.  When such action or work is planned on location, the production company shall determine the nearest emergency medical facilities and capabilities thereof and communication therewith and assure that transportation to such facilities is readily available at all times during the performance of such work.  The transportation vehicle referred to above shall be capable of accommodating a stretcher and first aid equipment.  The parties agree to recommend that the Industry-wide Labor/Management Safety Committee develop appropriate guidelines as to first aid equipment and visible identification for the aforementioned person qualified to administer medical assistance on an emergency basis.

E.   The performer's consent shall be required for flying in a helicopter.  If the performer intends to withhold consent, he or she must notify the Producer of such intent prior to engagement.

F.   Notice of Scripted Stunts

Effective October 7, 1983, Producer shall instruct stunt coordinators to notify the Union of scripted stunts involving non-stunt performers, which notice shall include the date, location and Producer involved, to the extent known.

PAR000066

### G.   Safety Guidelines

The Producer shall obtain copies of all safety guidelines
issued by the Industry-wide Labor/Management Safety Committee.
Copies of such guidelines shall be available at the offices of
the Alliance of Motion Picture & Television Producers and SAG.
The Alliance of Motion Picture & Television Producers and SAG
agree to cooperate in disseminating such guidelines to Producers
as they are formulated during the course of this Agreement.

### H.   On-Camera Vehicle Driving

Where any of the following conditions is planned as part of
a driving sequence and special expertise is necessary in order to
perform such driving sequence in a safe manner, the on-camera
driver shall qualify as a stunt performer under Schedule H of
this Agreement:

    (1)   When any or all wheels will leave the driving
         surface.

    (2)   When tire traction will be broken, e.g.,
         skids, slides, etc.

    (3)   Impaired vision - when the driver's vision
         will be substantially impaired by:

        (a)   Dust.
        (b)   Spray. (When driving through water, mud,
             etc.).
        (c)   Blinding lights.
        (d)   Restrictive covering over the windshield.
        (e)   Any other conditions which will substan-
             tially restrict the driver's normal vision.

    (4)   The speed of the vehicle will be greater than
         normally safe for the conditions of the driving
         surface, or when other conditions such as obstacles or
         difficulty of terrain will exist or offroad driving,
         other than normal low-speed driving for which the
         vehicle was designed, will occur.

    (5)   When any aircraft, fixed wing or helicopter, is flown
         in close proximity to the vehicle creating a hazardous
         driving condition.

    (6)   Whenever high speed or close proximity of two or more
         vehicles create conditions dangerous to the drivers,
         passengers, film crew or vehicles.

Nothing herein shall require the performer to be doubled
where the performer has the special expertise to perform the
sequence in a safe manner.

PAR000067

I.   Stunt Doubling

When for safety reasons, a performer is doubled on-camera as the driver of a vehicle, the double shall qualify as a stunt performer under Schedule H of this Agreement.  This would also apply to passengers in a vehicle who must be doubled for their safety.


29.   LOANOUTS

Where Producer "borrows" a performer, whether from a domestic or foreign company, and whether or not the lending company is a signatory to a Screen Actors Guild collective bargaining agreement, and such performer is used by Producer within the jurisdiction of this Agreement, Producer guarantees to the Union that the performer who is so borrowed shall receive the same working conditions as provided herein, except the Union Security and the pension and health provisions; provided, however that the Union Security and pension and health provisions shall apply where the lending company is a signatory to a Screen Actors Guild collective bargaining agreement (whether such lending company is a domestic or foreign corporation) and the performer is used by the borrowing Producer within the jurisdiction of this Agreement; provided further that the obligation to make the pension and health contributions shall be the obligation of the lending company.  Producer shall give reasonable advance written notice to the Union, prior to the commencement of the term of the loanout, when Producer borrows a performer from a company, foreign or domestic, which is not a signatory to a Screen Actors Guild collective bargaining agreement, to render services within the jurisdiction of this Agreement.


30.   PRODUCTION STAFF

A.   Persons employed as members of Producer's casting or production staff will neither be engaged nor utilized as performers in any pictures on which they also render any services on Producer's casting or production staff without the express consent of the Union.

B.   The only exceptions shall be the following:

(1)   animal handlers (appearing in a scene in which they handle animals);

(2)   performer/directors, performer/writers, or performer/producers engaged in written contract as such prior to the commencement of principal photography of a motion picture;

PAR000068

(3)  in an "emergency" on location.  Emergency is
defined as a situation on location in which a member of the
cast cannot perform because of unavailability for any
reason.

C.  Violations of the foregoing shall require payment of
liquidated damages, as follows:

| | |
|---|---|
| Day Performers: | $400.00 |
| Three-Day Performers: | $500.00 |
| Free-Lance Performers: | $700.00 |

31.  <u>PRODUCTION TIME REPORTS, LATE PAYMENTS AND OVERWITHHOLDING</u>

A.  <u>Production Time Reports</u>

(1)  It shall be the required custom and practice to
proffer a production time report made out in ink to all
performers at the end of each day, which report may include
other performers in the cast (working that day), and which
reflects time in and out, meal periods, hairdress, travel,
etc. for such performer.  Such report shall not be offered
in blank.  The performer shall initial or sign such report.
A performer may object to the accuracy of the information
contained in the report.  Signing or initialling of the
report by the performer shall not constitute acceptance of
the report, and the performer shall not be deemed to have
waived any right to file a timely claim.

(2)  Producer shall deliver a copy of the report for
the previous week to the Union no later than the end of the
following week.

(3)  In the event there is a substantial breach of the
foregoing requirements, liquidated damages in the amount of
$275 shall be payable to the Union for each day of such
substantial breach.  In the event there is a dispute as to
whether or not a substantial breach has occurred, the
dispute shall be referred to and determined by the
Cooperative Committee.  In the event the Cooperative
Committee cannot determine the dispute, the matter may be
referred to arbitration.

(4)  With reference to stunt performers, the amount of
stunt adjustment shall be noted on the production time
report or time card and shall be initialled by the stunt
performer and an authorized representative of the Producer.

B.  <u>Late Payments</u>

(1)  The time of payment for day performers shall be
five (5) days, excluding Saturday, Sunday, and holidays.  If
the company is on location, checks mailed on the fifth day

PAR000069

shall be deemed to constitute timely payment.  Time of payment for all other performers shall be as provided in this Agreement.

(2)  There shall be a $10 per day per performer late payment charge, excluding Saturdays, Sundays, and holidays, for late payment applicable to all Schedules from the time payment becomes due (excluding <u>bona fide</u> emergencies of which the Union shall be given prompt notice within the time specified for payment hereunder), for a period not to exceed twenty (20) days, excluding Saturdays, Sundays and holidays, to a maximum of $200 per violation.

Upon receipt by Producer of a written notice by the Union or the performer that Producer is still delinquent, Producer shall have five business days to issue the payment, including the late payment charges.

In the event payment is not made within said five-day period of the entire amount due, further late payment charges in the amount of $2.50 per day retroactive to the date of receipt of notice of non-payment shall be due and shall continue to accrue without limitation until the delinquent payment, together with late payment charges, are fully paid.

Such charges for late payment shall be in addition to all other remedies which the Union may have against Producer under the contract.

Late Payment charges shall accrue commencing ten (10) business days after the settlement of a disputed claim.

(3)  If there is a dispute over the amount due the performer, and Producer pays the undisputed amount on time, there will be no late payment charge.

C.  <u>Over Withholding</u>

(1)  The "Part-Year Employment Method" of withholding as currently set forth in Section 31.3402(h)(4)-1(c) of the Internal Revenue Code Regulations or any applicable successor regulations shall be utilized for any performer upon request of the performer and the form of declaration for each such use shall be attached to the performer's employment contract.

(2)  The withholding of taxes on a weekly basis rather than on a day basis for day performers as then currently set forth in Internal Revenue Code Regulation Section 31.3402(c)-(1)(d)(2) or any applicable successor regulations shall be utilized on the request of the day performer and the form of declaration for such use shall be attached to employment contracts of day performers.

PAR000070

(3)   The obligation of the Producer to permit the election of the foregoing alternative withholding formulas shall be effective during such time as the Internal Revenue Code Regulations permit such alternatives.


32.   NEW YORK EXTRA PLAYERS

Upon execution of this Agreement, Producer shall automatically be bound by the Screen Actors Guild existing applicable New York Extra Players Agreement negotiated by the Alliance of Motion Picture & Television Producers covering the production of theatrical motion pictures in New York.


33.   SUBCONTRACTING

Producer agrees that if Producer engages an independent contractor to photograph any footage to be used as part of a motion picture being produced hereunder by Producer, or to make still photographs or record sound tracks, then with respect to such performers employed by such independent contractor whose employment would have been covered by the Basic Agreement had Producer employed them directly, Producer shall remain responsible under this Agreement for wages, hours and work standards provided hereunder.  This shall not apply to the acquisition by Producer of stock film footage.


34.   PENSION AND HEALTH PLANS

A.   The Producer-Screen Actors Guild Pension and Health Plans established in 1960 shall be funded by contributions made by Producers under SAG collective bargaining agreements providing for such payments to the Plans.  With respect to employment commencing on and after July 1, 1983, Producer shall pay to said Plans contributions in the amount equal to 11% of all gross salaries and other compensation or remuneration (excluding any compensation payable under Section 4 hereof and including compensation payable under Sections 5.1, 5.2 and 5.3 hereof only to the extent provided in said Sections), for the first thirty (30) months of the Agreement, as and when paid by Producer to all employees covered hereunder.

The aforementioned 11% shall be allocated as follows:

7.15% of the contributions to the Health Plan and 3.85% of the contributions to the Pension Plan.  The allocation of the 11% contribution rate between the Health Plan and Pension Plan may be changed at any time during the term hereof by the Boards of Trustees of the Pension Plan and the Health Plan, based on actuarial studies.  In determining such allocation, the Trustees may consider allocating all additional contributions arising from the increases in ceilings provided below, entirely to the Health Plan.

SAG 1983                                    90

PAR000071

Said eleven percent (11%) contribution to the Health Plan shall continue for the term of this Agreement provided that, on or before December 31, 1985, the trustees of such Health Plan adopt a multiple-of-minimum-day-performer-rate eligibility standard at least equal to the present relationship (i.e., 8 times the minimum day performer rate).  In the event said trustees in their discretion fail to take such action, said eleven percent (11%) contribution shall be reduced to ten percent (10%) as of January 1, 1986, and the allocation between the Health Plan and the Pension Plan shall be 6.15% and 3.85%, respectively.

The terms "compensation or remuneration" shall include amounts paid to an employee as compensation with respect to services as a performer (including compensation paid as salary settlements) whether or not any services are performed.

However, with respect to motion pictures, the principal photography of which commenced on or after July 1, 1983, where a performer is paid compensation at a rate in excess of $200,000 per picture, such percentage shall be paid on the first $200,000 only of such performer's compensation for such picture.  Subject to the foregoing sentence the percentage to be paid shall apply to the performer's gross compensation without any deduction whatsoever.

In addition to the foregoing money ceiling of $200,000 the following money ceilings for term contract performers shall be applicable to contributions to the Pension and Health Plans:

(1)   Combination Term Contract

With respect to compensation for services in television motion pictures, under such a contract, the appropriate ceilings set forth in the applicable Producer-SAG Television Agreement shall apply.

(2)   Theatrical Term Contract

The $200,000 per picture ceiling referred to above with respect to the application of the pension and health contribution shall be computed as follows:

If the performer's individual employment contract contains a restriction on the number of theatrical pictures he may do in the period to which the restriction applies, then his total compensation for such period divided by that number determines his gross compensation per picture;

If there is no limitation on the number of pictures the performer may be required to do in the current contract term, then his total compensation for such term divided by the number of pictures in which he actually performed determines his gross compensation per picture;

SAG 1983                                91

If on the expiration of any contract term the performer is engaged in performing services in a picture and the Producer does not extend such current contract term, but exercises an option for the succeeding term and completes the production of such picture during such succeeding term, then for the purpose of computing gross compensation paid to the performer for such picture, all gross compensation paid to the performer during the period such services are rendered in the completion of such picture shall be deemed to have been paid the performer during such contract term, and such picture shall be deemed to have been completed during such current contract term;

If the performer does not perform in any theatrical picture during any contract term, then there is no ceiling with respect to such contract term.

In each instance in which a "Contract Term" is referred to in this paragraph (2) the same shall be deemed to include all extensions thereof.

B.   Each Plan shall be administered by at least sixteen Trustees, eight appointed by the Alliance of Motion Picture & Television Producers and eight appointed by SAG.  The Alliance of Motion Picture & Television Producers and SAG shall likewise each appoint eight Alternate Trustees to serve in the event of the death, disability, resignation or absence of such Trustees. The Alliance of Motion Picture & Television Producers and SAG shall have the right at any time to appoint, for any one or more such Trustees, Substitute Trustees.

The number of Producer Trustees shall be increased as and when determined by the Trustees, to give adequate representation to the Industry covered by the Plan, to be appointed by other employer associations whose members become parties to the Plan. In such event, the number of SAG Trustees shall be increased so that there shall always be an equal number of Producer and Union Trustees.  In no event shall there be more than nine Producer and nine Union Trustees and likewise their Alternates.

The number of Trustees to be allocated to the respective employer associations shall be subject to review every three years following the establishment of the Plans.  At such times the Trustees to be allocated to each employer association for the ensuing three-year period shall be determined in accordance with the proportion which the total cumulative contributions to the Plans, for the preceding three-year period, made by the members of each such employer association, bears to the total contribution to the Plans made by members of all such employer associations during such period.

The references in this Section 34 to the Alliance of Motion Picture & Television Producers shall apply to any employer association which may be or become a successor thereto.

SAG 1983                          92

C.   The Pension and Health Plans shall be Industry-wide and open to all Producers signatory to any of SAG's collective bargaining agreements which provide for payments to the Plans, as above set forth.   By signing a letter of adherence to the Trust Agreement (hereinafter described), and upon acceptance by the Trustees, such other Producers shall be deemed to be parties to the Plans and to have appointed the Producers' Trustees and Alternate Trustees previously appointed.

D.   The funds contributed under the Pension Plan (hereinafter referred to as the "Pension Plan") and the Health Plan (hereinafter referred to as the "Health Plan") shall each constitute a separate Trust Fund created by a Trust Agreement to be executed by the parties to this Basic Agreement and adopted by the Trustees.   The Trust Fund for the Pension Plan shall be used solely for the purpose of providing Pension benefits, and for expenses connected with the establishment and administration of the Plan.   The Trust Fund for the Health Plan shall be used solely for the purpose of providing health benefits for employees covered by SAG's collective bargaining agreements in the motion picture Industry, who are eligible for such benefits under the Plan, and in the discretion of the Trustees, for their families and for expenses connected with the establishment and administration of the Health Plan.

E.   The Trustees shall determine the form, nature and amount of pension and health benefits, respectively, the rules of eligibility for such benefits, and the effective dates of such benefits.   The health benefits may include, in the discretion of the Trustees, any one or more of the following benefits: death, accidental death, injury, disability, hospitalization, surgical expense and medical expense, and any other benefits permitted by law.

F.   The Pension Plan and the Health Plan provided for herein, including the respective plans of benefits thereunder, shall be subject to the approval of the Internal Revenue Service as qualified Plans and as an appropriate business expense.   If any part of either Plan is not so approved by the Internal Revenue Service, such Plan shall be modified by the Trustees, to such form as is approved by the Internal Revenue Service.

G.   The Agreement and Declarations of Trust shall provide that no portion of the contributions thereunder may be paid or revert to any Producer.

H.   Each Producer shall furnish the Trustees upon request with the required information pertaining to the names, job classification, Social Security numbers and wage information for all persons covered by this Agreement, together with such information as may be reasonably required for the proper and efficient administration of the Pension and Health Plans.   Upon the written request of SAG to the Producer, such information shall be made available to SAG.

SAG 1983                          93

PAR000074

I.   These provisions for the Pension and Health Plans are in addition to-and not in substitution in whole or in part for-any other existing pension and/or health plan covering any of the performers coming under this Agreement; and no performer shall lose, in whole or in part, any of his rights or privileges under such other pension and/or health plan by virtue of receiving or being entitled to receive benefits under the Pension and Health Plans.  No payments, rights or privileges available to a performer under the Pension and Health Plans may be credited to any payments, rights or privileges to which such performer may be entitled under any other pension and/or health plan, and vice versa.  However, the Health Plan may provide for a non-duplication of benefits with respect to persons coming under both this Health Plan and the AFTRA Health Plan.

J.   No part of the Producers' contributions to the Plans may be credited against the performer's overscale compensation or against any other remuneration that the performer may be entitled to, no matter what form such other remuneration may take, nor shall it be subject to any talent agency commissions or other deductions; nor shall such contributions constitute nor be deemed to be wages due to the individual employees subject to this Agreement, nor in any manner be liable for or subject to the debts, contracts, liabilities or torts of such employees.

K.   <u>Loanouts</u>

THE PROVISIONS RELATING TO LOANOUTS HAVE BEEN OMITTED AS THOSE PROVISIONS ARE CURRENTLY UNDER DISCUSSION BETWEEN THE PARTIES.

SAG 1983                              94

PAR000075

L.   <u>Adherence to Plans</u>

By signing this Agreement, Producer thereby applies to
become a party to and agrees to be bound by the Screen Actors
Guild-Producer's Pension Plan Trust Agreement and the Pension
Plan adopted thereunder; and the Screen Actors Guild-Producer's
Health Plan Trust Agreement and the Health Plan adopted
thereunder, if the Producer is not already a party to said
Agreements and Plans.

Producer further hereby accepts and agrees to be bound by
all amendments and supplements heretofore and hereafter made to
the foregoing Agreements and documents.

Producer hereby accepts the Producer Plan Trustees and the
Alternate Producer Plan Trustees under said Trust Agreements and
their successors designated as provided therein.

SAG 1983                           95

35.   ADDITIONAL PROVISIONS

    A.   Evasion

It is the policy of the Producer not to intentionally evade the provisions of this Agreement by acquiring pictures produced in the United States and which are made under terms and conditions less favorable than those provided herein.

    B.   Overnight Locations

    (1)   Notification

Performers shall be notified by Producer at the time of engagement, to the extent such information is then known, whether the engagement requires overnight location work and, if so, the approximate time and duration of such location work.

    (2) Per Diem

All performers shall be entitled to a basic per diem allowance for meals on overnight locations, which shall be as follows:

| | |
|---|---|
| Breakfast | $ 8.00 |
| Lunch | 12.00 |
| Dinner | 22.00 |
| TOTAL: | $42.00 |

The foregoing per diems are minimums only and are subject to individual bargaining at not less than the indicated per diem rate.

Producers recognize that on some locations the prevailing reasonable cost for meals exceeds the foregoing amounts and, in such instances, Producer will adjust the per diem rates accordingly.

Regardless of the time of call, the first major meal (either lunch or dinner) served shall be deducted at the lunch rate.

The Producer shall have the right to deduct from the per diem the appropriate amount for each such meal furnished.

    (3)   Holidays on Overnight Location

Saturday holidays may be recognized on Saturday on overnight location.

SAG 1983                    96

C.   Maintenance of Telephone

Producer shall maintain a telephone within a reasonable
distance on all locations where practical.

D.   First-Class Transportation

Wherever referred to in this Agreement, transportation shall
mean first-class transportation, where available.

First-class transportation shall be provided on commercial
airlines where the performer is required to fly at the request of
the Producer.  The foregoing shall apply to jet flights as well
as to prop-driven aircraft.  The foregoing shall not apply where
first-class transportation is not available or where a
substantial number of the company is being transported.  Charter
flights may be used which provide substantially equivalent
accommodations.  If six or more performers travel together on the
same flight and in the same class on jet flights, the coach class
for such performers shall be deemed to be first-class transportation.
This provision does not include "economy" flights.  Notwithstanding
the foregoing, first-class air transportation need not be provided
with respect to auditions and interviews.

E.   Where Producer makes late payments consistently as a
course of conduct, SAG, in addition to its other rights, shall be
entitled to recover damages to be determined by arbitration.

36.  TERM AND EFFECTIVE DATE

A.   A term commencing July 1, 1983, and expiring June 30,
1986 but continuing thereafter until terminated by either party
on at least sixty (60) days written notice; subject, however, to
the right of reopening as set forth in Section 5 I hereof.

B.   This Agreement is intended as a codification of the
Producer-Screen Actors Guild Codified Basic Agreement of 1977 as
modified by the Agreements of 1980 and 1983.  Services rendered,
and motion pictures subject to those respective and previous Agree-
ments, shall be governed by such Agreements respectively.

C.   Except as specifically otherwise provided, the
provisions hereof shall be effective on and after July 1, 1983,
and shall apply to services rendered on and after such date under
existing contracts of employment and contracts of employment
entered into on or after said date, and to motion pictures whose
principal photography commenced after such effective date.

37.  UNION'S ARTICLES AND BY-LAWS

The Union agrees that if there is anything in its Articles
of Incorporation or its By-Laws which will prevent it from

SAG 1983                         97

PAR000078

performing its obligations hereunder, it will take proper steps to amend such Articles or By-Laws so as to correct any such defect, and the Union further agrees that during the term of this Agreement it will not adopt any code for performers or any amendment to its Articles or By-Laws which will be in conflict with its obligations under this Agreement.  The Union states that its By-Laws provide that each of its members is bound by the provisions of this Agreement.

## 38.   SEPARATE AGREEMENT AS TO EACH PRODUCER

A.   This Agreement is a separate agreement as to each Producer, and is not joint and several, and shall be construed as a separate agreement between the Union and each Producer signatory hereto.

B.   This Agreement may be executed in any number of counterpart originals, each counterpart to have the same effect as an original, or by letter accepting all terms and conditions hereof.

C.   This Agreement shall be binding on the signatories hereto and all parties who by reason of mergers, consolidations, reorganizations, sale, assignment or the like shall succeed to, or become entitled to, a substantial part of the Production business of any signatory.  Each Producer agrees that its signature to this Agreement shall likewise bind subsidiary and controlled companies engaged in the production of motion pictures to the terms of this Agreement.

## 39.   OTHER PRODUCERS MAY BECOME PARTIES

Any person or corporation now or hereafter engaged in the business of producing motion pictures in the United States of America shall be afforded the opportunity of becoming a party to this Agreement.

## 40.   PURPOSES OF CODIFICATION - SAVING CLAUSE - TITLE

A.   The purpose of this Codified Agreement is to present in a more convenient and usable form the effective provisions contained in the Producer-Screen Actors Guild Codified Basic Agreement of 1977, as modified by the agreements of 1980 and 1983, without in any manner changing the intent or meaning of said provisions.

B.   In the event that the Union or any Producer shall discover that any effective provision contained in the foregoing Agreements has been unintentionally omitted from this Codification, such party may request its inclusion herein; the Union and the Alliance of Motion Pictures & Television Producers, agree to promptly discuss the request and if they determine that

PAR000079

the provision was unintentionally omitted, then the parties agree to include such provision in this Codification.

C.   Except as otherwise provided, these provisions cover new or increased minimum scale compensation for services (including such new or increased compensation resulting from new or different working conditions), new or increased minimum payments or contributions based upon compensation, and new or increased rerun and residual payments to be paid to the employees covered by the terms of the Agreement.

D.   This Agreement may be referred to as the PRODUCER-SCREEN ACTORS GUILD CODIFIED BASIC AGREEMENT OF 1983.

41.  <u>RULES OF CONSTRUCTION</u>

A.   The language in all parts of this Agreement shall in all cases be construed simply according to its fair meaning, and not strictly for or against the Union or the several Producers. Unless otherwise specifically defined herein, the terms used shall be given their common meaning in the motion picture Industry.

B.   The headings of Sections or subsections are not a part of this Agreement and shall not be construed as altering the meaning of the text of this Agreement.

C.   If any portion of this Agreement shall be held illegal, such portion shall be ineffective, but if such portion is a major provision of this Agreement, either party may thereupon terminate this Agreement on ninety days' written notice to the other party.

42.  <u>SERVICE OF NOTICES</u>

Any notice which either party may desire to serve upon the other may be served personally in Los Angeles County upon a corporate officer of such party, or by registered mail, postage prepaid, addressed to such party at its principal place of business in Los Angeles County.  The Union agrees that a copy of any such notice shall be delivered or mailed, as aforesaid, to the Alliance of Motion Picture & Television Producers at its office in Los Angeles, County.

43.  <u>NUDITY</u>

A.   The Producer's representative will notify the performer (or his representative) of any nudity or sex acts expected in the role (if known by management at the time) prior to the first interview or audition.  The performer shall also have prior notification of any interview or audition requiring nudity, and shall have the absolute right to have a person of the performer's choice present at that audition.

SAG 1983                              99

PAR000080

B.  During any production involving nudity or sex scenes, the set shall be closed to all persons having no business purpose in connection with the production.

C.  No still photography of nudity or sex acts will be authorized by the Producer to be made without the prior written consent of the performer.

D.  The appearance of a performer in a nude or sex scene or the doubling of a performer in such a scene shall be conditioned upon his or her prior written consent.  Such consent may be obtained by letter or other writing prior to a commitment or written contract being made or executed.  Such consent must include a general description as to the extent of the nudity and the type of physical contact required in the scene.  If a performer has agreed to appear in such scenes and then withdraws his or her consent, Producer shall have the right to double, but consent may not be withdrawn as to film already photographed. Producer shall also have the right to double children of tender years (infants) in nude scenes (not in sex scenes).

## 44.  HUMANE TREATMENT OF ANIMALS

### STATEMENT OF POLICY

The Producers believe that they have a highly commendable record of protecting animals and of preventing their abuse during production of motion picture and television films.  They believe that this has been a responsibility most filmmakers have accepted and exercised with diligence over the years.

Producers believe that trained animals are available which can perform with realism and without danger of injury or death and, in addition, as part of a long-term policy, Producers have cooperated with the Hollywood office of the American Humane Association.  Producers believe it is important for this liaison to continue in the interest of assuring responsible, decent and humane treatment of animals.

Producer shall not utilize any performer to perform in a scene for any motion picture in which an animal is intentionally tormented or killed, except that the photography of animals being killed pursuant to the provisions of a legal hunting season shall be excluded.

The Producer shall notify the American Humane Association prior to the commencement of any work involving an animal or animals and advise it of the nature of the work to be performed. Script scenes involving animals shall be made available to the American Humane Association.

Representatives of the American Humane Association may be present at any time during the filming of a motion picture where any animals are used.

PAR000081

45. <u>VIDEO TAPE</u>

All of the terms and conditions of this Agreement shall apply
to the employment of performers in video tape programs.

46. <u>VERIFICATION OF TELEVISION RUNS - CODING</u>

Regarding a possible system of coding product which appears
on television, a joint Producer-Union Committee will be estab-
lished to consider any workable system when it is available, and
such Committee shall investigate and make recommendations, which
will be given consideration by the Producers.

47. <u>CASTING</u>

Casting which is done outside the studio shall be conducted
on a businesslike basis, with regular business hours and telephone
service.

48. <u>FAVORED NATIONS CLAUSE</u>

If during the term of this Agreement any union through its
collective bargaining agreement negotiated with the Alliance of
Motion Picture & Television Producers obtains a "Cost of Living
Escalation Clause" with respect to minimum rates, then in such
event, the Union will be entitled to the benefits of such clause
commencing with the 3rd year of this collective bargaining
Agreement.

49. <u>PHOTOGRAPHY OF STAGE PERFORMANCE (INSTANT MOVIES)</u>

Producer will give the Union at least sixty (60) days'
advance notice of the employment of any performer in a motion
picture to be made from a currently running legitimate stage
play, ballet, opera, or other legitimate stage performance (all
being referred to in this Section for convenience as a "play"),
or a play which has closed within eight (8) weeks of the
commencement of the production of such motion picture, and which
play staged substantially as presented on the legitimate stage
and utilizing substantially the same cast as the play, is to be
photographed as a motion picture.  Producer and the Union agree
to meet within thirty (30) days from receipt of such notice for
the purpose of negotiating with respect to the terms and
conditions of such employment.  If no agreement is reached with
respect thereto within such sixty (60) day period, the Union may
instruct its members to withhold services with respect to the
production in such motion picture only.

This provision shall not apply to a motion picture produced
from a screenplay written for such motion picture, based on such
play, and photographed in a normal motion picture manner as

SAG 1983                          101

distinguished from a recordation, as such, of the play.

50. <u>EMPLOYMENT OF MINORS</u>

    A.    Preamble

        (1)  The Producers and Union, recognizing the special situation that arises when minor children are employed, have formulated the following provisions in addition to those contained in other Sections of this Agreement to ensure that:

            (a)  The environment in which the performance is to be produced is proper for the minor;

            (b)  The conditions of employment are not detrimental to the health and morals of the minor; and

            (c)  The minor's education will not be neglected or hampered by his or her participation in such performance.

    B.      It is recognized that when minors are employed in the State of California or taken from the State of California pursuant to a contractual arrangement made in the State of California, the applicable California laws and regulations shall regulate such employment.

        When minors are hired and employed within states <u>other than</u> California the Producer shall be required to determine and comply with the prevailing law governing and defining minors.  In addition to these legal requirements for minors not employed in the State of California or not taken from the State of California pursuant to a contractual arrangement made in the State of California, the Producer and the Union agree to the following provisions of Section 50 herein for the employment of minors:

    C.    Definition of Minor

        Any performer defined as a minor under the laws of the state governing his or her employment.

    D.    Education

        (a)  If a minor is guaranteed three (3) or more consecutive days of employment, Producer agrees to employ a teacher, from the first day of such employment, whenever the minor is engaged on any day during which the primary or secondary school regularly attended by the minor is in session.  The same shall apply where the Producer's production schedule for a given production plans for scenes to be photographed with the minor on three (3) or more

SAG 1983                  102

PAR000083

consecutive days.  Where the minor is employed in scenes
planned on the production schedules for only two (2) con-
secutive days and it is subsequently determined that
additional calls will be necessary, Producer shall use its
best efforts to provide a teacher on the third (3rd) con-
secutive day of such employment, or at the latest, on the
fourth (4th)  consecutive day of such employment and
thereafter.

      (b)  On any day a minor is employed but is not
otherwise entitled to have a teacher, the minor shall
nevertheless be taught if the primary or secondary
school such minor regularly attends is in session and
Producer has employed a teacher to instruct another
performer engaged on the same production.

      (c)  If Producer employs a minor for post-
production work, no teacher need be provided if the minor's
call for such work is after the minor's regular school has
been dismissed for the day.

    (2)  Such teacher shall have proper teaching
credentials from Washington D.C. or any state within the
United States, but need not be credentialed by or a resident
of the state wherein the minor's employment occurs unless
otherwise required by law.

    (3)  The teacher's remuneration shall be paid by
Producer.

    (4)  Producer shall provide a ratio of not more than 10
minors per teacher, except that up to 20 minors may be
taught per teacher if the minors are in not more than two
grade levels.

    (5)  A teacher may not serve more than one production
in any one day, except in an emergency and except as
provided in D.(1)(c) above.

    (6)  If the minor's regular instruction is primarily in
a language other than English, teaching in that language
will be provided whenever feasible.

    (7)  However, on any day that the minor is not required
to report to the set, the minor may attend his or her
regular school, but Producer shall not count more than three
(3) hours of the hours attended per day at the minor's
regular school as school time for purposes of this
Agreement.  If the minor's parent or guardian does not
choose to have the minor attend regular school on such day,
Producer may elect to either teach the minor on the set or
in the minor's home or in the home of the teacher employed
by Producer, but only if there are no other minors present
in the home who are not also being taught by the teacher.

SAG 1983                           103

PAR000084

(8)  Producer agrees to provide a school facility such as a schoolhouse, classroom, trailer schoolhouse, or other schooling area, which closely approximates the basic requirements for classrooms, especially with respect to adequate lighting, heating, desks and chairs.  Stationary buses or cars are not adequate school facilities unless used exclusively for the minors during instruction.  A moving car or bus shall never be used as a school facility; minors must not be taught while being transported to or from local locations.

(9)  Producer shall provide schooling equipment and supplies.  However, the minor's parent or guardian must, if permitted by the minor's regular school, secure school assignments and the minor's school books for use at the place of employment.

(10)  No one shall be allowed in an area being utilized by Producer as a school facility except the teacher and those minors being taught.

(11)  The teacher shall determine the required number of hours to be devoted to instruction during a day, but the minor must be taught an average of at least three hours per day, no period of less than 20 minutes duration being acceptable as school time.

(12)  Producer shall require the teacher to prepare a written report for each minor covering attendance, grades, etc.  These reports shall be given to the minor's parents or guardian to deliver to the minor's regular school at the end of each assignment or at such intervals as required by such school.

E.  Supervision

(1)  On days when the minor's regular school is in session, Producer must require the minor to report to the teacher immediately upon arrival at the place of employment. When school is in session, the teacher has primary responsibility for the education and supervision of the minor.

(2)  Presence of the teacher does not relieve parents, however, of the responsibility of caring for their own children.  A parent or guardian must be present at all times while a minor is working, and shall have the right, subject to filming requirements, to be within sight and sound of the minor, except as restricted herein by subsection D(10).

(3)  When a parent is working at the minor's place of employment but not at the scene of employment, either the other parent or a guardian must be present with the minor.

SAG 1983                    104

PAR000085

(4)   A guardian, as that term is used in this Section, must be at least 18 years of age, have the written permission of the minor's parent(s) to act as a guardian, and show sufficient maturity to be approved by Producer (and teacher, if teacher is present).

(5)   No minor may be sent to wardrobe, make-up, hairdressing, or employed in any manner unless under the general supervision of a teacher, parent or guardian.

(6)   If Producer engages any minor under the age of 14, Producer must designate one individual on each set to coordinate all matters relating to the welfare of the minor and shall notify the minor's parent or guardian and teacher, when one is present, of the name of such individual.

(7)   Parents and guardians are not permitted to bring other minors not engaged by Producer to the place of employment without Producer's specific permission.

F.   Working Hours

(1) Minors less than six years of age are permitted at the place of employment for six hours (excluding meal periods but including school time, if any).

(2)   Minors age six and older are permitted at the place of employment for eight hours (excluding meal periods but including school time).

(3)   If a minor is at location, the minor must leave location as soon as reasonably possible following the end of his or her working day, and may not be held for transportation.

(4)   A minor shall not work more than six consecutive days.  However, for this purpose, a day of school only or travel only shall not be counted as one of said consecutive days.

(5)   Producer shall set the first call at the beginning of the minor's employment and dismissal on the last day of the minor's employment so as to ensure that the minor will have a 12-hour rest period prior to and at the end of the employment.  For example, if a minor's last day of employment is Wednesday, and the minor will be attending school at 8:30 a.m. on Thursday, the minor must be dismissed by 8:30 p.m. on Wednesday.

G.   Dressing Rooms

No dressing rooms shall be occupied simultaneously by a minor and an adult performer or by minors of the opposite sex.

PAR000086

H.   Play Area

A safe and secure place for minors to rest and play must be provided by Producer.

I.   Medical Care and Safety

(1)   The minor's parent or guardian must provide Producer a certificate signed by a doctor licensed to practice medicine within the state wherein the minor resides or is employed, stating that the minor has been examined within six months prior to the date he or she was engaged by Producer and has been found to be physically fit.

(2)   Prior to a minor's first call, Producer must obtain the written consent of the minor's parent or legal guardian for medical care in the case of an emergency. However, if the parent or legal guardian refuses to provide such consent because of religious convictions, Producer must at least obtain written consent for external emergency aid, provided that the obtaining of such consent is not contrary to the aforementioned religious convictions.

(3)   No minor shall be required to work in a situation which places the child in clear and present danger to life or limb.  If a minor believes he/she would be in such danger, the parent or guardian may have the teacher and/or stunt coordinator, if either or both are present, discuss the situation wth the minor.  If the minor persists in his/her belief, regardless of its validity, the minor shall not be required to perform in such situation.

J.   Child Labor Laws

(1)   A summary of the applicable state child labor laws governing the employment of the minor shall be kept in the Producer's production office if such summary is readily available.

(2)   Any provision of this Section which is inconsistent and less restrictive than any child labor law or regulation in applicable state or other jurisdictions shall be deemed modified to comply with such laws or regulations.

K.   Inconsistent Terms

The provisions of this Section shall prevail over any inconsistent and less restrictive terms contained in any other Sections of this Agreement which would otherwise be applicable to the employment of the minor, but such terms shall be ineffective only to the extent of such inconsistency without invalidating the remainder of such Sections.

SAG 1983                          106

PAR000087

L.   Arbitration

Any dispute between performer and Producer with respect to any provision contained in this Section shall be arbitrable, regardless of the amount of compensation paid or guaranteed to the performer.  Any such dispute between the Union and Producers shall likewise be arbitrable.  The procedure for such arbitrations shall be those contained in Section 9 hereof.

M.   Overnight Location - Expenses

Where state law or this Agreement requires that a parent or guardian of a minor be present while such minor is working and such minor is employed on an overnight location under the terms of this Agreement, Producer will, in conjunction with its negotiation for the minor's services, also negotiate in good faith with respect to expenses incurred by the parent or guardian for transportation, lodging and meals that may be required for the assignment and such expenses must be approved in advance.  In the case of air transportation, Producer will endeavor to provide for the parent or guardian the same class of transportation, on the same flight as the minor, if reasonably available.  In the case of lodging, Producer shall endeavor to provide a room for the parent or guardian in the same facility and adjacent to the minor's room, if reasonably available, provided that a minor under eleven (11) years old may be required to share his/her room with his/her parent or guardian, and a minor eleven (11) years to sixteen (16) years old may be required to share his/her room with a parent of the same sex.

N.   Time Cards

On production time reports or time cards submitted to the Union, Producer shall designate minors with a "K" next to the minor's name.

51.  <u>ALCOHOLISM AND DRUG ABUSE PROGRAM</u>

Producers and the Union recognize alcoholism and drug abuse as conditions which impact upon the productivity and safety of the motion picture industry.  The parties agree to establish a functioning alcoholism and drug abuse program under the auspices of the Motion Picture and Television Fund to benefit the motion picture industry.

From time to time, amounts of money payable to members of the Union under the terms of the Basic Agreement and Television Agreement are delivered to the Union for processing and transmittal to such members.  Such amounts are mailed by the Union to the member at the address of the member shown on the

PAR000088

records of the Union, but in many instances are returned by the post office because the member is unknown at the address designated, or has moved without leaving a forwarding address. Although the Union makes all reasonable efforts to locate such members, it is frequently unable to do so.  Such monies are deposited in an interest bearing trust savings account. Producers and the Union agree that any such amounts not claimed by the member within five (5) years of receipt of such sums by the Union shall be transferred by the Union to the Motion Picture and Television Fund earmarked for use in such alcoholism and drug abuse program, if legally permissible.  In the event such program is adequately funded, such funds may be transferred to the Producer-Screen Actors Guild Pension and Health Plans.

52.  <u>TRANSLATION</u>

Performer may not be required to translate another performer's dialogue into any language other than that in which a script is written.  However, performer may bargain separately for such non-covered services.

53.  <u>DANCERS</u>

The following shall apply as to dancers if they are employed under this Agreement:

"Dancers" shall include swimmers and skaters where the performance is choreographed.

The compensation payable to a dancer for a hazardous activity shall be $65 per day, with a minimum of $100 if only one day's services are rendered.  "Wire flying" shall in all instances be considered "hazardous".

"Footwear" provided by the Producer shall be appropriate to the work and shall be clean, properly fitted, braced and rubbered.

Any dancer who is directed to and reports with his or her own footwear shall be paid an allowance of $7.50 per day for each pair of shoes utilized in the performance.

Producer shall exercise care, including prior testing of equipment (e.g., breakaway props) during rehearsal, to avoid injury to the performer.

For dancers engaged as assistant choreographers, Producer shall make contributions to the pension and health funds on the accounts of such individuals who have had prior contributions made in five (5) out of the last ten (10) years as dancers.

Nothing contained herein shall be construed to require the Producer to employ dancers under the terms of this Agreement.

PAR000089

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first herein written.


Dated: _____. 198__          SCREEN ACTORS GUILD, INC.


On Behalf Of The Producers In          By_____
The Multi-Employer Unit Listed         National Executive Secretary
On Exhibit A Hereto, Represented
By The Alliance Of Motion
Picture & Television Producers


By_____

PAR000090

COMPANIES IN MULTIEMPLOYER UNIT
REPRESENTED BY
ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS

1.  Aaron Spelling Productions, Inc.
2.  Alfred Hitchcock Productions
3.  Andras Enterprises, Inc.
4.  Aspen Productions
5.  Asselin Productions, Inc.
6.  Bing Crosby Productions, Inc.
7.  Bluebird, Inc.
8.  Bud Yorkin Productions, Inc.
9.  Cast & Crew Film Services Inc.
10. Chambers & Assoc. Inc.
11. Charles Fries Productions, Inc.
12. Chartoff Winkler Prod.
13. Cimarron Productions
14. Columbia Pictures Industries Inc.
15. Compass Int'l. Pictures
16. The Creative Works, Inc.
17. Danny Thomas Productions, Inc.
18. David Greene Productions Inc.
19. David Paradine Television, Inc.
20. Douglas S. Cramer Productions, Inc.
21. EGS International
22. Embassy Productions, Inc.
23. Embassy Television
24. Flamingo Films, Inc.
25. Frankel Films Inc.
26. Frankel Productions Inc.
27. Hanna-Barbera Productions
28. Herbert Leonard Enterprises, Inc.
29. James D. Parriott Prods.
30. Jemmin, Inc.
31. Johnson/Cowan Inc.
32. Kaleidoscope Films, Ltd.
33. Kurtz and Friends
34. The Ladd Company
35. Lance Enterprises
36. Lawrence Schiller Productions Inc.
37. Leonard Films, Inc.
38. The Leonard Goldberg Company
39  Levy-Gardner-Laven Productions, Inc.
40. The Londonderry Company
41. Lorimar Productions, Inc.
42. Lucille Ball Productions, Inc.
43. Mambrino Productions, Inc.
44. Mark Rydell Productions
45. McDermott Productions
46. Metro-Goldwyn-Mayer Film Co.
47. Metromedia Producers Corporation
48. Michael Rhodes Films
49. MTM Enterprises, Inc.

SAG 1983                EXHIBIT A (Page 1)

PAR000091

50. MTM Productions
51. Murakami Wolf Swenson, Inc.
52. One Pass Inc.
53. Orion TV Productions, Inc.
54. Palance/Levy Productions Inc.
55. Paramount Pictures Corporation
56. Petersen Communications, Inc.
57. Pierre Cossette Enterprises, Inc.
58. Playboy Productions, Inc.
59. Pyramid Films Corporation
60. Ray Stark Productions, Inc.
61. RFB Enterprises, Inc.
62. RLR Assoc. Ltd.
63. Robert Wise Productions
64. RSO Films, Ltd.
65. Sandy Frank Productions Inc.
66. Stephen J. Cannell Productions
67. Sunrise Productions, Inc.
68. Talent Payments, Inc.
69. Thorn EMI Films, Inc.
70. Three's Company - A Joint Venture of The NRW
        Company in association with T.T.C. Productions, Inc.
71. Tori Productions, Inc.
72. Trans-Atlantic Enterprises, Inc.
73. Trollet Prods. Inc.
74. T.T.C. Productions, Inc.
75. Twentieth Century-Fox Film Corp.
76. United Artists Productions, Inc.
77. Universal City Studios, Inc.
78. Viacom Productions, Inc.
79. Walt Disney Pictures
80. Warner Bros., Inc.
81. Witt/Thomas/Harris
82. WK Productions, Inc.
83. World Wide Pictures

PAR000092

CASTING DATA

(1)  PRODUCER _____

(2)  PERIOD COVERED (Quarter, Year) _____

(3)  PROJECT (Title, Prod. No., etc.) _____

(4)  DESCRIPTION (Feature, M.O.W., TV Series, etc.) _____

(5)  TOTAL NO. OF DAYS OF PRODUCTION (PRINCIPAL PHOTOGRAPHY) _____

PART I    (7)          (8)

| (6) Category | | Form of Hiring | | No. of | Age | | |
| | Day Performer | Freelance Performer | Series Performer | Days Worked | Under 40 | 40 or Over | Unknown |
| Male Lead | | | | | | | |
| Male Supporting | | | | | | | |
| Female Lead | | | | | | | |
| Female Supporting | | | | | | | |

PART II                          (10)

| (9) Category | | Form of Hiring | | | | | | No. of Days Worked | |
| | Day Performer | | Freelance Performer | | Series Performer | | | Male | Female |
| | Male | Female | Male | Female | Male | Female | | | |
| Asian/Pacific Lead | | | | | | | | | |
| Asian/Pacific Supporting | | | | | | | | | |
| Black Lead | | | | | | | | | |
| Black Supporting | | | | | | | | | |
| Caucasian Lead | | | | | | | | | |
| Caucasian Supporting | | | | | | | | | |
| Latino/Hispanic Lead | | | | | | | | | |
| Latino/Hispanic Supporting | | | | | | | | | |
| American Indian Lead | | | | | | | | | |
| American Indian Supporting | | | | | | | | | |
| Other or Unknown Lead | | | | | | | | | |
| Other or Unknown Supporting | | | | | | | | | |

THIS FORM MUST BE COMPLETED WITH RESPECT TO EACH MOTION PICTURE AND EACH EPISODE OF EACH SERIES PRODUCED BY PRODUCER.  See Page 2 for INSTRUCTIONS.

SAG 1983              EXHIBIT B (Page 1)

PAR000093

## INSTRUCTIONS

1.   Indicate the Production Company (e.g., "THE XYZ COMPANY").

2.   Indicate the quarter/year (e.g. "1st quarter, 1983").

 The quarters consist of:

| | | | |
|---|---|---|---|
| January | – | March | (1st) |
| April | – | June | (2nd) |
| July | – | September | (3rd) |
| October | – | December | (4th) |

3.   Indicate the name of the film for which you are reporting.

4.   Indicate the type of project (movie, television series).

5.   Use a number to respond to this question.

6.   Part I.  Indicate the total number of lead and supporting performers in each of the applicable categories.

7.   Use numbers only to indicate the total amount of days worked by all performers in the category.

8.   Use numbers only to indicate how many of the performers fell into a certain age group.

9.   Part II.  Indicate the total number of males and females in each category.

10.  Use numbers only to indicate the total number of days worked by all the performers in male and female category.


NOTE:  Please make every effort to insure that your numbers correspond across categories and among Parts I and II.

SAG 1983                    EXHIBIT B (Page 2)

SCHEDULE A

DAY PERFORMERS

Table of Contents

Section
  No.

1.  Definition
2.  Minimum Wage-Single Role
3.  Schedule A Included in Individual Contracts
4.  Engagement
5.  Recall for Next Day
6.  Consecutive Days of Employment
7.  Conversion to Weekly Basis
8.  Hours Per Day
9.  Overtime
10. Rest Period
11. Makeup, Hairdress, Wardrobe
12. Work Time-Definition and Exceptions
13. Meal Periods
14. Interviews
15. Auditions, Tests
16. Fittings, Wardrobe Tests, Makeup Tests
17. Story, Song, and Production Conferences
18. Study of Lines or Script
19. Publicity Interviews

Section
  No.

20. Publicity Stills
21. Rehearsal Time
22. Night Work
23. Saturday and Sunday Work
24. Work on Holidays; Work Before and After Holidays
25. Weather Permitting Calls
26. Script Lines
27. Stunt Adjustment
28. Retakes, Added Scenes, Etc.
29. Overlapping Engagement
30. Prerecordings
31. Preproduction Stills
32. Travel Time- Rules and Definitions
33. Right to Name or Character
34. Rate Not Specified
35. Time of Payment
36. Use of a "Double"

PAR000095

SCHEDULE A INDEX

|  | Section No. | Page No. |
|---|---|---|
| Added Scenes | 28 | 134 |
| Adjustment of Extras-Lines | 26 | 133 |
| Adjustment for Stunt | 27 | 134 |
| Arbitration-See General Provisions |  |  |
| Auditions, Tests | 15 | 126 |
| Cancellation of Call | 4A(6) | 115 |
| Closeups | 28B | 134 |
| Consecutive Days of Employment | 6 | 117 |
| Continuous Employment | 6 | 117 |
| Contract-Requirements | 4 | 114 |
| Conversion to Weekly Basis | 7 | 118 |
| Day Performer-Definition | 1 | 114 |
| Dubbing Voice-Replacement | 4E | 116 |
| "Double" Use of | 36 | 144 |
| Engagement | 4 | 114 |
| Engagement-Overlapping | 29 | 134 |
| Exceptions to Work Time | 12 | 123 |
| Extras-Adjustment for Lines | 26 | 133 |
| Fittings | 16 | 127 |
| "Fourteen-Day Clause" | 6 | 117 |
| Guarantee Not Affected by Overtime | 9D | 120 |
| Union Membership-See General Provisions |  |  |
| Hairdress | 11 | 122 |
| Holidays-Work Before & After | 24 | 131 |
| Hours Per Day | 8 | 119 |
| Intervening Time-Less Than Two Weeks | 6 | 117 |
| Interviews | 14 | 125 |
| Interviews for Publicity | 19 | 129 |
| Locations-See Travel Time (This Index) |  |  |
| Makeup Tests | 16B | 128 |
| Makeup, Hairdress, Wardrobe | 11 | 122 |
| Meal Periods | 13 | 124 |
| Minimum Wage | 2 | 114 |
| Name, Right to | 33 | 144 |
| Night Work | 22 | 130 |
| Overlapping Engagement | 29 | 134 |
| Overtime | 9 | 119 |

PAR000096

Schedule A Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Preference of Employment-See General Provisions | | |
| Preproduction Stills | 31 | 136 |
| Prerecordings | 30 | 136 |
| Publicity Interviews | 19 | 129 |
| Publicity Stills | 20 | 129 |
| Rate Not Specified | 34, 14 | 144, 125 |
| Recall for Next Day | 5 | 117 |
| Rehearsal Time | 21 | 129 |
| Replacement | 4E | 116 |
| Rest Period | 10 | 120 |
| Retakes, Added Scenes, Etc | 28 | 134 |
| Retakes Under Continuous Employment | 6 | 117 |
| Right to Name or Character | 33 | 144 |
| Saturday & Sunday Work | 23 | 130 |
| Schedule A Included In Individual Contracts | 3 | 114 |
| Script Lines | 26 | 133 |
| Story, Song, and Production Conferences | 17 | 128 |
| Study of Lines or Script | 18 | 129 |
| Stunt Adjustment | 27 | 134 |
| Sunday Work | 23 | 130 |
| Tests | 15 | 126 |
| Time of Payment | 35 | 144 |
| Travel Time | 32 | 136 |

|  | Subsection |  |
|---|---|---|
| Computation of Overtime Caused by Travel Time | Q | 141 |
| Deduction of Allowable Meal Periods | O | 141 |
| Deduction of Travel Time Otherwise Compensated For | P | 141 |
| Distant Location | I | 140 |
| Engagement of Performer-Other Areas | V | 142 |
| General | W | 143 |
| Intervening Time Between Dismissal and Travel | M | 141 |

SAG 1983                          112

Schedule A Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Subsection |  |  |
| Location and Overnight Location.....G | | 140 |
| Maximum Travel Time.................L | | 140 |
| Near Location.......................H | | 140 |
| Overnight Trip to or From Location..T | | 142 |
| Pay for Day of Arrival..............B | | 136 |
| Pay for Intervening Days of Travel..C | | 136 |
| Place of Reporting and Dismissal....J | | 140 |
| Studio Zone.........................F | | 139 |
| Transportation and Lodging Furnished........................N | | 141 |
| Transportation and Travel Time on Overnight Locations to and from Hotel or Camp...........................R | | 142 |
| Travel from Location................D | | 136 |
| Travel from Overnight Location-Intervening Time............................M(3) | | 141 |
| Travel on Sundays and Certain Holidays........................U | | 142 |
| Travel Provisions When Recalled for Retakes, Added Scenes, etc........E | | 137 |
| Travel Time is Work Time...........K | | 140 |
| Travel to Location-No Services Rendered on Day of Departure......A | | 136 |
| Travel to Overnight Location-Intervening Time............................M(2) | | 141 |
| Travel to or from Overnight Location on Boat or Train where Sleeping Accommodations are Provided.....................S | | 142 |
| Use of "Double"..............................36 | | 144 |
| Wages, Minimum...............................2 | | 114 |
| Wardrobe.....................................11 | | 122 |
| Wardrobe Tests..............................16B | | 128 |
| Weather Permitting Calls.....................25 | | 132 |
| Work on Holidays-and Before and After Holidays..................................24 | | 131 |
| Work Time-Definition and Exceptions...........12 | | 123 |

SAG 1983                    113

PAR000098

## SCHEDULE A

## DAY PERFORMERS

### 1.   DAY PERFORMER - DEFINITION

A day performer is a performer employed by the day, other than an Extra, stunt performer, professional singer, or airplane pilot.

### 2.   MINIMUM WAGE - SINGLE ROLE

The day performer rate provided herein shall cover only a single role in a specified picture.

The minimum wage for a day performer shall be $328.00 for the period July 1, 1983 through December 31, 1984 and $361.00 thereafter.

### 3.   SCHEDULE A INCLUDED IN INDIVIDUAL CONTRACTS

The conditions in this Schedule shall govern the employment of all day performers and shall become a part of the contract with the day performer.

### 4.   ENGAGEMENT

A.   A day performer shall be considered definitely engaged in any of the following events:

(1)   When the performer is given written notice of acceptance;

(2)   When a form contract signed by Producer is delivered to performer or when an unsigned contract is delivered by Producer to the performer and is executed by performer as so delivered and returned to Producer;

(3)   When a script is delivered to the performer by Producer; however, this does not include the delivery of a script for a test, audition or interview nor the submission of a script for the purpose of permitting the performer to determine if he desires the engagement;

(4)   When a performer is fitted for work; this shall not apply to wardrobe tests; and

(5)   When the performer is given a verbal call by Producer or an authorized company representative, which is accepted;

SAG 1983                           114

PAR000099

(6)   When the performer is actually called by the
Producer and agrees to report on the commencement date for
which the call is given; however, until noon of the day
preceding such commencement date, either the Producer or the
performer may cancel such employment.  If the Producer is
unable to reach the performer personally, either by
telephone or otherwise, notice of such cancellation may be
given to the performer by telegraph, in which event the time
when such telegram is given by the Producer to the telegraph
company, addressed to the performer at his address last
known to the Producer, shall be the time of such
cancellation.

B.    To the extent that the agreement reached between the
Producer and the performer can be reflected on the form required
by the collective bargaining agreement plus Producer's standard
riders to be filed with the Union, Producer shall deliver a copy
of such contract to the performer not later than the first day of
performer's employment.  Where the agreement cannot be so
reflected, Producer shall deliver a copy of such contract to the
performer not later than the first day of performer's employment
or four (4) business days after such agreement has been reached,
whichever is later.

Where Producer chooses to deliver a copy of a contract to
the performer on the set, an extra copy for retention by the
performer shall be provided.

W-4's shall be presented to performer no later than the
first day of employment.  A W-4 form may be given to performer on
the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the
performer's responsibility to return a completed W-4 form to
Producer in a timely manner.  It is understood that where a
performer fails to do so, there shall be no retroactive
adjustments to the withholding required by law.  W-4 forms shall
be attached to day-performer and 3-day-performer contracts.


C.    Liquidated damages in the amounts provided in Section
31B of the General Provisions hereof for late payments shall be
payable until a written contract is delivered to the performer.

D.    Neither auditions nor interviews shall constitute an
engagement.

E.    When a performer is engaged and not used for any reason
other than his default, illness, or other incapacity, he shall be
entitled to one day's salary or his guarantee, whichever is
greater.  If the performer who is selected is unavailable when
called to render actual services, he shall not be entitled to a
day's pay.

SAG 1983                      115

If a performer has been engaged and his services pursuant to such engagement have not commenced, he may accept (but is not obligated so to do) a substitute engagement in the same photoplay, in which event he shall be paid only for the substitute engagement, but not less than his original rate of pay and guarantee; provided, however, that if he has received a definite starting date the substitute engagement must have the same starting date.

A day performer who is replaced in a photoplay for reasons other than his default, illness or other incapacity, after commencement of his services pursuant to his engagement and before the completion of his engagement, shall receive his guarantee, or one day's salary in addition to payment for services rendered to that time, whichever is greater.

If a day performer has completed his performance in the picture, including the recording, and his voice is not satisfactory to the Producer and Producer re-dubs the entire sound track of the day performer, such re-dubbing shall not be a replacement.

In the event that a performer is replaced in the role, the performer, or performer's agent, shall be notified of this fact at the time of the replacement.

F.   A copy of the "booking slip" shall be provided to performer no later than the day next preceding the first day of performer's employment.

> (1)  <u>Definition of Booking Slip.</u>  A booking slip is a document containing a designation of the role, salary and number of days of guaranteed employment.
> [<u>NOTE</u>: PARTIES RESERVE POSTITIONS:  UNION WANTS "DATE OF COMMENCEMENT OF EMPLOYMENT" ADDED; PRODUCERS DISAGREE.]

> (2)  If performer is engaged after 6:00 p.m. on the day prior to the first day of performer's employment, the booking slip will be included with the script provided to performer.  However, if the script was provided to performer prior to such date and hour, Producer need not provide such booking slip.

> (3)  The foregoing requirements for delivery of a booking slip shall not apply if performer's contract has previously been delivered to performer or performer's agent.

SAG 1983                           116

PAR000101

5.   RECALL FOR NEXT DAY

When a day performer employed by a Producer has a bona fide
offer of work for the next day as a performer, he may notify the
first assistant director to that effect by 4:00 P.M., giving the
name of the studio and the source of the call.  In such event, if
the first assistant director or the casting office does not
notify the performer by 5:00 P.M. of the day the performer gives
such notice that he is through, the performer shall receive an
additional day's pay, if he is dismissed that day and does not
work on the succeeding day either for that Producer or any other
Producer.

The foregoing shall not apply where the call to work by the
then employing Producer is for 4:00 P.M. or later on the day the
notification is given.

6.   CONSECUTIVE DAYS OF EMPLOYMENT

A.   Employment of the day performer shall be for
consecutive days from the beginning of the engagement, Sundays,
holidays and studio Saturdays excepted, unless the performer's
services are required on such Sundays, holidays or studio
Saturdays.  The Producer shall have the right to terminate such
engagement at any time.  Performers engaged by the day may be
recalled by Producer for any purpose other than those hereinafter
in Section 28 referred to after a lapse of fourteen days*, as the
case may be, without payment for the intervening time, if at the
time of performer's original employment, performer is given a
firm start date for such subsequent call.

With respect to any performer recalled by Producer as a
free-lance performer, Producer and performer may agree that
performer shall be recalled on or after such recall date.  For
purposes of this provision, "on or after" shall mean the time on
the date specified or a time within twenty-four (24) hours
thereafter.  Where a performer is recalled on a free-lance basis,
the recall date may be advanced subject to performer's
availability; except, however, Producer may not recall performer
sooner than ten or fourteen days, as the case may be, without
being obligated to pay for such intervening time.

If, within fourteen (14) days* after termination of
performer's engagement, Producer recalls performer for any
purpose other than those hereinafter in Section 28 referred to,
the performer's compensation shall nevertheless be paid for the
intervening period between the date of such earlier termination

(*  With respect to domestic production of theatrical motion
pictures and features made primarily for first exhibition on
television, this period shall be ten (10) days.)

PAR000102

and the date of recall; provided, however, that if at any time when the Producer attempts to recall the performer, the performer is ill or otherwise incapacitated, or is employed, or is committed to other employment, or for any other reason is unavailable, then the Producer's obligation to pay compensation for such intervening time shall terminate when the Producer so attempts to recall the performer.  Furthermore, if during such intervening period the performer is ill or otherwise incapacitated or employed, no compensation shall accrue to the performer during such period of illness, incapacity or employment.  With respect to day performers, if a firm date for recall is not given and if the performer is recalled subsequent to fourteen days* after termination, compensation shall be paid to the performer for the intervening period between the date of such earlier termination and the date of recall.  The Producer shall be entitled to avoid payment for intervening time with respect to a recall subsequent to two weeks after earlier termination only once for the same performer in the same photoplay.

B.   Neither tests, auditions, fittings, publicity stills, preproduction stills, nor prerecordings, after employment but before the starting date of such employment, shall start the consecutive days of employment of day performers.

7.   <u>CONVERSION TO WEEKLY BASIS</u>

At any time whatsoever, either before or after the day performer commences work, the Producer shall have the option of converting such engagement to a weekly engagement on the terms specified in the Screen Actors Guild Minimum Contract for Free-Lance Performers, at the weekly salary specified at the time the engagement was entered into if such a weekly salary was so specified.  Such conversion may be made at any time, but shall be effective only for a period commencing with the effective date of the notice of conversion.  Notice of conversion by the Producer must be in writing and may be given to the performer personally or by telegraphing or mailing the same to the address furnished the Producer by the performer.  If the notice is delivered personally to the performer by noon or if a telegraphic notice is delivered to the telegraph office by noon, the date notice is delivered to performer shall be deemed the first day of the performer's weekly engagement.  However, the performer shall be paid for such day, including overtime, as a day performer.  If notice is delivered personally to the performer or to the telegraph office after noon, or if sent by mail, the conversion to a weekly engagement shall not be effective until the performer's next workday.  Overtime hours on the day of conversion shall not count towards weekly overtime hours.

(*  With respect to domestic production of theatrical motion pictures and features made primarily for first exhibition on television, this period shall be ten (10) days.)

SAG 1983                         118

PAR000103

8.  <u>HOURS PER DAY</u>

The salary agreed upon shall be compensation in full to the day performer for eight hours of work, but such compensation, if otherwise due, shall be paid to the performer even though eight hours of work is not required of the performer by the Producer.

If the performer is working at midnight of any day, then his hours of work for such day shall be computed until the performer has been dismissed subsequent to midnight, subject to all exceptions and deductions provided for in this Schedule.  Hours of work for the following day shall, except as otherwise provided in this Schedule, be computed from the time the performer, after having been so dismissed subsequent to midnight, is required to and does report.


9.  <u>OVERTIME</u>

A.   A day performer shall receive time and one-half for the ninth and tenth hours of work time, and double time thereafter, except that day performers receiving over $900 per day shall receive time and one-half instead of double time after the tenth hour.  For the purposes of such calculations the maximum daily rate shall be $900.00.

B.   To illustrate the application of the foregoing:

A day performer receiving $361.00 per day (the applicable day performer rate as of 1/1/85) is called for makeup, hairdress, or wardrobe at 7:30 A.M.  He spends one hour in such activities. He waits thirty minutes, and his call on the set is 9:00 A.M.  He works until 1:00 P.M., and is off an hour for lunch.  He works again from 2:00 to 7:30 P.M.  No time is spent in traveling.  His overtime pay is calculated as follows:

```
     Total continuous day............................... 11 hours
     Overtime...........................................  3 hours

     Pay for overtime
     (a)  Two hours at time and one half............... $135.38
     (b)  One hour at double time...................... $ 90.25

          Total Overtime............................... $225.63
```

C.   Overtime pay for day performers shall be computed on the basis of one-hour units.  To the extent that any overtime of any day performer is caused by travel time, whether at the beginning or at the end of the day, pay for such overtime shall be computed and paid pursuant to the provisions of Section 32 relating to travel time.


SAG 1983                        119

PAR000104

D.    Whenever a performer receives overtime or an additional day's pay pursuant to the provisions of this Schedule such overtime or additional day's pay shall not be deemed to reduce such performer's guaranteed employment or compensation.

10.    REST PERIOD

A.    Twelve-Hour Rest Period

The performer shall be entitled to a twelve-hour consecutive rest period from the time he is finally dismissed until his first call thereafter, whether for makeup, wardrobe, hairdress or any other purpose.

B.    Thirty-Six Hour Rest Period

The performer shall be entitled to one rest period in each week of thirty-six consecutive hours; provided, however, that if the performer is not required to work on the twenty-four hours constituting the first day of any workweek and has not worked for Producer during the twelve hours immediately preceding such day, or if the performer is not required to work on the twenty-four hours constituting the last day of any workweek and does not work for the Producer during the twelve hours immediately succeeding such day, then the thirty-six hour rest period requirement shall be satisfied regardless of the fact that twelve hours thereof may be in the preceding or succeeding week. Where the performer works on seven days in any week, and is paid, in addition to his base pay, an extra day's pay therefor, the performer need not be given a thirty-six hour rest period for such week, but must continue to receive his twelve-hour rest periods.

C.    Fifty-Eight Hour Rest Period

Where the performer is given two consecutive days off during a studio workweek, the 36 consecutive hour rest period shall be increased to 58 consecutive hours.  However, when there is night shooting consisting primarily of exterior photography and the performer's call is not earlier than 3:00 P.M. and he is dismissed in the studio at or before midnight on Friday, such 58-hour rest period, if otherwise applicable, may be reduced to 56 hours.

D.    The above provisions regarding the rest period shall be subject to the following exceptions:

(1)    Where the Producer is photographing on a location other than an overnight location, the twelve-hour rest period may be reduced to ten hours if exterior photography is required on such location on the day before and the day after such reduced rest period.  Where such reduction is allowed on any day by reason of exterior photography on a

SAG 1983                        120

nearby location, it may not be again allowed until after
three consecutive days have intervened.

(2)   Where a performer arrives at his place of lodging
on an overnight location after 9:00 P.M. and does not work
that night, the rest period with respect to the first call
following such arrival may be ten hours instead of twelve
hours, but the first call must be at the place of lodging.

(3)   Where more than one night's travel (by ordinary
means of transportation) is required to reach a location and
the performer is given a berth on a boat or train for each
night of traveling, the time spent in such traveling, to or
from such location, shall not be work time or travel time
for the purpose of computing the twelve-hour rest period.

(4)   Where an overnight trip to or from a location is
required, and the same takes at least seven hours to reach,
and the performer is given a berth on a boat or train, or if
the performer elects to travel by first-class plane
accommodations, the time spent in such traveling to or from
such location shall not be work time or travel time for the
purpose of computing the twelve-hour rest period.

(5)   The first call at the lodging for work (including
makeup, hairdress, wardrobe, or travel) determines the time
of first call for the next day for the purpose of computing
the rest period.

E.    The Performer may waive the rest period without the
Union's consent, but if he does so, he shall be entitled to an
automatic penalty of one day's pay or $900, whichever is the
lesser sum.  The performer may be required to waive the rest
period if the violation, in case of the twelve-hour rest period,
is not over two and one-half hours, or on an overnight location
not over two hours.  The performer may in any case be required to
waive the thirty-six hour rest period.  The above penalty of one
day's pay or $900, whichever is the lesser sum, shall be
automatically incurred in any case in which the performer waives
either rest period.  The penalty may not be waived without the
consent of the Union.

F.    Wherever it is provided in this Schedule that there
shall be no compounding of any premium pay and the penalty for
breach of the thirty-six hour rest period, it is expressly
understood that the twelve-hour rest period between calls, and
the penalty for violation thereof, remains in effect.

G.    Any performer who is required to travel by air in
excess of four (4) scheduled hours to a location may not be
called for work without a ten (10) hour rest period.  The ten
(10) hour rest period shall commence from the time of arrival at
the hotel, provided the performer goes directly to the hotel
designated by the Producer.  Failure to provide such ten (10)
hours constitutes a rest period violation.

SAG 1983                        121

PAR000106

11.  <u>MAKEUP, HAIRDRESS, WARDROBE</u>

A.   The Producer may require any performer to report made up, with hairdress, and in wardrobe, without assistance from the Producer, and in such case any time spent by the performer therein prior to the performer's first call shall not be work time for any purpose, but the Producer may not have the performer do any such preparation at any place designated by the Producer.

Any performer to whom Producer supplies the services of a make-up artist for makeup, or hairdresser for hairdressing, shall be considered to have a call for makeup or hairdress, as the case may be, and the time so spent shall be worktime.

The mere fact that a dressing room is furnished the performer, to which he is not directed to report, is not a designation of a place for preparation.  In the case of wardrobe, for this Section to apply the performer must be either allowed to take home the wardrobe, or must be furnished a dressing room and the wardrobe must be available to the performer in the dressing room.  Any call by the Producer for makeup, hairdress, or wardrobe is a call to work and not within the exception made within this Section.

B.   Where the performer has reported pursuant to the direction of Producer, for makeup, hairdress or wardrobe, the time so spent shall be work time, but to the extent that overtime is caused by makeup, hairdress, or wardrobe, such overtime shall be paid for as provided in Section 9 hereof.  Effective October 7, 1983, where other than ordinary make-up, hairdress or wardrobe requires assistance in the removal thereof, such removal time shall be worktime.

Effective October 7, 1983, where performer is not otherwise on compensable worktime, performer shall be compensated for up to 15 minutes of time spent in the removal of ordinary make-up, hairdress or wardrobe at the applicable overtime rate. Such compensation shall be based on actual time and shall not trigger additional hourly increments of pay.  Such removal time shall not be considered in computing rest period violations or other premiums or penalties.

C.   If any special hairdress necessitating an expenditure is required by Producer, Producer shall either furnish such hairdress or Producer may designate facilities for the procurement of such hairdress and reimburse performer for amounts expended.

D.   Where Performer supplies his or her own wardrobe at the request of Producer, Producer shall pay, as a cleaning allowance and reimbursement, the following amounts:

SAG 1983                          122

```
Formal wear           -   $15.00

All other wardrobe    -   $10.00 per outfit
```

Payment of the foregoing cleaning allowance and reimbursement shall be made at the same time as payment for Performer's services for such week and shall be separately identified.  Such wardrobe allowance shall be paid to performer for each calendar week in which the performer is employed on the production.

Wardrobe supplied by the Performer, which is damaged in the course of employment, shall either be repaired by Producer, or repaired at the expense of Producer at the facilities designated by Producer, provided that notice of such damage is given to Producer prior to the termination of the Performer's employment.

Effective October 7, 1983, Producer will supply performer with a copy of a wardrobe allowance voucher indicating the number of outfits provided to Producer, which voucher shall be supplied whenever he or she is signed off each week.

E.   There shall be a voucher provided at all wardrobe fittings to be signed by the performer indicating time in and time out.

## 12.   WORK TIME - DEFINITION AND EXCEPTIONS

A.   For the purpose of ascertaining and computing hours of work, the rest period, and overtime, the period from the time the performer is required to and does report as directed, until the time such performer is finally dismissed for the day, shall constitute work time, continuously and without interruption, except as follows:

(1)   Allowable meal periods, as provided by Section 13

(2)   Interviews, as provided by Section 14

(3)   Auditions, tests, and wardrobe tests, as provided by Section 15

(4)   Fittings, as provided by Section 16

(5)   Story, song, and production conferences, to the extent provided in Section 17

PAR000108

(6)   Study of lines or script, to the extent provided by Section 18

(7)   Interviews for publicity purposes, as provided by Section 19

(8)   Publicity stills, to the extent provided by Section 20

(9)   Makeup, hairdress, and/or wardrobe, to the extent provided by Section 11

(10)  Travel time, to the extent provided by Section 32.

B.   Any period during which the performer fails or refuses or is unable because of disability to render services, and any period during which the performer at his own request is excused from rendering services, shall not be work time for any purpose.

C.   After the day performer has been employed, and after the starting date of such employment, none of the provisions of this numbered Section shall break the continuous employment of such day performer, all as more particularly provided in Section 6 hereof.


13.  <u>MEAL PERIODS</u>

A.   Allowable meal periods shall not be counted as work time for any purpose.  The performer's first meal period shall commence within six (6) hours following the time of his first call for the day; succeeding meal periods of the same performer shall commence within six hours after the end of the preceding meal period.  A meal period shall not be less than one-half hour nor more than one hour in length.  If upon the expiration of such six-hour period the camera is in the actual course of photography, it shall not be a violation to complete such photography.  If on location or while traveling to or from location the delay is not due to any fault or negligence of the Producer or its agents or persons employed by it to render the catering service by contract, or if delay is caused by common carriers such as railroads, there shall be no penalty for violation of the above provisions.  If the caterer is chosen carefully, and is delayed in reaching the location beyond the required time for commencing a meal period, there shall be no penalty for the violation; but if such delay shall continue beyond one-half hour, work shall cease, and the time intervening between such cessation of work and the meal period shall be work time.

The performer shall be entitled to a non-deductible breakfast of fifteen (15) minutes in duration, not later than 9:00 a.m., during which performer will be freed of all activity. The first deductible meal period shall commence within six (6) hours thereafter.

PAR000109

Outside the studio, where the crew is provided a meal or a meal allowance (as distinguished from per diem or penalty), the performers (other than those receiving a per diem allowance for meals on overnight locations) will be provided either a meal or a meal allowance where they have satisfied the same terms and conditions for entitlement to such meal or meal allowance as the crew.

B.   The following amounts shall be paid to performers for meal period violations:

| | | |
|---|---|---|
| (1) | For the first half-hour or fraction thereof – | $25.00 per performer |
| (2) | For the second half-hour or fraction thereof | $35.00 per performer |
| (3) | For the third half-hour and each additional half-hour or fraction thereof | $50.00 per performer |

## 14.   INTERVIEWS

A day performer who is dismissed within one hour from the time he is requested to and does report for an interview shall not be entitled to any compensation.  A day performer who is detained by the Producer for more than one hour on such interview shall be compensated for all excess time over one hour at his straight time hourly rate, in one-half hour units.  In order to entitle the performer to compensation hereunder, a call for an interview must be for a definite time, and must be given or confirmed by the casting department.  If the performer is more than five minutes late he shall not be entitled to compensation.

If there has been no agreed salary before the interview, and if the performer and the Producer cannot agree, the salary rate at which he shall be compensated for such excess time shall be determined by conciliation, and if conciliation fails, by arbitration, such arbitration shall be conducted as provided by Section 9 of the General Provisions.

PAR000110

The latest version of the script will be made accessible to the performer in the casting office twenty-four hours in advance of a scheduled reading or immediately after the scheduling of the interview, whichever last occurs.

If the performer reads or speaks lines which he has not been given to learn outside the studio, without photography or sound recording, the same shall constitute an "interview."

If the studio has not, within three days after the interview, notified the performer in writing that he has been selected, then for the purpose hereof such performer shall be deemed to have been rejected.

If parking space is not provided or readily available, Producer will validate or reimburse parking costs incurred by performers in connection with interviews.

For scheduled interviews (other than general or get acquainted type interviews) conducted and confirmed by the casting office (or, if Producer has no casting office, in the office of Producer's casting representative), sign-in sheets shall be required at the place where the performer is first directed to report.  Copies of such sheets shall be kept by Producer for thirty (30) days and, during that time, such sheets will be made available to the Union upon request.  The sign-in sheet shall indicate whether parking was provided.

Effective October 7, 1983, sign-in sheets for scheduled interviews shall include the following information:  Performer's name; social security number; name of role; performer's agent (if any); whether interview was videotaped; whether parking was provided; whether the script was available; actual call; waiting time; and performer's initials.

15. <u>AUDITIONS, TESTS</u>

A.   If the performer is given employment in the picture, he shall not be entitled to compensation for auditions or tests unless required to wait more than one hour between the time of the call for such purpose and the commencement thereof; if required to wait more than one hour the performer shall receive compensation for excess waiting time, at straight time, in half-hour units.

PAR000111

B.   If the performer is not given employment in the picture, the performer shall receive one half day's pay.

C.   If the performer reads or speaks lines which he has not been given to learn outside the studio, without photography or sound recording, the same shall not constitute an audition or test but shall constitute an "interview," and the provisions of Section 14 hereof shall apply thereto.

D.   This Section does not apply to makeup or wardrobe tests; see Section 16 hereof.

E.   For scheduled auditions conducted and confirmed by the casting office (or, if Producer has no casting office, in the office of Producer's casting representative), sign-in sheets shall be required at the place where the performer is first directed to report.  Copies of such sheets shall be kept by Producer for thirty (30) days and, during that time, such sheets will be made available to the Union upon request.  The sign-in sheet shall indicate whether parking was provided.

Effective October 7, 1983, sign-in sheets for scheduled auditions shall include the following information:  Performer's name; social security number; name of role; performer's agent (if any); whether audition was videotaped; whether parking was provided; whether the script was available; actual call; waiting time; and performer's initials.

16.  FITTINGS, WARDROBE TESTS, MAKEUP TESTS

A.   Time spent by a day performer in fitting shall be paid for as follows:

(1)  Fittings on the same day that the performer works;

(a)  Time spent in such fittings shall be work time and part of the performer's continuous day the same as wardrobe, and to the extent that overtime is caused by such fittings, overtime shall be paid in accordance with Section 9 hereof.

(b)  There shall be a voucher provided at all wardrobe fittings to be signed by the performer indicating time in and time out.

PAR000112

(2)  Fittings on a day prior to work:

Where a day performer is fitted on a day prior to the day on which he works he shall be entitled to one hour minimum pay for each call.  Additional time shall be paid for in fifteen minute units.  Day performers receiving over $600 per day shall not be entitled to any compensation for such fittings.

(3)  Performer fitted and not used:

If the day performer is fitted and not used in the picture for which he was fitted, he shall be entitled to one day's pay; such performer shall not be entitled to any further compensation.

B.   Wardrobe Tests and Makeup Tests

(1)  If a performer is given a makeup or wardrobe test and not used in the photoplay for which he was tested, he shall receive one-half day's pay for each day on which he is given such tests.

(2)  If a performer is given a makeup or wardrobe test and is used in the picture for which he was tested, he shall be paid as follows:

(a)  Tests on the same day that the performer works:

Time spent in such tests shall be work time and part of the performer's continuous day the same as fittings, and the extent that overtime is caused by such tests, overtime shall be paid in accordance with Section 9 hereof.

(b)  Tests on day prior to work:

Where a day performer is given a makeup or wardrobe test on a day prior to the day on which he works he shall be entitled to one hour minimum pay for each call.  Additional time shall be paid for in fifteen-minute units.  Day performers receiving over $600 per day shall not be entitled to any compensation for such tests.

17.  STORY, SONG, AND PRODUCTION CONFERENCES

Story, song, and production conferences on any day on which the performer is not otherwise working shall not be counted as work time for any purpose.  This provision shall not be construed to interrupt the continuous employment of day performers.

SAG 1983                          128

PAR000113

18.  STUDY OF LINES OR SCRIPT

Study of lines or script, except during the period between reporting and dismissal, shall not be counted as work time for any purpose.

19.  PUBLICITY INTERVIEWS

Time spent by the performer in publicity interviews, whether on a day the performer works or otherwise, shall not be counted as work time for any purpose, but the performer shall be under no obligation to report for such interviews.

20.  PUBLICITY STILLS

If the Producer desires the services of the performer in making publicity stills, the performer agrees to render such services.  If the Producer desires such services of the performer without the payment of compensation therefor, it may request from the Union a waiver for such purpose, and the Union agrees to grant such waiver if it considers it to be of benefit to the performer.  If the Union does not grant such waiver, and the Producer uses the services of the performer for publicity stills, the performer shall be paid for such services a minimum of two hours' compensation, and for time in excess of two hours in hourly units.

21.  REHEARSAL TIME

A.    The reading of lines, acting, singing, or dancing, in preparation for the performer's performance, in the presence and under the supervision of a representative of Producer, constitutes a rehearsal.  Rehearsals shall be counted as work time.

B.    Auditions, tests, interviews, makeup and wardrobe tests do not constitute rehearsals.

C.    The Union agrees to freely grant waivers for the training of a performer in a particular skill such as horseback riding, fencing, etc.  Compensation, if any, shall be agreed to between the performer and the Producer, subject to the approval of the Union.

D.    Neither tests, auditions, fittings, publicity stills, preproduction stills, prerecordings, nor training under subsection C above, after employment but before the starting date of such employment, shall start the employment period of such performer.  Compensation, if any, for any of such services shall be as otherwise provided in this Schedule.

SAG 1983                         129

22.  NIGHT WORK

A.   Night work is defined as work between 8:00 P.M. and
6:00 A.M. except that a first call for the day at 5:00 A.M. or
thereafter shall not constitute night work.

The performer shall receive premium pay for each straight
time hour of night work equal to 10 percent of his hourly rate
for such hours, subject to the following:

If night work is necessary by reason of difficulty in
obtaining daytime access to the object or place (such as a public
building) to be photographed, the performer shall not be entitled
to any premium pay therefor.  This exemption shall not extend to
photography on a stage or a set.

Such premium pay shall be payable to any Schedule A
performer who is earning in excess of $900 on the basis of $900.

Such night premium pay shall not be paid on any overtime
hours.

The above in no way affects audience shows covered by
Section 40 of the 1983 Television Agreement.

B.   To the extent known Producer shall provide advance
notice, i.e., on the day prior, that night work will be required
and whether such night work will involve interiors or exteriors.

C.   Dismissal - New York City.  Any performer required to
work at night and not dismissed by 9:30 P.M. will be provided
transportation by Producer to Grand Central Station, Penn Station
or the Port Authority, unless such place of dismissal is within a
zone bordered by 34th Street on the south, 59th Street on the
north, and Third and Eighth Avenues on the east and west,
respectively.

23.  SATURDAY AND SUNDAY WORK

A.   For work on Sundays, a day performer receiving $900 per
day or less shall receive double what the performer would receive
for a week day; and a day performer receiving over $900 per day
shall receive one and one-half times what he would receive for a
week day.  Overtime shall be paid at the same rate as for the
first eight hours if premium pay is received.  If the performer
does not work, he shall not be paid.  For purposes of such
calculations the maximum daily rate shall be $900.00.

B.   For work on Saturdays which are studio Saturdays, a day
performer receiving $900 per day or less shall receive double
what the performer would receive for a week day; and a day
performer receiving over $900 per day shall receive one and
one-half times what he would receive for a week day.  Overtime

PAR000115

shall be paid at the same rate as for the first eight hours if premium pay is received.  If the performer does not work, he shall not be paid.  For purposes of such calculations the maximum daily rate shall be $900.00

C.    For any overnight location Saturday, worked or not worked, performer receives what he would receive for a week day. A Saturday, as such, worked on an overnight location, shall not be a premium day.

D.    An "overnight location Saturday" as used herein shall be deemed to mean any of the following:

(1)  Any Saturday spent or worked by the performer on an overnight location or on an exploitation tour;

(2)  A Saturday which is the day of departure for such location (provided the performer does not actually work in the studio on such day);

(3)  A Saturday which is the day of return from such location (provided the performer does not actually work in the studio on such day).

All other Saturdays shall be deemed to be "studio Saturdays."

E.    There shall be no compounding of the premium pay provided by this Section and the penalty provided for violation of the thirty-six or fifty-eight hour rest period.

## 24.   WORK ON HOLIDAYS: WORK BEFORE AND AFTER HOLIDAYS

A.    If a day performer works on any of the following nine holidays, to wit: New Year's Day, Washington's Birthday, Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, or Christmas, he shall receive double what he would receive for a week day.  Whenever any of said holidays falls on a Sunday, such holiday for all purposes of this Schedule A shall be deemed to fall on the Monday next succeeding.

B.    If the day performer is employed by Producer the day before and the day after any one of the above nine holidays, the continuous employment rule shall apply over such holiday, except when any such holiday occurs on a studio Saturday on which performer does not work.

C.    If a day performer is required to spend any of the holidays above mentioned on an overnight location and does not work, he shall receive a day's pay.

SAG 1983                        131

D.   Overtime shall be paid at the same rate as for the first eight hours.

E.   There shall be no compounding of the premium pay provided by this Section and the penalties provided for violation of the thirty-six or fifty-eight hour rest period.

## 25.  WEATHER PERMITTING CALLS

Weather permitting calls are allowable for day performers subject to the following limitations and conditions:

A.   Weather permitting calls to day performers receiving $600 per day or less shall not be issued for stages in studios. The Union has heretofore upon request issued waivers permitting the giving of weather permitting calls for work on certain stages, such as the so-called "Phantom Stage" at Universal City Studios where rain, wind, or hail rendered sound recording unusable.  Similarly, waivers have been granted authorizing weather permitting calls when caused by fog, wind, rain, or hail on uncovered, tarpaulin covered, or open structures.  It is agreed that weather permitting calls within the limits provided by this Agreement may be given to performers on such or similar stages and on open or uncovered structures where the making of usable sound track is rendered impossible because of rain, wind, or hail, or where usable photography on an uncovered structure is rendered impossible by fog, wind, rain, or hail.  Disputes which may arise hereunder are subject to the arbitration provision of this Agreement.

B.   A day performer receiving $600 per day or less shall be paid a half check upon the cancellation of any weather permitting call.  This check shall entitle the Producer to hold the day performer for not exceeding four hours.  The day performer shall receive a half check for each additional four hours, or portion thereof, during which he is held by the Producer.  During this waiting period the Producer has the privilege of putting day performers into costumes, rehearsing, or making other use of their services.  If, however, any recording or photographing is done, whether still pictures or otherwise, the day performer shall be paid the agreed daily wage.

C.   Weather permitting calls may not be issued to a day performer after the commencement of his photography, and the fact that a weather permitting call or calls have been issued before the commencement of photography shall not cause the continuous employment provisions of day performer rules to come into effect. "Photography" as used herein does not refer to such photographing as is referred to in Section 28 hereof.

PAR000117

26.  SCRIPT LINES

A.   The Producer agrees that all script line parts shall be played by performers hired directly, and not by Extras adjusted on the set, except where a performer has been hired to play the part and for any reason is unavailable or unable to portray the part properly.

Except as above provided no Extra hired as such may be employed for script lines on location; and no Extra hired as such may be employed for script lines for work at the studio on the same day as the day on which he was employed as an Extra.

Non-script lines are defined as lines which are not pre-planned or preconceived and which are not deliberately omitted for the purpose of evading these provisions.

B.   An Extra hired as such may speak non-script lines, in which case the Extra shall be signed off as an Extra and employed as a day performer.  The performer so adjusted may be closed and signed off as a day performer and be re-employed in the same photoplay to perform Extra work, but not in the same part for which he was adjusted.  If such a person is again adjusted to perform day performer services in a different part in the same photoplay, he shall not be entitled to continuous or consecutive days of employment between the time when he is first signed off as a day performer and the time when he is again adjusted.  If an Extra has been adjusted to perform day performer work, the Producer may retake the scene with a different day performer, without any penalty for failure to recall such Extra.  An Extra adjusted for non-script lines shall not be entitled to day performer pay for any day or days before he was adjusted.

C.   The compensation due for the day to a performer hired as an Extra, whether by the day or the week, and adjusted for day performer work, including services as an Extra and as a day performer shall be computed as follows:

(1)  He shall receive his full day's pay as an Extra.

(2)  In addition thereto he shall receive his full day's pay as a day performer.

(3)  The Producer shall be entitled to a credit against the sum payable under (2) of that portion of the sum payable under (1) as represents the part of the day from and after the time the performer is signed off as an Extra, computed in units of tenths of an hour.

Overtime, if any, shall commence to accrue after the performer so adjusted has rendered eight hours' work as a day performer.

PAR000118

To illustrate the application of the foregoing rule:

An Extra starts work at 9:00 A.M. and works until 10:07 A.M.  At 10:07 A.M. he is signed off as an Extra and employed as a day performer.  He thereafter works seven and one-half hours as a day performer.  Under subparagraph (1) he receives eight hours' pay as an Extra; under subparagraph (2) he receives eight hours' pay as a day performer; under subparagraph (3) the Producer is entitled to a credit of six hours and forty-eight minutes' pay at his Extra rate.  Assume the performer's Extra rate is $87.00 per day and his day performer rate is $328.00, the performer would receive $341.05.

## 27.  STUNT ADJUSTMENT

Unless otherwise bargained for at the time of his engagement, a day performer shall receive an adjustment of an additional applicable daily stunt performer's minimum on any day on which he performs a stunt.  In no event shall the day performer ever receive less than the stunt performer's day minimum on the day the performer does the stunt.  Overtime compensation on such day shall be based on the performer's aggregate compensation for such day.

## 28.  RETAKES, ADDED SCENES, ETC.

A.   As an exception to the consecutive employment requirements of Section 6 hereof, compensation for services in connection with retakes, added scenes, sound track, process shots, transparencies, trick shots, trailers, changes and foreign versions, shall be paid to the day performer only for the days on which the performer is actually so employed.  If such services are commenced within three months after the prior termination of employment, compensation therefor shall be at the daily rate originally agreed upon, except in case of conversion to the weekly basis, in which latter event the compensation shall be prorated on the weekly rate originally agreed upon.

B.   Closeups

The Union will freely grant waivers of continuous employment for the making of closeups made after the completion of the Director's first rough cut of the photoplay, so that the performer shall be paid only for the day or days upon which he renders such services.

## 29.  OVERLAPPING ENGAGEMENT

In any case where the engagement of a performer under a free-lance contract extends into or overlaps any other engagement of such performer as a free-lance performer or day performer

SAG 1983                                134

(1)   Because of any unanticipated delay in production or bona fide mistake, or

(2)   Because of any failure of such performer to disclose his other engagements at the time of accepting any engagement, or

(3)   In any case where, as an accommodation to such performer, such performer is permitted to work currently in two pictures,

it is agreed as follows:  For any day or days in which such performer renders his services for the Producer of the picture in which he has first rendered his service, he shall receive compensation from such first Producer.  For any day or days in which such performer renders services for the Producer of the second picture in which he has rendered his services, he shall be compensated by the Producer of such second picture.  For any day or days on which the performer does not render his services either for the first Producer or for the second Producer he shall be compensated by the second Producer, unless the first and second Producers agree between themselves (and notice thereof is given to the performer) that compensation for such additional day or days shall be paid by the first Producer.  The compensation to be paid by the first Producer shall be paid at the rate specified in the performer's contract with the first Producer, and the compensation to be paid by the second Producer shall be at the rate specified in the performer's contract with the second Producer; provided, however, that if the rate paid by the first Producer is less than the rate specified in the performer's contract with the second Producer the difference shall be paid by the second Producer, and provided, further, that for any day or days on which the performer does not render services either for the first or for the second Producer he shall be compensated at the rate of compensation which is the higher of the two.  This paragraph does not affect such performer's right to receive compensation from both Producers where the Performer, while employed by one Producer, makes retakes, added scenes, etc., for the other Producer after the expiration of his term of employment with such other Producer, in any case where the performer is otherwise entitled thereto.  Nothing in this paragraph contained shall be deemed or construed in any way to limit or prejudice any right or remedy of any Producer, either with respect to any of the contingencies hereinbefore specified or otherwise.  A free-lance performer may be required to state on his contract the starting date of his engagement by inserting such date in the following statement, which may be endorsed or printed on such contracts:

"The starting date of the performer's next engagement is _____."

PAR000120

30.  PRERECORDINGS

Prerecordings, including rehearsals therefor, after employment but before the starting date of such employment, shall not start the consecutive days of employment of a day performer; such performer shall be paid for the day or days on which he renders services in connection with prerecordings.

31.  PREPRODUCTION STILLS

Preproduction stills, including rehearsals and preparations therefor, after employment but before the starting date of such employment, shall not start the consecutive days of employment of a day performer; such performer shall be paid for the day or days on which he renders services in connection with preproduction stills.

32.  TRAVEL TIME - RULES AND DEFINITIONS

A.  Travel to Location - No Services Rendered on Day of Departure

If a day performer is transported to location and such traveling is commenced on any day on which he does not render services, he shall be compensated at a day's pay.

B.  Pay for Day of Arrival

If a day performer is transported to or from location and he does not arrive at the destination on the day of departure, any travel time past midnight of the day preceding the day of arrival shall not be work time or travel time for any purpose whatsoever with respect to the day of arrival, but such day performer shall nevertheless be entitled to not less than a full day's pay for the day of arrival, whether or not he renders any services on such day.

C.  Pay for Intervening Days of Travel

If a day performer is transported to or from location and does not arrive at the destination on the day following the day of departure, he shall be entitled to one day's pay for each intervening day of travel.

D.  Travel from Location

If a day performer departs from location, he shall be entitled to a full day's pay for such day of departure, but if he has not otherwise rendered services on such day, his travel time on such day shall not be counted as work time or travel time for any purpose.  If a day performer departs from location on a day on which he has rendered services, then, for the purpose of

SAG 1983                           136

PAR000121

computing his pay for the day of departure, his travel time, if any, past midnight of such day shall not be work time or travel time for any purpose unless he arrives at the destination and renders services on the day next following the day of departure; but if in such event he does arrive at the destination and renders services on the day next following the day of departure, his travel time past midnight of the day of departure shall be included in his travel time for the purpose of computing his pay for the day of departure; it being understood that for the purpose of computing his pay for the day of departure as aforesaid, such performer shall in no event be entitled to more than one day's pay on account of all such travel time.

### E.   Travel Provisions When Recalled for Retakes, Added Scenes, etc.

Any day performer living within the City of Los Angeles or its environs, who is outside such area when he is recalled by the Producer for any of the purposes specified in Section 28 hereof (including performers who are entitled to the provisions of the following paragraph), shall be provided with transportation or reimbursed for the cost of transportation only, from the place where he is when recalled to the place designated by the Producer, by the particular mode of transportation specified by the Producer, regardless of any other mode of transportation the performer may actually use.  Return transportation shall be furnished or the performer shall be reimbursed for such return transportation, as above set forth, only if the performer shall so return within one week from the date of dismissal by Producer.

Any day performer living within the City of Los Angeles or its environs, who is at a place beyond a radius of 150 miles from the intersection of Beverly Boulevard and La Cienega, Los Angeles, California, when he is recalled by Producer for any of the aforesaid reasons, shall be placed on salary as of the day he is directed to and does report to the place designated by Producer, and shall remain on salary each day until dismissed, except for the provisions relating to Sundays and holidays.  If after dismissal the performer remains in this locality or delays his return, unless by the Producer's request, and is again recalled by the Producer, he shall not be entitled to any payment for the time intervening between his dismissal and his recall. The performer shall be entitled to travel time compensation based on the same rate paid for his principal engagement, for the period of time, and only for the period of time that is required in traveling to and from the said place designated by the Producer by the particular mode of transportation specified by the Producer, regardless of any other mode of transportation the performer may actually use.  Such travel time compensation shall be computed in accordance with the travel time allowance provisions for day performers as provided in this subsection E. The said travel time allowance for the day performer's return to the place of original departure shall be paid only if the performer shall so return within one week from the date of dismissal by Producer.

SAG 1983                           137

If the Producer designates the mode of transportation and the day of departure and the performer follows such directions, there shall be no lapse in payment for days intervening between end of travel and commencement of work.

In the event the Producer does not specify the mode of transportation, then the travel time allowance shall be based upon the most expeditious mode of transportation possible, including travel by commercial airlines.  The performer need not fly, but if he elects not to fly when requested to do so it shall not increase the travel time allowance as specified above.

There shall be no duty on the Producer to procure return transportation for the performer so long as Producer pays for the same.

To illustrate the foregoing, a performer, a resident of Los Angeles, is temporarily in San Francisco.  Within three months from the close of his principal engagement, he is recalled by the Producer as follows:  On a Monday the Producer directs the performer to report at the Los Angeles studio of Producer at 11:00 A.M. on the following Thursday for retakes.  The performer elects to travel by train.  He departs from San Francisco on Wednesday night, arriving at Los Angeles Thursday morning, and reports at 11:00 A.M.  The Producer dismisses the performer at 2:00 P.M. on the same day.  The performer elects to return to San Francisco by train.  The performer shall be entitled to one day's pay at the same rate as was paid for his original engagement, plus the cost of transportation by commercial airline.

In the foregoing example, if the performer had been dismissed at 6:00 P.M. with an hour off for lunch (six hours work, four hours travel), the performer would have been entitled to pay for one day plus two hours in time and one-half.  The performer shall not be entitled to a travel allowance of more than eight hours in any period of twenty-four hours; and the performer shall not be entitled to any travel time allowance for a period of travel for which he is otherwise paid.

Where principal photography takes place in New York, the provisions of this subsection E of Schedule A shall apply to performers living in New York and absent therefrom, and shall be applied to other cities in the same manner by analogy.

An out-of-state performer who is recalled for any of the purposes specified in subsection E of this Schedule A shall not be required to remain in this locality after dismissal unless he is carried on salary during the period he is so required to wait.

Transportation shall mean first-class transportation.

SAG 1983                              138

F.   Studio Zone

(1)  With respect to studios situated in Los Angeles, California, or its environs, the "studio zone" shall include all territory within the radius of thirty (30) miles from the intersection of Beverly Boulevard and La Cienega Boulevard, Los Angeles, California, and such other territory (such as the present Columbia Ranch and Disney Studio) as is generally recognized as being within the studio zone.  With respect to studios not situated in Los Angeles or its environs, a similar territory as the studio zone, and similar rules in relation thereto, shall be agreed upon between the Union and the Producers, and in default of such agreement, such territory and such rules (which shall conform as nearly as possible to the rules herein set forth) shall be determined by arbitration under Section 9 of the General Provisions whenever the situation arises.

(2)  With respect to studios situated in New York, New York, the "studio zone" shall include all territory within the radius of 8 miles from Columbus Circle.

(3)  The Los Angeles 30 mile Studio Zone.  Performers may be required to report anywhere within such studio zone provided that, when the place of reporting is elsewhere than the Producer's studio, the following shall apply:

(a)  Performers shall be paid $.30 per mile mileage allowance figured from the studio to the place of reporting and back; and

(b)  Distances shall be clearly stated on the performer's production time report.

(c)  If, during the term of this Agreement, the International Alliance of Theatrical and Stage Employees through its collective bargaining agreement negotiates with Producer a more favorable mileage allowance than the foregoing thirty cents ($.30) per mile allowance, then, in such event, from such date forward the Union will be entitled to the benefits of such increase.

(d)  The mileage allowance may be paid as a portion of the performer's payroll check, provided it is separately identified as such mileage reimbursement.

(4)  When a performer is required to report for work in the studio zone other than at a studio, Producer shall pay for parking in a supervised public parking lot.  If no such public parking is available, Producer will provide supervised or secured parking.

PAR000124

(5)  With respect to studios situated in San Francisco,
California, the "studio zone" shall include all territory
within the radius of thirty (30) miles from the intersection
of Market and Powell Streets.

G.    Location and Overnight Location

Location shall mean any place of work not at the
Producer's studio which is outside the studio zone.  Overnight
location shall be any location where the performer is lodged or
offered lodging by the Producer at or near the location for one
or more nights, or any location which takes overnight to reach by
ordinary means of transportation.

H.    Near Location

A near location shall be any place which can be reached
from the Producer's studio within twenty-four hours of travel by
ordinary means of transportation.  If the Producer instructs the
performer to fly to a location and the trip takes less than
twenty-four hours by air, the same shall be deemed to be a near
location.

I.    Distant Location

A distant location shall be any place which cannot be
reached from the Producer's studio within twenty-four hours of
travel by ordinary means of transportation.

J.    Place of Reporting and Dismissal

Except when already at an overnight location,
performers shall be required to report only at the Producer's
studio or within the studio zone, and shall be dismissed only at
the place of reporting within the studio zone or the Producer's
studio.  When the performer is returning from such overnight
location, he shall be dismissed only at the Producer's studio or
the place of reporting within the studio zone, and not at the
overnight location.

K.    Travel Time is Work Time

Except as otherwise provided in this Agreement, all
time spent by any performer in traveling at the request of the
Producer between any place at which he is required to and does
report and any location, both to and from, shall be travel time,
and as such shall be work time, subject to all deductions,
limitations, and exceptions for which provision is made in this
Agreement.

L.    Maximum Travel Time

Time spent in traveling shall not be included as travel
time or work time to the extent of more than eight hours in any
twenty-four hours.

SAG 1983                        140

M.   Intervening Time between Dismissal and Travel

(1)   Time intervening between the completion of a performer's work on any day and the commencement of travel on the same day shall be travel time except as otherwise provided in this Agreement.

(2)   Travel to Overnight Location:  Except as otherwise provided in this Agreement, the period of time intervening between the performer's dismissal for the day and the commencement of travel to an overnight location on the same day shall be travel time.  This provision shall not affect the day performer's right to a minimum of one day's pay for such day.

(3)   Travel from Overnight Location:  The period intervening between the performer's dismissal for the day and the commencement of travel on the same day from an overnight location shall, as to day performers, be travel time, except as in this Agreement otherwise provided.

N.   Transportation and Lodging Furnished

The Producer shall furnish reasonable transportation to and from location and shall furnish reasonable meals, and (where the Producer requires a performer to stay overnight), lodging to the performer on location.  Separate rooms shall be provided to performers transported to overnight locations unless such rooms are not available.

In the event Producer believes that separate rooms will not be available at a particular location, Producer will notify the Union and the performer prior to departure, with reasonable time for each to investigate to determine whether the foregoing requirement can be complied with by Producer.

O.   Deduction of Allowable Meal Periods

Reasonable meal periods shall be given during traveling, and allowable meal periods of not less than one-half hour nor more than one hour each shall be deducted from travel time, provided a reasonable meal is made available.

P.   Deduction of Travel Time Otherwise Compensated For

Any travel time for which the performer is compensated as work time shall not be paid for as travel time.

Q.   Computation of Overtime Caused by Travel Time

On a day on which a performer travels only, the performer shall be compensated at a day's pay.  On a day on which the performer travels and works, overtime caused by such will be compensated at time and one-half and not at double time.

PAR000126

R.   Transportation and Travel Time on Overnight Locations
     to and from Hotel or Camp

     On overnight locations, the Producer shall provide
transportation to and from the hotel or camp and, except as in
this Agreement otherwise provided, the time to and from the hotel
or camp shall be travel time.  The rest period may be reduced to
ten hours (under Section 10.D(2)).

S.   Travel to or from Overnight Locations on Boat or Train
     Where Sleeping Accommodations are Provided

     Where more than one night's travel, by ordinary means
of transportation, is required to reach a location, and the
performer is given a berth on a boat or train, the time spent in
traveling to or from such location shall not be work time or
travel time for the purpose of computing the twelve-hour rest
period or for the purpose of computing the eight-hour day; it
being agreed, however, that time spent in traveling on the day of
arrival at such location, after 9:00 A.M. of such day, shall be
counted for the purpose of computing the eight-hour day if the
performer works on such day, and provided further that the
interval between the completion of travel on such day and the
commencement of work shall not be considered travel time or work
time for any purpose.  Nothing herein contained shall be
construed to interrupt the performer's right to remain on salary
if the performer is otherwise entitled thereto.

T.   Overnight Trip to or from Location

     Where an overnight trip to or from location is
required, and the same takes at least seven hours to reach and
the performer is given a berth on a boat or train, the time spent
in such traveling to or from such location, whether at the
beginning, during or at the end of the engagement, shall not be
work time or travel time for the purpose of computing overtime
and the rest period.

U.   Traveling on Sundays and Certain Holidays

     The holidays herein referred to are New Year's Day,
Washington's Birthday, Good Friday, Memorial Day, July Fourth,
Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and
Christmas.  Where a day performer travels on any Sunday or on any
of said holidays, he shall receive time and one-half for such
travel time.

V.   Engagement of Performers - Other Areas

     (1)  If a performer, residing or working in any area in
which SAG maintains a Branch, is brought to Producer's base or
distant location in a different area of the United States for any
purpose, the performer shall receive transportation and a $55 per
day allowance from the time he commences travel at Producer's
request until the time his salary commences.

SAG 1983                         142

(2)   If Producer is photographing on a location in the
United States and brings a performer to such location from
anywhere in the United States, such performer shall be provided
transportation to and from such location.

(3)   Except as otherwise provided in (1) and (2) above,
nothing herein contained shall prevent a Producer from engaging a
performer outside of California (if such performer has not gone
out of California for the purpose of evading this rule) to report
in California or to report at any location, and in any such case
the Producer shall not be required to pay for or provide
transportation of such performer to the place of reporting, or to
pay such performer for any time spent in traveling thereto; nor
shall the Producer be required to pay for or provide
transportation of such performer, at the end of the engagement
back to the place where such performer was engaged, or to pay
such performer for any time spent in traveling back to the place
where such performer was engaged; such performer may be dismissed
on location.   This does not limit the second sentence of
subsection F hereof.

(4)   Performers shall not be held on a per diem longer
than three (3) days.

W.   <u>General</u>

(1)   Nothing in this Section 32 shall be deemed to
break the continuous employment of a day performer.

(2)   This Agreement uses the expressions "reasonable
transportation" and "first-class transportation."   The terms are
intended to be synonymous.   The type of transportation required
can best be illustrated by examples:   Bus transportation for a
relatively short distance (Hollywood to Lake Arrowhead) meets
these requirements; bus transportation for a long distance
(Hollywood to San Francisco) does not.   Pullman accommodations to
San Francisco, or any other long distance, meets these
requirements; deluxe transportation (e.g., Super Chief) is not
required.   Transportation on a commercial airline without sleeper
accommodations is first-class transportation.   First-class
transportation shall be provided on commercial airlines where the
performer is required to fly at the request of the Producer.   The
foregoing shall apply to jet flights as well as to prop-driven
aircraft.   The foregoing shall not apply where first-class
transportation is not available or six or more of the company are
being transported.   Charter flights may be used which provide
substantially equivalent accommodations.   Notwithstanding the
foregoing, first-class air transportation need not be provided
with respect to auditions and interviews.

PAR000128

## 33.  RIGHT TO NAME OR CHARACTER

No Producer shall after the termination of the performer's employment prevent such performer from continuing the use of any stage or screen name used by such performer.  The name of a role owned or created by the Producer, such as Tarzan or Charlie Chan, belongs to the Producer and not to the performer.

## 34.  RATE NOT SPECIFIED

Wherever this Schedule states that a performer shall receive compensation for work done before he is employed, if he is not employed, and no rate is specified in this Schedule, such compensation shall be computed upon the agreed rate of compensation, if there was such an agreed rate of compensation, and if not, upon the performer's established compensation. Disputes between the performer and the Producer under this provision are subject to conciliation and arbitration.

## 35.  TIME OF PAYMENT

Paychecks shall be mailed or delivered to the performer within three working days after completion of his day's work; Saturdays, Sundays and holidays excepted.

## 36.  USE OF "DOUBLE"

The provisions of Schedule B Section 36 shall apply to day performers employed at or above a salary of $475.00 per day.

PAR000129

SCHEDULE B

FREE-LANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS
$3500 OR LESS PER WEEK AND WHO ARE GUARANTEED LESS
THAN $30,000 PER THEATRICAL PICTURE OR
LESS THAN $25,000 PER TELEVISION PICTURE

Table of Contents

Section
  No.

1.   Definition
2.   Schedule B Included in
     Individual Contracts
3.   Minimum Contract -
     Required Provisions
4.   Starting Date
5.   Minimum Salary - Guarantee
6.   Execution of Agreement -
     Engagement-Delivery of
     Contract
7.   Rate Not Specified
8.   Studio Payroll Week -
     Time of Payment
9.   The Performer's Workweek;
     Studio 5-Day Week;
     Overnight Location Week
10.  Performers Week
11.  Hours Per Day; Work Past
     Midnight
12.  Daily Rate of Compensation;
     Prorating
13.  Overtime
14.  Rest Period
15.  Work Time
16.  Makeup, Hairdress, Wardrobe
17.  Meal Periods
18.  Dressing Rooms
19.  Tests, Auditions, Wardrobe
     Tests, Makeup Tests,
     Interviews
20.  Wardrobe Fittings
21.  Story, Song, and Production
     Conferences
22.  Study of Lines or Script
23.  Publicity Interviews
24.  Publicity Stills

Section
  No.

25.  Rehearsal Time
26.  Night Work
27.  Work on Holidays,
     or Holidays and
     Saturday or Sunday
28.  Work Past Midnight
     on Last Day
29.  Stunt Adjustment
30.  Retakes, Added
     Scenes, Etc.
31.  Overlapping
     Engagement
32.  Prerecordings and
     Preproduction
     Stills
33.  Reporting Prior to
     Commencement of
     Employment
34.  Damage to Wardrobe
35.  Definition of Role
36.  Use of Double
37.  Right to Name or
     Character
38.  Studio Rules
39.  Rights Granted to
     Producer
40.  General Right of
     Termination
41.  Illness of Performer
42.  Emergency Suspension
     or Termination
43.  Resumed Production
     after Termination
44.  Travel Time
45.  Looping

PAR000130

SCHEDULE B INDEX

|  | Section No. | Page No. |
|---|---|---|
| Added Scenes | 30, 44T | 179,190 |
| Adjustment for Stunt | 29 | 178 |
| Agreement, Execution of | 6 | 154 |
| Arbitration-See General Provisions |  |  |
| Auditions, Tests Etc | 19 | 169 |
|  |  |  |
| Closeups | 30C | 179 |
| Conferences - Story, Song and Production | 21 | 172 |
| Contract - Requirements | 3 | 151 |
| Contract - Minimum Free-Lance Form | 3 | 151 |
| Commencement at Distant Location - See Travel Time | 44-0 | 189 |
| Computation of Overtime | 13 | 161 |
| Continuous Employment | 15D | 166 |
|  |  |  |
| Daily Rate of Compensation | 12 | 161 |
| Damage to Wardrobe | 34 | 181 |
| Date When Overtime Due | 13E | 163 |
| Definition of Free-Lance Performer | 1 | 151 |
| Definition of Role | 35 | 183 |
| Definition of Week (Minimum Contract) | 3 | 151 |
| Delivery of Contract | 6 | 154 |
| Double Use of | 36 | 182 |
| Dressing Rooms | 18 | 169 |
|  |  |  |
| Emergency Suspension or Termination | 42 | 185 |
| Engagement, Overlapping | 31 | 180 |
| Engagement | 6 | 154 |
| Error in Computation of Overtime | 13D | 163 |
| Execution of Agreement | 6 | 154 |
|  |  |  |
| Fittings, Wardrobe | 20 | 171 |
| Fittings Without Employment | 20A | 171 |
| Five-Day Workweek; Studio | 9B | 157 |
| Free-Lance Performer - Definition | 1 | 151 |
| Furnishing of Wardrobe | 34 | 181 |
|  |  |  |
| General Right of Termination | 40 | 184 |
| Guarantee - Minimum Salary | 5 | 154 |
| Guarantee Not Affected by Overtime | 13F | 163 |
| Union Branches - 5-Day Week | 9F | 160 |
| Union Membership-See General Provisions |  |  |
|  |  |  |
| Hairdress | 16 | 166 |
| Holidays; Holidays & Sat. or Sun | 27 | 174 |

PAR000131

Schedule B Index
(Continued)

|  | Section No.<br>No. | Page<br>No. |
|---|---|---|
| Hours Per Day and Per Week......................9 | | 157 |
|     Overnight Location – 6-Day Week..........9C | | 159 |
|     Studio – 5-Day Week.......................9B | | 157 |
| Individual Contract – Schedule B Included......2 | | 151 |
| Illness of Performer...........................41 | | 184 |
| Interviews....................................19 | | 169 |
| Interviews, Publicity.........................23 | | 172 |
| Lines, Study of................. .............22 | | 172 |
| Locations – See Travel Time(This Index) | | |
| Looping.......................................45 | | 193 |
| Makeup Tests..................................19 | | 169 |
| Makeup, Hairdress, Wardrobe...................16 | | 166 |
| Mass Test....................................19B | | 169 |
| Meal Periods..................................17 | | 168 |
| Minimum Contract – Required Provisions........3 | | 151 |
| Minimum Guarantee.............................5 | | 154 |
| Minimum Rates.................................5 | | 154 |
| Minimum Salary – Guarantee....................5 | | 154 |
| Name, Right to................................37 | | 183 |
| Night Work...................................26 | | 173 |
| Notices – Performer's Address and Telephone | | |
|     Number.....................................3 | | 151 |
| "On or About" Clause........................3, 4 | | 152,153 |
| Overlapping Engagement........................31 | | 180 |
| Overnight Location – 6-Day Week...............9C | | 159 |
| Overtime......................................13 | | 161 |
| Pay Not Specified.............................7 | | 156 |
| Payment, Time of..............................8 | | 156 |
| Performer's Workweek.......................9, 10 | | 157,160 |
| Prerecordings.................................32 | | 181 |
| Preproduction Stills..........................32 | | 181 |
| Process Shots.................................30 | | 179 |
| Production Conferences........................21 | | 172 |
| Production, Resumed after Termination.........43 | | 185 |
| Prorating Salary..............................12 | | 161 |
| Publicity Interviews.........................23 | | 172 |
| Publicity Stills.............................24 | | 172 |
| Rate Not Specified............................7 | | 156 |
| Rate – Overtime.............................13A | | 161 |
| Recall for Added Scenes......................30 | | 179 |

PAR000132

Schedule B Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Recall on Saturday or Sunday................... | 9D | 160 |
| Rehearsals...................................... | 25 | 173 |
| Reporting Prior to Commencement of Employment................................ | 33 | 181 |
| Rest Period.................................... | 14 | 163 |
| Resumed Production After Termination.......... | 43 | 185 |
| Retakes, Added Scenes, Etc.................... | 30 | 179 |
| Rights Granted to Producer.................... | 39 | 183 |
| Right to Name or Character.................... | 37 | 183 |
| Role, Definition of........................... | 35 | 181 |
| Role and Salary (Minimum Contract)............ | 3 | 151 |
| | | |
| Salary - Minimum Guarantee.................... | 5 | 154 |
| Salary - Prorating............................ | 12 | 161 |
| Saturday & Sunday Work (Studio 5-Day Week)..... | 9B(3) | 157 |
| Saturday or Sunday & Holidays (Studio 5-Day Week)........................ | 27B | 174 |
| Schedule B Included in Individual Contracts.... | 2 | 151 |
| Script, Study of.............................. | 22 | 172 |
| Six-Day Workweek; Overnight Location.......... | 9C | 159 |
| Starting Date................................. | 4 | 153 |
| Stills, Publicity............................. | 24 | 172 |
| Story, Song, and Production Conferences....... | 21 | 172 |
| Study of Lines or Script...................... | 22 | 172 |
| Studio 5-Day Week............................. | 9B | 157 |
| Studio Payroll Week........................... | 8 | 156 |
| Studio Rules.................................. | 38 | 183 |
| Stunt Adjustment.............................. | 29 | 178 |
| Sunday Work (Overnight Location 6-Day Week).... | 9C(3) | 159 |
| Sunday Work (Studio 5-Day Week)............... | 9B(3) | 157 |
| Sundays & Holidays (Overnight Location 6-Day Week)................................ | 27C | 176 |
| Sundays & Holidays (Studio 5-Day Week)........ | 27B | 174 |
| Suspension, Emergency......................... | 42 | 185 |
| | | |
| Termination, General Right of................. | 40 | 184 |
| Termination, Emergency........................ | 42 | 185 |
| Termination, Resumed Production After......... | 43 | 185 |
| Tests, Auditions, Wardrobe Tests, Interviews.................................. | 19 | 169 |
| Tests, Makeup................................. | 19 | 169 |
| Time of Payment............................... | 8 | 156 |
| Transparencies................................ | 30 | 179 |
| Travel Time................................... | 44 | 186 |

|  | Subsection | Section No. | Page No. |
|---|---|---|---|
| Application of Rules.......... | A | | 186 |

PAR000133

Schedule B Index
(Continued)

|  | Subsection | Section No. | Page No. |
|---|---|---|---|
| **Travel Time (continued)** | | | |
| Computation of Overtime Caused by Travel Time | N | | 189 |
| Deduction of Allowable Meal Periods | L | | 189 |
| Deduction of Travel Time Otherwise Compensated For | M | | 189 |
| Distant Location | E | | 187 |
| Engagement of Performer - Other Areas | U | | 192 |
| General | V | | 193 |
| Intervening Time between Dismissal and Travel | I | | 188 |
| Location and Overnight Location | C | | 187 |
| Maximum Travel Time | H | | 188 |
| Near Location | D | | 187 |
| Overnight Trip to or from Location | R | | 190 |
| Place of Reporting and Dismissal | F | | 187 |
| Studio Zone | B | | 186 |
| Transportation and Lodging Furnished | K | | 188 |
| Transportation and Travel Time on Overnight Location to and from Hotel or Camp | P | | 189 |
| Travel from Overnight Location-Intervening Time | I(3) | | 188 |
| Travel on Holidays and Sundays | S | | 190 |
| Travel on Seventh Day | J | | 188 |
| Travel Pursuant to Recall for Added Scenes, Etc. | T | | 190 |
| Travel Time is Work Time | G | | 188 |
| Travel Time re Distant Locations at Beginning or End of Performer's Term of Employment | O | | 189 |
| Travel to Overnight Location-Intervening Time | I(2) | | 188 |
| Travel to or from Overnight Locations on Boat or Train where Sleeping Accommodations are Provided | Q | | 190 |

PAR000134

Schedule B Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Trick Shots | 30, 44T | 179,190 |
| Units of Overtime | 13B | 162 |
| Use of "Double" | 36 | 182 |
| Waivers re Starting Date | 4C | 153 |
| Walk-Through | 19B | 169 |
| Wardrobe | 16 | 166 |
| Wardrobe, Damage to | 34 | 181 |
| Wardrobe Fittings | 20 | 171 |
| Wardrobe Tests | 19 | 169 |
| Week, Definition of (Minimum Contract) | 3 | 151 |
| Week, Five-Day Studio | 9B | 157 |
| Week, Proration of | 12 | 161 |
| Week, Six-Day Overnight Location | 9C | 159 |
| Week Studio Payroll | 8 | 156 |
| Work on Holiday | 27 | 174 |
| Work Past Midnight on Last Day | 28 | 178 |
| Work Time | 15 | 165 |
| Workweek | 9 | 157 |
| Working at Midnight | 11 | 160 |

PAR000135

## SCHEDULE B

### FREE-LANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS $3500 OR LESS PER WEEK AND WHO ARE GUARANTEED LESS THAN $30,000 PER THEATRICAL PICTURE OR LESS THAN $25,000 PER TELEVISION PICTURE

1.  DEFINITION

    A free-lance performer is a performer employed for a specific picture in a designated role on a weekly basis at a salary of $3500 or less per week but no less than $1142.00 for the period July 1, 1983 through December 31, 1984 and $1256.00 thereafter and who are guaranteed less than $30,000 per theatrical picture or less than $25,000 per television picture.

2.  SCHEDULE B INCLUDED IN INDIVIDUAL CONTRACTS

    It is agreed that the conditions of this Schedule shall govern the employment of free-lance performers and shall become a part of the contract with the free-lance performer.

3.  MINIMUM CONTRACT - REQUIRED PROVISIONS

    The minimum free-lance contract shall be as follows:

        SCREEN ACTORS GUILD, INC. MINIMUM FREE-LANCE CONTRACT

    Continuous Employment-Weekly Basis-Weekly Salary-One Week
                  Minimum Employment

    THIS AGREEMENT, made this _____day of _____,19____, between _____ hereinafter called "Producer," and _____ hereinafter called "Performer."

                        WITNESSETH:

    1.  Photoplay, Role, Salary, and Guarantee. Producer hereby engages Performer to render service as such in the role of _____, in a photoplay, the working title of which is now_____, at the salary of $_____($_____) per week. Performer accepts such engagement upon the terms herein specified. Producer guarantees that it will furnish Performer not less than _____week's employment (if this blank is not filled in, the guarantee shall be one week).

SAG 1983                        151

2.   <u>Term</u>.   The term of employment hereunder shall begin on
_____on or about*_____, and
shall continue thereafter until the completion of the photography
and recordation of said role.

3.   <u>Basic Contract</u>.  All provisions of the collective
bargaining agreement between Screen Actors Guild, Inc. and
Producer, relating to theatrical motion pictures, which are
applicable to the employment of the Performer hereunder, shall be
deemed incorporated herein.

4.   <u>Performer's Address</u>.  All notices which the Producer is
required or may desire to give to the Performer may be given
either by mailing the same addressed to the Performer at
_____,_____, or
such notice may be given to the Performer personally, either
orally or in writing.

5.   <u>Performer's Telephone</u>.  The Performer must keep the
Producer's casting office or the assistant director of said
photoplay advised as to where the Performer may be reached by
telephone without unreasonable delay.  The current telephone
number of the Performer is _____.

6.   <u>Motion Picture and Television Fund</u>.  The Performer
(does) (does not) hereby authorize the Producer to deduct from
the compensation hereinabove specified an amount equal to
_____per cent of each installment of compensation due
the Performer hereunder, and to pay the amount so deducted to the
Motion Picture and Television Fund.

                              (Performer)
7.   <u>Furnishing of Wardrobe</u>.  The (Producer) agrees to
furnish all modern wardrobe and wearing apparel reasonably
necessary for the portrayal of said role; it being agreed,
however, that should so-called "character" or "period" costumes
be required, the Producer shall supply the same.

8.   <u>Arbitration of Disputes</u>.  Should any dispute or
controversy arise between the parties hereto with reference to
this contract, or the employment herein provided for, such
dispute or controversy shall be settled and determined by
conciliation and arbitration in accordance with the conciliation
and arbitration provisions of the collective bargaining agreement
between the Producer and Screen Actors Guild relating to
theatrical motion pictures, and such provisions are hereby

_____

* The "on or about" clause may only be used when the contract is
delivered to the Performer at least seven days before the
starting date.  See Codified Basic Agreement of 1983, Schedule B,
Section 4; Schedule C, Section 4; otherwise a specific starting
date must be stated.

PAR000137

referred to and by such reference incorporated herein and made a part of this agreement with the same effect as though the same were set forth herein in detail.

9.   <u>Next Starting Date</u>.  The starting date of Performer's next engagement is _____.

10.  The Performer may not waive any provision of this contract without the written consent of Screen Actors Guild, Inc.

11.  Producer makes the material representation that either it is presently a signatory to the Screen Actors Guild collective bargaining agreement covering the employment contracted for herein, or, that the above-referred-to photoplay is covered by such collective bargaining agreement under the provisions of Section 24 of the General Provisions of the Producer-Screen Actors Guild Codified Basic Agreement of 1983.

IN WITNESS WHEREOF, the parties have executed this agreement on the day and year first above written.

PRODUCER_____

_____    By_____
PERFORMER


4.   <u>STARTING DATE</u>

A.   The phrase "on or about" as used in a free-lance performer's contract shall allow a latitude of twenty-four hours, exclusive of Saturdays, Sundays and holidays, either prior to or after the date specified in the contract as the commencement of the term thereof.

B.   If a free-lance contract is delivered to the performer at least seven days before the starting date, the "on or about" clause may be used.  If a contract is delivered to a performer less than seven days before the specified starting date, a definite starting date must be specified and the "on or about" clause shall not be used.  To illustrate:  If the starting date of a performer is on the eighth day of the month, and the contract is delivered to the performer on the first day of the month, the "on or about" clause may be used, but if the contract is delivered to the performer on the second day of the month, the "on or about" clause may not be used.

C.   In any case where it is impracticable or impossible to fix any definite starting date of any performer to be employed under a free-lance contract because of such performer's activities on the stage or in radio or otherwise in the amusement business (except motion pictures), the Union agrees to waive the

SAG 1983                            153

requirement of a definite starting date in such free-lance
contract, provided that such free-lance contract contains a
reasonable provision for the fixing of the starting date thereof
and notice thereof.  Any dispute between the Union and any
Producer with respect to the issuance of any such waiver shall be
determined by arbitration under Section 9 of the General
Provisions hereof.

 D. In the event a performer is engaged in accordance with
Section 6B hereof, but a start date has not yet been provided to
the performer by the Producer, performer may terminate such
engagement in order to accept conflicting <u>bona fide</u> employment by
a third party, subject, however, to the performer first giving
Producer the following minimum period during which Producer may
specify a start date which then becomes binding, which conflicts
with the proferred third party employment.

 (1) if performer informs Producer before noon of a business
day, by the end of the same day; or

 (2) if performer informs Producer at any other time, by
noon of the next business day.

## 5. <u>MINIMUM SALARY - GUARANTEE</u>

 The minimum salary for a free-lance performer shall be
$1142.00 per week for the period July 1, 1983 through December
31, 1984 and $1256.00 thereafter.

 One picture employment for a free-lance performer shall
guarantee at least one week's employment.  The guarantee in this
paragraph provided shall be subject to the rights of suspension
and termination granted to the Producer by the provisions of
Sections 40, 41, and 42 of this Schedule B.

## 6. <u>EXECUTION OF AGREEMENT - ENGAGEMENT - DELIVERY OF CONTRACT</u>

 A. If said free-lance contract is delivered by the
Producer to the performer and if said free-lance contract is
executed without alteration by the performer and is so returned
to the Producer by noon of the next succeeding business day after
its delivery to the performer, it shall thereupon constitute a
contract binding on both parties even though not executed by the
Producer, but the Producer on demand shall deliver a signed copy
to the performer.

 B. Free-lance performers under this Schedule B shall be
considered definitely engaged in any of the following events:

 (1) When the performer is given written notice of
acceptance;

PAR000139

(2)   When a form contract signed by Producer is delivered to performer or when an unsigned contract is delivered by Producer to performer and is executed by performer as so delivered and returned to Producer;

(3) When a script is delivered to the performer by Producer; however, this does not include the delivery of a script for a test, audition or interview nor the submission of a script for the purpose of permitting the performer to determine if he desires the engagement;

(4)   When a performer is fitted for work; this shall not apply to wardrobe tests; and

(5)   When the performer is given a verbal call by Producer or an authorized company representative, which is accepted;

C.   <u>Delivery of Contracts</u>

(1)   To the extent that the agreement reached between the Producer and the performer can be reflected on the form required by the collective bargaining agreement plus Producer's standard riders to be filed with the Union, Producer shall deliver a copy of such contract to the performer not later than the first day of performer's employment.   Where the agreement cannot be so reflected, Producer shall deliver a copy of such contract to the performer not later than the first day of performer's employment or four (4) business days after such agreement has been reached, whichever is later.

The present rule that a performer may not be required to sign contracts on the set shall continue.   Delivery to a performer's agent constitutes delivery to the performer.

(2)   Where Producer chooses to deliver a copy of a contract to the performer on the set, an extra copy for retention by the performer shall be provided.

(3)   Liquidated damages in the amounts provided in Section 31B of the General Provisions hereof for late payment shall be payable until a written contract is delivered to the performer.

(4)   W-4's shall be presented to performer no later than the first day of employment. A W-4 form may be given to performer on the set on the first day of employment. W-4 forms shall be available on every set.   It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.   It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.   W-4 forms shall be attached to 3-day-performer contracts.

SAG 1983                              155

PAR000140

D.   Delivery of Booking Slip

     (1)   A copy of the "booking slip" shall be provided to performer no later than the day next preceding the first day of performer's employment.

               (A)   Definition of Booking Slip.   A booking slip is a document containing a designation of the role, salary and number of days of guaranteed employment.
               [NOTE:   PARTIES RESERVE POSITIONS:   UNION WANTS "DATE OF COMMENCEMENT OF EMPLOYMENT" ADDED; PRODUCERS DISAGREE.]

               (B)   If performer is engaged after 6:00 p.m. on the day prior to the first day of performer's employment, the booking slip will be included with the script provided to performer.   However, if the script was provided to performer prior to such date and hour, Producer need not provide such booking slip.

               (C)   The foregoing requirements for delivery of a booking slip shall not apply if performer's contract has previously been delivered to performer or performer's agent.


7.   RATE NOT SPECIFIED

     Wherever this Schedule states that a performer shall receive compensation for work done before he is employed, if he is not employed, and no rate is specified in this Schedule, such compensation shall be computed upon the agreed rate of compensation, if there was such an agreed rate of compensation, and if not, upon the performer's established compensation. Disputes between the performer and the Producer under this provision are subject to conciliation and arbitration.


8.   STUDIO PAYROLL WEEK - TIME OF PAYMENT

     A.   The studio payroll week shall be deemed to start at 12:01 A.M. on Sunday and end at 12:00 midnight of the succeeding Saturday.

     B.   Compensation, including daily overtime if any, earned by the performer under a free-lance contract shall be payable on the regular studio pay day for services rendered up to and including the preceding Saturday.

PAR000141

9.    THE PERFORMER'S WORKWEEK: STUDIO 5-DAY WEEK; OVERNIGHT LOCATION  WEEK

   A.    Definitions-General

        (1)   An "overnight location workweek," as used herein, shall be deemed to be a workweek consisting of six (6) overnight location days (excluding Sunday) or six (6) days (excluding Sunday) of any combination of studio and overnight location days, which combination includes a Saturday overnight location day.
        Any workweek other than such an overnight location workweek, for the purposes of this Section, shall be deemed to be a "studio workweek."

        (2)   An "overnight location day" as used herein shall be deemed to mean any of the following days, if the performer is on salary that day, as provided in the Basic Agreement:

             (a)   Any day spent or worked by the performer on an overnight location or on an exploitation tour;

             (b)   The day of departure for such location (provided the performer does not actually work in the studio on such day);

             (c)   The day of return from such location (provided the performer does not actually work in the studio on such day);

        (3)   For all purposes, the performer's weekly base rate shall be his weekly rate of salary as specified in his contract; the performer's straight-time hourly rate shall be 1/44th of his weekly base rate.

   B.    Studio 5-Day Workweek

        (1)   The performer's studio workweek shall be a 5-day workweek.

        (2)   The regular studio workweek shall be 44 cumulative hours commencing with the first day of the performer's workweek; weekly overtime shall be at one and one-half (1½) times the straight time hourly rate for hours worked in excess of 44 hours in such workweek, as provided in Section 13 entitled "Overtime."

        (3)   Saturday and Sunday Work

        If the performer works on a Saturday or Sunday and performer is on a studio workweek, he shall in each case be entitled to premium pay in accordance with the following:

SAG 1983                          157

(a)   If the performer works seven days in his workweek, he shall be entitled to an additional two days' pay for work beyond five days' plus two days' premium pay or a total of nine days' pay.  Hours worked on such Saturday and Sunday shall not be included in calculating performer's forty-four hour week.  The other five days in the week will constitute the workweek for such purpose.

(b)   If the performer works six days in his workweek including work on both Saturday and Sunday, he shall be entitled to an additional day's pay for work beyond five days plus two days' premium pay, or a total of eight days' pay.  Hours worked on such Saturday, to and including ten hours, shall be included in calculating performer's forty-four hour week but hours worked on such Sunday shall not be so included.  The other five days in the week will constitute the workweek for such purpose.

(c)   If performer works six days in his workweek including work on either a Saturday or Sunday, but not both, he shall be entitled to an additional day's pay for work beyond 5 days plus one day's premium pay, or a total of seven days' pay.  Hours worked on such Saturday or Sunday shall not be included in calculating performer's forty-four hour week.  The other five days in the week will constitute the workweek for such purpose.

(d)   If performer works five days or less in his workweek including both a Saturday and Sunday, he shall be entitled to two day's premium pay or a total of seven day's pay.  Hours worked on such Saturday and Sunday, to and including ten hours each, are included in calculating performer's forty-four hour week.

(e)   If performer works five days or less in his workweek including a Saturday or Sunday, but not both, he shall be entitled to one day's premium pay, or a total of six day's pay.  Hours worked on such Saturday or Sunday, to and including ten hours each, are included in calculating the performer's forty-four hour week.

(f)   If the performer works on a Saturday or Sunday during a fractional workweek at the end of his engagement, the performer shall receive a premium of one day's pay for each such Saturday or Sunday worked.  The hours worked on such Saturday or Sunday, to and including ten hours each, are included for the purpose of calculating the prorated workweek.

(g)   Notwithstanding the foregoing, a Saturday, as such, worked on an overnight location shall not be a premium day.

SAG 1983                         158

PAR000143

(h)   For work time in excess of ten hours on any Saturday or Sunday for which the performer receives a premium of one day's pay as above provided, the performer shall receive double the weekly straight time hourly rate, including overtime caused by makeup, hairdress, wardrobe or fittings.

C.   Overnight Location 6-Day Workweek

(1)   The overnight location 6-day workweek shall be 48 cumulative hours, commencing with the first day of the performer's workweek, which 48 hours include an additional 4 hours overtime at the straight time hourly rate (whether worked or not).

(2)   If the time included in calculating the performer's forty-eight hour week, as above provided, exceeds forty-eight hours, such excess time shall be paid for at the rate of one and one-half times the weekly straight time hourly rate, except as otherwise provided in Section 13 entitled "Overtime."

(3)   Sunday Work

If the performer works on a Sunday and performer is on an overnight location workweek, he shall in each case be entitled to a premium of an extra day's pay in accordance with the following:

(a)   If the performer works seven days in his workweek, including a Sunday, he shall receive an additional day's pay for work beyond six days plus a premium of one days' pay, or a total of eight days' pay.  Hours worked on such Sunday shall not be included in calculating the performer's forty-eight hour week.  The other six days in the week will constitute the workweek for such purpose.

(b)   If the performer works on only six days or less in his workweek, including work on a Sunday, the performer shall receive a premium of one additional day's pay for work on such Sunday or a total of 7 days' pay.  The hours worked on such Sunday to and including ten hours are included in calculating the performer's forty-eight hour week.

(c)   If the performer works on Sunday during a fractional week at the end of his engagement, the performer shall receive a premium of one additional day's pay for work on such Sunday.  The hours worked on such Sunday to and including ten hours are included for the purpose of calculating the prorated workweek.

PAR000144

(d)   For work time in excess of ten hours on any Sunday, for which the performer receives a premium of one day's pay as above provided, the performer shall receive double the weekly straight time hourly rate, including overtime caused by makeup, hairdress, wardrobe or fittings.

D.   <u>Recall on Saturday or Sunday</u>

If the performer is recalled on a Saturday or Sunday (for which the performer received a premium of one day's pay, as above provided) for any purpose mentioned in Section 30 of this Schedule B and therefore receives day performer conditions, the premium for Saturday or Sunday work shall not exceed $950 for the first eight hours worked.  Overtime in such case shall be paid at the same rate as for the first eight hours.

E.   <u>No Compounding</u>

There shall be no compounding of the foregoing premiums and the penalty or premium prescribed by Section 15 insofar as the same relates to the 36 or 58-hour rest period, or Section 27, it being understood that, if, for example, a performer works seven days in a studio workweek, he shall be entitled to only nine days' pay plus overtime, if any.

F.   <u>Union Branches</u>

Any area in which the Union maintains a Branch shall be deemed a five-day workweek area for performers employed in such area, where principal photography for a picture is substantially photographed in such area.  The scope of such areas are defined in General Provisions, Section 14, entitled "Preference of Employment."


10.   <u>PERFORMER'S WEEK</u>

The performer's week in each instance shall commence on the day of the week on which such performer is first placed on salary.  In case of any suspension or interruption of such performer's employment at any time for seven consecutive days or more, for any reason whatsoever, such performer's week shall thereafter commence on the day of the week when he is again placed on salary.


11.   <u>HOURS PER DAY; WORK PAST MIDNIGHT</u>

If the performer is working at midnight of any day, then his hours of work for such day shall be computed until the performer has been dismissed subsequent to midnight, subject to all exceptions and deductions provided for in this Schedule.  Hours of work for the following day shall, except as otherwise provided in this Schedule, be computed from the time that the performer,

SAG 1983                              160

after having been so dismissed subsequent to midnight, is next required to and does report.  Nothing herein shall derogate from the rule that where a free-lance performer works after 12:01 A.M. of any day, he has worked on that day for the purpose of the studio five-day week or overnight location six-day week, whichever is applicable.  Daily overtime shall only commence to accrue after ten hours of work time, as more particularly provided in Section 13 hereof.

## 12.   DAILY RATE OF COMPENSATION; PRORATING

Whenever it is necessary to prorate the workweek in order to determine an additional day's pay, such prorating shall be on the basis of one-fifth (1/5) of the performer's weekly base rate, for either the studio or overnight location workweek; however such proration shall not in any manner change the performer's weekly base rate for either the studio or the overnight location workweek.

For the purpose of paying the performer at the end of a payroll week, that portion of performer's studio workweek which is part of such payroll week shall be paid on the basis of 1/5th of the weekly base rate for each such day (excluding Saturday and Sunday) in that payroll week.  This is exclusive of any overtime or premium pay, if any, due in such performer's workweek.

Weekly overtime shall not be prorated except on a fractional week at the end of the performer's engagement; weekly overtime shall only be computed on the basis of performer's week, as fully set forth in Section 13, Overtime.

## 13.   OVERTIME

Overtime shall be computed and paid pursuant to the following:

### A.   Rate

Except as otherwise provided by the provisions of this Schedule B,

#### (1)   Daily Overtime

Two times the straight-time rate for hours worked in excess of ten hours in any day.  Hours paid for as daily overtime are not to be included in computing weekly overtime.

#### (2)   Weekly Overtime

(a)  With respect to performers on a studio 5-day, 44-hour workweek, one and one-half times the straight time rate for hours worked in excess of forty-four hours in the week of such performer.

SAG 1983                          161

PAR000146

(b)   With respect to performers on an overnight location, 6-day, 48-hour workweek, such workweek shall include an additional 4 hours overtime (4/44) at the straight time hourly rate, whether worked or not.   Weekly overtime shall be paid at one and one-half (1½) times the straight time hourly rate for hours worked in excess of 48 in such workweek.

(3)   Travel Time

To the extent that any weekly or daily overtime is caused by travel time at the beginning or at the end of the day, such overtime shall be computed as provided in Section 44 relating to Travel Time.

(4)   Makeup, Hairdress, Wardrobe, Fittings

For the purpose of computing premium pay for overtime, whether daily or weekly, to the extent that such overtime is caused by makeup, hairdress, wardrobe, or fittings, overtime shall be paid in hourly units, except to the extent and in the manner provided by Sections 9B(3)(h), 9C(3)(d), 9D, 27B(9), and 27C(7) of this Schedule.

B.   Units of Overtime and Computation

Overtime payable on the basis of time and one-half or double time shall be computed in one-hour units.

For the purpose of accumulating the number of hours worked during any week, the number of hours worked each day during such week shall be accumulated on the basis of six-minute units; there shall be excluded all time during such week for which any daily overtime compensation shall be payable to such performer.   For the purpose of computing such overtime, such performer's week in each instance shall commence on the day of the week on which such performer is first placed on salary.   In case of any suspension or interruption of such performer's employment at any time for seven consecutive days or more, for any reason whatsoever, such performer's week shall thereafter commence on the day of the week when he is again placed on salary.

C.   Partial Workweek

Where compensation is payable for less than a full workweek, the number of hours worked shall be prorated on a forty-eight hour basis, when performer is on an overnight location 6-day week and shall be prorated on a forty-four hour basis when performer is on a studio 5-day week.   To illustrate the foregoing, if the final fractional week of a performer's employment on an overnight location 6-day week consists of Thursday, Friday and Saturday, overtime shall be computed only as to the period beyond twenty-four hours.   As a further illustration, on such 6-day basis, if the final fractional week

PAR000147

of a performer's employment consists of Friday, Saturday, and
Sunday, overtime shall be computed only as to the period beyond
twenty-four hours; provided, however, that for work on Sundays or
holidays, the hours worked shall be used in computing overtime
only to the extent and in the manner provided by Sections
9B(3)(f) and 9C(3)(c) hereof, as the same may be applicable.

### D.   Effect of Error in Computation

Any failure through error to pay all or any part of
overtime compensation shall give the performer no right except to
collect the amount so unpaid.

### E.   Date When Due

The overtime accruing under the provisions of this
Section shall be payable not later than the studio pay day of the
calendar week next following the expiration of the performer's
week in which such overtime accrues.

### F.   Guaranteed Employment not Affected

Whenever a performer receives overtime or an additional
day's pay pursuant to the provisions of this Schedule, such
overtime or additional day's pay shall not be deemed to reduce
such performer's guaranteed employment or compensation.


## 14.   REST PERIOD

### A.   Twelve-Hour Rest Period

The performer shall be entitled to a twelve-hour
consecutive rest period from the time he is finally dismissed
until his first call thereafter, whether for makeup, wardrobe,
hairdress or any other purpose.

### B.   Thirty-Six Hour Rest Period

The performer shall be entitled to one rest period in
each week of thirty-six consecutive hours; provided, however,
that if the performer is not required to work on the twenty-four
hours constituting the first day of any workweek and has not
worked for Producer during the twelve hours immediately preceding
such day, or if the performer is not required to work on the
twenty-four hours constituting the last day of any workweek and
does not work for the Producer during the twelve hours
immediately succeeding such day, then the thirty-six hour rest
period requirement shall be satisfied regardless of the fact that
twelve hours thereof may be in the preceding or succeeding week.
Where the performer works on seven days in any week, and is paid,
in addition to his base pay, an extra day's pay therefore, the
performer need not be given a thirty-six hour rest period for
such week, but must continue to receive his twelve-hour rest
periods.

SAG 1983                        163

PAR000148

C.   Fifty-Eight Hour Rest Period

Where the performer is given two consecutive days off during a studio workweek, the 36 consecutive hour rest period shall be increased to 58 consecutive hours.  However, when there is night shooting consisting primarily of exterior photography and the performer's call is not earlier than 3:00 P.M. and he is dismissed in the studio at or before midnight on Friday, such 58-hour rest period, if otherwise applicable, may be reduced to 56 hours.

D.   The above provisions regarding the rest period shall be subject to the following exceptions:

(1)   Where the Producer is photographing on a location other than an overnight location, the twelve-hour rest period may be reduced to ten hours if exterior photography is required on such location on the day before and the day after such reduced rest period.  Where such reduction is allowed on any day by reason of exterior photography on a nearby location it may not be again allowed until after three consecutive days have intervened.

(2)   Where a performer arrives at his place of lodging on an overnight location after 9:00 P.M. and does not work that night, the rest period with respect to the first call following such arrival may be ten hours instead of twelve hours, but the first call must be at the place of lodging.

(3)   Where more than one night's travel (by ordinary means of transportation) is required to reach a location and the performer is given a berth on a boat or train for each night of traveling, the time spent in such traveling to or from such location shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

(4)   Where an overnight trip to or from a location is required, and the same takes at least seven hours to reach, and the performer is given a berth on a boat or train, or if the performer elects to travel by first-class plane accommodations, the time spent in such traveling to or from such location shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

(5)   The first call at the lodging for work (including makeup, hairdress, wardrobe, or travel) determines the time of first call for the next day for the purpose of computing the rest period.

E.   The Performer may waive the rest period without the Union's consent, but if he does so, he shall be entitled to an automatic penalty of one day's pay or $950, whichever is the lesser sum.  A performer may be required to waive the rest period if the violation, in case of the twelve-hour rest period, is not

SAG 1983                           164

over two and one-half hours, or on an overnight location not over
two hours.  The performer may in any case be required to waive
the 36-hour or 58-hour rest period.  In any case in which the
performer waives either rest period, the penalty of one day's
pay, not exceeding $950 shall be automatically incurred.  The
penalty may not be waived without the consent of the Union.

     F.    Wherever it is provided in this Schedule that there
shall be no compounding of any premium pay and the penalty for
breach of the 36-hour or 58-hour rest period, it is expressly
understood that the twelve-hour rest period between calls, and
the penalty for violation thereof, remains in effect.

     G.    Any performer who is required to travel by air in
excess of four (4) scheduled hours to a location may not be
called for work without a ten (10) hour rest period.  The ten
(10) hour rest period shall commence from the time of arrival at
the hotel, provided the performer goes directly to the hotel
designated by the Producer.  Failure to provide such ten (10)
hours constitutes a rest period violation.

## 15.  WORK TIME

     A.    The provisions of this Section shall apply only to
free-lance performers whose weekly guaranteed salary is $3,500 or
less per week and who are guaranteed less than $30,000 per
theatrical picture or $25,000 per television picture.

     B.    For the purpose of ascertaining and computing hours of
work, the rest period and overtime, the period from the time the
performer is required to and does report as directed, until the
time such performer is finally dismissed for the day, shall
constitute work time, continuously and without interruption,
except as follows:

     (1)    Allowable meal periods, as provided by Section 17

     (2)    Tests, auditions, wardrobe tests, and interviews, as
          provided by Section 19

     (3)    Fittings, as provided by Section 20

     (4)    Story, song, and production conferences, to the extent
          provided in Section 21

     (5)    Study of lines or script, to the extent provided by
          Section 22

     (6)    Interviews for publicity purposes, as provided by
          Section 23

     (7)    Publicity stills, to the extent provided by Section 24

PAR000150

(8)  Makeup, hairdress, and wardrobe, to the extent provided by Section 16

(9)  Travel time, to the extent provided by Section 44.

C.  Any period during which the performer fails or refuses or is unable because of disability to render services, and any period during which the performer at his own request is excused from rendering services, shall not be work time for any purpose.

D.  After the free-lance performer has been employed, and after the starting date of such employment, none of the provisions of this Section shall break the continuous days of employment of such free-lance performer, except as provided in subsection C above.


## 16.  MAKEUP, HAIRDRESS, WARDROBE

A.  The Producer may require any performer to report made up, with hairdress, and in wardrobe, without assistance from the Producer, and in such case any time spent by the performer therein prior to the performer's first call shall not be work time for any purpose, but the Producer may not have the performer do any such preparation at any place designated by the Producer.

Any performer to whom Producer supplies the services of a make-up artist for makeup, or hairdresser for hairdressing, shall be considered to have a call for makeup or hairdress, as the case may be, and the time so spent shall be worktime.

The mere fact that a dressing room is furnished the performer, to which he is not directed to report, is not a designation of a place for preparation.  In the case of wardrobe, for this paragraph to apply, the performer either must be allowed to take home the wardrobe or must be furnished a dressing room, and the wardrobe must be available to the performer in the dressing room.  Any call by the Producer for makeup, hairdress, or wardrobe is a call to work and not within the exception made within this subsection.

B.  Where the performer has reported pursuant to the direction of Producer for makeup, hairdress, wardrobe, or fittings, the time so spent shall be work time, but to the extent that overtime, whether daily or weekly, is caused by makeup, hairdress, wardrobe, or fittings, such overtime shall be paid for as provided in Section 13 hereof.  Effective October 7, 1983, where other than ordinary make-up, hairdress or wardrobe requires assistance in the removal thereof, such removal time shall be worktime.

PAR000151

Effective October 7, 1983, where performer is not otherwise on compensable worktime, performer shall be compensated for up to 15 minutes of time spent in the removal of ordinary make-up, hairdress or wardrobe at the applicable overtime rate. Such compensation shall be based on actual time and shall not trigger additional hourly increments of pay. Such removal time shall not be considered in computing rest period violations or other premiums or penalties.

C.   If any special hairdress necessitating an expenditure is required by Producer, Producer shall either furnish such hairdress or Producer may designate facilities for the procurement of such hairdress and reimburse performer for amounts expended.

D.   Where Performer supplies his or her own wardrobe at the request of Producer, Producer shall pay, as a cleaning allowance and reimbursement, the following amounts:

Formal wear          -  $15.00

All other wardrobe  -  $10.00 per outfit

Payment of the foregoing cleaning allowance and reimbursement shall be made at the same time as payment for Performer's services for such week and shall be separately identified. Such wardrobe allowance shall be paid to performer for each workweek in which the performer is employed on the production.

Wardrobe supplied by the Performer, which is damaged in the course of employment, shall either be repaired by Producer, or repaired at the expense of Producer at the facilities designated by Producer, provided that notice of such damage is given to Producer prior to the termination of the Performer's employment.

Effective October 7, 1983, Producer will supply performer with a copy of a wardrobe allowance voucher indicating the number of outfits provided to Producer, which voucher shall be supplied by the end of the week.

E.   There shall be a voucher provided at all wardrobe fittings to be signed by the performer indicating time in and time out.

PAR000152

17.  <u>MEAL PERIODS</u>

A.  Allowable meal periods shall not be counted as work time for any purpose.  The performer's first meal period shall commence within six (6) hours following the time of his first call for the day; succeeding meal periods of the same performer shall commence within six hours after the end of the preceding meal period.  A meal period shall not be less than one-half hour nor more than one hour in length.  If upon the expiration of such six-hour period the camera is in the actual course of photography, it shall not be a violation to complete such photography.  If on location or while traveling to or from location the delay is not due to any fault or negligence of the Producer or its agents or persons employed by it to render the catering service by contract, or if delay is caused by common carriers such as railroads, there shall be no penalty for violation of the above provisions.  If the caterer is chosen carefully, and is delayed in reaching the location beyond the required time for commencing a meal period, there shall be no penalty for the violation; but if such delay shall continue beyond one-half hour, work shall cease, and the time intervening between such cessation of work and the meal period shall be work time.

The performer shall be entitled to a non-deductible breakfast of fifteen (15) minutes in duration, not later than 9:00 a.m., during which performer will be freed of all activity.  The first deductible meal period shall commence within six (6) hours thereafter.

Outside the studio, where the crew is provided a meal or a meal allowance (as distinguished from per diem or penalty), the performers (other than those receiving a per diem allowance for meals on overnight locations) will be provided either a meal or a meal allowance where they have satisfied the same terms and conditions for entitlement to such meal or meal allowance as the crew.

B.  The following amounts shall be paid to performers for meal period violations:

PAR000153

(1)   For the first half-hour or
      fraction thereof -                    $25.00 per performer

(2)   For the second half-hour
      or fraction thereof -                 $35.00 per performer

(3)   For the third half-hour
      and each additional
      half-hour or fraction
      thereof -                             $50.00 per performer

18.   DRESSING ROOMS

      A.   See General Provisions Section 21.

      B.   Whenever a performer is required by Producer to make a change of wardrobe, Producer shall provide suitable facilities affording privacy for such purpose.  A private canvas dressing room will be deemed a suitable facility.

19.   TESTS, AUDITIONS, WARDROBE TESTS, MAKEUP TESTS, INTERVIEWS

      A.   Individual Test

      Except as provided in subsection E hereof, a free-lance performer may be given an individual photographic test, including wardrobe and makeup tests, before employment, without compensation.

      B.   Mass Test, Audition

      A free-lance performer receiving two times weekly scale a week or less, if given an audition or a so-called "mass photographic test," shall receive one-half a day's pay if not used in the picture for which auditioned or tested.  A "mass test" is understood to be a "walk through."  An "audition" is defined as the speaking of lines the performer has been required to learn outside the studio, without photography, and whether or not such lines are recorded.

      C.   Interview

      If the performer reads or speaks lines which he has not been given to learn outside the studio, without photography or sound recording, the same shall not constitute an audition or test but shall constitute an "interview," and the performer shall not be entitled to compensation therefor.

      There shall be no individual video-taped interviews without the Union's prior consent.

PAR000154

D.   Neither tests nor auditions, after employment but before the starting date of such employment, shall start the consecutive days of employment of a free-lance performer.

E.   A free-lance performer who is called and reports for a makeup or wardrobe test given for the purpose of testing makeup or wardrobe and not to test the performer's suitability for the part, shall be entitled to compensation as follows:

(1)   If the performer is not given employment in the picture, he shall receive half a day's pay for each day tested;

(2)   If the performer is given employment in the picture, the Producer shall be entitled to one day's free time for such tests for each week worked by the performer in the picture; and the performer shall be entitled to half a day's pay for each additional day tested in excess of such free time.

F.   Interviews and Auditions

(1)   A performer employed under this Schedule B shall not be kept waiting for an interview or audition for more than one hour after the time scheduled for the interview or audition.  The type of interview or audition referred to is an interview or audition for a specific picture, not a general or get-acquainted type of interview.  If the performer is more than five minutes late, the above rule shall not be applicable.  It is not the intent of this provision to limit the duration of the interview or audition itself.  If a performer is detained for more than the permitted period he shall be compensated for the excess time he is required to wait at his straight time hourly rate in one-half hour units. If no salary has been agreed upon before the interview or audition, and if the performer and Producer cannot agree on the applicable salary, the salary rate at which such performer shall be compensated for such excess time shall be determined by conciliation, and if conciliation fails, by arbitration in accordance with the applicable provisions of the Basic Agreement. However, claims for violation of this subsection F must be filed by the Screen Actors Guild not later than fifteen days after the date of the alleged violation.

(2)   If parking space is not provided or readily available, Producer will validate or reimburse parking costs incurred by performers in connection with interviews.

(3)   The latest version of the script will be made accessible to the performer in the casting office twenty-four hours in advance of a scheduled reading or immediately after the scheduling of the interview, whichever last occurs.

SAG 1983                              170

(4)   For scheduled interviews (other than general or get acquainted type interviews) and auditions conducted and confirmed by the casting office (or, if Producer has no casting office, in the office of Producer's casting representative), sign-in sheets shall be required at the place where the performer is first directed to report.  Copies of such sheets shall be kept by Producer for thirty (30) days and, during that time, such sheets will be made available to the Union upon request.  The sign-in sheet shall indicate whether parking was provided.

Effective October 7, 1983, sign-in sheets for scheduled interviews and auditions shall include the following information: Performer's name; social security number; name of role; performer's agent (if any); whether the interview or audition was videotaped; whether parking was provided; whether the script was available; actual call; waiting time; and performer's initials.

20.   <u>WARDROBE FITTINGS</u>

A.   Time spent by a free-lance performer in fitting shall be paid for as follows:

(1)   Fittings on the Same Day That the Performer Works;

Time spent in such fittings shall be work time and part of the performer's continuous day, the same as wardrobe, and to the extent that overtime is caused by such fittings, overtime shall be paid.

(2)   Fittings on a Day Prior to Work:

The Producer shall be entitled to not more than four hours free fitting time on two days for each week worked in the picture.  Excess time shall be paid for at the salary rate specified in the performer's contract and shall be computed as follows:  Initial call shall be for a minimum of one hour; time over one hour on such call shall be computed in fifteen minute units.  Excess time, if any, shall be paid for at the end of the performer's engagement.

(3)   A free-lance performer who is fitted but not offered a written contract of employment for the role in the picture for which he was fitted at his prior agreed salary (or, if there has been no agreement, at his usual salary) shall receive one day's pay for each day on which he was

PAR000156

fitted.  If there has been no agreed salary before the
fitting, and if the performer and Producer cannot agree, the
salary rate at which he shall receive the day's pay shall be
determined by conciliation and if conciliation fails, by
arbitration; but in no event shall the day's pay be in
excess of the applicable day performer minimum.  The
provisions of this Section shall not apply to fittings for
tests, auditions, or interviews.

B.    Fittings, after employment but before the starting date
of such employment, shall not start the consecutive days of
employment of a free-lance performer.

C.    There shall be a voucher provided at all wardrobe
fittings to be signed by the performer indicating time in and
time out.

## 21.  STORY, SONG, AND PRODUCTION CONFERENCES

Story, song, and production conferences on any day on which
the performer is not otherwise working shall not be counted as
work time for any purpose.  This provision shall not be construed
to interrupt the continuous employment of a free-lance performer.

## 22.  STUDY OF LINES OR SCRIPT

Study of lines or script, except during the period between
reporting and dismissal, shall not be counted as work time for
any purpose.

## 23.  PUBLICITY INTERVIEWS

Publicity interviews held at a time mutually satisfactory to
the performer and the Producer shall not be work time for any
purpose unless held on a day on which the performer is otherwise
working for the Producer.  Such interviews for publicity purposes
held on any day on which the performer is otherwise working for
the Producer shall not be counted as work time if held after the
performer's dismissal for the day, if such interview is held at a
time mutually satisfactory to the performer and the Producer.  If
the interview is held during a meal period it shall not be deemed
to constitute a violation thereof.

## 24.  PUBLICITY STILLS

A.    If the Producer should desire the services of a
free-lance performer for making publicity stills either before
the commencement of his term of employment or after the
expiration thereof, the performer shall render such services
without compensation for one day, as and when requested by the

SAG 1983                        172

Producer, unless the performer is otherwise employed, but if otherwise employed the performer will cooperate to the fullest extent in the making of such publicity stills.

B.   Publicity stills, after employment but before the starting date of such employment, shall not start the consecutive days of employment of a free-lance performer.


25.  REHEARSAL TIME

A.   The reading of lines, acting, singing, or dancing, in preparation for the performers performance, in the presence and under the supervision of a representative of Producer, constitute a rehearsal.  Rehearsals shall be counted as work time.

B.   Auditions, tests, interviews, makeup and wardrobe tests do not constitute rehearsals.

C.   The Union agrees to freely grant waivers for the training of a performer in a particular skill such as horseback riding, fencing, etc.  Compensation, if any, shall be agreed to between the performer and the Producer, subject to the approval of the Union.

D.   Neither tests, auditions, fittings, publicity stills, preproduction stills, prerecordings, nor training under subsection C above, after employment but before the starting date of such employment, shall start the employment period of such performer.  Compensation, if any, for any of such services shall be as otherwise provided in this Schedule.


26.  NIGHT WORK

Night work is defined as work between 8:00 P.M. and 6:00 A.M., except that a first call for the day at 5:00 A.M. or thereafter shall not constitute night work.

The performer shall receive premium pay for each straight time hour of night work equal to 10 percent of his hourly rate for such hours, subject to the following:

If night work is necessary by reason of difficulty in obtaining daytime access to the object or place (such as a public building) to be photographed, the performer shall not be entitled to any premium pay therefor.  This exemption shall not extend to photography on a stage or a set.

Such night premium pay shall not be paid on any overtime hours.


SAG 1983                        173

To the extent known Producer shall provide advance notice, i.e., on the day prior, that night work will be required and whether such night work will involve interiors or exteriors.

Dismissal - New York City.  Any performer required to work at night and not dismissed by 9:30 P.M. will be provided transportation by Producer to Grand Central Station, Penn Station or the Port Authority, unless such place of dismissal is within a zone bordered by 34th Street on the south, 59th Street on the north, and Third and Eighth Avenues on the east and west, respectively.

## 27. WORK ON HOLIDAYS, OR HOLIDAYS AND SATURDAYS OR SUNDAYS

### A. Holidays

The nine holidays hereinafter referred to are the following:  New Year's Day, Washington's Birthday, Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and Christmas.  Whenever any of said holidays falls on a Sunday, such holiday for all purposes of this Schedule B shall be deemed to fall on the Monday next succeeding.

### B. Studio 5-Day Workweek; Work on Holidays, or Holidays and Saturday or Sunday

If the performer works on any of the nine holidays, or a holiday and on a Saturday or Sunday, he shall in each case (that is, separately for the holiday and for the Saturday and for the Sunday, if he works on each such respective day) be entitled to a premium of an extra day's pay, in accordance with the following rules:

(1)  If the performer works seven days in his workweek, including work on such a holiday and on a Saturday and a Sunday, and such holiday did not fall on such Saturday or Sunday, he receives three days' premium pay plus two additional days' pay for two days beyond his five-day week or a total of ten days' pay.  Hours worked on Saturday and Sunday shall not be included in calculating performer's 44-hour workweek.  The other five days shall be used for this purpose.

(2)  If the performer works seven days in his workweek including work on such a holiday (which falls on Saturday) and on Sunday, he receives two days' premium pay plus two additional days' pay for two days beyond his 5-day week or a total of nine days' pay.  Hours worked on such Saturday holiday and Sunday shall not be included in calculating performer's 44-hour workweek.  The other five days shall be used for this purpose.

PAR000159

(3)  If the performer works six days in his workweek including work on such a holiday and on Saturday and Sunday and such holiday did not fall on such Saturday or Sunday, he receives three premium days' pay plus one additional days' pay for one day's work beyond his 5-day week or a total of nine days' pay.  Hours worked on the Saturday and the holiday to and including ten hours shall be included in calculating performer's 44-hour workweek, but hours worked on Sunday shall not be so included.  The other five days in the week shall constitute performer's workweek for such purpose.

(4)  If performer works six days in his workweek including work on such a holiday and on Saturday and Sunday but such holiday fell on such Saturday, he receives two premium days' pay plus one additional days' pay for one day beyond his 5-day week or a total of eight days' pay.  Hours worked on Saturday and including ten hours shall be included in calculating performer's 44-hour workweek, but hours worked on Sunday shall not be so included.  The other five days in the week shall constitute performer's workweek for such purpose.

(5)  If performer works six days in his workweek including work on such a holiday (which did not fall on Saturday) and on Saturday or Sunday, he receives two premium days' pay plus one additional days' pay for one day beyond his 5-day week or a total of eight days' pay.  Hours worked on such holiday to and including ten hours each shall be included in calculating performer's 44-hour workweek, but hours worked on such Saturday or Sunday shall not be included.  The other five days in the week shall constitute performer's workweek for such purpose.

(6)  If performer works five days or less in his workweek, he receives a premium of an extra day's pay for each day worked which is such a holiday, Saturday or Sunday, unless such holiday is a Saturday Holiday in which case only one premium day's pay is due for such Saturday Holiday worked.

For example, performer works on:

(a)  Holiday (not on Sat.), Sat. & Sun. - 3 days' premium pay

(b)  Sat. Holiday & Sunday - 2 days' premium pay

(c)  Holiday (not on Sat.) & Sun - 2 days' premium pay

(d)  Holiday (not on Sat.) & Sat. - 2 days' premium pay

(e)  Holiday (incl. Sat. Holiday) - 1 day's premium pay.

SAG 1983                    175

PAR000160

Where a performer works five days or less in his workweek including a Saturday, a Sunday or holiday, or any combination of such days, hours worked on such days up to and including ten hours are included in calculating performer's forty-four hour week.

(7)  If the performer works on such a holiday, Saturday or Sunday during a fractional workweek at the end of his engagement, the performer receives a premium of an additional day's pay for each such day, except that work on a holiday on Saturday calls for only one premium day's pay. Hours worked on such holiday, Saturday or Sunday up to and including ten hours are included for the purpose of calculating the prorated workweek.

(8)  If the time included in calculating the performer's 44-hour week as above provided exceeds 44 hours, such excess time shall be paid for in hourly units at the rate of one and one-half times the weekly straight time hourly rate, or at the rate of straight time in hourly units to the extent the same is caused by makeup, hairdress, wardrobe, or fittings.

(9)  For work time in excess of ten hours on any such holiday, Saturday or Sunday, for which the performer receives a premium of one day's pay, as herein provided, the performer receives double the weekly straight time hourly rate including overtime caused by makeup, hairdress, wardrobe, or fittings.

(10) Notwithstanding the foregoing, a Saturday as such, worked on an overnight location shall not be a premium day, unless it is a Saturday holiday.

C.    Overnight Location Six-Day Workweek; Work on Holiday or
      Holiday and Sunday

If the performer works on any of the nine holidays, and on a Sunday he shall in each case (that is, separately for the holiday and for the Sunday) be entitled to a premium of an extra day's pay, in accordance with the following rules:

(1)  If the performer works seven days in his workweek including such a holiday and Sunday, he receives two premium days' pay plus one additional days' pay for one day beyond his six-day week or a total of nine days' pay.  The hours worked on such a Sunday shall not be included in calculating performer's 48-hour workweek.  The hours worked on such holiday, up to and including ten hours, shall be included in calculating performer's 48-hour week.

PAR000161

(2)  If the performer works seven days in his workweek
including such a holiday or Sunday, he receives one days'
premium pay plus one additional days' pay for one day beyond
his six-day week or a total of eight days' pay.  Hours
worked on such a holiday and/or Sunday shall not be included
in calculating the performer's 48-hour week.

(3)  If performer works six days or less in his
workweek including such a holiday and a Sunday, the
performer receives two days' premium pay or a total of eight
days' pay.  Hours worked on such a holiday and Sunday up to
and including ten hours, on each such day, are included in
calculating performer's 48-hour week.

(4)  If the performer works six days or less in his
workweek, including work on such a holiday, the performer
receives a premium day's pay, or a total of seven days' pay
for that week, and the hours worked on such holiday, up to
and including ten hours, are included in calculating the
performer's forty-eight hour week.

(5)  If the performer works on such a holiday and a
Sunday during a fractional week at the end of the
engagement, the performer receives a premium day's pay for
each such day worked, and the hours worked on each such a
holiday and Sunday, up to and including ten hours on each
such day, are included for the purpose of calculating the
prorated workweek.

(6)  If the performer works on such a holiday or Sunday
during a fractional week at the end of the engagement, the
performer receives one premium day's pay, and the hours
worked on such a holiday or Sunday, up to and including ten
hours, are included for the purpose of calculating the
prorated workweek.

(7)  If the time included in calculating the
performer's forty-eight hour week, as above provided,
exceeds forty-eight hours, such excess time shall be paid
for in hourly units at the rate of one and one-half times
the weekly straight time hourly rate, or at the rate of
straight time in hourly units to the extent the same is
caused by makeup, hairdress, wardrobe, or fittings.

(8)  For work time in excess of ten hours on any such
holiday or Sunday the performer receives double the weekly
straight time hourly rate including overtime caused by
makeup, hairdress, wardrobe, or fittings.

D.   If the performer is not required to work on such a
holiday, no deduction shall be made from his guaranteed weekly
pay.

PAR000162

E.   If performer works on such Holiday Saturday and Sunday, as above provided, he shall be entitled to the premiums provided by this subsection but insofar as the Holiday Saturday and Sunday premiums are concerned, there shall be no compounding of such premium and the penalty or premium prescribed by Section 14 as the same relates to the 58 or 36-hour rest period, whichever is applicable, or Section 13; it being understood that if for example a performer on an overnight location workweek works seven days in his week including work on such a holiday, he shall be entitled to nine days' pay plus overtime, if any.

28.   WORK PAST MIDNIGHT ON LAST DAY

Where a performer works past midnight on the last day of his engagement, he shall be compensated for services rendered past midnight by the payment of 1/5 of his weekly rate as his base for that day.

Subject to the overtime provisions, where the total engagement for any week of the performer's services is night work and where the last day of such week goes past midnight, the work past midnight does not count as an additional day.   For this purpose night work is defined as a call for 4:00 P.M. or later.

29.   STUNT ADJUSTMENT

Unless otherwise bargained for at the time of his engagement, a free-lance performer shall receive an additional daily stunt performer's applicable minimum on any day on which he performs a stunt.   In no event shall the performer receive less than the stunt performer's daily minimum on the day the performer does the stunt (no application to a free-lance performer whose pro rata for the day is the equivalent or more than the applicable daily stunt performer's minimum salary.)

Overtime compensation shall be based on the performer's aggregate compensation and shall be computed in the manner provided in Section 13 of this Schedule B.   To illustrate, suppose a free-lance performer on a studio 5-day workweek, is employed at $1,500 per week and a stunt is not bargained for.   On Wednesday he does a stunt and works eleven hours.   For Wednesday he shall be paid $661 straight time ($300 pro rata plus stunt performer's daily minimum of $361 (the applicable rate as of 1/1/85)) plus $165.25 overtime.   During the week he works 47 hours including the eleven hours on Wednesday.   The one hour overtime for which he was paid on Wednesday, separate and apart is disregarded.   The performer receives weekly overtime based on $1,861, two hours at time and one-half or $126.90.

PAR000163

His total pay for the week would be:

| | |
|---|---|
| $1,500.00 | base pay as free-lance performer |
| 361.00 | stunt adjustment |
| 165.25 | One-hour daily overtime at double time over 10 hours |
| 126.90 | two hours weekly overtime at time and one-half |
| $2,153.15 | total pay for week |

30.  **RETAKES, ADDED SCENES, ETC.**

A.   If, after the expiration of the term provided by the
free-lance contract, the Producer should desire the services of
the performer in making retakes, or in making added scenes or
sound track, or in making any process shots, transparencies or
trick shots, or in making trailers, or in making any change or
changes in said photoplay, or in making any foreign version or
versions of said photoplay, then and in either of said events,
the performer agrees to render such services in connection
therewith as and when the Producer may request, unless the
performer is otherwise employed, but if otherwise employed the
performer will cooperate to the fullest extent.  If commenced
within three (3) months after the expiration of the term hereof,
such services shall be at the same rate of compensation as set
forth in the performer's contract, except that compensation for
such services shall be paid only for the days on which the
performer is actually so employed, and except also that the
applicable conditions governing the employment of day performers
under the Basic Agreement shall apply to the computation of time
in connection with such services.  It is agreed, however, that if
prior to the commencement of the rendition of such services the
Producer shall have agreed in writing to guarantee the performer
at least one week's work or one week's compensation in connection
therewith, then and in that event such services shall be upon the
same terms and at the same rate of compensation as elsewhere in
this Schedule set forth, such compensation to be paid from the
time when the performer's services are first rendered in
connection therewith until the completion of the performer's
services in connection therewith.

B.   The performer's contract shall not include guarantees
for looping, retakes, added scenes, process transparencies, trick
shots, trailers, changes or foreign versions (subject to
availability) outside the period of consecutive employment.

C.   Closeups

The Union will freely grant waivers of continuous
employment for the making of closeups made after the completion
of the Director's first rough cut of the photoplay, so that the
performer shall be paid only for the day or days upon which he
renders such services.

SAG 1983                              179

31.  <u>OVERLAPPING ENGAGEMENT</u>

In any case where the engagement of a performer under a free-lance contract extends into or overlaps any other engagement of such performer as a free-lance performer or day performer

(1)  Because of any unanticipated delay in production of <u>bona fide</u> mistake, or

(2)  Because of any failure of such performer to disclose his other engagements at the time of accepting any engagement, or

(3)  In any case where, as an accommodation to such performer, such performer is permitted to work concurrently in two pictures, it is agreed as follows:  For any day or days in which such performer renders his services for the Producer of the picture in which he has first rendered his services, he shall receive compensation from such first Producer.  For any day or days in which such performer renders services for the Producer of the second picture in which he has rendered his services, he shall be compensated by the Producer of such second picture.  For any day or days on which the performer does not render his services either for the first Producer or for the second Producer, he shall be compensated by the second Producer, unless the first and second Producer agree between themselves (and notice thereof is given to the performer) that compensation for such additional day or days shall be paid by the first Producer. The compensation to be paid by the first Producer shall be paid at the rate specified in the performer's contract with the first Producer, and the compensation to be paid by the second Producer shall be at the rate specified in the performer's contract with the second Producer; provided, however, that if the rate paid by the first Producer is less than the rate specified in the performer's contract with the second Producer the difference shall be paid by the second Producer, and provided, further, that for any day or days on which the performer does not render services either for the first or for the second Producer he shall be compensated at the rate of compensation which is the higher of the two. This section does not affect such performer's right to receive compensation from both Producers where the performer, while employed by one Producer, makes retakes, added scenes, etc., for the other Producer after the expiration of his term of employment with such other Producer, in any case where the performer is otherwise entitled thereto.  Nothing in this Section contained shall be deemed or construed in any way to limit or prejudice any right or remedy of any Producer, either with respect to any of the contingencies hereinbefore specified or otherwise. Free-lance performers may be required to state on their contracts the starting date of their next engagement by inserting such date in the following statement, which may be endorsed or printed on such contracts:

SAG 1983                          180

PAR000165

"The starting date of the performer's next engagement is
_____."

## 32.  PRERECORDINGS AND PREPRODUCTION STILLS

Section 25 of this Schedule provides that neither
prerecordings nor preproduction stills, after employment but
before the starting date of such employment, shall start the
consecutive days of employment of a free-lance performer.  It is
agreed that such a performer shall be paid for the day or days on
which he renders services in connection with prerecordings and
preproduction stills.

## 33.  REPORTING PRIOR TO COMMENCEMENT OF EMPLOYMENT

A performer residing outside of the County of Los Angeles
shall not be required to report for tests or wardrobe earlier
than ten days prior to the commencement of his employment except
where Producer agrees to pay reasonable compensation for the
excess time over the ten-day period.

## 34.  DAMAGE TO WARDROBE

Any loss of or damage to costumes, wardrobe, and other
property furnished by the performer necessarily arising through
the performance of the performer's services, or through lack of
due care on the part of the Producer shall be paid for by the
Producer to the performer.  All costumes, wardrobe, and other
property furnished by the Producer shall belong to the Producer
and be returned promptly to it, and any loss of or damage thereto
arising through lack of due care on the part of the performer, or
not necessarily arising through the performance of the
performer's services, shall be paid for by the performer to the
Producer.  Any loss of or damage to wardrobe, for which either
party hereto may be liable, shall be computed on the basis of
depreciation schedules to be furnished from time to time by the
American Appraisal Company.

## 35.  DEFINITION OF ROLE

The term "role" as used in the Minimum Contract for
Free-lance Performers shall be deemed to refer to said role as
written at the time the free-lance contract is entered into, or
as it may from time to time thereafter be rewritten or lengthened
or shortened by the Producer in the exercise of its sole
discretion and judgment.

PAR000166

36.  USE OF "DOUBLE"

A.   The Producer agrees that it will not "dub" or use a "double" in lieu of the performer, except under the following circumstances:

(1)  When necessary to expeditiously meet the requirements of foreign exhibition;

(2)  When necessary to expeditiously meet censorship requirements, both foreign and domestic;

(3)  When, in the opinion of the Producer, the failure to use a double for the performance of hazardous acts might result in physical injury to the performer;

(4)  When the performer is not available; and

(5)  When the performer fails or is unable to meet certain requirements of the role, such as singing or the rendition of instrumental music or other similar services requiring special talent or ability other than that possessed by the performer.

The performer does hereby agree that under either or any of the conditions hereinabove in subparagraphs (1) to (5), both inclusive, of this Section set forth, the Producer shall have the right to double and/or dub not only the acts, poses, plays and appearances of the performer, but also the voice of the performer, and all instrumental, musical, and other sound effects to be produced by the performer, to such extent as may be required by the Producer.

B.   Preproduction

Upon the application of Producer, the Union agrees to liberally grant waivers so that there will be no continuous employment for a free-lance performer where that performer is doubled in preproduction.  The Union may require, as a condition of the issuance of such a waiver, one day's pay to the performer for each day that the performer is doubled.

In order to encourage the use of principals in preproduction, the Union will liberally grant waivers to permit principals to appear in preproduction shots without commencing their consecutive employment until principal photography actually commences.  This provision shall apply only to Hollywood-based domestic production of theatrical motion pictures and features made primarily for first exhibition on television.

PAR000167

## 37.  RIGHT TO NAME OR CHARACTER

No Producer shall after the termination of the performer's employment prevent such performer from continuing the use of any stage or screen name used by such performer.  The name of a role owned or created by the Producer, such as Tarzan or Charlie Chan, belongs to the Producer and not to the performer.

## 38.  STUDIO RULES

The performer agrees to be prompt in appearing for work as required by the Producer, to perform services hereunder in a conscientious and painstaking manner and in accordance with the reasonable instructions of the Producer, and to abide by the reasonable studio rules and regulations of the Producer.  The Producer shall have the exclusive right to the services of the performer during the term hereof, and the performer agrees that during the term hereof the performer will not render any services of any kind to or for any person, firm or corporation other than the Producer without first obtaining the express written consent of the Producer.

## 39.  RIGHTS GRANTED TO PRODUCER

The term "photoplay" as used in said free-lance contract shall be deemed to include motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices, including television, which are now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production.  The Producer shall have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and exploit in connection with the said photoplay any and all of the performer's acts, poses, plays and appearances of any and all kinds hereunder, and shall further have the right to record, reproduce, transmit, exhibit, distribute, and exploit in connection with said photoplay the performer's voice, and all instrumental, musical, and other sound effects produced by the performer in connection with such acts, poses, plays and appearances.  The Producer shall likewise have the right to use and give publicity to the performer's name and likeness, photographic or otherwise, and to recordations and reproductions of the performer's voice and all instrumental, musical and other sound effects produced by the performer hereunder, in connection with the advertising and exploitation of said photoplay.  The rights in this Section granted to the Producer shall inure to the benefit not only of the Producer, but also to the benefit of all persons who may hereafter acquire from the Producer any right to distribute, transmit, exhibit, advertise, or exploit said photoplay.

PAR000168

The grant of rights provided herein shall not be deemed to
include:

A.    Merchandising rights unless separately bargained for
with the performer;

B.    The photograph or likeness of the performer in books
commercially published for sale to the public, unless the prior
written consent of the performer is obtained;

C.    The right to feature the photograph or likeness of the
performer on the album or jacket cover of commercial phonograph
or tape recordings which would indicate that the performer's
performance is included in the recording when in fact the
performer's performance is not included in such recording, unless
the prior written consent of the performer is obtained.


40.   GENERAL RIGHT OF TERMINATION

A.    The Producer may terminate the performer's employment
at any time, either prior to the commencement of production of
said photoplay or during the course of production.

B.    If the Producer elects to terminate the performer's
employment under the free-lance contract prior to the
commencement of the term thereof, the Producer shall be obligated
to pay the performer compensation during the minimum guaranteed
period provided for in said free-lance contract, but if the
performer receives other employment during such period, the
compensation received by the performer from such other employment
shall be applied in reduction of the Producer's liability.

C.    If the Producer elects to terminate the performer's
employment at any time after the commencement of the term of said
free-lance contract, the Producer shall be obligated to pay the
performer such balance, if any, as is then unpaid for services
theretofore rendered by the performer, and also one week's
compensation, upon the payment of which the Producer shall be
discharged of and from all liability whatsoever thereunder,
subject, however, to the provisions of paragraph 1 of the
free-lance contract and Sections 41 and 42 hereof.

D.    In the event that a performer is replaced in the role,
the performer, or the performer's agent, shall be notified of
this fact at the time of the replacement.


41.   ILLNESS OF PERFORMER (Suspension of Salary and Termination)

The Producer need pay no salary during any period that the
performer is incapacitated, by illness or otherwise, from
performing the required services under a free-lance contract, and
in the event of such illness or incapacity the Producer, at its
option, may terminate such employment without further liability.

PAR000169

42.   EMERGENCY SUSPENSION OR TERMINATION

If the production of the photoplay specified in the free-lance contract be necessarily prevented, suspended, or postponed during the course of production, by reason of fire, accident, strike, riot, act of God, or of the public enemy, or by any executive or judicial order, or postponed by reason of the illness of any other member of the cast or of the director, one-half salary shall be paid the performer for the first three weeks' prevention, suspension, or postponement.  It shall be the duty of the Producer during the first week of any prevention, suspension, or postponement to notify the performer in writing whether the Producer will entirely discontinue the production or further suspend or postpone it, and in the latter event the Producer shall pay the performer half salary during such further suspended or postponed period.  At the end of three weeks from the date on which the Producer has stopped production the performer may terminate said employment if the performer so elects, unless the Producer continues thereafter to pay the performer full weekly compensation.  If the production of said photoplay is prevented, suspended, or postponed for any reason hereinabove in this Section provided, then and in that event the Producer may terminate said employment at any time after the commencement of such prevention, suspension, or postponement.  If the Producer elects to terminate said employment by reason of the illness of any other member of the cast or of the director, then the Producer shall be obligated to pay the performer such balance, if any, as is then unpaid for services theretofore rendered by the performer, and also one week's compensation, upon the payment of which the Producer shall be discharged of and from all liability whatsoever thereunder.  If such termination be based on the happening of any other cause hereinabove in this Section set forth, then the Producer shall be obligated to pay the performer only such balance, if any, as is then unpaid for services theretofore rendered by the performer, and upon the payment of such unpaid balance, if any, the Producer shall be discharged of and from all liability whatsoever thereunder.

Where the production is suspended as a result of illness of another member of the cast or the director, and such suspension continues for five days or more, the suspension may be effective as of the beginning of the event of illness, but if the duration is less than five days, the suspension is not effective.

43.   RESUMED PRODUCTION AFTER TERMINATION

If the Producer elects to terminate a performer's employment under a free-lance contract pursuant to its right to do so for any cause hereinabove in Section 42 specified, and if at any time more than three weeks after such termination the Producer shall desire to resume the production of said photoplay, the Producer shall notify the performer of its election to resume production and in such event the performer agrees to render his services in

SAG 1983                           185

connection with such resumed production as and when the Producer may request, unless the performer is otherwise employed, but if otherwise employed the performer will cooperate to the fullest extent in trying to make his services available for the Producer in connection with such resumed production.  If production is resumed within six months from the date of termination the performer's compensation shall be at the same rate as that hereinabove specified, and shall be payable only from the date of commencement of the performer's services in such resumed production.

44.   TRAVEL TIME

A.   Application of Rules

The provisions of this Section shall apply only to free-lance performers included in this Schedule B.

B.   Studio Zone

(1)  With respect to studios situated in Los Angeles, California, or its environs, the "studio zone" shall include all territory within the radius of thirty (30) miles from the intersection of Beverly Boulevard and La Cienega Boulevard, Los Angeles, California, and such other territory (such as the present Columbia Ranch and Disney Studio) as is generally recognized as being within the studio zone.  With respect to studios not situated in Los Angeles or its environs, a similar territory as the studio zone, and similar rules in relation thereto, shall be agreed upon between the Union and the Producers, and in default of such agreement, such territory and such rules (which shall conform as nearly as possible to the rules herein set forth) shall be determined by arbitration under Section 9 of the General Provisions whenever the situation arises.

(2)  With respect to studios situated in New York, New York, the "studio zone" shall include all territory within the radius of 8 miles from Columbus Circle.

(3)  The Los Angeles 30 mile Studio Zone.  Performers may be required to report anywhere within such studio zone provided that, when the place of reporting is elsewhere than the Producer's studio, the following shall apply:

(a)  Performers shall be paid $.30 per mile mileage allowance figured from the studio to the place of reporting and back; and

(b)  Distances shall be clearly stated on the performer's production time report.

PAR000171

(c)   If, during the term of this Agreement, the International Alliance of Theatrical and Stage Employees through its collective bargaining agreement negotiates with Producer a more favorable mileage allowance than the foregoing thirty cents ($.30) per mile allowance, then, in such event, from such date forward the Union will be entitled to the benefits of such increase.

(d)   The mileage allowance may be paid as a portion of the performer's payroll check, provided it is separately identified as such mileage reimbursement.

(4)   When a performer is required to report for work in the studio zone other than at a studio, Producer shall pay for parking in a supervised public parking lot.  If no such public parking is available, Producer will provide supervised or secured parking.

(5)   With respect to studios situated in San Francisco, California, the "studio zone" shall include all territory within the radius of thirty (30) miles from the intersection of Market and Powell Streets.

C.   <u>Location and Overnight Location</u>

Location shall mean any place of work not at the Producer's studio which is outside the studio zone.  Overnight location shall be any location where the performer is lodged or offered lodging by the Producer at or near the location for one or more nights, or any location which takes overnight to reach by ordinary means of transportation.

D.   <u>Near Location</u>

A near location shall be any place which can be reached from the Producer's studio within twenty-four hours of travel by ordinary means of transportation.  If the Producer instructs the performer to fly to a location and the trip takes less than twenty-four hours by air, the same shall be deemed to be a near location.

E.   <u>Distant Location</u>

A distant location shall be any place which cannot be reached from the Producer's studio within twenty-four hours of travel by ordinary means of transportation.

F.   <u>Place of Reporting and Dismissal</u>

Except when already at an overnight location, performers shall be required to report only at the Producer's studio or within the studio zone, and shall be dismissed only at the place of reporting within the studio zone or the Producer's

PAR000172

studio.  When the performer is returning from such overnight location, he shall be dismissed only at the Producer's studio or the place of reporting within the studio zone, and not at the overnight location.  The provisions of this subsection F shall not be deemed to limit provisions of subsection U hereof.

     G.   <u>Travel Time is Work Time</u>

     Except as otherwise provided in this Schedule all time spent by any performer in traveling at the request of the Producer between any place at which he is required to and does report and any location, both to and from, shall be travel time, and as such shall be work time, subject to all deductions, limitations, and exceptions for which provision is made in this Agreement.

     H.   <u>Maximum Travel Time</u>

     Time spent in traveling shall not be included as travel time or work time to the extent of more than eight hours in any twenty-four hours.

     I.   <u>Intervening Time between Dismissal and Travel</u>

     (1)  Time intervening between the completion of a performer's work on any day and the commencement of travel on the same day shall be travel time except as otherwise provided in this Agreement.

     (2)  Travel to Overnight Location:  Except as otherwise provided in this Agreement, the period of time intervening between the performer's dismissal for the day and the commencement of travel to an overnight location on the same day shall be travel time.

     (3)  Travel from Overnight Location:  The period intervening between the performer's dismissal for the day and the commencement of travel on the same day from an overnight location shall not be work time or travel time for any purpose.

     J.   <u>Travel on Seventh Day</u>

     The six-day week as set forth in this Schedule does not apply in any case where the performer travels seven consecutive days, whether or not the seventh day falls within the same week.

     K.   <u>Transportation and Lodging Furnished</u>

     The Producer shall furnish reasonable transportation to and from location and shall furnish reasonable meals, and (where the Producer requires a performer to stay overnight), lodging to the performer on location.  Separate rooms shall be provided to performers transported to overnight locations unless such separate rooms are not available.

SAG 1983              188

PAR000173

In the event Producer believes that separate rooms will
not be available at a particular location, Producer will notify
the Union and the performer prior to departure, with reasonable
time for each to investigate to determine whether the foregoing
requirement can be complied with by Producer.

L.   Deduction of Allowable Meal Periods

Reasonable meal periods shall be given during
traveling, and allowable meal periods of not less than one-half
hour nor more than one hour each shall be deducted from travel
time, provided a reasonable meal is made available.

M.   Deduction of Travel Time Otherwise Compensated For

Any travel time for which the performer is compensated
as work time shall not be paid for as travel time.

N.   Computation of Overtime Caused by Travel Time

On a day on which a performer travels only, the
performer shall be compensated at a day's pay.  On a day on which
the performer travels and works, overtime caused by such travel
will be compensated at time and one-half and not at double time.

O.   Travel Time re Distant Locations at Beginning or End of
     Performer's Term of Employment

The time spent in traveling to a distant location at
the beginning of a performer's term of employment shall not be
work time or travel time for any purpose.  The time spent in
traveling from a distant location at the end of a performer's
term of employment shall be travel time except as in this
Agreement otherwise provided.  If the performer arrives at the
distant location at or before 1:00 P.M., his compensation shall
begin with that day (whether he works that day or not), and any
work or travel that day after such arrival shall be work time or
travel time, as the case may be, except as in this Agreement
otherwise provided.  If the performer arrives at the distant
location after 1:00 P.M., such day shall not be work time or
travel time for any purpose, unless the performer actually works
on such day after such arrival, in which case his compensation
shall begin with that day, and the time worked shall be work
time, except as in this Schedule otherwise provided.  If the
performer does not work on such day his compensation shall begin
with the next day.

P.   Transportation and Travel Time on Overnight Locations
     to and from Hotel or Camp

On overnight locations, the Producer shall provide
transportation to and from the hotel or camp and, except as
in this Schedule otherwise provided, the time to and from the
hotel or camp shall be travel time.  The rest period may be
reduced to ten hours (under Section 14.D(2)).

SAG 1983                        189

Q.   Travel to or from Overnight Locations on Boat or Train
     Where Sleeping Accommodations are Provided

Where more than one night's travel, by ordinary means
of transportation, is required to reach a location, and the
performer is given a berth on a boat or train, the time spent in
traveling to or from such location shall not be work time or
travel time for the purpose of computing the twelve-hour rest
period or for the purpose of computing the ten-hour day; it being
agreed, however, that time spent in traveling on the day of
arrival at such location, after 9:00 A.M. of such day, shall be
counted for the purpose of computing the ten-hour day if the
performer works on such day, and provided further, that the
interval between the completion of travel on such day and the
commencement of work shall not be considered travel time or work
time for any purpose.  Nothing herein contained shall be
construed to interrupt the performer's right to remain on salary
if the performer is otherwise entitled thereto.

R.   Overnight Trip to or from Location

Where an overnight trip to or from location is
required, and the same takes at least seven hours to reach and
the performer is given a berth on a boat or train, the time spent
in such traveling to or from such location, whether at the
beginning, during or at the end of the engagement, shall not be
work time or travel time for the purpose of computing overtime
and the rest period.

S.   Travel on Holidays and Sundays

(1)  The holidays herein referred to are New Year's
Day, Washington's Birthday, Good Friday, Memorial Day, July
Fourth, Labor Day, Thanksgiving Day, the Friday after
Thanksgiving, and Christmas.

(2)  Travel to or from Location:  Where a free-lance
performer travels to or from location on a Sunday or holiday
such travel shall be deemed work time for purposes of
premium pay and performer shall be entitled to a straight
time day, plus an additional one-half day's premium pay as
compensation for traveling on such day.

T.   Travel Pursuant to Recall for Added Scenes, etc.

Any free-lance performer living within the City of Los
Angeles or its environs, who is outside such area when he is
recalled by the Producer for any of the reasons set forth in
Section 31 hereof (including performers who are entitled to the
provisions of the following paragraph), shall be provided with
transportation or reimbursed for the cost of transportation only,
from the place where he is when recalled to the place designated
by the Producer, by the particular mode of transportation
specified by the Producer, regardless of any other mode of

SAG 1983                    190

transportation the performer may actually use.  Return transportation shall be furnished or the performer shall be reimbursed for such return transportation, as above set forth, only if the performer shall so return within one week from the date of dismissal by Producer.

Any performer living within the City of Los Angeles or its environs, who is at a place beyond a radius of 150 miles from the intersection of Beverly Boulevard and La Cienega, Los Angeles, California, when he is recalled by Producer for any of the aforesaid reasons, shall be placed on salary as of the day he is directed to and does report to the place designated by Producer, and shall remain on salary each day until dismissed, except for the provisions relating to Sundays and holidays.  If after dismissal the performer remains in this locality or delays his return, unless by the Producer's request, and is again recalled by the Producer, he shall not be entitled to any payment for the time intervening between his dismissal and his recall.  The performer shall be entitled to travel time compensation based on the same rate for his principal engagement, for the period of time, and only for the period of time that is required in traveling to and from the said place designated by the Producer by the particular mode of transportation specified by the Producer, regardless of any other mode of transportation the performer may actually use.  Such travel time compensation shall be computed in accordance with the travel time allowance provisions for day performers as provided for in Schedule A.  The said travel time allowance for the performer's return to the place of original departure shall be paid only if the performer shall so return within one week from the date of dismissal by Producer.

If the Producer designates the mode of transportation and the day of departure and the performer follows such directions, there shall be no lapse in payment for days intervening between end of travel and commencement of work.

In the event the Producer does not specify the mode of transportation, then the travel time allowance shall be based upon the most expeditious mode of transportation possible, including travel by commercial airlines.  The performer need not fly, but if he elects not to fly when requested to do so it shall not increase the travel time allowance as specified above.

There shall be no duty on the Producer to procure return transportation for the performer so long as Producer pays for the same.

To illustrate the foregoing, a performer, a resident of Los Angeles, is temporarily in San Francisco.  Within three months from the close of his principal engagement he is recalled by the Producer as follows:  On a Monday the Producer directs the performer to report at the Los Angeles studio of Producer at 11:00 A.M. on the following Thursday for retakes.  The performer

SAG 1983                          191

PAR000176

elects to travel by train.  He departs from San Francisco on Wednesday night, arriving at Los Angeles Thursday morning, and reports at 11:00 A.M.  The Producer dismisses the performer at 2:00 P.M. on the same day.  The performer elects to return to San Francisco by train.  The performer shall be entitled to one day's pay at the same rate as was paid for his original engagement, plus the cost of transportation by commercial airline.

Transportation shall mean first-class transportation.

In the foregoing example, if the performer had been dismissed at 6:00 P.M. with an hour off for lunch (six hours work, four hours travel), the performer would have been entitled to pay for one day plus two hours at time and one-half.  The performer shall not be entitled to a travel allowance of more than eight hours in any period of twenty-four hours; and the performer shall not be entitled to any travel time allowance for a period of travel for which he is otherwise paid.

Where principal photography takes place in New York, the provisions of this subsection T of Section 44 of Schedule B shall apply to performers living in New York and absent therefrom, and shall be applied to other cities in the same manner by analogy.

Any out-of-state performer who is recalled for any of the purposes specified in Section 30 hereof shall not be required to remain in this locality after dismissal unless he is carried on salary during the period he is so required to wait.

U.   Engagement of Performer - Other Areas

(1)   If a performer, residing or working in any area in which SAG maintains a Branch, is brought to Producer's base or distant location in a different area of the United States for any purpose, the performer shall receive transportation and a $55 per day allowance from the time he commences travel at Producer's request until the time his salary commences.

(2)   If Producer is photographing on a location in the United States and brings a performer to such location from anywhere in the United States, such performer shall be provided transportation to and from such location.

(3)   Except as otherwise provided in (1) and (2) above, nothing herein contained shall prevent a Producer from engaging a performer outside of California (if such performer has not gone out of California for the purpose of evading this rule) to report in California or to report at any location, and in any such case the Producer shall not be required to pay for or provide transportation of such performer to the place of reporting, or to pay such performer for

PAR000177

any time spent in traveling thereto; nor shall the
Producer be required to pay for or provide
transportation of such performer, at the end of the
engagement back to the place where such performer was
engaged, or to pay such performer for any time spent in
traveling back to the place where such performer was
engaged; such performer may be dismissed on location.
This does not limit the second sentence of subsection B
hereof.

(4)  Performers shall not be held on a per diem
longer than three (3) days.

V.   <u>General</u>

(1)  Nothing in this Section 44 shall be deemed to
break the continuous employment of a free-lance
performer.

(2)  This Agreement uses the expressions
"reasonable transportation" and "first-class
transportation."  The terms are intended to be
synonymous.  The type of transportation required can
best be illustrated by examples:  Bus transportation
for a relatively short distance (Hollywood to Lake
Arrowhead) meets these requirements; bus transportation
for a long distance (Hollywood to San Francisco) does
not.  Pullman accommodations to San Francisco, or any
other long distance, meets these requirements; deluxe
transportation (e.g., Super Chief) is not required.
Transportation on a commercial airline without sleeper
accommodations is first-class transportation.
First-class transportation shall be provided on
commercial airlines where the performer is required to
fly at the request of the Producer.  The foregoing
shall apply to jet flights as well as to prop-driven
aircraft.  The foregoing shall not apply where
first-class transportation is not available or six or
more of the company are being transported.  Charter
flights may be used which provide substantially
equivalent accommodations.  Notwithstanding the
foregoing, first-class air transportation need not be
provided with respect to auditions and interviews.

45.  <u>LOOPING</u>

Performer may be recalled to loop (record sound track) after
completion of principal photography at one-half of the
Performer's pro rata daily salary for a four-hour looping
session.  If the session exceeds four hours, a full day's pro
rata salary shall be payable.  (See Section 30 above).

PAR000178

## SCHEDULE C

FREE-LANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS
MORE THAN $3500 PER WEEK AND WHO ARE GUARANTEED LESS
THAN $30,000 PER THEATRICAL PICTURE OR
LESS THAN $25,000 PER TELEVISION PICTURE

### Table of Contents

Section
  No.

1. Definition
2. Schedule C Included in Individual Contracts
3. Minimum Contract - Required Provisions
4. Starting Date
5. Guarantee
6. Execution of Agreement - Engagement-Delivery of Contract
7. Rate Not Specified
8. Studio Payroll Week - Time of Payment
9. The Performer's Workweek; Studio 5-Day Week; Overnight Location Week
10. Performer's Week
11. Hours Per Day; Work Past Midnight
12. Daily Rate of Compensation; Prorating
13. Overtime
14. Rest Period
15. Work Time for Purposes of Overtime
16. Makeup, Hairdress, Wardrobe
17. Meal Periods
18. Dressing Rooms
19. Wardrobe Fittings
20. Story, Song, and Production Conferences
21. Study of Lines or Script
22. Publicity Interviews
23. Publicity Stills
24. Rehearsal Time
25. Work on Holidays, and Saturdays or Sundays Before and After

Section
  No.

26. Work past Midnight on Last Day
27. Retakes, Added Scenes, Etc.
28. Overlapping Engagement
29. Prerecordings and Preproduction Stills
30. Reporting Prior to Commencement of Employment
31. Damage to Wardrobe
32. Definition of Role
33. Use of "Double"
34. Right to Name or Character
35. Studio Rules
36. Rights Granted to Producer
37. General Right of Termination
38. Illness of Performer
39. Emergency Suspension or Termination
40. Resumed Production After Termination
41. Travel Time
42. Commencement of Term of Employment at Near and Distant Location
43. Guarantee Not Affected by Additional Day's Pay
44. Interviews and Auditions
45. Looping

PAR000179

SCHEDULE C INDEX

|  | Section No. | Page No. |
|---|---|---|
| Added Scenes | 27 | 222 |
| Agreement, Execution of | 6 | 203 |
| Arbitration-See General Provisions | | |
| | | |
| Closeups | 27C | 223 |
| Commencement at Distant Location | 42 | 237 |
| Commencement at Near Location | 42 | 237 |
| Contract - Minimum Free-Lance Form | 3 | 200 |
| Contract - Minimum Requirements | 3 | 200 |
| | | |
| Daily Rate of Compensation | 12 | 209 |
| Damage to Wardrobe | 31 | 224 |
| Definition of Free-Lance Performer | 1 | 200 |
| Definition of Role | 32 | 225 |
| Definition of Week (Minimum Contract) | 3 | 200 |
| Delivery of Contract | 6 | 203 |
| Double, Use of | 33 | 225 |
| | | |
| Emergency Suspension or Termination | 39 | 228 |
| Engagement | 6 | 203 |
| Engagement, Overlapping | 28 | 223 |
| Execution of Agreement | 6 | 203 |
| | | |
| Fittings, Wardrobe | 19 | 216 |
| Fittings Without Employment | 19 | 216 |
| Five-Day Workweek Studio | 9B | 206 |
| Free-Lance Performer - Definition | 1 | 200 |
| | | |
| General Right of Termination | 37 | 227 |
| Guarantee | 5 | 203 |
| Guarantee Not Affected by Additional Day's Pay | 43 | 237 |
| | | |
| Holidays and Saturdays or Sundays Before and After | 25 | 218 |

PAR000180

Schedule C Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Illness of Performer | 38 | 228 |
| Individual Free-Lance Contract – Schedule C Included | 2 | 200 |
| Interviews and Auditions | 44 | 237 |
| Interviews, Publicity | 22 | 217 |
| Location Expenses | 41K | 232 |
| Looping | 45 | 239 |
| Maximum Travel Time | 41H | 231 |
| Meal Periods | 17 | 215 |
| Minimum Contract – Required Provisions | 3 | 200 |
| Minimum Guarantee | 5 | 203 |
| Name, Right to | 34 | 226 |
| Notices – Performer's Address and Telephone Number | 34 | 226 |
| "On or About" Clause | 3,4B | 201,202 |
| Overlapping Engagement | 28 | 223 |
| Overnight Location – 6-Day Week | 9C | 207 |
| Overtime | 13 | 210 |
| Pay Not Specified | 7 | 205 |
| Payment, Time of | 8 | 205 |
| Performer's Workweek | 9, 10 | 206,209 |
| Preproduction Stills | 29 | 224 |
| Prerecordings | 29 | 224 |
| Process Shots | 27B | 222 |
| Production, Resumed after Termination | 40 | 229 |
| Prorating Salary | 12 | 209 |
| Publicity Interviews | 22 | 217 |
| Publicity Stills | 23 | 217 |
| Rate Not Specified | 7 | 205 |
| Recall for Retakes, Added Scenes, Etc | 27 | 222 |
| Rehearsal Time | 24 | 218 |
| Reporting Prior to Commencement of Employment | 30 | 224 |

PAR000181

Schedule C Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Rest Period | 14 | 211 |
| Resumed Production After Termination | 40 | 229 |
| Retakes, Added Scenes, Etc. | 27 | 222 |
| Rights Granted to Producer | 36 | 226 |
| Right to Name or Character | 34 | 226 |
| Role, Definition of | 32 | 225 |
| Role and Salary (Minimum Contract) | 3 | 200 |
|  |  |  |
| Salary - Minimum Guarantee | 5 | 203 |
| Salary - Prorating | 12 | 209 |
| Saturday & Sunday Work (Studio 5-Day Week) | 9B(3) | 206 |
| Saturday or Sunday Before and After Holidays (Studio 5-Day Week) | 25B | 218 |
| Schedule C Included in Individual Contracts | 2 | 200 |
| Six-Day Week, Overnight Location | 9C | 207 |
| Starting Date | 4 | 202 |
| Stills, Publicity | 23 | 217 |
| Studio 5-Day Week | 9B | 206 |
| Studio Payroll Week | 8 | 205 |
| Studio Rules | 35 | 226 |
| Sunday Before and After Holiday (Overnight Location 6-Day Week) | 25C | 220 |
| Sunday Before and After Holiday (Studio 5-Day Week) | 25B | 218 |
| Sunday Work (Overnight Location 6-Day Week) | 9C(3) | 208 |
| Sunday Work (Studio 5-Day Week) | 9B(3) | 206 |
| Suspension, Emergency | 39 | 228 |
|  |  |  |
| Termination, Emergency | 39 | 228 |
| Termination, General Right of | 37 | 227 |
| Termination, Resumed Production After | 40 | 229 |
| Time of Payment | 8 | 205 |
| Transparencies | 27 | 222 |
| Travel Time | 41 | 229 |

|  | Subsection No. | Page No. |
|---|---|---|
| Application of Rules | A | 229 |
| Computation of Overtime Caused by Travel Time | N | 232 |

PAR000182

Schedule C Index
(Continued)

|                                                                          | Subsection No. | Page No. |
|--------------------------------------------------------------------------|----------------|----------|
| Travel Time (continued)                                                  |                |          |
| Deduction of Allowable Meal Periods....L                                 |                | 232      |
| Deduction of Travel Time Otherwise Compensated For......................M |                | 232      |
| Distant Location.......................E                                  |                | 231      |
| Engagement of Performers - Other Areas...........................U       |                | 235      |
| General................................V                                 |                | 236      |
| Intervening Time between Dismissal and Travel...............................I |            | 231      |
| Location and Overnight Location........C                                  |                | 230      |
| Maximum Travel Time....................H                                  |                | 231      |
| Near Location..........................D                                  |                | 231      |
| Overnight Trip to or from Location.....R                                  |                | 233      |
| Place of Reporting and Dismissal.......F                                  |                | 231      |
| Studio Zone............................B                                  |                | 229      |
| Transportation and Lodging Furnished...K                                 |                | 232      |
| Transportation and Travel Time on Overnight Locations to and from Hotel or Camp..P |     | 233      |
| Travel from Overnight Location-Intervening Time................................I(3) |    | 232      |
| Travel on Holidays, and Sundays........S                                  |                | 233      |
| Travel on Seventh Day..................J                                  |                | 232      |
| Travel Pursuant to Recall for Added Scenes, Etc...........................T |              | 234      |
| Travel Time is Work Time...............G                                  |                | 231      |
| Travel Time re Distant Locations at Beginning or End of Performer's Term of Employment.............................O |  | 233      |
| Travel to Overnight Location-Intervening Time................................I(2) |     | 232      |
| Travel to or from Overnight Locations on Boat or Train where Sleeping Accommodations Are Provided.........................Q |  | 233      |

PAR000183

Schedule C Index
(Continued)

|                                                          | Section No. | Page No. |
| -------------------------------------------------------- | ----------- | -------- |
| Trick Shots.............................                 | 27          | 222      |
| Use of Double..........................                  | 33          | 225      |
| Waivers re Starting Date................                 | 4C          | 202      |
| Wardrobe, Damage to.....................                 | 31          | 224      |
| Wardrobe Fittings.......................                 | 19          | 216      |
| Week, Definition of (Minimum Contract)...                | 3           | 200      |
| Week, Six-Day Overnight Location.........                | 9C          | 207      |
| Week, Studio 5-Day......................                 | 9B          | 206      |
| Week Studio Payroll.....................                 | 8           | 205      |
| Work on Holidays and Saturdays and Sundays Before and After............... | 25 | 218 |
| Work Past Midnight on Last Day...........                | 11          | 209      |

PAR000184

SCHEDULE C

FREE-LANCE PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS
MORE THAN $3500 PER WEEK AND WHO ARE GUARANTEED
LESS THAN $30,000 PER THEATRICAL PICTURE
OR LESS THAN $25,000 PER TELEVISION PICTURE

1.   DEFINITION

For the purposes of this Schedule C, the words "free-lance performer" shall be defined as follows:  A free-lance performer is a performer employed for a specific picture in a designated role, on a weekly basis, at a salary of more than $3500 per week and whose guarantee is less than $30,000 per theatrical picture or less than $25,000 per television picture.

2.   SCHEDULE C INCLUDED IN INDIVIDUAL CONTRACTS

It is agreed that the conditions of this Schedule shall govern the employment of free-lance performers within the class referred to in Section 1 and shall become a part of the contract with such free-lance performer.

3.   MINIMUM CONTRACT - REQUIRED PROVISIONS

The minimum free-lance contract shall be as follows:

SCREEN ACTORS GUILD, INC. MINIMUM FREE-LANCE CONTRACT

Continuous Employment-Weekly Basis-Weekly Salary-One Week
Minimum Employment

THIS AGREEMENT, made this _____day of
_____,19___, between_____
hereinafter called "Producer," and _____
hereinafter called "Performer."

WITNESSETH:

1.   Photoplay, Role, Salary, and Guarantee.  Producer hereby engages Performer to render service as such in the role of _____, in a photoplay, the working title of which is now_____, at the salary of $_____($_____) per week. Performer accepts such engagement upon the terms herein specified.  Producer guarantees that it will furnish Performer not less than _____week's employment (if this blank is not filled in, the guarantee shall be one week).

PAR000185

2.   <u>Term</u>.  The term of employment hereunder shall begin on
_____ on or about * _____,
and shall continue thereafter until the completion of the
photography and recordation of said role.

3.   <u>Basic Contract</u>.  All provisions of the collective
bargaining agreement between Screen Actors Guild, Inc. and
Producer, relating to theatrical motion pictures, which are
applicable to the employment of the Performer hereunder, shall be
deemed incorporated herein.

4.   <u>Performer's Address</u>.  All notices which the Producer is
required or may desire to give to the Performer may be given
either by mailing the same addressed to the Performer at
_____,_____, or
such notice may be given to the Performer personally, either
orally or in writing.

5.   <u>Performer's Telephone</u>.  The Performer must keep the
Producer's casting office or the assistant director of said
photoplay advised as to where the Performer may be reached by
telephone without unreasonable delay.  The current telephone
number of the Performer is
_____.

6.   <u>Motion Picture and Television Fund</u>.  The Performer
(does) (does not) hereby authorize the Producer to deduct from
the compensation hereinabove specified an amount equal to
_____per cent of each installment of compensation due
the Performer hereunder, and to pay the amount so deducted to the
Motion Picture and Television Fund.

7.   <u>Furnishing of Wardrobe</u>.  The Producer agrees to furnish
all modern wardrobe and wearing apparel reasonably necessary for
the portrayal of said role; it being agreed, however, that should
so-called "character" or "period" costumes be required, the
Producer shall supply the same.

8.   <u>Arbitration of Disputes</u>.  Should any dispute or
controversy arise between the parties hereto with reference to
this contract, or the employment herein provided for, such
dispute or controversy shall be settled and determined by
conciliation and arbitration in accordance with the conciliation
and arbitration provisions of the collective bargaining agreement

---

* The "on or about" clause may only be used when the contract is
delivered to the Performer at least seven days before the
starting date.  See Codified Basic Agreement of 1983, Schedule B,
Section 4; Schedule C, Section 4; otherwise a specific starting
date must be stated.

SAG 1983                         201

between the Producer and Screen Actors Guild relating to theatrical motion pictures, and such provisions are hereby referred to and by such reference incorporated herein and made a part of this agreement with the same effect as though the same were set forth herein in detail.

9.   Next Starting Date.  The starting date of Performer's next engagement is _____.

10.   The Performer may not waive any provision of this contract without the written consent of Screen Actors Guild, Inc.

11.   Producer makes the material representation that either it is presently a signatory to the Screen Actors Guild collective bargaining agreement covering the employment contracted for herein, or, that the above-referred-to photoplay is covered by such collective bargaining agreement under Section 24 of the General Provisions of the Producer-Screen Actors Guild Codified Basic Agreement of 1983.

IN WITNESS WHEREOF, the parties have executed this agreement on the day and year first above written.

PRODUCER_____

_____
PERFORMER             By_____

4.   STARTING DATE

A.   The phrase "on or about" as used in a free-lance performer's contract shall allow a latitude of twenty-four hours, exclusive of Saturdays, Sundays and holidays, either prior to or after the date specified in the contract as the commencement of the term thereof.

B.   If a free-lance contract is delivered to the performer at least seven days before the starting date, the "on or about" clause may be used.  If a contract is delivered to a performer less than seven days before the specified starting date, a definite starting date must be specified and the "on or about" clause shall not be used.  To illustrate:  If the starting date of a performer is on the eighth day of the month, and the contract is delivered to the performer on the first day of the month, the "on or about" clause may be used, but if the contract is delivered to the performer on the second day of the month, the "on or about" clause may not be used.

C.   In any case where it is impracticable or impossible to fix any definite starting date of any performer to be employed under a free-lance contract because of such performer's activities on the stage or in radio or otherwise in the amusement business (except motion pictures), the Union agrees to waive the

SAG 1983                      202

requirement of a definite starting date in such free-lance contract, provided that such free-lance contract contains a reasonable provision for the fixing of the starting date thereof and notice thereof.  Any dispute between the Union and any Producer with respect to the issuance of any such waiver shall be determined by arbitration under Section 9 of the General Provisions hereof.

D.   In the event a performer is engaged in accordance with Section 6B hereof, but a start date has not yet been provided to the performer by the Producer, performer may terminate such engagement in order to accept conflicting <u>bona</u> <u>fide</u> employment by a third party, subject, however, to the performer first giving Producer the following minimum period during which Producer may specify a start date which then becomes binding, which conflicts with the proferred third party employment:

> (1)   if performer informs Producer before noon of a business day, by the end of the same day; or

> (2)   if performer informs Producer at any other time, by noon of the next business day.

## 5.   <u>GUARANTEE</u>

One-picture employment for a free-lance performer shall guarantee at least one week's employment.  The guarantee in this paragraph provided shall be subject to the rights of suspension and termination granted to the Producer by the provisions of Sections 37, 38, and 39 of this Schedule C.

## 6.   <u>EXECUTION OF AGREEMENT - ENGAGEMENT - DELIVERY OF CONTRACT</u>

A.   If said free-lance contract is delivered by the Producer to the performer and if said free-lance contract is executed without alteration by the performer and is so returned to the Producer by noon of the next succeeding business day after its delivery to the performer, it shall thereupon constitute a contract binding on both parties even though not executed by the Producer, but the Producer on demand shall deliver a signed copy to the performer.

B.   A free-lance performer under this Schedule C shall be considered definitely engaged in any of the following events:

> (1)   When the performer is given written notice of acceptance;

> (2)   When a form contract signed by Producer is delivered to performer or when an unsigned contract is delivered by Producer to performer and is executed by performer as so delivered and returned to Producer;

PAR000188

(3) When a script is delivered to the performer by Producer; however, this does not include the delivery of a script for a test, audition or interview nor the submission of a script for the purpose of permitting the performer to determine if he desires the engagement;

(4)  When a performer is fitted for work; this shall not apply to wardrobe tests; and

(5)  When the performer is given a verbal call by Producer or an authorized company representative, which is accepted.

C.   <u>Delivery of Contracts</u>

(1)  To the extent that the agreement reached between the Producer and the performer can be reflected on the form required by the collective bargaining agreement plus Producer's standard riders to be filed with the Union, Producer shall deliver a copy of such contract to the performer not later than the first day of performer's employment.  Where the agreement cannot be so reflected, Producer shall deliver a copy of such contract to the performer not later than the first day of performer's employment or four (4) business days after such agreement has been reached, whichever is later.

The present rule that a performer may not be required to sign contracts on the set shall continue. Delivery to a performer's agent constitutes delivery to the performer.

(2)  Where Producer chooses to deliver a copy of a contract to the performer on the set, an extra copy for retention by the performer shall be provided.

(3)  Liquidated damages in the amounts provided in Section 31B of the General Provisions hereof for late pay- ment shall be payable until a written contract is delivered to the performer.

(4)  W-4's shall be presented to performer no later than the first day of employment.  A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.  It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.  W-4 forms shall be attached to 3-day-performer contracts.

PAR000189

D.   Delivery of Booking Slip

(1)   A copy of the "booking slip" shall be provided to performer no later than the day next preceding the first day of performer's employment.

(A)   Definition of Booking Slip.   A booking slip is a document containing a designation of the role, salary and number of days of guaranteed employment.

[NOTE: PARTIES RESERVE POSITIONS:   UNION WANTS "DATE OF COMMENCEMENT OF EMPLOYMENT" ADDED; PRODUCERS DISAGREE]

(B)   If performer is engaged after 6:00 p.m. on the day prior to the first day of performer's employment, the booking slip will be included with the script provided to performer.   However, if the script was provided to performer prior to such date and hour, Producer need not provide such booking slip.

(C)   The foregoing requirements for delivery of a booking slip shall not apply if performer's contract has previously been delivered to performer or performer's agent.

## 7.   RATE NOT SPECIFIED

Wherever this Schedule states that a performer shall receive compensation for work done before he is employed, if he is not employed, and no rate is specified in this Schedule, such compensation shall be computed upon the agreed rate of compensation, if there was such an agreed rate of compensation, and if not, upon the performer's established compensation.   Disputes between the performer and the Producer under this provision are subject to conciliation and arbitration.

## 8.   STUDIO PAYROLL WEEK - TIME OF PAYMENT

A.   The studio payroll week shall be deemed to start at 12:01 A.M. on Sunday and end at 12:00 midnight of the succeeding Saturday.

B.   Compensation, including daily overtime if any, earned by the performer under a free-lance contract shall be payable on the regular studio pay day for services rendered up to and including the preceding Saturday.

PAR000190

9.   THE PERFORMER'S WORKWEEK: STUDIO 5-DAY WEEK; OVERNIGHT
     LOCATION WEEK

     A.   Definitions-General

          (1)  An "overnight location workweek," as used herein,
shall be deemed to be a workweek consisting of six (6) overnight
location days (excluding Sunday) or six (6) days (excluding
Sunday) of any combination of studio and overnight location days,
which combination includes a Saturday overnight location day.

          Any workweek other than such an overnight location
workweek, for the purposes of this Agreement, shall be deemed to
be a "studio workweek."

          (2)  An "overnight location day" as used herein shall
be deemed to mean any of the following days, if the performer is
on salary that day, as provided in the Basic Agreement:

          (a)  Any day spent or worked by the performer on
an overnight location or on an exploitation tour;

          (b)  The day of departure for such location (pro-
vided the performer does not actually work in the studio on
such day);

          (c)  The day of return from such location (pro-
vided the performer does not actually work in the studio on
such day);

          (3)  For all purposes, the performer's weekly base rate
shall be his weekly rate of salary as specified in his contract.

     B.   Studio 5-Day Workweek

          (1)  The performer's studio workweek shall be a 5-day
workweek.

          (2)  Overtime is to be computed on a daily basis over
10 hours in any day, as set forth in Section 13 hereof.  Weekly
overtime does not apply to this Schedule.

          (3)  Saturday and Sunday Work.

          If the performer works on a Saturday or Sunday and
performer is on a studio workweek, he shall in each case be
entitled to premium pay in accordance with the following rules:

          (a)  If the performer works on seven days in his
workweek, he shall be entitled to an additional two day's
pay for work beyond five days' plus a premium of two
additional days' pay or $1900 whichever is the lesser sum
(i.e., 9 days or 7 days plus $1900 whichever is the lesser);

SAG 1983                    206

PAR000191

(b)   If the performer works six days in his workweek including both Saturday and Sunday, he shall be entitled to an additional day's pay for work beyond five days plus a premium of two days' additional pay, or $1900 whichever is the lesser sum (i.e., 8 days or 6 days plus $1900 whichever is the lesser);

(c)   If performer works six days in his workweek including work on either a Saturday or Sunday, but not both, he shall be entitled to an additional day's pay for work beyond 5 days plus a premium of one additional days' pay or $950 whichever is the lesser sum (i.e., 7 days or 6 days plus $950 whichever is the lesser);

(d)   If performer works five days or less in his workweek including both a Saturday and Sunday, he shall be entitled to receive his weekly salary plus a premium of two days' additional pay or $1900 whichever is the lesser sum (i.e., 7 days or 5 days plus $1900 whichever is the lesser);

(e)   If performer works five days or less in his workweek including a Saturday or Sunday, but not both, he shall be entitled to his weekly salary plus a premium of an additional day's pay or $950 whichever is the lesser sum (i.e., 6 days or 5 days plus $950 whichever is the lesser);

(f)   If the performer works on a Saturday or Sunday during a fractional week at the end of his engagement, the performer shall receive in addition to his pro rata weekly salary a premium of an additional day's pay for each such Saturday or Sunday worked or $950 for each such day whichever is the lesser sum.

(g)   Notwithstanding the foregoing, a Saturday, as such, worked on an overnight location, shall not be a premium day;

(h)   For work time in excess of ten hours on any Saturday or Sunday for which performer receives a premium as above provided, the performer shall receive double the straight time hourly rate provided in Section 13, including overtime caused by makeup, hairdress, wardrobe and fittings, subject to the provisions of Section 13E hereof.

C.   Overnight Location 6-Day Workweek

(1)   The performer's "overnight location workweek", as above defined, shall be a 6-day workweek.

(2)   Overtime is to be computed on a daily basis over 10 hours in any day as set forth in Section 13 hereof.  Weekly overtime does not apply to this Schedule.

SAG 1983                                207

PAR000192

(3)   Sunday Work

If the performer works on a Sunday and performer is on
an overnight location workweek, he shall in each case be entitled
to premium pay in accordance with the following rules:

(a)   If the performer works seven days in his
workweek including a Sunday, he shall receive an additional
day's pay for work beyond six days plus one days' premium
pay, or $950 whichever is the lesser sum (i.e.. 8 days or 7
days plus $950 whichever is the lesser);

(b)   If the performer works on only six days or
less in his workweek including work on a Sunday, the
performer shall receive a week's salary plus a premium of an
additional day's pay or $950 whichever is the lesser sum
(i.e., 7 days or 6 days plus $950 whichever is the lesser);

(c)   If the performer works on a Sunday during a
fractional week at the end of his engagement, the
performer shall receive in addition to his pro rata weekly salary a
premium of an additional day's pay or $950 whichever is the
lesser sum;

(d)   For work time in excess of ten hours on any
Sunday for which performer receives a premium as above
provided, the performer shall receive double the straight
time hourly rate provided in Section 13, including overtime
caused by makeup, hairdress, wardrobe and fittings, subject,
however, to the provisions of Section 13E hereof.

D.   Recall on Saturday or Sunday

If the performer is recalled on a Saturday or Sunday
for any purpose mentioned in Section 27 of this Schedule and,
therefore, receives day performer's conditions, the premium for
Saturday or Sunday work shall not exceed $950.

E.   For work on holidays and Saturdays or Sundays before
and after a holiday, see Section 25 of this Schedule C.

F.   No Compounding

There shall be no compounding of the foregoing premiums
and the penalty or premiums prescribed by Section 14 insofar as
the same relates to the 36-hour or 58-hour rest period, or
Section 25 entitled "Work on Holidays and Saturday or Sunday
Before and After" it being understood that if for example, a
performer works seven days in a studio workweek, he shall be
entitled to nine days' pay, or seven days' pay plus $1900, which-
ever is the lesser.

SAG 1983                     208

### G.   Union Branches

Any area in which the Union maintains a Branch shall be deemed a five-day workweek area for performers employed in such area, where principal photography for a feature is substantially photographed in such area.  The scope of such areas is defined in General Provisions, Section 14, "Preference of Employment - Performers Employed by the Day."

### 10.   PERFORMER'S WEEK

The performer's week in each instance shall commence on the day of the week on which such performer is first placed on salary.  In case of any suspension or interruption of such performer's employment at any time for seven consecutive days or more, for any reason whatsoever, such performer's week shall thereafter commence on the day of the week when he is again placed on salary.

### 11.   HOURS PER DAY; WORK PAST MIDNIGHT

If the performer is working at midnight of any day, then his hours of work for such day shall be computed until the performer has been dismissed subsequent to midnight, subject to all exceptions and deductions provided for in this Schedule.  Hours of work for the following day shall, except as otherwise provided in this Schedule, be computed from the time the performer, after having been so dismissed subsequent to midnight, is next required to and does report.  Nothing herein shall derogate from the rule that where a free-lance performer works after 12:01 A.M. of any day, he has worked on that day for the purpose of the studio five-day week or overnight location six-day week, whichever is applicable.  Daily overtime shall only commence to accrue after ten hours of work time, as more particularly provided in Section 13 hereof.

Subject to the overtime provisions, where the total engagement for any week of the performer's services is night work and where the last day of such week goes past midnight, the work past midnight does not count as an additional day.  For this purpose night work is defined as a call for 4:00 P.M. or later.

### 12.   DAILY RATE OF COMPENSATION; PRORATING

Whenever it is necessary to prorate the workweek in order to determine an additional day's pay, such prorating shall be on the basis of one-fifth (1/5) of the performer's weekly base rate, for either the studio or overnight location workweek; however such proration shall not in any manner change the performer's weekly base rate for either the studio or the overnight location workweek.

SAG 1983                     209

PAR000194

With respect to prorating the performer's workweek for the purpose of paying the performer at the end of a payroll week, that portion of performer's studio workweek which is part of such payroll week shall be prorated on the basis of 1/5th of the weekly base rate for each such day (excluding Saturday and Sunday) in that payroll week.  This is exclusive of any overtime or premium pay, if any, due in such performer's workweek.

13.  <u>OVERTIME</u>

Overtime shall be computed and paid pursuant to the following:

A.   Daily overtime shall be paid at double time for each hour or portion thereof worked in excess of ten (10) hours in any day, figured on the maximum basis of $3,500.

B.   <u>Travel Time</u>

To the extent that any daily overtime is caused by travel time at the beginning or at the end of the day, such overtime shall be computed as provided in Section 41 hereof relating to travel time.

C.   <u>Makeup, Hairdress, Wardrobe, Fittings</u>

For the purpose of computing premium pay for overtime, to the extent that overtime is caused by makeup, hairdress, wardrobe, or fittings, it shall be paid for in hourly units, except to the extent and in the manner provided by Sections 9B(3)(h), 9C(3)(d), 9D, 25B(8), and 25C(7) of this Schedule.

D.   For purposes of this Section, one hour's pay at straight time shall be $79.55 and at double time $159.10.

E.   Any such performer whose contract for employment in a motion picture contains a provision giving such performer a percentage or other participation in the receipts, revenues or profits of the motion picture shall be paid the required overtime at the time of employment; provided, however, such performer may agree in such contract that the overtime payments so made may be credited against such participations when and if received by the performer.

F.   <u>Effect of Error in Computation</u>

Any failure through error to pay all or any part of overtime compensation shall give the performer no right except to collect the amount so unpaid.

SAG 1983                         210

PAR000195

G.    Date When Due

       The overtime accruing under the provisions of this
Section shall be payable not later than the studio pay day of the
calendar week next following the expiration of the performer's
week in which such overtime accrues.

H.    Guaranteed Employment not Affected

       Whenever a performer receives overtime or an additional
day's pay pursuant to the provisions of this Schedule, such
overtime or additional day's pay shall not be deemed to reduce
such performer's guaranteed employment or compensation.

14.  REST PERIOD

A.    Twelve-Hour Rest Period

       The performer shall be entitled to a twelve-hour
consecutive rest period from the time he is finally dismissed
until his first call thereafter, whether for makeup, wardrobe,
hairdress or any other purpose.

B.    Thirty-Six Hour Rest Period

       The performer shall be entitled to one rest period in
each week of thirty-six consecutive hours; provided, however,
that if the performer is not required to work on the twenty-four
hours constituting the first day of any workweek and has not
worked for Producer during the twelve hours immediately preceding
such day, or if the performer is not required to work on the
twenty-four hours constituting the last day of any workweek and
does not work for the Producer during the twelve hours
immediately succeeding such day, then the thirty-six hour rest
period requirement shall be satisfied regardless of the fact that
twelve hours thereof may be in the preceding or succeeding week.
Where the performer works on seven days in any week, and is paid,
in addition to his base pay, an extra day's pay therefor, the
performer need not be given a thirty-six hour rest period for
such week, but must continue to receive his twelve-hour rest
periods.

C.    Fifty-Eight Hour Rest Period

       Where the performer is given two consecutive days off
during a studio workweek, the 36 consecutive hour rest period
shall be increased to 58 consecutive hours.  However, when there
is night shooting consisting primarily of exterior photography
and the performer's call is not earlier than 3:00 P.M. and he is
dismissed in the studio at or before midnight on Friday, such
58-hour rest period, if otherwise applicable, may be reduced to
56 hours.

SAG 1983                          211

D.   The above provisions regarding the rest period shall be subject to the following exceptions:

(1)   Where the Producer is photographing on a location other than an overnight location, the twelve-hour rest period may be reduced to ten hours if exterior photography is required on such location on the day before and the day after such reduced rest period.  Where such reduction is allowed on any day by reason of exterior photography on a nearby location, it may not be again allowed until after three consecutive days have intervened.

(2)   Where a performer arrives at his place of lodging on an overnight location after 9:00 P.M. and does not work that night, the rest period with respect to the first call following such arrival may be ten hours instead of twelve hours, but the first call must be at the place of lodging.

(3)   Where more than one night's travel (by ordinary means of transportation) is required to reach a location and the performer is given a berth on a boat or train for each night of traveling, the time spent in such traveling, to or from such location, shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

(4)   Where an overnight trip to or from a location is required, and the same takes at least seven hours to reach, and the performer is given a berth on a boat or train, or if the performer elects to travel by first-class plane accommodations, the time spent in such traveling to or from such location shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

(5)   The first call at the lodging for work (including makeup, hairdress, wardrobe, or travel) determines the time of first call for the next day for the purpose of computing the rest period.

E.   The Performer may waive the rest period without the Union's consent, but if he does so, he shall be entitled to an automatic penalty of one day's pay or $950, whichever is the lesser sum.  A performer may be required to waive the rest period if the violation, in case of the twelve-hour rest period, is not over two and one-half hours, or on an overnight location not over two hours.  The performer may in any case be required to waive the 36-hour or 58-hour hour rest period.  In any case in which the performer waives either rest period, the penalty of one day's pay, not exceeding $950, shall be automatically incurred.  The penalty may not be waived without the consent of the Union.

F.   Wherever it is provided in this Schedule that there shall be no compounding of any premium pay and the penalty for breach of the 36-hour or 58-hour rest period, it is expressly understood that the twelve-hour rest period between calls, and the penalty for violation thereof, remains in effect.

PAR000197

G.  Any performer who is required to travel by air in excess of four (4) scheduled hours to a location may not be called for work without a ten (10) hour rest period.  The ten (10) hour rest period shall commence from the time of arrival at the hotel, provided the performer goes directly to the hotel designated by the Producer.  Failure to provide such ten (10) hours constitutes a rest period violation.

15.  WORK TIME FOR PURPOSES OF OVERTIME

A.  For the purpose of ascertaining and computing hours of work for overtime, the period from the time the performer is required to and does report as directed until the time such performer is finally dismissed for the day shall constitute work time, continuously and without interruption, except as follows:

(1)  Allowable meal periods, as provided by Section 17;

(2)  Tests, auditions, wardrobe tests, and interviews;

(3)  Fittings, as provided by Section 19;

(4)  Story, song, and production conferences, to the extent provided in Section 20;

(5)  Study of lines or script, to the extent provided by Section 21;

(6)  Interviews for publicity purposes, as provided by Section 22;

(7)  Publicity stills, to the extent provided by Section 23;

(8)  Makeup, hairdress, and wardrobe, to the extent provided by Section 16;

(9)  Travel time, to the extent provided by Section 41.

B.  Any period during which the performer fails or refuses or is unable because of disability to render services, and any period during which the performer at his own request is excused from rendering services, shall not be work time for any purpose.

C.  After the free-lance performer has been employed, and after the starting date of such employment, none of the provisions of this Section shall break the continuous days of employment of such free-lance performer, except as provided in subsection B above.

PAR000198

16.  <u>MAKEUP, HAIRDRESS, WARDROBE</u>

A.   The Producer may require any performer to report made up, with hairdress, and in wardrobe, without assistance from the Producer, and in such case any time spent by the performer therein prior to the performer's first call shall not be work time for any purpose, but the Producer may not have the performer do any such preparation at any place designated by the Producer.

Any performer to whom Producer supplies the services of a make-up artist for makeup, or hairdresser for hairdressing, shall be considered to have a call for makeup or hairdress, as the case may be, and the time so spent shall be worktime.

The mere fact that a dressing room is furnished the performer, to which he is not directed to report, is not a designation of a place for preparation.  In the case of wardrobe, for this Paragraph to apply the performer must be either allowed to take home the wardrobe, or must be furnished a dressing room and the wardrobe must be available to the performer in the dressing room.  Any call by the Producer for makeup, hairdress, or wardrobe is a call to work and not within the exception made within this subsection.

B.   Where the performer has reported pursuant to the direction of Producer, for makeup, hairdress, wardrobe, or fittings, the time so spent shall be work time, but to the extent that overtime is caused by makeup, hairdress, wardrobe, or fittings, such overtime shall be paid as provided in Section 13 hereof.  Effective October 7, 1983, where other than ordinary make-up, hairdress or wardrobe requires assistance in the removal thereof, such removal time shall be worktime.

Effective October 7, 1983, where performer is not otherwise on compensable worktime, performer shall be compensated for up to 15 minutes of time spent in the removal of ordinary make-up, hairdress or wardrobe at the applicable overtime rate.  Such compensation shall be based on actual time and shall not trigger additional hourly increments of pay.  Such removal time shall not be considered in computing rest period violations or other premiums or penalties.

C.   If any special hairdress necessitating an expenditure is required by Producer, Producer shall either furnish such hairdress or Producer may designate facilities for the procurement of such hairdress and reimburse performer for amounts expended.

D.   Where Performer supplies his or her own wardrobe at the request of Producer, Producer shall pay, as a cleaning allowance and reimbursement, the following amounts:

Formal wear          -  $15.00

All other wardrobe   -  $10.00 per outfit

SAG 1983                    214

PAR000199

Payment of the foregoing cleaning allowance and reimbursement shall be made at the same time as payment for Performer's services for such week and shall be separately identified.   Such wardrobe allowance shall be paid to performer for each workweek in which the performer is employed on the production.

Wardrobe supplied by the performer which is damaged in the course of employment shall either be repaired by Producer or repaired at the expense of Producer at facilities designated by Producer, provided that notice of such damage is given to Producer prior to the termination of the performer's employment.

Effective October 7, 1983, Producer will supply performer with a copy of a wardrobe allowance voucher indicating the number of outfits provided to Producer, which voucher shall be supplied by the end of the week.

E.   There shall be a voucher provided at all wardrobe fittings to be signed by the performer indicating time in and time out.

## 17.  MEAL PERIODS

A.   Allowable meal periods shall not be counted as work time for any purpose.  The performer's first meal period shall commence within six (6) hours following the time of his first call for the day; succeeding meal periods of the same performer shall commence within six hours after the end of the preceding meal period.  A meal period shall not be less than one-half hour nor more than one hour in length.  If upon the expiration of such six-hour period the camera is in the actual course of photography, it shall not be a violation to complete such photography.  If on location or while traveling to or from location the delay is not due to any fault or negligence of the Producer or its agents or persons employed by it to render the catering service by contract, or if delay is caused by common carriers such as railroads, there shall be no penalty for violation of the above provisions.  If the caterer is chosen carefully, and is delayed in reaching the location beyond the required time for commencing a meal period, there shall be no penalty for the violation; but if such delay shall continue beyond one-half hour, work shall cease, and the time intervening between such cessation of work and the meal period shall be work time.

The performers shall be entitled to a non-deductible breakfast of fifteen (15) minutes in duration, not later than 9:00 a.m., during which performer will be freed of all activity.  The first deductible meal period shall commence within six (6) hours thereafter.

PAR000200

Outside the studio, where the crew is provided a meal or a meal allowance (as distinguished from per diem or penalty), the performers (other than those receiving a per diem allowance for meals on overnight locations) will be provided either a meal or a meal allowance where they have satisfied the same terms and conditions for entitlement to such meal or meal allowance as the crew.

B.   The following amounts shall be paid to performers for meal period violations:

| | | |
|---|---|---|
| (1) | For the first half-hour or fraction thereof - | $25.00 per performer |
| (2) | For the second half-hour or fraction thereof - | $35.00 per performer |
| (3) | For the third half-hour and each additional half-hour or fraction thereof - | $50.00 per performer |

## 18.  DRESSING ROOMS

A.   See General Provisions Section 21.

B.   Whenever a performer is required by Producer to make a change of wardrobe, Producer shall provide suitable facilities affording privacy for such purpose.  A private canvas dressing room will be deemed a suitable facility.

## 19.  WARDROBE FITTINGS

A.   For purposes of computing daily overtime:

Time spent in fittings on the same day that the performer works shall be work time and part of the performer's continuous day, the same as wardrobe, but to the extent that overtime is caused by such fittings, overtime shall be paid.

B.   A free-lance performer who is fitted but not offered a written contract of employment for the role in the picture for which he was fitted at his prior agreed salary (or, if there has been no agreement, at his usual salary) shall receive one day's pay for each day on which he was fitted.  If there has been no agreed salary before the fitting, and if the performer and Producer cannot agree, the salary rate at which he shall receive the day's pay shall be determined by conciliation and if conciliation fails, by arbitration; but in no event shall the day's pay be in excess of weekly scale.  The provisions of this Section shall not apply to fittings for tests, auditions, or interviews.

SAG 1983                          216

PAR000201

C.   Fittings, after employment but before the starting date of such employment, shall not start the consecutive days of employment of a free-lance performer.

D.   There shall be a voucher provided at all wardrobe fittings to be signed by the performer indicating time in and time out.

## 20.   STORY, SONG, AND PRODUCTION CONFERENCES

Story, song, and production conferences on any day on which the performer is not otherwise working shall not be counted as work time for any purpose.   This provision shall not be construed to interrupt the continuous employment of a free-lance performer.

## 21.   STUDY OF LINES OR SCRIPT

Study of lines or script, except during the period between reporting and dismissal, shall not be counted as work time for any purpose.

## 22.   PUBLICITY INTERVIEWS

Publicity interviews held at a time mutually satisfactory to the performer and the Producer shall not be work time for any purpose unless held on a day on which the performer is otherwise working for the Producer.   Such interviews for publicity purposes held on any day on which the performer is otherwise working for the Producer shall not be counted as work time if held after the performer's dismissal for the day, if such interview is held at a time mutually satisfactory to performer and Producer.   If the interview is held during a meal period it shall not be deemed to constitute a violation thereof.

## 23.   PUBLICITY STILLS

A.   If the Producer should desire the services of a free-lance performer for making publicity stills either before the commencement of his term of employment or after the expiration thereof, the performer shall render such services without compensation for one day, as and when requested by the Producer, unless the performer is otherwise employed, but if otherwise employed the performer will cooperate to the fullest extent in the making of such publicity stills.

B.   Publicity stills, after employment but before the starting date of such employment, shall not start the consecutive days of employment of a free-lance performer.

SAG 1983                        217

24.  <u>REHEARSAL TIME</u>

A.   The reading of lines, acting, singing, or dancing, in preparation for the performers performance, in the presence and under the supervision of a representative of Producer, constitute a rehearsal.  Rehearsals shall be counted as work time.

B.   Auditions, tests, interviews, makeup and wardrobe tests do not constitute rehearsals.

C.   The Union agrees to freely grant waivers for the training of a performer in a particular skill such as horseback riding, fencing, etc.  Compensation, if any, shall be agreed to between the performer and the Producer, subject to the approval of the Union.

D.   Neither tests, auditions, fittings, publicity stills, preproduction stills, prerecordings, nor training under subsection C above, after employment but before the starting date of such employment, shall start the employment period of such performer.  Compensation, if any, for any of such services shall be as otherwise provided in this Schedule.

25.  <u>WORK ON HOLIDAYS AND SATURDAYS OR SUNDAYS BEFORE AND AFTER</u>

A.   The nine holidays hereinafter referred to are the following:  New Year's Day, Washington's Birthday, Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and Christmas.  Whenever any of said holidays falls on a Sunday, such holiday for all purposes of this Schedule C shall be deemed to fall on the Monday next succeeding, and the Saturday and Sunday preceding shall be deemed a Saturday and Sunday before such holiday.

B.   <u>Studio 5-Day Workweek</u>

If the performer works on any of the nine holidays, or any Saturday or Sunday before or Saturday or Sunday after such a holiday, he shall in each case (that is, separately for the holiday and for the Saturday and the Sunday, if he works on each respective day) be entitled to a premium of an extra day's pay, in accordance with the following rules:

(1)  If the performer works on seven days in his workweek, including work on such a holiday and on a Saturday and a Sunday, and such holiday did not fall on such Saturday, he receives three days' premium pay plus two additional days' pay for two days beyond his five-day week or a total of ten days' pay.

SAG 1983                         218

(2)  If the performer works on seven days in his
workweek including work on such a holiday (which falls on
Saturday) and on Sunday, he receives two days' premium pay
plus two additional days' pay for two days beyond his 5-day
week or a total of nine days' pay.

(3)  If performer works on six days in his workweek
including work on such a holiday and on Saturday and Sunday
and such holiday did not fall on such Saturday, he receives
three premium days' pay plus one additional days' pay for
one days work beyond his 5-day week or a total of nine days'
pay.

(4)  If performer works on six days in his workweek
including work on such a holiday and on Saturday and Sunday
but such holiday fell on such Saturday, he receives two
premium days' pay plus one additional days' pay for one day
beyond his 5-day week or a total of eight days' pay.

(5)  If performer works on six days in his workweek
including work on such a holiday (which did not fall on
Saturday) and on Saturday or Sunday, he receives two premium
days' pay plus one additional days' pay for one day beyond
his 5-day week or a total of eight days' pay.

(6)  If performer works on five days or less in his
workweek, he receives a premium of an extra day's pay for
each day worked which is such a holiday, Saturday or Sunday,
unless such holiday is a Saturday holiday in which case only
one premium day's pay is due for such Saturday holiday
worked.

For example, performer works on:

(a)  Holiday (not on Sat.), Sat. & Sun. - 3 days'
     premium pay

(b)  Sat. Holiday & Sunday - 2 days' premium pay

(c)  Holiday (not on Sat.) & Sun - 2 days' premium pay

(d)  Holiday (not on Sat.) & Sat. - 2 days' premium pay

(e)  Holiday (incl. Sat. Holiday) - 1 day's premium pay.

(7)  If the performer works on such a holiday, Saturday
or Sunday during a fractional week at the end of his
engagement, the performer receives a premium of an
additional day's pay for each such day, except that work on
a holiday on Saturday calls for only one premium day's pay.

SAG 1983                            219

(8)  For work time in excess of ten hours on any such holiday, Saturday or Sunday, for which the performer receives a premium as above provided, the performer shall receive double the weekly straight time hourly rate as provided in Section 13 including overtime caused by makeup, hairdress, wardrobe, or fittings subject, however, to the provisions of Section 13E hereof.

(9)  Notwithstanding the foregoing, a Saturday as such, worked on an overnight location shall not be a premium day, unless it is a Saturday holiday.

(10) As to any performer entitled to additional compensation for services rendered on any of the nine holidays, it is agreed that if any such holiday shall occur prior to the commencement of the term of employment of any such performer, the Saturday or Sunday after such holiday shall not be deemed, as to such performer, a Saturday or Sunday after a holiday; and if a Saturday or Sunday prior to a holiday shall occur during the employment of such performer, but the performer's employment is terminated prior to the holiday and at least one day has intervened between such termination and the holiday, such Saturday or Sunday shall be considered an ordinary Saturday or Sunday under Section 9 above.

C.  Overnight Location Six-Day Workweek; Work on Holidays or on Such Holidays and Sundays - Before and After

If the performer is on an overnight location workweek and works on any of the nine holidays, or on such holidays and on a Sunday before or Sunday after such holiday, he shall in each case (that is, separately for the holiday and for the Sunday) be entitled to premium pay, in accordance with the following rules:

(1)  If the performer works on seven days in his workweek including such a holiday (not on Sunday) and Sunday, he receives two  premium days' pay plus one additional days' pay for one day beyond his six-day week or a total of nine days' pay.

(2)  If the performer works on seven days in his workweek including such a holiday or Sunday, he receives one days'  premium pay plus one additional days' pay for one day beyond his six-day week or a total of eight days' pay.

(3)  If performer works on only six days or less in his workweek including work on such a holiday and Sunday, the performer receives two days' premium pay or a total of eight days' pay.

(4)  If the performer works on only six days or less in his workweek, including work on such a holiday or Sunday, the performer receives a premium day's pay, or a total of seven days' pay for that week.

PAR000205

(5)   If the performer works on such a holiday (not on Sunday) and Sunday during a fractional week at the end of the engagement, the performer receives two premium days' pay.

(6)   If the performer works on such a holiday or Sunday during a fractional week at the end of the engagement, the performer receives a premium of an additional day's pay.

(7)   For work time in excess of ten hours on any such holiday or Sunday for which the performer receives a premium as above provided, the performer shall receive double the straight time hourly rate as provided in Section 13 including overtime caused by makeup, hairdress, wardrobe, or fittings, subject, however, to the provisions of Section 13E hereof.

(8)   As to any performer entitled to additional compensation for services rendered on any of the nine holidays, it is agreed that if any such holidays shall occur prior to the commencement of the term of employment of any such performer, the Sunday after such holiday shall not be deemed, as to such performer, a Sunday after a holiday; and if a Sunday prior to a holiday shall occur during the employment of such performer, but the performer's employment is terminated prior to the holiday and at least one day has intervened between such termination and the holiday, such Sunday shall be considered an ordinary Sunday under Section 9 above.

D.   If the performer is not required to work on such a holiday, no deduction shall be made from his guaranteed weekly pay.

E.   If performer works on such holiday, Saturday or Sunday, he shall be entitled to the premiums provided by this section but insofar as the Saturday and Sunday premiums are concerned, there shall be no compounding of such premium and the penalty or premium prescribed by Section 14 as the same relates to the 58 or 36-hour rest period, whichever is applicable, or Section 13; it being understood that if for example a performer on an overnight location workweek works seven days in his week including work on such a holiday, he shall be entitled to nine days' pay plus overtime, if any.

F.   In the event performer works on a Saturday or Sunday which is not before or after a holiday, see Section 9 of this Schedule.

PAR000206

26.  WORK PAST MIDNIGHT ON LAST DAY

     Where a performer works past midnight on the last day of his
engagement, he shall be compensated for services rendered past
midnight by the payment of 1/5 of his weekly rate as his base for
that day.

     Subject to the overtime provisions, where the total
engagement for any week of the performer's services is night work
and where the last day of such week goes past midnight, the work
past midnight does not count as an additional day.  For this
purpose night work is defined as a call for 4:00 P.M. or later.


27.  RETAKES, ADDED SCENES, ETC.

     A.   If, after the expiration of the term provided by the
free-lance contract, the Producer should desire the services of
the performer in making retakes, or in making added scenes or
sound track, or in making any process shots, transparencies or
trick shots, or in making trailers, or in making any change or
changes in said photoplay, or in making any foreign version or
versions of said photoplay, then and in either of said events,
the performer agrees to render such services in connection
therewith as and when the Producer may request, unless the
performer is otherwise employed, but if otherwise employed the
performer will cooperate to the fullest extent.  If commenced
within three (3) months after the expiration of the term hereof,
such services shall be at the same rate of compensation as set
forth in the performer's contract, except that compensation for
such services shall be paid only for the days on which the
performer is actually so employed, and except also that the
applicable conditions governing the employment of day performers
under the Basic Agreement shall apply to the computation of time
in connection with such services.  It is agreed, however, that if
prior to the commencement of the rendition of such services the
Producer shall have agreed in writing to guarantee the performer
at least one week's work or one week's compensation in connection
therewith, then and in that event such services shall be upon the
same terms and at the same rate of compensation as elsewhere in
this Schedule set forth, such compensation to be paid from the
time when the performer's services are first rendered in
connection therewith until the completion of the performer's
services in connection therewith.

     B.   The performer's contract shall not include guarantees
for looping, retakes, added scenes, process transparencies, trick
shots, trailers, changes or foreign versions (subject to availa-
bility) outside the period of consecutive employment.

PAR000207

C.   Closeups

The Union will freely grant waivers of continuous employment for the making of closeups made after the completion of the Director's first rough cut of the photoplay, so that the performer shall be paid only for the day or days upon which he renders such services.

28.  OVERLAPPING ENGAGEMENT

In any case where the engagement of a performer under a free-lance contract extends into or overlaps any other engagement of such performer as a free-lance performer or day performer

(1)  Because of any unanticipated delay in production or bona fide mistake, or

(2)  Because of any failure of such performer to disclose his other engagements at the time of accepting any engagement, or

(3)  In any case where, as an accommodation to such performer, such performer is permitted to work concurrently in two pictures, it is agreed as follows:  For any day or days in which such performer renders his services for the Producer of the picture in which he has first rendered his services he shall receive compensation from such first Producer.  For any day or days in which such performer renders services for the Producer of the second picture in which he has rendered his services he shall be compensated by the Producer of such second picture.  For any day or days on which the performer does not render his services either for the first Producer or for the second Producer he shall be compensated by the second Producer, unless the first and second Producer agree between themselves (and notice thereof is given to the performer) that compensation for such additional day or days shall be paid by the first Producer. The compensation to be paid by the first Producer shall be paid at the rate specified in the performer's contract with the first Producer, and the compensation to be paid by the second Producer shall be at the rate specified in the performer's contract with the second Producer; provided, however, that if the rate paid by the first Producer is less than the rate specified in the performer's contract with the second Producer the difference shall be paid by the second Producer, and provided, further, that for any day or days on which the performer does not render services either for the first or for the second Producer he shall be compensated at the rate of compensation which is the higher of the two. This Section does not affect such performer's right to receive compensation from both Producers where the performer, while employed by one Producer, makes retakes, added scenes, etc., for the other Producer after the

SAG 1983                                    223

expiration of his term of employment with such other Producer, in any case where the performer is otherwise entitled thereto.  Nothing in this Section contained shall be deemed or construed in any way to limit or prejudice any right or remedy of any Producer, either with respect to any of the contingencies hereinbefore specified or otherwise. Free-lance performers may be required to state on their contracts the starting date of their next engagement by inserting such date in the following statement, which may be endorsed or printed on such contracts:

"The starting date of the performer's next engagement is _____."

## 29.  PRERECORDINGS AND PREPRODUCTION STILLS

Section 24 of this Schedule provides that neither pre-recordings nor preproduction stills, after employment but before the starting date of such employment, shall start the consecutive days of employment of a free-lance performer.  It is agreed that such a performer shall be paid for the day or days on which he renders services in connection with prerecordings and prepro-duction stills.

## 30.  REPORTING PRIOR TO COMMENCEMENT OF EMPLOYMENT

A performer residing outside of the County of Los Angeles shall not be required to report for tests or wardrobe earlier than ten days prior to the commencement of his employment except where Producer agrees to pay reasonable compensation for the excess time over the ten-day period.

## 31.  DAMAGE TO WARDROBE

Any loss of or damage to costumes, wardrobe, and other property furnished by the performer necessarily arising through the performance of the performer's services, or through lack of due care on the part of the Producer shall be paid for by the Producer to the performer.  All costumes, wardrobe, and other property furnished by the Producer shall belong to the Producer and be returned promptly to it, and any loss of or damage thereto arising through lack of due care on the part of the performer, or not necessarily arising through the performance of the performer's services, shall be paid for by the performer to the Producer.  Any loss of or damage to wardrobe, for which either party hereto may be liable, shall be computed on the basis of depreciation schedules to be furnished from time to time by the American Appraisal Company.

SAG 1983                          224

## 32. DEFINITION OF ROLE

The term "role" as used in the Minimum Contract for free-lance Performers shall be deemed to refer to said role as written at the time the freelance contract is entered into, or as it may from time to time thereafter be rewritten or lengthened or short-ened by the Producer in the exercise of its sole discretion and judgment.

## 33. USE OF "DOUBLE"

A.   The Producer agrees that it will not "dub" or use a "double" in lieu of the performer, except under the following circumstances:

(1)   When necessary to expeditiously meet the requirements of foreign exhibition;

(2)   When necessary to expeditiously meet censorship requirements, both foreign and domestic;

(3)   When, in the opinion of the Producer, the failure to use a double for the performance of hazardous acts might result in physical injury to the performer;

(4)   When the performer is not available; and

(5)   When the performer fails or is unable to meet certain requirements of the role, such as singing or the rendition of instrumental music or other similar services requiring special talent or ability other than that possessed by the performer.

The performer does hereby agree that under either or any of the conditions hereinabove in subparagraphs (1) to (5), both inclusive, of this Section set forth, the Producer shall have the right to double and/or dub not only the acts, poses, plays and appearances of the performer, but also the voice of the performer, and all instrumental, musical, and other sound effects to be produced by the performer, to such extent as may be required by the Producer.

B.   Preproduction

Upon the application of Producer, the Union agrees to liberally grant waivers so that there will be no continuous employment for a free-lance performer where that performer is doubled in preproduction.  The Union may require, as a condition of the issuance of such a waiver, one day's pay to the performer for each day that the performer is doubled.

PAR000210

In order to encourage the use of principals in preproduction, the Union will liberally grant waivers to permit principals to appear in preproduction shots without commencing their consecutive employment until principal photography actually commences. This provision shall apply only to Hollywood-based domestic production of theatrical motion pictures and features made primarily for first exhibition on television.

## 34. RIGHT TO NAME OR CHARACTER

No Producer shall after the termination of the performer's employment prevent such performer from continuing the use of any stage or screen name used by such performer. The name of a role owned or created by the Producer, such as Tarzan or Charlie Chan, belongs to the Producer and not to the performer.

## 35. STUDIO RULES

The performer agrees to be prompt in appearing for work as required by the Producer, to perform services hereunder in a conscientious and painstaking manner and in accordance with the reasonable instructions of the Producer, and to abide by the reasonable studio rules and regulations of the Producer. The Producer shall have the exclusive right to the services of the performer during the term hereof, and the performer agrees that during the term hereof the performer will not render any services of any kind to or for any person, firm or corporation other than the Producer without first obtaining the express written consent of the Producer.

## 36. RIGHTS GRANTED TO PRODUCER

The term "photoplay" as used in said free-lance contract shall be deemed to include motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices, including television, which are now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production. The Producer shall have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and exploit in connection with the said photoplay any and all of the performer's acts, poses, plays and appearances of any and all kinds hereunder, and shall further have the right to record, reproduce, transmit, exhibit, distribute, and exploit in connection with said photoplay the performer's voice, and all instrumental, musical, and other sound effects produced by the performer in connection with such acts, poses, plays and appearances. The Producer shall likewise have the right to use and give publicity to the performer's name and likeness, photographic or otherwise, and to recordations and reproductions of the

SAG 1983                              226

PAR000211

performer's voice and all instrumental, musical and other sound effects produced by the performer hereunder, in connection with the advertising and exploitation of said photoplay.  The rights of this Section granted to the Producer shall inure to the benefit not only of the Producer, but also to the benefit of all persons who may hereafter acquire from the Producer any right to distribute, transmit, exhibit, advertise, or exploit said photoplay.

The grant of rights provided herein shall not be deemed to include:

A.   Merchandising rights unless separately bargained for with the performer;

B.   The photograph or likeness of the performer in books commercially published for sale to the public, unless the prior written consent of the performer is obtained;

C.   The right to feature the photograph or likeness of the performer on the album or jacket cover of commercial phonograph or tape recordings which would indicate that the performer's performance is included in the recording when in fact the performer's performance is not included in such recording, unless the prior written consent of the performer is obtained.

37.   <u>GENERAL RIGHT OF TERMINATION</u>

A.   The Producer may terminate the performer's employment at any time, either prior to the commencement of production of said photoplay or during the course of production.

B.   If the Producer elects to terminate the performer's employment under the free-lance contract prior to the commencement of the term thereof, the Producer shall be obligated to pay the performer compensation during the minimum guaranteed period provided for in said free-lance contract, but if the performer receives other employment during such period, the compensation received by the performer from such other employment shall be applied in reduction of the Producer's liability.

C.   If the Producer elects to terminate the performer's employment at any time after the commencement of the term of said free-lance contract, the Producer shall be obligated to pay the performer such balance, if any, as is then unpaid for services theretofore rendered by the performer, and also one week's compensation, upon the payment of which the Producer shall be discharged of and from all liability whatsoever thereunder, subject, however, to the provisions of paragraph 1 of the free-lance contract and Sections 38 and 39 hereof.

PAR000212

D.   In the event that a performer is replaced in the role, the performer, or performer's agent, shall be notified of this fact at the time of the replacement.

38.  ILLNESS OF PERFORMER (Suspension of Salary and Termination)

The Producer need pay no salary during any period that the performer is incapacitated, by illness or otherwise, from performing the required services under a free-lance contract, and in the event of such illness or incapacity the Producer, at its option, may terminate such employment without further liability.

39.  EMERGENCY SUSPENSION OR TERMINATION

If the production of the photoplay specified in the free-lance contract be necessarily prevented, suspended, or postponed during the course of production, by reason of fire, accident, strike, riot, act of God, or of the public enemy, or by any executive or judicial order, or postponed by reason of the illness of any other member of the cast or of the director, one-half salary shall be paid the performer for the first three weeks' prevention, suspension, or postponement.  It shall be the duty of the Producer during the first week of any prevention, suspension, or postponement to notify the performer in writing whether the Producer will entirely discontinue the production or further suspend or postpone it, and in the latter event the Producer shall pay the performer half salary during such further suspended or postponed period.  At the end of three weeks from the date on which the Producer has stopped production the performer may terminate said employment if the performer so elects, unless the Producer continues thereafter to pay the performer full weekly compensation.  If the production of said photoplay is prevented, suspended, or postponed for any reason hereinabove in this Section provided, then and in that event the Producer may terminate said employment at any time after the commencement of such prevention, suspension, or postponement.  If the Producer elects to terminate said employment by reason of the illness of any other member of the cast or of the director, then the Producer shall be obligated to pay the performer such balance, if any, as is then unpaid for services theretofore rendered by the performer, and also one week's compensation, upon the payment of which the Producer shall be discharged of and from all liability whatsoever thereunder.  If such termination be based on the happening of any other cause hereinabove in this Section set forth, then the Producer shall be obligated to pay the performer only such balance, if any, as is then unpaid for services theretofore rendered by the performer, and upon the payment of such unpaid balance, if any, the Producer shall be discharged of and from all liability whatsoever thereunder.

SAG 1983                              228

PAR000213

Where the production is suspended as a result of illness of another member of the cast or the director, and such suspension continues for five days or more, the suspension may be effective as of the beginning of the event of illness, but if the duration is less than five days, the suspension is not effective.

## 40.  RESUMED PRODUCTION AFTER TERMINATION

If the Producer elects to terminate a performer's employment under a free-lance contract pursuant to its right to do so for any cause hereinabove in Section 39 specified, and if at any time more than three weeks after such termination the Producer shall desire to resume the production of said photoplay, the Producer shall notify the performer of its election to resume production and in such event the performer agrees to render his services in connection with such resumed production as and when the Producer may request, unless the performer is otherwise employed, but if otherwise employed the performer will cooperate to the fullest extent in trying to make his services available for the Producer in connection with such resumed production.  If production is resumed within six months from the date of termination the performer's compensation shall be at the same rate as that hereinabove specified, and shall be payable only from the date of commencement of the performer's services in such resumed production.

## 41.  TRAVEL TIME

### A.  Application of Rules

The provisions of this Section shall apply only to free-lance performers included in this Schedule C.

### B.  Studio Zone

(1)  With respect to studios situated in Los Angeles, California, or its environs, the "studio zone" shall include all territory within the radius of thirty (30) miles from the intersection of Beverly Boulevard and La Cienega Boulevard, Los Angeles, California, and such other territory (such as the present Columbia Ranch and Disney Studio) as is generally recognized as being within the studio zone.  With respect to studios not situated in Los Angeles or its environs, a similar territory as the studio zone, and similar rules in relation thereto, shall be agreed upon between the Union and the Producers, and in default of such agreement, such territory and such rules (which shall conform as nearly as possible to the rules herein set forth) shall be determined by arbitration under Section 9 of the General Provisions whenever the situation arises.

PAR000214

(2)   With respect to studios situated in New York, New York, the "studio zone" shall include all territory within the radius of 8 miles from Columbus Circle.

(3)   The Los Angeles 30 mile Studio Zone.  Performers may be required to report anywhere within such studio zone provided that, when the place of reporting is elsewhere than the Producer's studio, the following shall apply:

(a)   Performers shall be paid $.30 per mile mileage allowance figured from the studio to the place of reporting and back; and

(b)   Distances shall be clearly stated on the performer's production time report.

(c)   If, during the term of this Agreement, the International Alliance of Theatrical and Stage Employees through its collective bargaining agreement negotiates with Producer a more favorable mileage allowance than the foregoing thirty cents ($.30) per mile allowance, then, in such event, from such date forward the Union will be entitled to the benefits of such increase.

(d)   The mileage allowance may be paid as a portion of the performer's payroll check, provided it is separately identified as such mileage reimbursement.

(4)   When a performer is required to report for work in the studio zone other than at a studio, Producer shall pay for parking in a supervised public parking lot.  If no such public parking is available, Producer will provide supervised or secured parking.

(5)   With respect to studios situated in San Francisco, California, the "studio zone" shall include all territory within the radius of 30 miles from the intersection of Market and Powell Streets.

C.   <u>Location and Overnight Location</u>

Location shall mean any place of work not at the Producer's studio which is outside the studio zone.  Overnight location shall be any location where the performer is lodged or offered lodging by the Producer at or near the location for one or more nights, or any location which takes overnight to reach by ordinary means of transportation.

SAG 1983                    230

PAR000215

D.   <u>Near Location</u>

A near location shall be any place which can be reached from the Producer's studio within twenty-four hours of travel by ordinary means of transportation.  If the Producer instructs the performer to fly to a location and the trip takes less than twenty-four hours by air, the same shall be deemed to be a near location.

E.   <u>Distant Location</u>

A distant location shall be any place which cannot be reached from the Producer's studio within twenty-four hours of travel by ordinary means of transportation.

F.   <u>Place of Reporting and Dismissal</u>

Except when already at an overnight location, performers shall be required to report only at the Producer's studio or within the studio zone, and shall be dismissed only at the place of reporting within the studio zone or the Producer's studio.  When the performer is returning from such overnight location, he shall be dismissed only at the Producer's studio or the place of reporting within the studio zone, and not at the overnight location.  The provisions of this subsection F shall be subject to and shall not be deemed to limit the provisions of subsection U hereof.

G.   <u>Travel Time is Work Time</u>

Except as otherwise provided in this Schedule, all time spent by any performer in traveling at the request of the Producer between any place at which he is required to and does report and any location, both to and from, shall be travel time, and as such shall be work time, subject to all deductions, limitations, and exceptions for which provision is made in this Agreement.

H.   <u>Maximum Travel Time</u>

Time spent in traveling shall not be included as travel time or work time to the extent of more than eight hours in any twenty-four hours.

I.   <u>Intervening Time between Dismissal and Travel</u>

(1)  Time intervening between the completion of a performer's work on any day and the commencement of travel on the same day shall be travel time except as otherwise provided in this Agreement.

SAG 1983                         231

PAR000216

(2)   Travel to Overnight Location:  Except as otherwise provided in this Agreement, the period of time intervening between the performer's dismissal for the day and the commencement of travel to an overnight location on the same day shall be travel time.

(3)   Travel from Overnight Location:  The period intervening between the performer's dismissal for the day and the commencement of travel on the same day from an overnight location shall not be work time or travel time for any purpose.

J.   <u>Travel on Seventh Day</u>

The six-day week as set forth in this Schedule does not apply in any case where the performer travels seven consecutive days, whether or not the seventh day falls within the same week.

K.   <u>Location Expenses and Lodging</u>

The Producer shall furnish reasonable transportation to and from location and shall furnish reasonable meals, and (where the Producer requires a performer to stay overnight), lodging to the performer on location.  Separate rooms shall be provided to performers transported to overnight locations unless such separate rooms are not available.

In the event Producer believes that separate rooms will not be available at a particular location, Producer will notify the Union and the performer prior to departure, with reasonable time for each to investigate to determine whether the foregoing requirement can be complied with by Producer.

L.   <u>Deduction of Allowable Meal Periods</u>

Reasonable meal periods shall be given during traveling, and allowable meal periods of not less than one-half hour nor more than one hour each shall be deducted from travel time, provided a reasonable meal is made available.

M.   <u>Deduction of Travel Time Otherwise Compensated For</u>

Any travel time for which the performer is compensated as work time shall not be paid for as travel time.

N.   <u>Computation of Overtime Caused by Travel Time</u>

On a day on which a performer travels only, the performer shall be compensated at a day's pay.  On a day on which the performer travels and works, overtime caused by travel will be compensated at time and one-half and not at double time.

PAR000217

O.   Travel Time re Distant Locations at Beginning or End of Performer's Term of Employment

The time spent in traveling to a distant location at the beginning of a performer's term of employment shall not be work time or travel time for any purpose.  The time spent in traveling from a distant location at the end of a performer's term of employment shall be travel time except as in this Agreement otherwise provided.

P.   Transportation and Travel Time on Overnight Locations to and from Hotel or Camp

On overnight locations, the Producer shall provide transportation to and from the hotel or camp and, except as in this Schedule otherwise provided, the time to and from the hotel or camp shall be travel time.  The rest period may be reduced to ten hours (under Section 14.D(2)).

Q.   Travel to or from Overnight Locations on Boat or Train Where Sleeping Accommodations are Provided

Where more than one night's travel, by ordinary means of transportation, is required to reach a location, and the performer is given a berth on a boat or train, the time spent in traveling to or from such location shall not be work time or travel time for the purpose of computing the twelve-hour rest period or for the purpose of computing the ten-hour day; it being agreed, however, that time spent in traveling on the day of arrival at such location, after 9:00 A.M. of such day, shall be counted for the purpose of computing the ten-hour day if the performer works on such day, and provided further that the interval between the completion of travel on such day and the commencement of work shall not be considered travel time or work time for any purpose.  Nothing herein contained shall be construed to interrupt the performer's right to remain on salary if the performer is otherwise entitled thereto.

R.   Overnight Trip to or from Location

Where an overnight trip to or from location is required, and the same takes at least seven hours to reach and the performer is given a berth on a boat or train, the time spent in such traveling to or from such location, whether at the beginning, during or at the end of the engagement, shall not be work time or travel time for the purpose of computing overtime and the rest period.

S.   Travel on Holidays and Sundays

(1)  The holidays herein referred to are New Year's Day, Washington's Birthday, Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and Christmas.

SAG 1983                                    233

(2)   Travel to or from Location:  Where a free-lance
performer travels to or from location on a Sunday or holiday
such travel shall be deemed work time for purposes of
premium pay and performer shall be entitled to a straight
time day, plus an additional one-half day's premium pay as
compensation for traveling on such day.

T.   Travel Pursuant to Recall for Added Scenes, etc.

Any free-lance performer living within the City of Los
Angeles or its environs, who is outside such area when he is
recalled by the Producer for any of the reasons set forth in
Section 27 hereof (including performers who are entitled to the
provisions of the following paragraph), shall be provided with
transportation or reimbursed for the cost of transportation only,
from the place where he is when recalled to the place designated
by the Producer, by the particular mode of transportation
specified by the Producer, regardless of any other mode of
transportation the performer may actually use.  Return
transportation shall be furnished or the performer shall be
reimbursed for such return transportation, as above set forth,
only if the performer shall so return within one week from the
date of dismissal by Producer.

Any performer living within the City of Los Angeles or its
environs, who is at a place beyond a radius of 150 miles from the
intersection of Beverly Boulevard and La Cienega, Los Angeles,
California, when he is recalled by Producer for any of the
aforesaid reasons, shall be placed on salary as of the day he is
directed to and does report to the place designated by Producer,
and shall remain on salary until dismissed, except for the
provisions relating to Saturdays, Sundays and holidays.  If after
dismissal the performer remains in this locality or delays his
return, unless by the Producer's request, and is again recalled
by the Producer, he shall not be entitled to any payment for the
time intervening between his dismissal and his recall.  The
performer shall be entitled to travel time compensation based on
the same rate for his principal engagement, for the period of
time, and only for the period of time that is required in travel-
ing to and from the said place designated by the Producer by the
particular mode of transportation specified by the Producer,
regardless of any other mode of transportation the performer may
actually use.  Such travel time compensation shall be computed in
accordance with the travel time allowance provisions for day
performers as provided for in Schedule A.  The said travel time
allowance for the performer's return to the place of original
departure shall be paid only if the performer shall so return
within one week from the date of dismissal by Producer.

If the Producer designates the mode of transportation and
the day of departure and the performer follows such directions,
there shall be no lapse in payment for days intervening between
end of travel and commencement of work.

PAR000219

In the event the Producer does not specify the mode of transportation, then the travel time allowance shall be based upon the most expeditious mode of transportation possible, including travel by commercial air lines.  The performer need not fly, but if he elects not to fly when requested to do so it shall not increase the travel time allowance as specified above.

There shall be no duty on the Producer to procure return transportation for the performer so long as Producer pays for the same.

To illustrate the foregoing, a performer, a resident of Los Angeles, is temporarily in San Francisco.  Within three months from the close of his principal engagement he is recalled by the Producer as follows:  On a Monday the Producer directs the performer to report at the Los Angeles studio of Producer at 11:00 A.M. on the following Thursday for retakes.  The performer elects to travel by train.  He departs from San Francisco on Wednesday night, arriving at Los Angeles Thursday morning, and reports at 11:00 A.M.  The Producer dismisses the performer at 2:00 P.M. on the same day.  The performer elects to return to San Francisco by train.  The performer shall be entitled to one day's pay at the same rate as was paid for his original engagement, plus the cost of transportation by commercial airline.

Transportation shall mean first-class transportation.

In the foregoing example, if the performer had been dismissed at 6:00 P.M. with an hour off for lunch (six hours work, four hours travel), the performer would have been entitled to pay for one day plus two hours at time and one-half.  The travel allowance contemplated by this paragraph shall entitle the performer to time and one-half.  The performer shall not be entitled to a travel allowance of more than eight hours in any period of twenty-four hours; and the performer shall not be entitled to any travel time allowance for a period of travel for which he is otherwise paid.

Where principal photography takes place in New York, the provisions of this subsection T shall apply to performers living in New York and absent therefrom, and shall be applied to other cities in the same manner by analogy.

Any out-of-state performer who is recalled for any of the purposes specified in Section 27 hereof shall not be required to remain in this locality after dismissal unless he is carried on salary during the period he is so required to wait.

U.    Engagement of Performers - Other Areas

(1)  If a performer, residing or working in any area in which SAG maintains a Branch, is brought to Producer's base or distant location in a different area

SAG 1983                              235

of the United States for any purpose, the performer shall receive transportation and a $55 per day allowance from the time he commences travel at Producer's request until the time his salary commences.

(2)   If Producer is photographing on a location in the United States and brings a performer to such location from anywhere in the United States, such a performer shall be provided transportation to and from such location.

(3)   Except as otherwise provided in (1) and (2) above, nothing herein contained shall prevent a Producer from engaging a performer outside of California (if such performer has not gone out of California for the purpose of evading this rule) to report in California or to report at any location, and in any such case the Producer shall not be required to pay for or provide transportation of such performer to the place of reporting, or to pay such performer for any time spent in traveling thereto; nor shall the Producer be required to pay for or provide transportation of such performer, at the end of the engagement back to the place where such performer was engaged, or to pay such performer for any time spent in traveling back to the place where such performer was engaged; such performer may be dismissed on location.  This does not limit the second sentence of subsection B of this Section 41.

V.   General

(1)   Nothing in this Section 41 shall be deemed to break the continuous employment of a free-lance performer.

(2)   This Agreement uses the expressions "reasonable transportation" and "first-class transportation." The terms are intended to be synonymous.  The type of transportation required can best be illustrated by example:  Bus transportation for a relatively short distance (Hollywood to Lake Arrowhead) meets these requirements; bus transportation for a long distance (Hollywood to San Francisco) does not.  Pullman accommodations to San Francisco, or any other long distance, meet these requirements; deluxe transportation (e.g., Super Chief) is not required.  Transportation on a commercial airline without sleeper accommodations is first-class transportation.  First-class transportation shall be provided on commercial airlines where the performer is required to fly at the request of the Producer.  The foregoing shall apply to jet flights as well as to prop-driven aircraft.  The foregoing shall not apply where first-class transportation is not

PAR000221

available or six or more of the company is being transported.  Charter flights may be used which provide substantially equivalent accommodations. Notwithstanding the foregoing, first-class air transportation need not be provided with respect to auditions and interviews.

42.  COMMENCEMENT OF TERM OF EMPLOYMENT AT NEAR AND DISTANT LOCATION

A.    If the services of the performer at the commencement of the term of employment are to be rendered at a place which can be reached from the Producer's studio within twenty-four hours of travel by ordinary means of transportation, then and in that event compensation shall not begin to accrue to the performer until the performer's first appearance before the camera at such place or until the performer is first put on call at such place; provided, however, that in any event compensation must commence to accrue to the performer not later than twenty-four hours after such place has been reached; and compensation shall accrue to the performer during the time reasonably required to return the performer to his proper place of dismissal (note 41 U(1) & (2) above).

B.    If the services of the performer at commencement of the term of employment are to be rendered at a place which cannot be reached from the Producer's studio within twenty-four hours of travel by ordinary means of transportation, then and in that event compensation shall not commence to accrue to the performer during such travel period and prior to the performer's first appearance before the camera at such place, or prior to the time when the performer is first put on call at such place; provided, however, that in any event compensation must commence to accrue to the performer not later than twenty-four hours after such place has been reached; and compensation shall accrue to the performer during the time reasonably required to return the performer to his proper place of dismissal (note 41 U(1) & (2) above).

43.  GUARANTEE NOT AFFECTED BY ADDITIONAL DAY'S PAY

Whenever a performer receives an additional day or days' pay pursuant to the provisions of this Schedule, such additional day or days' pay shall not be deemed to reduce such performer's guaranteed employment or compensation.

44.  INTERVIEWS AND AUDITIONS

A.    A performer employed under Schedule B or C shall not be kept waiting for an interview or audition for more than one hour after the time scheduled for the interview or audition.  The type

PAR000222

of interview or audition referred to is an interview or audition for a specific picture, not a general or get-acquainted type of interview.  If the performer is more than five minutes late, the above rule shall not be applicable.  It is not the intent of this provision to limit the duration of the interview or audition itself.  If a performer is detained for more than the permitted period he shall be compensated for the excess time he is required to wait at his straight time hourly rate in one-half hour units. If no salary has been agreed upon before the interview or audition, and if the performer and Producer cannot agree on the applicable salary, the salary rate at which such performer shall be compensated for such excess time shall be determined by conciliation, and if conciliation fails, by arbitration in accordance with the applicable provisions of the Basic Agreement. However, claims for violation of this subsection A must be filed by the Screen Actors Guild not later than fifteen days after the date of the alleged violation.

B.   If parking space is not provided or readily available, Producer will validate or reimburse parking costs incurred by performers in connection with interviews.

C.   The latest version of the script will be made accessible to the performer in the casting office twenty-four hours in advance of a scheduled reading or immediately after the scheduling of the interview, whichever last occurs.

D.   For scheduled interviews (other than general or get acquainted type interviews) and auditions conducted and confirmed by the casting office (or, if Producer has no casting office, in the office of Producer's casting representative), sign-in sheets shall be required at the place where the performer is first directed to report.  Copies of such sheets shall be kept by Producer for thirty (30) days and, during that time, such sheets will be made available to the Union upon request.  The sign-in sheet shall indicate whether parking was provided.

Effective October 7, 1983, sign-in sheets for scheduled interviews and auditions shall include the following information: Performer's name; social security number; name of role; performer's agent (if any); whether the interview or audition was videotaped; whether parking was provided; whether the script was available; actual call; waiting time; and performer's initials.

PAR000223

45.   <u>LOOPING</u>

    Performer may be recalled to loop (record sound track) after completion of principal photography at one-half of the performer's pro rata daily salary for a four-hour looping session.  If the session exceeds four hours, a full day's pro rata salary shall be payable. (See Section 27B above).

PAR000224

SCHEDULE D


MULTIPLE-PICTURE PERFORMERS RECEIVING $3500 OR LESS
PER WEEK AND GUARANTEED LESS THAN $30,000 PER THEATRICAL
PICTURE OR LESS THAN $25,000 PER TELEVISION PICTURE


TABLE OF CONTENTS

Section
No.

Section
No.

1.   Definition
2.   Minimum Compensation
3.   Incorporation of
     Schedule B -
     Exceptions

4.   Schedule D Included
     in Individual
     Contracts
5.   Replacement of Performer

---

INDEX


For Index see Schedule B; exceptions contained in
Section 3 of this Schedule.

---

PAR000225

SCHEDULE D


MULTIPLE-PICTURE PERFORMERS RECEIVING $3500 OR LESS
PER WEEK AND GUARANTEED LESS THAN $30,000 PER THEATRICAL PICTURE
OR LESS THAN $25,000 PER TELEVISION PICTURE


1.   DEFINITION

A multiple picture performer, for the purposes of this
Schedule D, is a performer who is employed for two or more
pictures per year, whose contract with respect to services in the
production of motion pictures is non-exclusive, whose
compensation is at the rate of $3,500 or less per week or
equivalent compensation on a picture or other basis, and who is
guaranteed less than $30,000 per theatrical picture or less than
$25,000 per television picture.  A multiple picture performer
contract may be for a period of years, provided that the contract
calls for at least two pictures in any yearly period.


2.   MINIMUM COMPENSATION

The minimum salary for a multiple picture performer shall be
$1142 per week for the period July 1, 1983 through December 31,
1984 and $1256 per week thereafter.

W-4's shall be presented to performer no later than the
first day of employment.  A W-4 form may be given to performer on
the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the
performer's responsibility to return a completed W-4 form to
Producer in a timely manner.  It is understood that where a
performer fails to do so, there shall be no retroactive
adjustments to the withholding required by law.

3.   INCORPORATION OF SCHEDULE B - EXCEPTIONS

Reference is made to Schedule B of this Agreement; each of
the provisions of Schedule B is incorporated in this Schedule
except:

(1)  Sections 1, 2, and 3;

(2)  The requirement to designate the role, the
photoplay, and the starting date; and


SAG 1983                     241

(3)   Section 42, Emergency Suspension or Termination, and Section 43, Resumed Production after Termination, where the multiple picture performer is guaranteed $10,000 or more for his services in a photoplay.

## 4.   SCHEDULE D INCLUDED IN INDIVIDUAL CONTRACTS

It is agreed that the conditions of this Schedule, including the incorporation by reference in Section 3 hereof, shall become a part of the contract with the multiple picture performer to whom this Schedule applies.

## 5.   REPLACEMENT OF PERFORMER

In the event that a performer is replaced in the role, the performer, or performer's agent, shall be notified of this fact at the time of the replacement.

PAR000227

SCHEDULE E

CONTRACT PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS
$3500 OR LESS PER WEEK

Table of Contents

Section
  No.

1. Definition
2. Classifications of Contract Performers  - Term Contract
3. Schedule E Included in Individual Contracts
4. Minimum Salary of Contract Performers
5. Combination Term Contracts
6. Beginners
7. Rate Not Specified
8. The Performer's Workweek; Studio 5-Day Week; Overnight Location Week
9. Hours Per Day; Work Past Midnight
10. Daily Rate of Compensation; Prorating
11. Overtime
12. Rest Period
13. Work Time
14. Makeup, Hairdress, Wardrobe
15. Meal Periods
16. Dressing Rooms
17. Tests and Auditions
18. Study of Lines or Script
19. Story, Song and Production

Section
  No.

20. Publicity Interviews
21. Publicity Stills
22. Retakes, Added Scenes, and Changes
23. Tours and Personal Appearances
24. Rehearsal Time
25. Night Work
26. Work on Holidays, or Holidays and Saturday or Sunday
27. Right to Name or Character
28. "Act of God" Clause - Suspension of Performer
29. Illness - Cancellation Period
30. Length of Layoff
31. Breaking the Layoff
32. Travel Time
33. Commercials
34. Emergency Suspension or Termination
35. Resumed Production After Termination
36. Replacement of Performer Conferences

PAR000228

## SCHEDULE E INDEX

|  | Section No. | Page No. |
|---|---|---|
| "Act of God" Clause | 28 | 275 |
| Added Scenes | 22 | 268 |
| Auditions, Tests | 17, 31 | 267, 275 |
| Beginners | 6, 28A | 252, 275 |
| Breaking the Layoff | 31 | 275 |
| Cancellation Period, Illness | 29 | 275 |
| Changes | 22 | 268 |
| Classifications of Contract Performers | 2 | 248 |
| Combination Term Contracts | 5 | 249 |
| Commencement at Distant Location - See Travel Time | 32-O | 280 |
| Commercials | 33 | 282 |
| Computation of Overtime Rate, Etc. | 11 | 259 |
| Conferences - Story, Song and Production | 19, 31 | 267, 275 |
| Contract Performer - Definition | 1 | 248 |
| Daily Rate of Compensation | 10 | 258 |
| Date When Overtime Due | 11E | 263 |
| Definition of Contract Performer | 1 | 248 |
| Emergency Suspension or Termination | 34 | 282 |
| Error in Computation of Overtime | 8E | 258 |
| Fittings | 14, 31 | 264, 275 |
| Five-Day Workweek (Studio) | 11F | 263 |
| Guarantee - Minimum Salary | 4 | 249 |
| Guarantee Not Affected by Overtime | 11F | 263 |
| Hairdress | 14 | 264 |
| Holidays or Holidays & Saturdays or Sundays | 26 | 271 |
| Hours Per Day and Per Week | 8 | 254 |

PAR000229

Schedule E Index
(Continued)

|                                                          | Section No. | Page No.   |
|----------------------------------------------------------|-------------|------------|
| Illness of Performer - Cancellation Period               | 29          | 275        |
| Individual Contract - Schedule E Included                | 3           | 249        |
| Individual Contract May Not Change Provisions re Breaking Layoff | 31   | 275        |
| Interviews, Publicity                                    | 20, 31B(2)  | 268, 276   |
| Layoff, Breaking the                                     | 31, 19, 20, 21 | 275, 267, 268 |
| Layoff, Length of                                        | 30          | 275        |
| Lines, Study of                                          | 18          | 267        |
| Locations - See Travel Time(This Index)                  |             |            |
| Makeup, Hairdress, Wardrobe, Fittings                    | 14          | 264        |
| Meal Periods                                             | 15          | 266        |
| Minimum Rates                                            | 4           | 249        |
| Minimum Salary                                           | 4           | 249        |
| Name, Right to                                           | 27          | 275        |
| Night Work                                               | 25          | 270        |
| Overnight Location - 6-Day Week                          | 8C          | 256        |
| Overtime                                                 | 11          | 259        |
| Pay Not Specified                                        | 7           | 254        |
| Personal Appearances, Tours                              | 23          | 269        |
| Production Conferences                                   | 19, 31      | 267, 275   |
| Proration of Week                                        | 10          | 258        |
| Publicity Interviews                                     | 20, 31      | 268, 275   |
| Publicity Stills                                         | 21, 31      | 268, 275   |
| Rate Not Specified                                       | 7           | 254        |
| Rate - Overtime                                          | 11          | 259        |
| Recall for Retakes and Added Scenes - Layoff Subject to  | 30          | 275        |
| Rehearsal Time                                           | 24          | 269        |
| Replacement of Performer                                 | 36          | 283        |
| Rest Period                                              | 12          | 261        |
| Resumed Production After Termination                     | 35          | 283        |
| Retakes, Added Scenes, and Changes                       | 22, 30      | 268, 275   |
| Right to Name or Character                               | 27          | 275        |

PAR000230

Schedule E Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Salary - Minimum Guarantee....................4 | | 249 |
| Saturday & Sunday Work (Studio 5-Day Week)....8B(3) | | 255 |
| Saturday or Sunday & Holiday (Studio 5-Day Week)........................26B | | 271 |
| Schedule E Included in Individual Contracts...3 | | 249 |
| Script, Study of............................18 | | 267 |
| Script, Submission of.......................19, 31 | | 267, 275 |
| Six-Day Week Overnight Location..............8C | | 256 |
| Stills, Publicity...........................21, 31 | | 268, 275 |
| Story, Song, and Production Conferences.......19, 31 | | 267, 275 |
| Studio 5-Day Week...........................8B | | 254 |
| Study of Lines or Script....................18 | | 267 |
| Submission of Script........................19, 31 | | 267, 275 |
| Sunday Work (Overnight Location 6-Day Week)...8C(3) | | 257 |
| Sunday Work (Studio 5-Day Week)..............8B(3) | | 255 |
| Sundays & Holidays (Overnight Location 6-Day Week)...............................26C | | 273 |
| Sundays & Holidays (Studio 5-Day Week)........26B | | 271 |
| Suspension of Performer - "Act of God" Clause....................................28 | | 275 |
| | | |
| Term Contract...............................2 | | 248 |
| Tests and Auditions.........................17, 31 | | 267, 275 |
| Tours and Personal Appearances..............23 | | 269 |
| Training and Coaching of Performer...........31 | | 275 |
| Travel Time.................................32 | | 276 |

Subsection

| Application of Rules..................A | 276 |
|---|---|
| Computation of Overtime Caused by Travel Time.......................N | 279 |
| Deduction of Allowable Meal Periods...L | 279 |
| Deduction of Travel Time Otherwise Compensated For.....................M | 279 |
| Distant Location.....................E | 278 |
| Engagement of Performers - Other Area..........................T | 281 |

PAR000231

Schedule E Index
(Continued)

|  | Section No. Subsection | Page No. |
|---|---|---|
| General..............................U | | 282 |
| Intervening Time between Dismissal and Travel..............................I | | 278 |
| Location and Overnight Location.......C | | 277 |
| Maximum Travel Time..................H | | 278 |
| Near Location........................D | | 278 |
| Overnight Trip to or from Location....R | | 281 |
| Place of Reporting and Dismissal......F | | 278 |
| Studio Zone..........................B | | 276 |
| Transportation and Lodging Furnished..K | | 279 |
| Transportation and Travel Time on Overnight Location to and from Hotel or Camp.......................P | | 280 |
| Travel from Overnight Location- Intervening Time...................I(3) | | 279 |
| Travel on Holidays and Sundays.......S | | 281 |
| Travel on Seventh Day................J | | 279 |
| Travel Time is Work Time.............G | | 278 |
| Travel Time re Distant Locations at Beginning or End of Performer's Term of Employment.....................O | | 280 |
| Travel to Overnight Location- Intervening Time...................I(2) | | 279 |
| Travel to or from Overnight Locations on Boat or Train where Sleeping Accommodations are Provided...........................Q | | 280 |
| Units of Overtime.............................11B | | 260 |
| Wardrobe........................................14 | | 264 |
| Week, Proration of..............................10 | | 258 |
| Work on Holidays or Holidays and Saturday or Sunday......................26 | | 271 |
| Work Time.......................................13 | | 263 |
| Workweek........................................8 | | 254 |
| Working at Midnight.............................9 | | 258 |

SAG 1983                    247

PAR000232

SCHEDULE E

CONTRACT PERFORMERS WHOSE WEEKLY GUARANTEED
SALARY IS $3500 OR LESS PER WEEK

1.   DEFINITION

A contract performer is a performer employed under a
contract for television motion pictures or theatrical motion
pictures or both (in which latter case such contracts are
sometimes referred to as "combination term contracts") which
contract is for a term of at least 10 out of 13 weeks and which
may not specify any role, picture or series, unless otherwise
requested by the performer and approved by the Union.  The Union
agrees it will liberally grant waivers in the event of such
request.  The Producer and the performer may agree on any
over-all term of hiring in excess of ten (10) guaranteed weeks,
provided that the guaranteed number of weeks is in the same
proportion to the over-all period as "ten out of thirteen."

2.   CLASSIFICATIONS OF CONTRACT PERFORMERS - TERM CONTRACT

A.   Where a performer is employed for two or more pictures
per year or other specified period (hereinafter referred to as
the "employment period") and the contract is exclusive with
respect to his services in the production of motion pictures, the
performer shall be classified for the purpose of this Agreement
as a "term contract performer" and his classification as a term
contract performer with respect to "hours" shall be determined in
accordance with the following formula:

The total guaranteed compensation of the performer shall be
divided by the proportionate number of weeks in the employment
period that 40 bears to 52.  For example; if the employment
period is one year, the guaranteed compensation shall be divided
by 40 weeks; if the employment period is six months, the guar-
anteed compensation shall be divided by 20 weeks, etc.  If the
resulting figure reflects a compensation of more than $3,500 per
week the provisions of Schedule F shall apply to the employment.
If the resulting figure is $3,500 per week or less the provisions
of Schedule E shall apply to the employment.

When a performer who, under the above formula, has been
classified so as to receive the provisions of Schedule E receives
compensation in addition to his minimum guaranteed compensation,
which additional compensation when added to his total minimum
guaranteed compensation and divided by the said proportionate
number of weeks in the employment period would raise the
performer above the $3,500 breaking point, then such performer
from that time forward shall receive the provisions of Schedule F

SAG 1983                          248

PAR000233

instead of Schedule E for the balance of the employment period in question.  The so-called "breaking point" for a performer whose employment period is one year shall be $100,000, for an employment period of six months; $50,000, for an employment period of three months; $25,000, etc.

B.   The employment period of ten out of thirteen weeks may not be used in the same term contract except during the first year; thereafter the contract shall guarantee a minimum period of employment of twenty out of twenty-six weeks.  This subsection is subject to Section 12(C) of the 1983 Screen Actors Guild Television Agreement.

3.   <u>SCHEDULE E INCLUDED IN INDIVIDUAL CONTRACTS</u>

It is agreed that the terms, conditions, and exceptions of this Schedule shall become a part of the contract of a contract performer while he is receiving $3,500 or less per week.

W-4's shall be presented to performer no later than the first day of employment.  A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.  It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.

4.   <u>MINIMUM SALARY OF CONTRACT PERFORMERS</u>

The minimum weekly salary for contract performers, other than "beginners," is as follows:

> If performer is guaranteed 10 but no more than 19 weeks - $979.00 for the period July 1, 1983 through December 31, 1984 and $1077.00 thereafter.
>
> If performer is guaranteed 20 or more weeks - $815.00 per week for the period July 1, 1983 through December 31, 1984 and $896.00 thereafter.

5.   <u>COMBINATION TERM CONTRACTS</u>

A.   Performer employed under a combination term contract and used in a television series in a continuing role

SAG 1983                                    249

PAR000234

(1)   If a performer is used in a continuing role in a ½
hour television series, he shall be adjusted for the dura-
tion of such services to the series contract salaries and
applicable rerun, theatrical and foreign telecast rates.

(2)   If performer is used in a continuing role in a one
hour or one and one-half hour television series, he shall be
adjusted for the duration of such services to the weekly
free-lance salary rate and applicable rerun, theatrical and
foreign telecast rates, it being understood in this connection
that such adjustment shall not result, with respect to his
services in any episode in such series, in his receiving less
than a week's free-lance salary.

(3)   If Producer uses the performer in a greater number
of episodes than the number of weeks of employment
guaranteed under this provision A, or in a combination of
this provision and provision B below, the performer shall be
paid the weekly free-lance salary and applicable rerun,
theatrical and foreign telecast rates for each additional
episode in which his services are used.  If the performer is
employed beyond the guaranteed period of employment, he
shall be paid an amount equal to the weekly free-lance
salary for each additional week or episode, whichever is the
greater.

B.   Performer employed under a combination term contract
and used in a television episode - but not continuing role

(1)   A term performer who is guaranteed a minimum of 20
out of 26 weeks who works in a television episode or
episodes but who does not have a continuing role in a
series, shall not be used in more than fifteen (15)
television episodes during such period.  If he is used in
more than fifteen (15) such episodes, he shall be paid an
additional week's salary and applicable rerun, theatrical
and foreign telecast rates for each such additional episode.

(2)   A term performer who is guaranteed a minimum of 10
out of 13 weeks who works in a television episode or episodes but
who does not have a continuing role in a series, if he is used in
more than seven (7) such episodes, shall be paid an additional
week's salary and applicable rerun, theatrical and foreign
telecast rates for each such additional episode.

(3)   If such performer is used beyond the guaranteed
period of employment, he shall be paid an amount equal to
his weekly salary for each additional week or episode,
whichever is greater.

(4)   For all such term performers who do not appear in
a continuing role the applicable rerun, theatrical and
foreign telecast rates per episode shall be based on the
applicable weekly rate.

SAG 1983                          250

PAR000235

C.   Applicable TV weekly free-lance salary, series contract salary, rerun, theatrical and foreign telecast rates referred to above, are those rates provided by the applicable Screen Actors Guild television agreement in effect when such services were rendered in such television films.

D.   Where a term contract performer is assigned to regular employment in television and Producer avails himself of the layoff rights provided for term contract performers, Producer may not also exercise its hiatus rights provided in the collective bargaining agreement covering the employment of term contract performers in television.

E.   A separate clause shall be inserted in all combination term contracts, specifying separate compensation for services, reruns, theatrical exhibition and foreign telecasting of television motion pictures for each contract term or option period.

F.   No advance payments may be made for reruns or theatrical or foreign telecast rights nor may overscale salary be credited against any sums due the performer under the contract.  As to term contracts in existence on February 1, 1960 providing for advances against reruns, no such advances may be applied against reruns except reruns of episodes made within the contract period or option term during which such advances were made.

G.   Other Conditions for Combination Term Contracts

(1)   If a performer employed under a combination term contract performs, in any single employment week during such term, services in rehearsals or recordings or before the camera, in both a television motion picture film and a theatrical motion picture film hereunder, such performer shall receive as additional compensation for such week an amount not less than the applicable weekly term contract minimum.

(2)   If a performer under a combination term contract renders services in any single employment week in principal photography in either a television motion picture or a theatrical motion picture and also renders services in such week in retakes, added scenes, sound track, process shots, transparencies, trick shots, trailers, changes or foreign versions of the photoplay (hereinafter referred to as "retakes, etc."), in the other field, such performer shall be paid, in addition to his weekly term contract salary, one-fifth (1/5) of the minimum term contract weekly rates, for each day on which he renders services on such retakes, etc.

(3)   If the performer renders services in any week in both a television motion picture and a theatrical motion picture, he shall be paid as in this subsection G provided even though he is also placed on layoff at any time during such week.

PAR000236

(4)  If a performer who is on layoff is recalled for retakes, etc., in either television motion pictures or theatrical motion pictures, or both, he shall be paid one-fifth (1/5) of the minimum term contract weekly rates, for each day in each field on which he renders such services.

(5)  If a performer renders services in either a television motion picture or a theatrical motion picture in any week and also renders services in retakes, etc., in the same week in the other field, and is placed on layoff prior to the end of such week, he shall be paid, in addition to the weekly salary due, an amount equal to one-fifth (1/5) of the minimum term contract weekly rates for each day on which he renders services in such retakes, etc.

(6)  When a performer employed under a combination term contract renders services in any week in both theatrical motion pictures and television motion pictures, for the purpose of determining whether Schedule E or Schedule F applies, and making the computations therein, the performer's weekly salary for such week shall be deemed to be his aggregate weekly salary, as herein provided.

6.   <u>BEGINNERS</u>

A.   <u>Definition</u>

A "beginner" is defined as:

(1)  A person under the age of thirty with no professional experience as a performer prior to a date twelve months before the commencement of the term of his employment, and for such person, chorus work or extra work, even though he was adjusted as an extra performer for speaking lines, shall not constitute professional experience as a performer, or

(2)  A person thirty years of age or over who has had no professional experience as a performer prior to the commencement of the term of his employment, and for such person, chorus work or extra work shall constitute professional experience as a performer.

For the purpose of the foregoing definitions, little theatre work shall not be considered to be professional experience as a performer.

PAR000237

(3)   A person employed as a beginner under a term employment contract shall not for the purpose of the minimum compensation provisions of this paragraph continue to be a beginner under such employment contract after the expiration of twelve months from the commencement of the term of such employment contract.   If a person has been employed as a beginner under a term employment contract, such person may not, after the expiration of twelve months from the date of the commencement of the term of such employment contract, be again employed as a beginner by the same or any other Producer unless a waiver is obtained from the Union.

B.   <u>Minimum Salary</u>

For the first 6 months - $439.00 per week for the period July 1, 1983 through December 31, 1984 and $483.00 thereafter;

For the second 6 months - $491.00 per week for the period July 1, 1983 through December 31, 1984 and $540.00 thereafter.

C.   <u>Employment in Television or Theatrical Pictures</u>

A beginner used by Producer in a television motion picture shall be adjusted to the non-beginner's applicable term contract rates and adjustments, if any, herein provided for the time he performs such services in such television motion picture and to the applicable rerun, theatrical and foreign telecast rates.

If Producer uses a beginner in a theatrical motion picture produced by Producer, or in which Producer has a financial interest, the performer shall remain a beginner.

D.   <u>Loanouts</u>

A beginner loaned out to a television Producer for a television motion picture in which Producer has no financial interest shall be paid the television free-lance rate during the time he performs such services, and applicable rerun, theatrical and foreign telecast rates.   When he returns to Producer, he returns as a beginner.

A beginner who is loaned out to a television Producer for a television motion picture, in which Producer has a financial interest, shall be paid at the weekly rate specified in Section 4 of this Schedule for the time he performs such services, and applicable rerun, theatrical and foreign telecast rates.   When he returns to Producer, he returns as a beginner.

A beginner loaned out for a theatrical motion picture remains a beginner during such services.

SAG 1983                    253

PAR000238

7.   RATE NOT SPECIFIED

Wherever this Schedule states that a performer shall receive
compensation for work done before he is employed, if he is not
employed, and no rate is specified in this Schedule, such com-
pensation shall be computed upon the agreed rate of compensation,
if there was such an agreed rate of compensation, and if not,
upon the performer's established compensation.  Disputes between
the performer and the Producer under this provision are subject
to conciliation and arbitration.

8.   THE PERFORMER'S WORKWEEK: STUDIO 5-DAY WEEK; OVERNIGHT
LOCATION WEEK

A.   Definitions-General

(1)  An "overnight location workweek," as used herein,
shall be deemed to be a workweek consisting of six (6)
overnight location days (excluding Sunday) or six (6) days
(excluding Sunday) of any combination of studio and
overnight location days, which combination includes a
Saturday overnight location day.

Any workweek other than such an overnight location
workweek, for the purposes of this Section, shall be deemed
to be a "studio workweek."

(2)  An "overnight location day" as used herein shall
be deemed to mean any of the following days, if the
performer is on salary that day, as provided in the Basic
Agreement:

(a)  Any day spent or worked by the performer on
an overnight location or on an exploitation tour;

(b)  The day of departure for such location
(provided the performer does not actually work in the
studio on such day);

(c)  The day of return from such location
(provided the performer does not actually work in the
studio on such day);

(3)  For all purposes, the performer's weekly base rate
shall be his weekly rate of salary as specified in his
contract; the performer's straight-time hourly rate shall be
1/44th of his weekly base rate.

B.   Studio 5-Day Workweek

(1)  The performer's studio workweek shall be a 5-day
workweek.

PAR000239

(2)   The regular studio workweek shall be 44 cumulative hours commencing with the first day of the performer's workweek; weekly overtime shall be at one and one-half (1½) times the straight time hourly rate for hours worked in excess of 44 hours in such workweek, except as otherwise provided in Section 11 entitled "Overtime."

(3)   Saturday and Sunday Work

If the performer works on a Saturday or Sunday and performer is on a studio workweek, he shall in each case be entitled to premium of an extra day's pay in accordance with the following:

(a)   If the performer works seven days in his workweek, he shall be entitled to an additional two day's pay for work beyond five days' plus two days' premium pay or a total of nine days' pay.  Hours worked on such Saturday and Sunday shall not be included in calculating performer's forty-four hour week, and the other five days in the week will constitute the workweek for such purpose.

(b)   If the performer works six days in his workweek including work on both Saturday and Sunday, he shall be entitled to an additional day's pay for work beyond five days plus two days' premium pay, or a total of eight days' pay.  Hours worked on such Saturday, to and including ten hours, shall be included in calculating performer's forty-four hour week but hours worked on such Sunday shall not be so included; the other five days in the week will constitute the workweek for such purpose.

(c)   If performer works six days in his workweek including work on either a Saturday or Sunday, but not both, he shall be entitled to an additional day's pay for work beyond 5 days plus one day's premium pay, or a total of seven days' pay.  Hours worked on such Saturday or Sunday shall not be included in calculating performer's forty-four hour week, and the other five days in the week will constitute the workweek for such purpose.

(d)   If performer works five days or less in his workweek including both a Saturday and Sunday, he shall be entitled to two day's premium pay or a total of seven day's pay.  Hours worked on such Saturday and Sunday, to and including ten hours each, are included in calculating performer's forty-four hour week.

PAR000240

(e)   If performer works five days or less in his workweek including a Saturday or Sunday, but not both, he shall be entitled to one day's premium pay, or a total of six day's pay.  Hours worked on such Saturday or Sunday, to and including ten hours each, are included in calculating the performer's forty-four hour week.

(f)   If the performer works on a Saturday or Sunday during a fractional week at the end of his engagement, the performer shall receive an extra day's pay for each such Saturday or Sunday worked.  The hours worked on such Saturday or Sunday, to and including ten hours each, are included for the purpose of calculating the prorated workweek.

(g)   Notwithstanding the foregoing, a Saturday, as such, worked on an overnight location shall not be a premium day.

(h)   For work time in excess of ten hours on any Saturday or Sunday for which the performer receives a premium of one day's pay as above provided, the performer shall receive double the weekly straight time hourly rate, including overtime caused by makeup, hairdress, wardrobe or fittings.

(i)   If the time included in calculating the performer's forty-four hour week, as above provided, exceeds forty-four hours, such excess time shall be paid for in hourly units at the rate of one and one-half times the weekly straight time hourly rate, or at the rate of straight time to the extent the same is caused by makeup, hairdress and wardrobe.

C.   Overnight Location 6-Day Workweek

(1)   The overnight location 6-day workweek shall be 48 cumulative hours, commencing with the first day of the performer's workweek, which 48 hours include an additional 4 hours overtime at the straight time hourly rate (whether worked or not).

(2)   If the time included in calculating the performer's forty-eight hour week, as above provided, exceeds forty-eight hours, such excess time shall be paid for at the rate of one and one-half times the weekly straight time hourly rate, except as otherwise provided in Section 11 entitled "Overtime."

PAR000241

(3)  Sunday Work

If the performer works on a Sunday and performer is on an overnight location workweek, he shall in each case be entitled to a premium of an extra day's pay in accordance with the following:

(a)  If the performer works seven days in his workweek, including a Sunday, he shall receive an additional day's pay for work beyond six days plus one days' premium pay, or a total of eight days' pay. Hours worked on such Sunday shall not be included in calculating the performer's forty-eight hour week and the other six days in the week will constitute the workweek for such purpose.

(b)  If the performer works on only six days or less in his workweek, including work on a Sunday on an overnight location, the performer shall receive a premium of an additional day's pay for work on such Sunday or a total of 7 days' pay and the hours worked on such Sunday to and including ten hours are included in calculating the performer's forty-eight hour week.

(c)  If the performer works on Sunday during a fractional week at the end of his engagement, the performer shall receive a premium of an additional day's pay for work on such Sunday and the hours worked on such Sunday to and including ten hours are included for the purpose of calculating the prorated workweek.

(d)  For work time in excess of ten hours on any Sunday, for which the performer receives a premium of one day's pay as above provided, the performer shall receive double the weekly straight time hourly rate, including overtime caused by makeup, hairdress, wardrobe or fittings.

(e)  If the time included in calculating the performer's forty-eight hour week, as above provided, exceeds forty-eight hours, such excess time shall be paid for in hourly units at the rate of one and one-half times the weekly straight time hourly rate, or at the rate of straight time to the extent the same is caused by makeup, hairdress and wardrobe.

D.  Time of Call

If the performer's first call on the set on Friday (when performer is on a studio five-day week) or on Saturday (when performer is on an overnight six-day week), is 6:00 P.M. or thereafter, the work past midnight to time of dismissal shall not

SAG 1983                              257

PAR000242

be counted as work on Saturday or Sunday, as the case may be, for the purpose of this Section, even though the performer may have been called earlier than 6:00 P.M. for travel, makeup, wardrobe, hairdress, and the like.

   E.   <u>No Compounding</u>

      There shall be no compounding of the foregoing premiums and the penalty or premium prescribed by Section 12 insofar as the same relates to the 36 or 58-hour rest period, or Section 26, entitled "Work on Holidays, Saturday or Sunday;" it being understood that, if, for example, a performer works seven days in a studio workweek, he shall be entitled to only nine days' pay plus overtime, if any.

   F.   <u>Union Branches</u>

      Any area in which the Union maintains a Branch shall be deemed a five-day workweek area for performers employed in such area, where principal photography for a picture is substantially photographed in such area.  The scope of such areas is defined in General Provisions, Section 14, entitled "Preference of Employment."


9.   <u>HOURS PER DAY; WORK PAST MIDNIGHT</u>

      If the performer is working at midnight of any day, then his hours of work for such day shall be computed until the performer has been dismissed subsequent to midnight, subject to all exceptions and deductions provided for in this Schedule.  Hours of work for the following day shall, except as otherwise provided in this Schedule, be computed from the time the performer, after having been so dismissed subsequent to midnight, is next required to and does report.  Daily overtime shall only commence to accrue after ten hours of work time, as more particularly provided in Section 11 hereof.

      Subject to the overtime provisions, where the total engagement for any week of the performer's services is night work and where the last day of such week goes past midnight, the work past midnight does not count as an additional day.  For this purpose night work is defined as a call for 4:00 P.M. or later.


10.   <u>DAILY RATE OF COMPENSATION; PRORATING</u>

      Whenever it is necessary to prorate the workweek in order to determine an additional day's pay, such prorating shall be on the basis of one-fifth (1/5) of the performer's weekly base rate, for either the studio or overnight location workweek; however such proration shall not in any manner change the performer's weekly base rate for either the studio or the overnight location workweek.

SAG 1983                         258

With respect to prorating the performer's workweek for the purpose of paying the performer at the end of a payroll week, that portion of performer's studio workweek which is part of such payroll week shall be prorated on the basis of 1/5th of the weekly base rate for each such day (excluding Saturday and Sunday) in that payroll week.  This is exclusive of any overtime or premium pay, if any, due in such performer's workweek.

In any event when a performer is guaranteed a fixed compensation on a picture or term basis, such fixed amount shall not be exceeded by reason of the amount of proration accruing in the final payroll week of the respective period or picture involved.

Weekly overtime shall not be prorated except on a fractional week at the end of the performer's engagement; weekly overtime shall only be computed on the basis of performer's week, as fully set forth in Section 11, Overtime.

## 11.   <u>OVERTIME</u>

Overtime shall be computed and paid pursuant to the following:

A.   Rate:  Except as otherwise provided by the provisions of this Schedule E

(1)  Daily Overtime

Two times the straight-time rate for hours worked in excess of ten hours in any day.  Hours paid for as daily overtime are not to be included in computing weekly overtime.

(2)  Weekly Overtime

(a)  With respect to performer on a studio 5-day, 44-hour workweek, one and one-half times the straight time rate for hours worked in excess of forty-four hours in the week of such performer.

(b)  With respect to performers on an overnight location, 6-day, 48-hour workweek, such workweek shall include an additional 4 hours overtime (4/44) at the straight time hourly rate, whether worked or not. Weekly overtime shall be paid at one and one-half (1½) times the straight time hourly rate for hours worked in excess of 48 in such workweek.

PAR000244

(3)   Travel Time

To the extent that any weekly or daily overtime is
caused by travel time at the beginning or at the end of the
day, such overtime shall be computed as provided in Section
32 relating to Travel Time.

(4)   Makeup, Hairdress, Wardrobe, Fittings

For the purpose of computing premium pay for overtime,
whether daily or weekly, to the extent that such overtime is
caused by makeup, hairdress, wardrobe, or fittings, shall be paid
for, except to the extent and in the manner provided by Sections
8B(3)(h), 8C(3)(d), 26B(9), and 26C(8) of this Schedule.

B.   Units of Overtime and Computation

All overtime shall be computed in units of fifteen
minutes except for work on Saturdays and Sundays during a studio
workweek and on Sundays during an overnight location 6-day
workweek pursuant to Sections 8B(3)(i) and 8C(3)(e) hereof and
work on holidays pursuant to Sections 26B(8) and 26C(6) hereof, which
shall be computed in hourly units.

For the purpose of accumulating the number of hours
worked during any week, the number of hours worked each day
during such week shall be accumulated on the basis of six-minute
units; there shall be excluded all time during such week for
which any daily overtime compensation shall be payable to such
performer.  For the purpose of computing such overtime, such
performer's week in each instance shall commence on the day of
the week on which such performer is first placed on salary.  In
case of any suspension or interruption of such performer's
employment at any time for seven consecutive days or more, for
any reason whatsoever, such performer's week shall thereafter
commence on the day of the week when he is again placed on
salary.

C.   Partial Workweek

Where compensation is payable for less than a full
workweek, the number of hours worked shall be prorated on a
forty-eight hour basis, when performer is on an overnight
location 6-day week, and on a forty-four hour basis when
performer is on a studio 5-day week.  To illustrate the
foregoing, if the final fractional week of a performer's
employment on an overnight location 6-day week consists of
Thursday, Friday and Saturday, overtime shall be computed only as
to the period beyond twenty-four hours.  As a further
illustration, on such 6-day basis, if the final fractional week
of a performer's employment consists of Friday, Saturday, and
Sunday, overtime shall be computed only as to the period beyond
twenty-four hours; provided, however, that for work on Sundays

PAR000245

or holidays, the hours worked shall be used in computing overtime only to the extent and in the manner provided by Sections 8B(3)(f) and 8C(3)(C) hereof, as the same may be applicable.

### D.   Effect of Error in Computation

Any failure through error to pay all or any part of overtime compensation shall give the performer no right except to collect the amount so unpaid.

### E.   Date When Due

The overtime accruing under the provisions of this Section shall be payable not later than the studio pay day of the calendar week next following the expiration of the performer's week in which such overtime accrues.

### F.   Guaranteed Employment not Affected

Whenever a performer receives overtime or an additional day's pay pursuant to the provisions of this Schedule, such overtime or additional day's pay shall not be deemed to reduce such performer's guaranteed employment or compensation.

### G.   Retakes, Added Scenes, Etc.

Where a contract performer works more than ten hours in a day, or more than forty-four hours in a studio workweek or more than forty-eight hours in an overnight location workweek, and during such day or week has performed services in retakes, added scenes, or changes in a photoplay, then the provisions of this Section shall be construed with the provisions of Section 22 of this Schedule E.

## 12.  REST PERIOD

### A.   Twelve-Hour Rest Period

The performer shall be entitled to a twelve-hour consecutive rest period from the time he is finally dismissed until his first call thereafter, whether for makeup, wardrobe, hairdress or any other purpose.

### B.   Thirty-Six Hour Rest Period

The performer shall be entitled to one rest period in each week of thirty-six consecutive hours; provided, however, that if the performer is not required to work on the twenty-four hours constituting the first day of any workweek and has not worked for Producer during the twelve hours immediately preceding such day, or if the performer is not required to work on the

PAR000246

twenty-four hours constituting the last day of any workweek and does not work for the Producer during the twelve hours immediately succeeding such day, then the thirty-six hour rest period requirement shall be satisfied regardless of the fact that twelve hours thereof may be in the preceding or succeeding week. Where the performer works on seven days in any week and is paid, in addition to his base pay, extra pay therefor, the performer need not be given a thirty-six hour rest period for such week but must continue to receive his twelve-hour rest periods.

C.   Fifty-Eight Hour Rest Period

Where the performer is given two consecutive days off during a studio workweek, the 36 consecutive hour rest period shall be increased to 58 consecutive hours.  However, when there is night shooting consisting primarily of exterior photography and the performer's call is not earlier than 3:00 P.M. and he is dismissed in the studio at or before midnight on Friday, such 58-hour rest period, if otherwise applicable, may be reduced to 56 hours.

D.   The above provisions regarding the rest period shall be subject to the following exceptions:

(1)   Where the Producer is photographing on a location other than an overnight location, the twelve-hour rest period may be reduced to ten hours if exterior photography is required on such location on the day before and the day after such reduced rest period.  Where such reduction is allowed on any day by reason of exterior photography on a nearby location it may not be again allowed until after three consecutive days have intervened.

(2)   Where a performer arrives at his place of lodging on an overnight location after 9:00 P.M. and does not work that night, the rest period with respect to the first call following such arrival may be ten hours instead of twelve hours, but the first call must be at the place of lodging.

(3)   Where more than one night's travel (by ordinary means of transportation) is required to reach a location and the performer is given a berth on a boat or train for each night of traveling, the time spent in such traveling, to or from such location, shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

(4)   Where an overnight trip to or from a location is required, and the same takes at least seven hours to reach, and the performer is given a berth on a boat or train, or if the performer elects to travel by first-class plane accommodations, the time spent in such traveling to or from such location shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

SAG 1983                             262

PAR000247

(5)   The first call at the lodging for work (including makeup, hairdress, wardrobe, or travel) determines the time of first call for the next day for the purpose of computing the rest period.

E.   The performer may waive the rest period without the Union's consent, but if he does so, he shall be entitled to an automatic penalty of one day's pay or $950, whichever is the lesser sum.   A performer may be required to waive the rest period if the violation, in case of the twelve-hour rest period, is not over two and one-half hours, or on an overnight location not over two hours.   The performer may in any case be required to waive the 36-hour or 58-hour hour rest period.   In any case in which the performer waives either rest period, the penalty of one day's pay, not exceeding $950, shall be automatically incurred.   The penalty may not be waived without the consent of the Union.

F.   Wherever it is provided in this Schedule that there shall be no compounding of any premium pay and the penalty for breach of the 36-hour or 58-hour rest period, it is expressly understood that the twelve-hour rest period between calls, and the penalty for violation thereof, remains in effect.

G.   Any performer who is required to travel by air in excess of four (4) scheduled hours to a location may not be called for work without a ten (10) hour rest period.   The ten (10) hour rest period shall commence from the time of arrival at the hotel, provided the performer goes directly to the hotel designated by the Producer.   Failure to provide such ten (10) hours constitutes a rest period violation.

13.   <u>WORK TIME</u>

A.   For the purpose of ascertaining and computing hours of work, the rest period, and overtime, the period from the time the performer is required to and does report as directed, until the time such performer is finally dismissed for the day, shall constitute work time, continuously and without interruption, except as follows:

(1)   Allowable meal periods, as provided by Section 15;

(2)   Tests and auditions as provided by Section 17;

(3)   Study of lines or script, to the extent provided by Section 18;

(4)   Story, song and production conferences, to the extent provided by Section 19;

SAG 1983                                   263

    (5)    Interviews for publicity purposes, as provided by Section 20;

    (6)    Publicity stills, to the extent provided by Section 21;

    (7)    Makeup, hairdress, wardrobe and fittings, to the extent provided by Section 14;

    (8)    Retakes, added scenes, and changes in a photoplay, to the extent provided by Section 22;

    (9)    Tours and personal appearances, to the extent provided by Section 23;

  (10)    Travel time, to the extent provided by Section 32.

B.   Any period during which the performer fails or refuses or is unable because of disability to render services, and any period during which the performer at his own request is excused from rendering services, shall not be work time for any purpose.

C.   After such a performer has been employed and after the starting date of such employment, none of the provisions of this Section shall derogate from his right to receive salary, except:

    (1)    under the circumstances provided in subsection B above;

    (2)    if the performer is on layoff;

    (3)    if the performer is under suspension; or

    (4)    if pursuant to the provisions of his individual contract he is otherwise not entitled to receive salary.

## 14.   MAKEUP, HAIRDRESS, WARDROBE

A.   The Producer may require any performer to report made up, with hairdress, and in wardrobe, without assistance from the Producer, and in such case any time spent by the performer therein prior to the performer's first call shall not be work time for any purpose, but the Producer may not have the performer do any such preparation at any place designated by the Producer.

Any performer to whom Producer supplies the services of a make-up artist for makeup, or hairdresser for hairdressing, shall be considered to have a call for makeup or hairdress, as the case may be, and the time so spent shall be worktime.

PAR000249

The mere fact that a dressing room is furnished the performer, to which he is not directed to report, is not a designation of a place for preparation.  In the case of wardrobe, for this Paragraph to apply the performer must be either allowed to take home the wardrobe, or must be furnished a dressing room and the wardrobe must be available to the performer in the dressing room.  Any call by the Producer for makeup, hairdress, or wardrobe is a call to work and not within the exception made within this subsection.

B.   Where the performer has reported pursuant to the direction of Producer, for makeup, hairdress, wardrobe or fittings, the time so spent shall be work time, but to the extent that overtime, whether daily or weekly, is caused by makeup, hairdress, wardrobe or fittings, such overtime shall be paid for as provided in Section 11 hereof.  Effective October 7, 1983, where other than ordinary make-up, hairdress or wardrobe requires assistance in the removal thereof, such removal time shall be worktime.

Effective October 7, 1983, where performer is not otherwise on compensable worktime, performer shall be compensated for up to 15 minutes of time spent in the removal of ordinary make-up, hairdress or wardrobe at the applicable overtime rate.  Such compensation shall be based on actual time and shall not trigger additional hourly increments of pay.  Such removal time shall not be considered in computing rest period violations or other premiums or penalties.

C.   If any special hairdress necessitating an expenditure is required by Producer, Producer shall either furnish such hairdress or Producer may designate facilities for the procurement of such hairdress and reimburse performer for amounts expended.

D.   Wardrobe supplied by the performer, which is damaged in the course of employment, shall either be repaired by Producer, or repaired at the expense of Producer at facilities designated by Producer, provided that notice of such damage is given to Producer prior to the termination of the Performer's employment.

E.   Fittings before the employment of a contract performer shall not be counted as work time for any purpose.  Fittings after employment shall be work time for such performers. Fittings during the consecutive layoff of a contract performer shall be deemed to break such layoff, unless a waiver is obtained from the Union.

F.   There shall be a voucher provided at all wardrobe fittings to be signed by the performer indicating time in and time out.

PAR000250

15.  <u>MEAL PERIODS</u>

    A.   Allowable meal periods shall not be counted as work time for any purpose.  The performer's first meal period shall commence within six (6) hours following the time of his first call for the day; succeeding meal periods of the same performer shall commence within six hours after the end of the preceding meal period.  A meal period shall not be less than one-half hour nor more than one hour in length.  If upon the expiration of such six-hour period the camera is in the actual course of photography, it shall not be a violation to complete such photography.  If on location or while traveling to or from location the delay is not due to any fault or negligence of the Producer or its agents or persons employed by it to render the catering service by contract, or if delay is caused by common carriers such as railroads, there shall be no penalty for violation of the above provisions.  If the caterer is chosen carefully, and is delayed in reaching the location beyond the required time for commencing a meal period, there shall be no penalty for the violation; but if such delay shall continue beyond one-half hour, work shall cease, and the time intervening between such cessation of work and the meal period shall be work time.

    The performer shall be entitled to a non-deductible breakfast of fifteen (15) minutes in duration, not later than 9:00 a.m., during which performer will be freed of all activity.  The first deductible meal period shall commence within six (6) hours thereafter.

    Outside the studio, where the crew is provided a meal or a meal allowance (as distinguished from per diem or penalty), the performers (other than those receiving a per diem allowance for meals on overnight locations) will be provided either a meal or a meal allowance where they have satisfied the same terms and conditions for entitlement to such meal or meal allowance as the crew.

PAR000251

B.   The following amounts shall be paid to performers for meal period violations:

(1)   For the first half-hour or
      fraction thereof -                    $25.00 per performer

(2)   For the second half-hour
      or fraction thereof -                 $35.00 per performer

(3)   For the third half-hour
      and each additional
      half-hour or fraction
      thereof -                             $50.00 per performer

16.   <u>DRESSING ROOMS</u>

A.   See General Provisions Section 21.

B.   Whenever a performer is required by Producer to make a change of wardrobe, Producer shall provide suitable facilities affording privacy for such purpose.  A private canvas dressing room will be deemed a suitable facility.

17.   <u>TESTS AND AUDITIONS</u>

Tests and auditions before the employment of contract performers shall not be counted as work time for any purpose. Tests and auditions after the employment of contract performers shall be worktime.  Tests and auditions which occur during the consecutive layoff period of any contract performer shall be deemed to break such layoff period unless a waiver is obtained from the Union.  Option test agreements are not to be construed as contracts to employ.

18.   <u>STUDY OF LINES OR SCRIPT</u>

Study of lines or script, except during the period between reporting and dismissal, shall not be counted as work time for any purpose.

19.   <u>STORY, SONG, AND PRODUCTION CONFERENCES</u>

Story, song, and production conferences on any day on which the performer is not otherwise working shall not be counted as work time for any purpose, except that if the same occur at the request of the Producer during the consecutive layoff period of any contract performer, such layoff period shall be deemed broken thereby.  The submission of a script to a contract performer, at the studio or elsewhere, during his layoff, shall not be deemed to break the same.

PAR000252

20.  <u>PUBLICITY INTERVIEWS</u>

Publicity interviews held at a time mutually satisfactory to
the performer and the Producer shall not be work time for any
purpose unless held on a day on which the performer is otherwise
working for the Producer.  Such interviews for publicity purposes
held on any day on which the performer is otherwise working for
the Producer shall not be counted as work time if held after the
performer's dismissal for the day, if such interview is held at a
time mutually satisfactory to the performer and the Producer.  If
the interview is held during a meal period it shall not be deemed
to constitute a violation thereof.

Interviews for publicity purposes, including those held at
the studio, shall not be deemed to break the layoff.

21.  <u>PUBLICITY STILLS</u>

Services rendered by any performer covered by this Schedule
in connection with publicity stills shall be work time, except
where such services are rendered for not exceeding eight hours on
a day in which such performer is not otherwise working, in which
event such services shall not be counted as work time for any
purpose, except as provided in the next sentence.  If a performer
is on layoff and is called and reports for publicity stills, the
same shall break the consecutive layoff and the day upon which
the performer renders such services shall not be considered
layoff.

22.  <u>RETAKES, ADDED SCENES, AND CHANGES</u>

Services rendered by a contract performer in retakes after
completion of ordinary photography of the performer's role, and
in added scenes and changes after the completion of the ordinary
photography of the picture, when such services are rendered on
the same day on which such performer works in a different
picture, whether at the same or a different studio, shall not be
counted as work time for the purpose of computing the overtime,
if any, worked by such performer in excess of ten hours during
such day; but this provision shall not be applied by a Producer
to the same contract performer with respect to more than three
days in any week or with respect to more than six weeks in any
year.  Such services shall be counted as work time for the
purpose of computing the overtime, if any, worked by such
performer in excess of forty-eight hours during the week in which
such services are rendered, but to the extent that the weekly
overtime for such week is caused by such services, it shall be
computed on the basis of straight time instead of on the basis of
time and one-half.  Where the period intervening between the time
of such performer's dismissal for the day in connection with the
picture in which he is then currently employed and the time such
performer is requested to and does report for retakes, added

SAG 1983                          268

PAR000253

scenes, or changes, as aforesaid, is two hours or more, such intervening time shall not be counted as work time for any purpose.  In special cases the Union may by waiver give its consent to the application of the provisions of this Section to added scenes and changes made by contract performers after the completion of ordinary photography of the role and before the completion of ordinary photography of the picture.

The performer's contract shall not include guarantes for looping, retakes, added scenes, process transparencies, trick shots, trailers, changes or foreign versions (subject to availability) outside the period of consecutive employment.

## 23.  TOURS AND PERSONAL APPEARANCES

A.   If a performer agrees in his contract to make tours or personal appearances and he is simultaneously working in a picture, all hours spent in connection therewith shall be worktime for all purposes.

B.   As to all performers under this Schedule, if the performer is not working in a picture, he shall receive a day's pay at straight time for each day including travel days in which he is engaged in tours or personal appearances.

C.   First-class transportation and reasonable expenses shall be paid to all performers on tours and personal appearances.

D.   Producers shall cooperate to ensure that performers on tour and personal appearances are allowed adequate rest periods.

E.   One personal appearance of any such performer requested by the Producer in connection with the opening of any picture in which such performer has performed, one rehearsal in connection therewith and any period immediately prior thereto which otherwise would not be worktime, shall not be worktime for any purpose.  Personal appearances requested of any such performer by the Producer in connection with any benefit approved by the Theatre Authority, Inc., so long as the same has the sanction of the Union, or by any similar agency substituted therefor which at the time has the sanction of the Union, rehearsal in connection therewith and any period immediately prior thereto which otherwise would not be worktime, shall not be worktime for any purpose.

## 24.  REHEARSAL TIME

A.   The reading of lines, acting, singing, or dancing, in preparation for the performers performance, in the presence and under the supervision of a representative of Producer, constitutes a rehearsal.  Rehearsals shall be counted as work time.

PAR000254

B.   Auditions, tests, interviews, makeup and wardrobe tests do not constitute rehearsals.

C.   The Union agrees to freely grant waivers for the training of a performer in a particular skill such as horseback riding, fencing, etc.  Compensation, if any, shall be agreed to between the performer and the Producer, subject to the approval of the Union.

D.   Neither tests, auditions, fittings, publicity stills, preproduction stills, prerecordings, nor training under subsection C above, after employment but before the starting date of such employment, shall start the employment period of such performer.  Compensation, if any, for any of such services shall be as otherwise provided in this Schedule.

25. <u>NIGHT WORK</u>

Night work is defined as work between 8:00 P.M. and 6:00 A.M., except that a first call for the day at 5:00 A.M. or thereafter shall not constitute night work.

The performer shall receive premium pay for each straight time hour of night work equal to 10 percent of his hourly rate for such hours, subject to the following:

If night work is necessary by reason of difficulty in obtaining daytime access to the object or place (such as a public building) to be photographed, the performer shall not be entitled to any premium pay therefor.  This exemption shall not extend to photography on a stage or a set.

Such night premium pay shall not be paid on any overtime hours.

To the extent known, Producer shall provide advance notice, i.e., on the day prior, that night work will be required and whether such night work will involve interiors or exteriors.

Dismissal - New York City.  Any performer required to work at night and not dismissed by 9:30 P.M. will be provided transportation by Producer to Grand Central Station, Penn Station or the Port Authority, unless such place of dismissal is within a zone bordered by 34th Street on the south, 59th Street on the north, and Third and Eighth Avenues on the east and west, respectively.

PAR000255

26.  WORK ON HOLIDAYS, OR HOLIDAYS AND SATURDAY OR SUNDAY

A.  Holidays

The nine holidays hereinafter referred to are the
following:  New Year's Day, Washington's Birthday, Good Friday,
Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the
Friday after Thanksgiving, and Christmas.  Whenever any of said
holidays falls on a Sunday, such holiday for all purposes of this
Schedule E shall be deemed to fall on the Monday next succeeding.
In other words holidays which fall on Sunday are Monday holidays.

B.  Studio 5-Day Workweek; Work on Holidays, or Holidays
and Saturday or Sunday

If the performer works on any of the nine holidays, or
a holiday and on a Saturday or Sunday, he shall in each case
(that is, separately for the holiday and for the Saturday and for
the Sunday, if he works on each such respective day) be entitled
to a premium of an extra day's pay, in accordance with the
following rules:

(1)  If the performer works on seven days in his
workweek, including work on such a holiday and on a Saturday
and a Sunday, and such holiday did not fall on such Saturday
or Sunday, he receives three days' premium pay plus two
additional days' pay for two days beyond his five-day week
or a total of ten days' pay.  Hours worked on Saturday and
Sunday shall not be included in calculating performer's
44-hour workweek.  The other five days shall be used for
this purpose.

(2)  If the performer works seven days in his workweek
including work on such a holiday (which falls on Saturday)
and on Sunday, he receives two days' premium pay plus two
additional days' pay for two days beyond his 5-day week or a
total of nine days' pay.  Hours worked on such Saturday
holiday and Sunday shall not be included in calculating
performer's 44-hour workweek.  The other five days shall be
used for this purpose.

(3)  If performer works six days in his workweek
including work on such a holiday and on Saturday and Sunday
and such holiday did not fall on such Saturday or Sunday, he
receives three premium days' pay plus one additional day's
pay for one day's work beyond his 5-day week or a total of
nine days' pay.  Hours worked on the Saturday and the
holiday to and including ten hours shall be included in
calculating performer's 44-hour workweek, but hours worked
on Sunday shall not be so included.  The other five days in
the week shall constitute performer's workweek for such
purpose.

PAR000256

(4)   If performer works on six days in his workweek including work on such a holiday and on Saturday and Sunday but such holiday fell on such Saturday, he receives two premium days' pay plus one additional day's pay for one day beyond his 5-day week or a total of eight days' pay.  Hours worked on Saturday to and including ten hours shall be included in calculating performer's 44-hour workweek, but hours worked on Sunday shall not be so included.  The other five days in the week shall constitute performer's workweek for such purpose.

(5)   If performer works six days in his workweek including work on such a holiday (which did not fall on Saturday) and on Saturday or Sunday, he receives two premium days' pay plus one additional day's pay for one day beyond his 5-day week or a total of eight days' pay.  Hours worked on such holiday to and including ten hours, shall be included in calculating performer's 44-hour workweek, but hours worked on such Saturday or Sunday shall not be so included.  The other five days in the week shall constitute performer's workweek for such purpose.

(6)   If performer works five days or less in his workweek, he receives a premium of an extra day's pay for each day worked which is such a holiday, Saturday or Sunday, unless such holiday is a Saturday holiday in which case only one premium day's pay is due for such Saturday holiday worked.

For example, performer works on:

(a)   Holiday (not on Sat.), Sat. & Sun. - 3 days' premium pay

(b)   Sat. Holiday & Sunday - 2 days' premium pay

(c)   Holiday (not on Sat.) & Sun - 2 days' premium pay

(d)   Holiday (not on Sat.) & Sat. - 2 days' premium pay

(e)   Holiday (incl. Sat. Holiday) - 1 day's premium pay.

Where a performer works five days or less in his workweek including a Saturday, a Sunday or holiday, or any combination of such days, hours worked on such days up to and including ten hours are included in calculating performer's forty-four hour week.

(7)   If the performer works on such a holiday, Saturday or Sunday during a fractional week at the end of his engagement, the performer receives a premium of an additional day's pay for each such day, except that work on a holiday on Saturday calls for only one premium day's pay. Hours worked on such holiday, Saturday or Sunday up to and

PAR000257

including ten hours, are included for the purpose of
calculating the prorated workweek.

(8)  If the time included in calculating the
performer's 44-hour week as above provided exceeds 44 hours,
such excess time shall be paid for in hourly units at the
rate of one and one-half times the weekly straight time
hourly rate, or at the rate of straight time in hourly units
to the extent the same is caused by makeup, hairdress,
wardrobe or fittings.

(9)  For work time in excess of ten hours on any such
holiday, Saturday or Sunday, for which the performer
receives a premium of one day's pay, as herein provided, the
performer receives double the weekly straight time hourly
rate including overtime caused by makeup, hairdress,
wardrobe, or fittings.

(10) Notwithstanding the foregoing, a Saturday as such,
worked on an overnight location shall not be a premium day,
unless it is a Saturday holiday.

C.   Overnight Location Six-Day Workweek; Work on Holiday or
Holiday and Sunday

If the performer works on any of the nine holidays, or
a holiday and on a Sunday he shall in each case (that is,
separately for the holiday and for the Sunday) be entitled to a
premium of an extra day's pay, in accordance with the following
rules:

(1)  If the performer works seven days in his workweek
including such a holiday and a Sunday, he receives two
premium days' pay plus one additional days' pay for one day
beyond his six-day week or a total of nine days' pay.  The
hours worked on such a Sunday shall not be included in cal-
culating performer's 48-hour week.  The hours worked on such
holiday, up to and including ten hours, shall be included in
calculating performer's 48-hour week.

(2)  If the performer works seven days in his workweek
including such a holiday or Sunday, he receives one days'
premium pay plus one additional days' pay for one day beyond
his six-day week or a total of eight days' pay.  Hours
worked on such a holiday and/or Sunday shall not be included
in calculating the performer's 48-hour week.

(3)  If performer works only six days or less in his
workweek including work on such a holiday and a Sunday, the
performer receives two days' premium pay or a total of eight
days' pay.  Hours worked on such holiday and Sunday up to
and including ten hours, on each such day, are included in
calculating performer's 48-hour week.

PAR000258

(4)  If the performer works only six days or less in his workweek, including work on such a holiday but not including a Sunday, the performer receives a premium of one day's pay, or a total of seven days' pay for that week, and the hours worked on such holiday, up to and including ten hours, are included in calculating the performer's forty-eight hour week.

(5)  If the performer works on such a holiday and a Sunday during a fractional week at the end of the engagement, the performer receives a premium of one day's pay, for each such day worked, and the hours worked on each such a holiday and a Sunday, up to and including ten hours on each such day, are included for the purpose of calculating the prorated workweek.

(6)  If the performer works on such a holiday but not including a Sunday during a fractional week at the end of the engagement, the performer receives a premium of one day's pay, and the hours worked on such a holiday, up to and including ten hours, are included for the purpose of calculating the prorated workweek.

(7)  If the time included in calculating the performer's forty-eight hour week, as above provided, exceeds forty-eight hours, such excess time shall be paid for in hourly units at the rate of one and one-half times the weekly straight time hourly rate, or at the rate of straight time in hourly units to the extent the same is caused by makeup, hairdress, wardrobe, or fittings.

(8)  For work time in excess of ten hours on any such holiday or Sunday, the performer receives double the weekly straight time hourly rate including overtime caused by makeup, hairdress, wardrobe, or fittings.

D.  If the performer is not required to work on such a holiday, no deduction shall be made from his guaranteed weekly pay.

E.  If performer works on such holiday, Saturday and Sunday, as above provided, he shall be entitled to the premiums provided by this subsection but, insofar as the holiday, Saturday and Sunday premiums are concerned, there shall be no compounding of such premium and the penalty or premium prescribed by Section 12 as the same relates to the 58 or 36-hour rest period, whichever is applicable, or Section 11; it being understood that if for example a performer on an overnight location workweek works seven days in his week including work on such a holiday, he shall be entitled to nine days' pay plus overtime, if any.

PAR000259

27. <u>RIGHT TO NAME OR CHARACTER</u>

No Producer shall after the termination of the performer's employment prevent such performer from continuing the use of any stage or screen name used by such performer.  The name of a role owned or created by the Producer, such as Tarzan or Charlie Chan, belongs to the Producer and not to the performer.

28. <u>"ACT OF GOD" CLAUSE - SUSPENSION OF PERFORMER</u>

A.   This Section shall only apply to "beginners" and to contract performers receiving no more than the minimum salaries provided herein.

B.   The suspension period specified in the "Act of God" clause of a performer's individual contract shall be limited to four weeks; however, Producer retains the right to continue such suspension, from week to week, for an additional period of eight weeks, provided Producer pays to such performer one-half salary for such additional period.

29. <u>ILLNESS - CANCELLATION PERIOD</u>

The cancellation period specified in the illness clause of a contract performer's individual contract shall not be less than a period or aggregate of periods of three weeks per year.

30. <u>LENGTH OF LAYOFF</u>

A layoff for a contract performer shall be for at least one consecutive week, subject to recall for retakes and added scenes as more particularly provided in Section 31B of this Schedule. If the unused portion on any layoff shall be less than one week, such unused layoff may be availed of by the Producer at any time but only in one consecutive period.

31. <u>BREAKING THE LAYOFF</u>

A.   <u>Services Which Break the Layoff</u>

The rendition by a contract performer of any of the following services shall break the layoff:  Principal photography, including recording and rehearsals in connection therewith; auditions; tests; story, song, and production conferences which occur at the request of the Producer; publicity stills connected with production which are made at the request of the Producer; fittings; hairdress; makeup; wardrobe; and radio and personal appearances made at the direction of the Producer. Training or coaching of the performer shall break the layoff unless a waiver is granted therefor.  The Union agrees, upon the request of the performer, to freely grant such waivers.

PAR000260

Where the performer has had less than one week's layoff prior to the commencement of such services, the performer shall be deemed not to have been on layoff and his regular salary shall continue to accrue during the intervening period.  Where the performer has had a week or more of layoff before commencing any of such services, then the performer shall be placed on salary at the time of commencing such services unless the Union has agreed to issue a waiver therefor.

B.   Services Which Do Not Break the Layoff

(1)  A performer may be required to render services in retakes and added scenes while on layoff, and such services shall not be deemed to interrupt or break the layoff; however, the performer shall be entitled to pay at one-fifth his weekly rate for the day or days upon which he renders such services.

(2)  A performer may be requested to render the following services, which shall not break the layoff: Submission of scripts to the performer at the studio or elsewhere; publicity interviews and publicity stills in connection therewith; fashion stills; consultation on proposed hairdress, makeup, and wardrobe; "music voice key;" and radio or personal appearances not made at the direction of the Producer.  The performer shall not be entitled to any compensation for rendering the services enumerated in this subparagraph (2).

C.   The provisions of this Schedule which relate to breaking the layoff may not be changed to the detriment of the performer by the terms of an individual employment contract without the approval of the Union.

32.  TRAVEL TIME

A.   Application of Rules

The provisions of this Section shall apply only to performers included in this Schedule E.

B.   Studio Zone

(1)  With respect to studios situated in Los Angeles, California, or its environs, the "studio zone" shall include all territory within the radius of thirty (30) miles from the intersection of Beverly Boulevard and La Cienega Boulevard, Los Angeles, California, and such other territory (such as the present Columbia Ranch and Disney Studio) as is generally recognized as being within the studio zone.  With respect to studios not situated in Los Angeles or its environs, a similar territory as the studio zone, and similar rules in relation thereto, shall be agreed upon

SAG 1983                         276

between the Union and the Producers, and in default of such agreement, such territory and such rules (which shall conform as nearly as possible to the rules herein set forth) shall be determined by arbitration under Section 9 of the General Provisions, whenever the situation arises.

(2)  With respect to studios situated in New York, New York, the "studio zone" shall include all territory within the radius of 8 miles from Columbus Circle.

(3)  The Los Angeles 30 mile Studio Zone.  Performers may be required to report anywhere within such studio zone provided that, when the place of reporting is elsewhere than the Producer's studio, the following shall apply:

(a)  Performers shall be paid $.30 per mile mileage allowance figured from the studio to the place of reporting and back; and

(b)  Distances shall be clearly stated on the performer's production time report.

(c)  If, during the term of this Agreement, the International Alliance of Theatrical and Stage Employees through its collective bargaining agreement negotiates with Producer a more favorable mileage allowance than the foregoing thirty cents ($.30) per mile allowance, then, in such event, from such date forward the Union will be entitled to the benefits of such increase.

(d)  The mileage allowance may be paid as a portion of the performer's payroll check, provided it is separately identified as such mileage reimbursement.

(4)  When a performer is required to report for work in the studio zone other than at a studio, Producer shall pay for parking in a supervised public parking lot.  If no such public parking is available, Producer will provide supervised or secured parking.

(5)  With respect to studios situated in San Francisco, California, the "studio zone" shall include all territory within the radius of thirty (30) miles from the intersection of Market and Powell Streets.

C.   Location and Overnight Location

Location shall mean any place of work not at the Producer's studio which is outside the studio zone.  Overnight location shall be any location where the performer is lodged or offered lodging by the Producer at or near the location for one or more nights, or any location which takes overnight to reach by ordinary means of transportation.

PAR000262

### D.   Near Location

A near location shall be any place which can be reached
from the Producer's studio within twenty-four hours of travel by
ordinary means of transportation.  If the Producer instructs the
performer to fly to a location and the trip takes less than
twenty-four hours by air, the same shall be deemed to be a near
location.

### E.   Distant Location

A distant location shall be any place which cannot be
reached from the Producer's studio within twenty-four hours of
travel by ordinary means of transportation.

### F.   Place of Reporting and Dismissal

Except when already at an overnight location,
performers shall be required to report only at the Producer's
studio or within the studio zone, and shall be dismissed only at
the place of reporting within the studio zone or the Producer's
studio.  When the performer is returning from such overnight
location, he shall be dismissed only at the Producer's studio or
the place of reporting within the studio zone, and not at the
overnight location.  This rule shall not derogate from any rule
hereinafter set forth with regard to travel to location at the
commencement of an engagement.  The provisions of this subsection
F shall not be deemed to limit the provisions of subsection T
hereof.

### G.   Travel Time is Work Time

Except as otherwise provided in this Schedule, all time
spent by any performer in traveling at the request of the
Producer between any place at which he is required to and does
report and any location, both to and from, shall be travel time,
and as such shall be work time, subject to all deductions,
limitations, and exceptions for which provision is made in this
Agreement.

### H.   Maximum Travel Time

Time spent in traveling shall not be included as travel
time or work time to the extent of more than eight hours in any
twenty-four hours.

### I.   Intervening Time between Dismissal and Travel

(1)  Time intervening between the completion of a
performer's work on any day and the commencement of travel
on the same day shall be travel time except as otherwise
provided in this Agreement.

(2)   Travel to Overnight Location:   Except as otherwise provided in this Agreement, the period of time intervening between the performer's dismissal for the day and the commencement of travel to an overnight location on the same day shall be travel time.

(3)   Travel from Overnight Location:   The period intervening between the performer's dismissal for the day and the commencement of travel on the same day from an overnight location shall not be work time or travel time for any purpose.

J.   <u>Travel on Seventh Day</u>

The six-day week as set forth in this Schedule does not apply in any case where the performer travels seven consecutive days, whether or not the seventh day falls within the same week.

K.   <u>Transportation and Lodging Furnished</u>

The Producer shall furnish reasonable transportation to and from location and shall furnish reasonable meals, and where the Producer requires the performer to stay overnight, lodging to the performer on location. Separate rooms shall be provided to performers transported to overnight locations unless such separate rooms are not available.

In the event Producer believes that separate rooms will not be available at a particular location, Producer will notify the Union and the performer prior to departure, with reasonable time for each to investigate to determine whether the foregoing requirement can be complied with by Producer.

L.   <u>Deduction of Allowable Meal Periods</u>

Reasonable meal periods shall be given during traveling, and allowable meal periods of not less than one-half hour nor more than one hour each shall be deducted from travel time, provided a reasonable meal is made available.

M.   <u>Deduction of Travel Time Otherwise Compensated For</u>

Any travel time for which the performer is compensated as work time shall not be paid for as travel time.

N.   <u>Computation of Overtime Caused by Travel Time</u>

On a day on which a performer travels only, the performer shall be compensated at a day's pay.  On a day on which the performer travels and works, overtime caused by travel will be compensated at time and one-half and not at double time.

PAR000264

O.   <u>Travel Time re Distant Locations at Beginning or End of Performer's Term of Employment</u>

The time spent in traveling to a distant location at the beginning of a performer's term of employment shall not be work time or travel time for any purpose.  The time spent in traveling from a distant location at the end of a performer's term of employment shall be travel time except as in this Agreement otherwise provided.  If the performer arrives at the distant location at or before 1:00 P.M., his compensation shall begin with that day (whether he works that day or not), and any work or travel that day after such arrival shall be work time or travel time, as the case may be, except as in this Agreement otherwise provided.  If the performer arrives at the distant location after 1:00 P.M., such day shall not be work time or travel time for any purpose, unless the performer actually works on such day after such arrival, in which case his compensation shall begin with that day; and the time worked shall be work time, except as in this Schedule otherwise provided.  If the performer does not work on such day his compensation shall begin with the next day.

P.   <u>Transportation and Travel Time on Overnight Locations to and from Hotel or Camp</u>

On overnight locations, the Producer shall provide transportation to and from the hotel or camp and, except as in this Schedule otherwise provided, the time to and from the hotel or camp shall be travel time.  The rest period may be reduced to ten hours (under Section 12D(1)).

Q.   <u>Travel to or from Overnight Locations on Boat or Train Where Sleeping Accommodations are Provided</u>

Where more than one night's travel, by ordinary means of transportation, is required to reach a location, and the performer is given a berth on a boat or train, the time spent in traveling to or from such location shall not be work time or travel time for the purpose of computing the twelve-hour rest period or for the purpose of computing the ten-hour day; it being agreed, however, that time spent in traveling on the day of arrival at such location, after 9:00 A.M. of such day, shall be counted for the purpose of computing the ten-hour day if the performer works on such day, and provided further that the interval between the completion of travel on such day and the commencement of work shall not be considered travel time or work time for any purpose.  Nothing herein contained shall be construed to interrupt the performer's right to remain on salary if the performer is otherwise entitled thereto.

PAR000265

R.    <u>Overnight Trip to or from Location</u>

Where an overnight trip to or from location is required, and the same takes at least seven hours to reach and the performer is given a berth on a boat or train, the time spent in such traveling to or from such location, whether at the beginning, during or at the end of the engagement, shall not be work time or travel time for the purpose of computing overtime and the rest period.

S.    <u>Travel on Holidays and Sundays</u>

(1)  The holidays herein referred to are New Year's Day, Washington's Birthday, Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and Christmas Day.

(2)  Travel to or from Location:  Where a performer travels to or from location on a Sunday or holiday such travel shall be deemed work time for purposes of premium pay and performer shall be entitled to a straight time day, plus an additional one-half day's premium pay as compensation for traveling on such day.

T.    <u>Engagement of Performers - Other Areas</u>

(1)  If a performer, residing or working in any area in which SAG maintains a Branch, is brought to Producer's base or distant location in a different area of the United States for any purpose, the performer shall receive transportation and a $55 per day allowance from the time he commences travel at Producer's request until the time his salary commences.

(2)  If Producer is photographing on a location in the United States and brings a performer to such location from anywhere in the United States, such performer shall be provided transportation to and from such location.

(3)  Except as otherwise provided in (1) and (2) above, nothing herein contained shall prevent a Producer from engaging a performer outside of California (if such performer has not gone out of California for the purpose of evading this rule) to report in California or to report at any location, and in any such case the Producer shall not be required to pay for or provide transportation of such performer to the place of reporting, or to pay such performer for any time spent in traveling thereto; nor shall the Producer be required to pay for or provide transportation of such performer, at the end of the engagement back to the place where such performer was engaged, or to pay such performer for any time spent in traveling back to the place where such performer was engaged; such performer may be dismissed on location.  This does not limit the second sentence of subsection B hereof.

SAG 1983                          281

U.   Underline{General}

(1)  Nothing in this Section 32 contained shall be deemed to interrupt the compensation of a contract performer if and when such compensation is payable pursuant to his individual contract.

(2)  This Agreement uses the expressions "reasonable transportation" and "first-class transportation."  The terms are intended to be synonymous.  The type of transportation required can best be illustrated by examples:  Bus transportation for a relatively short distance (Hollywood to Lake Arrowhead) meets these requirements; bus transportation for a long distance (Hollywood to San Francisco) does not.  Pullman accommodations to San Francisco, or any other long distance, meets these requirements; deluxe transportation (e.g., Super Chief) is not required.  Transportation on a commercial airline without sleeper accommodations is first-class transportation.  First-class transportation shall be provided on commercial airlines where the performer is required to fly at the request of the Producer.  The foregoing shall apply to jet flights as well as to prop-driven aircraft.  The foregoing shall not apply where first-class transportation is not available or six or more of the company are being transported.  Charter flights may be used which provide substantially equivalent accommodations.  Notwithstanding the foregoing, first-class air transportation need not be provided with respect to auditions and interviews.

## 33.   COMMERCIALS

A.   All commercials shall be bargained for separately by the performer and Producer under the terms of the Industry-wide Screen Actors Guild Commercials Contract in effect at the time of such bargaining.

B.   Employment agreements in effect on July 1, 1983 shall be excluded from the foregoing provision and shall be governed by the television agreement in effect when such employment contract was entered into.

## 34.   EMERGENCY SUSPENSION OR TERMINATION

If the production of the photoplay specified in the free-lance contract be necessarily prevented, suspended, or postponed during the course of production, by reason of fire, accident, strike, riot, act of God, or of the public enemy, or by any executive or judicial order, or postponed by reason of the illness of any other member of the cast or of the director, one-half salary shall be paid the performer for the first three weeks' prevention, suspension, or postponement.  It shall be the duty of the Producer during the first week of any prevention, suspension, or postponement to notify the performer in writing whether the Producer will entirely discontinue the production or

PAR000267

further suspend or postpone it, and in the latter event the Producer shall pay the performer half salary during such further suspended or postponed period. At the end of three weeks from the date on which the Producer has stopped production the performer may terminate said employment if the performer so elects, unless the Producer continues thereafter to pay the performer full weekly compensation. If the production of said photoplay is prevented, suspended, or postponed for any reason hereinabove in this Section provided, then and in that event the Producer may terminate said employment at any time after the commencement of such prevention, suspension, or postponement. If the Producer elects to terminate said employment by reason of the illness of any other member of the cast or of the director, then the Producer shall be obligated to pay the performer such balance, if any, as is then unpaid for services theretofore rendered by the performer, and also one week's compensation, upon the payment of which the Producer shall be discharged of and from all liability whatsoever thereunder. If such termination be based on the happening of any other cause hereinabove in this Section set forth, then the Producer shall be obligated to pay the performer only such balance, if any, as is then unpaid for services theretofore rendered by the performer, and upon the payment of such unpaid balance, if any, the Producer shall be discharged of and from all liability whatsoever thereunder.

Where the production is suspended as a result of illness of another member of the cast or the director, and such suspension continues for five days or more, the suspension may be effective as of the beginning of the event of illness, but if the duration is less than five days, the suspension is not effective.

## 35. RESUMED PRODUCTION AFTER TERMINATION

If the Producer elects to terminate a performer's employment under a free-lance contract pursuant to its right to do so for any cause hereinabove in Section 42 specified, and if at any time more than three weeks after such termination the Producer shall desire to resume the production of said photoplay, the Producer shall notify the performer of its election to resume production and in such event the performer agrees to render his services in connection with such resumed production as and when the Producer may request, unless the performer is otherwise employed, but if otherwise employed the performer will cooperate to the fullest extent in trying to make his services available for the Producer in connection with such resumed production. If production is resumed within six months from the date of termination the performer's compensation shall be at the same rate as that hereinabove specified, and shall be payable only from the date of commencement of the performer's services in such resumed production.

## 36. REPLACEMENT OF PERFORMER

In the event that a performer is replaced in the role, the performer, or performer's agent, shall be notified of this fact at the time of the replacement.

SAG 1983                        283

PAR000268

SCHEDULE F

CONTRACT PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS IN EXCESS
OF $3500 PER WEEK; MULTIPLE PICTURE PERFORMERS RECEIVING
MORE THAN $3500 PER WEEK OR WHO ARE GUARANTEED
$30,000 OR MORE PER THEATRICAL PICTURE OR $25,000 OR MORE PER
TELEVISION PICTURE; PERFORMERS EMPLOYED UNDER
"DEAL CONTRACTS" OR OTHERWISE, WHO ARE GUARANTEED $30,000
OR MORE PER THEATRICAL PICTURE OR $25,000 OR
MORE PER TELEVISION PICTURE

Table of Contents

Section No.

1. Definitions
2. Combination Term Contracts
3. The Performer's Workweek; Studio 5-Day Week; Overnight Location Week
4. Work on Holiday, or Holidays and Saturday or Sunday
5. Saturday and Sunday Work - Single Picture Engagement Less Than $50,000
6. Work on Holidays and/or Saturdays or Sundays Before and After - Single Picture Engagement Less Than $50,000
7. Prorating
8. Overtime
9. Rest Period
10. Meal Periods

Section No.

11. Makeup, Hairdress, Wardrobe
12. Dressing Rooms
13. Tours and Personal Appearances
14. Right to Name or Character
15. Illness - Cancellation Period
16. Length of Layoff
17. Breaking the Layoff
18. Rehearsal Time
19. Commercials
20. Travel on Sundays or Holidays
21. Applicable Provisions of Schedule F Included in Individual Contracts
22. Replacement of Performer

PAR000269

SCHEDULE F INDEX

|                                                                                  | Section No. | Page No. |
|----------------------------------------------------------------------------------|-------------|----------|
| Breaking the Layoff                                                              | 17          | 311      |
| Breaking Point                                                                   | 1A          | 287      |
| Cancellation Period - Illness                                                    | 15          | 311      |
| Combination Term Contracts                                                       | 2           | 289      |
| Commercials                                                                      | 19          | 313      |
| Contract Performer - Definition                                                  | 1A          | 287      |
| Deal Performer - Definition                                                      | 1C          | 288      |
| Definitions                                                                      | 1           | 287      |
| Dressing Rooms                                                                   | 12          | 310      |
| Five-Day Workweek; Studio                                                        | 3B          | 292      |
| Hairdress                                                                        | 11          | 309      |
| Holidays and/or Saturdays or Sundays Before and After (Single Picture Less than $50,000) | 6           | 301      |
| Holidays or Holidays and Saturday or Sunday                                      | 4           | 295      |
| Illness - Cancellation Period                                                    | 15          | 311      |
| Individual Contract - Applicable Provisions of Schedule F Included               | 21          | 313      |
| Layoff, Breaking the                                                             | 17          | 311      |
| Layoff, Length of - Contract Performer                                           | 16          | 311      |
| Makeup, Hairdress, Wardrobe                                                      | 11          | 309      |
| Meal Periods                                                                     | 10          | 308      |
| Multiple Picture Performer - Definition                                          | 1B          | 288      |
| Name, Right to                                                                   | 14          | 311      |
| Overtime                                                                         | 8           | 306      |
| Personal Appearances                                                             | 13          | 310      |
| Performer's Workweek                                                             | 3           | 291      |
| Prorating                                                                        | 7           | 305      |
| Recall for Retakes and Added Scenes - Layoff Subject to                          | 16          | 311      |
| Rehearsal Time                                                                   | 18          | 312      |
| Replacement of Performer                                                         | 22          | 313      |
| Rest Period                                                                      | 9           | 306      |
| Right to Name or Character                                                       | 14          | 311      |

SAG 1983                    285

PAR000270

Schedule F Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Saturdays & Sundays (Studio 5-Day Week).......3B | | 292 |
| Saturdays and Sundays – (Studio 5-Day Week – Single Picture Under $50,000)........5B | | 299 |
| Schedule F, Applicable Provisions Included in Individual Contracts............21 | | 313 |
| Six-Day Workweek (Overnight Location).........3C | | 294 |
| Studio 5-Day Week............................3B | | 292 |
| Sundays (Overnight Location 6-Day Workweek)...................................3C | | 294 |
| Sundays (Overnight Location 6-Day Workweek Single Picture Under $50,000)......5C | | 300 |
| Time of Call.................................3D | | 294 |
| Tours and Personal Appearances...............13 | | 310 |
| Travel on Sundays or Holidays................20 | | 313 |
| Wardrobe.....................................11 | | 309 |

SAG 1983                           286

PAR000271

SCHEDULE F

CONTRACT PERFORMERS WHOSE WEEKLY GUARANTEED SALARY IS IN
EXCESS OF $3500 PER WEEK; MULTIPLE PICTURE PERFORMERS
RECEIVING MORE THAN $3500 PER WEEK OR WHO ARE GUARANTEED
$30,000 OR MORE PER THEATRICAL PICTURE OR $25,000 OR MORE
PER TELEVISION PICTURE; PERFORMERS EMPLOYED UNDER "DEAL
CONTRACTS" OR OTHERWISE, WHO ARE GUARANTEED $30,000 OR MORE
PER THEATRICAL PICTURE OR $25,000 OR MORE PER TELEVISION
PICTURE

1.  DEFINITIONS

    A.  Contract Performer

    For the purpose of this Schedule F, a contract performer is
a performer employed under a contract at a salary in excess of
$3500 per week for television motion pictures or theatrical
motion pictures or both (in which latter case such contracts are
sometimes referred to as "combination term contracts") which
contract is for a term of at least 10 out of 13 weeks and which
may not specify any role, picture or series, unless otherwise
requested by the performer and approved by the Union.  The Union
agrees it will liberally grant waivers in the event of such
request.  The Producer and the performer may agree on any
over-all term of hiring in excess of ten (10) guaranteed weeks,
provided that the guaranteed number of weeks is in the same
proportion to the over-all period as "ten out of thirteen."

    Where a performer is employed for two or more pictures per
year or other specified period (hereinafter referred to as the
"employment period") and the contract is exclusive with respect
to his services in the production of motion pictures, the
performer shall be classified for the purpose of this Agreement
as a "contract performer" and his classification as a contract
performer with respect to "hours" shall be determined in
accordance with the following formula:

    The total guaranteed compensation of the performer shall be
divided by the proportionate number of weeks in the employment
period that 40 bears to 52.  For example: If the employment
period is one year, the guaranteed compensation shall be divided
by 40 weeks; if the employment period is six months, the guaran-
teed compensation shall be divided by 20 weeks, etc.  If the
resulting figure reflects a compensation of more than $3500 per
week, the provisions of Schedule F shall apply to the employment.
If the resulting figure is $3500 per week or less, the provisions
of Schedule E shall apply to the employment.

    When a performer who, under the above formula, has been
classified so as to receive the provisions of Schedule E receives

PAR000272

compensation in addition to his minimum guaranteed compensation, which additional compensation when added to his total minimum guaranteed compensation and divided by the said proportionate number of weeks in the employment period would raise the performer above the $3500 breaking point, then such performer from that time forward shall receive the provisions of Schedule F instead of Schedule E for the balance of the employment period in question.  The so-called "breaking point" for a performer whose employment period is one year shall be $100,000; for an employment period of six months, $50,000; for an employment period of three months, $25,000, etc.

B.   <u>Multiple Picture Performer</u>

A multiple picture performer, for the purpose of this Schedule F, is a performer who is employed for two or more pictures per year, whose contract with respect to services in the production of motion pictures is nonexclusive, whose compensation is more than $3500 per week or equivalent compensation on a picture or other basis, or who is guaranteed $30,000 or more per theatrical picture or $25,000 or more per television picture.  A multiple picture contract may be for a period of years, provided that the contract calls for at least two pictures in any yearly period.

C.   <u>Deal Performer</u>

A deal performer is a performer who is employed for one or more pictures at a guaranteed salary of $30,000 or more per theatrical picture or $25,000 or more per television picture.

2.   <u>COMBINATION TERM CONTRACTS</u>

A.   Performer employed under a combination term contract and used in a television series in a continuing role

(1)   If a performer is used in a continuing role in a ½ hour television series he shall be adjusted for the duration of such services to the series contract salaries and applicable rerun, theatrical and foreign telecast rates under the television agreement then in effect.

(2)   If performer is used in a continuing role in a one hour or one and one-half hour television series, he shall be adjusted for the duration of such services to the weekly free-lance salary rate and applicable rerun, theatrical and foreign telecast rates, it being understood in this connection that such adjustment shall not result, with respect to his services in any episode in such series, in his receiving less than a week's free-lance salary.

(3)   If Producer uses the performer in a greater number of episodes than the number of weeks of employment

SAG 1983                              288

PAR000273

guaranteed under this provision A, or in a combination of this provision and provision B below, the performer shall be paid the weekly free-lance salary and applicable rerun, theatrical and foreign telecast rates for each additional episode in which his services are used.  If the performer is employed beyond the guaranteed period of employment, he shall be paid an amount equal to the weekly free-lance salary for each additional week or episode, whichever is the greater.

B.   Performer employed under a combination term contract and used in a television episode - not continuing role

(1)  A term performer who is guaranteed a minimum of 20 out of 26 weeks who works in a television episode or episodes but who does not have a continuing role in a series, shall not be used in more than fifteen (15) television episodes during such period.  If he is used in more than fifteen (15) such episodes, he shall be paid an additional week's salary and applicable rerun, theatrical and foreign telecast rates for each such additional episode.

(2)  A term performer who is guaranteed a minimum of 10 out of 13 weeks who works in a television episode or episodes but who does not have a continuing role in a series, if he is used in more than seven (7) such episodes, shall be paid an additional week's salary and applicable rerun, theatrical and foreign telecast rates for each such additional episode.

(3)  If such performer is used beyond the guaranteed period of employment he shall be paid an amount equal to his weekly salary for each additional week or episode, whichever is greater.

(4)  For all such term performers who do not appear in a continuing role the applicable rerun, theatrical and foreign telecast rates per episode shall be based on the applicable weekly rate.

C.   Applicable TV weekly free-lance, series contract, rerun, theatrical and foreign telecast rates referred to above are those rates provided by the applicable Screen Actors Guild television agreement in effect when such services were rendered in such television film.

D.   Where a term contract performer is assigned to regular employment in television and Producer avails himself of the layoff rights provided for term contract performers, Producer may not also exercise its hiatus rights provided in the television collective bargaining agreement covering the employment of term contract performers in television.

SAG 1983                          289

PAR000274

E.   A separate clause shall be inserted in all combination term contracts, specifying separate compensation for services, reruns, theatrical exhibition and foreign telecasting of television motion pictures for each contract term or option period.

F.   No advance payments may be made for reruns or theatrical rights or foreign telecast rights, nor may overscale salary be credited against any sums due the performer under the contract.  As to term contracts in existence on February 1, 1960 providing for advances against reruns, no such advances may be applied against reruns except reruns of episodes made within the contract period or option term during which such advances were made.

G.   Other Conditions for Combination Term Contracts

(1)   If a performer employed under a combination term contract performs, in any single employment week during such term, services in rehearsals or recordings or before the camera, in both a television motion picture film and a theatrical motion picture film hereunder, such performer shall receive as additional compensation for such week an amount not less than the applicable weekly term contract minimum.

(2)   If a performer under a combination term contract renders services in any single employment week in principal photography in either a television motion picture or a theatrical motion picture and also renders services in such week in retakes, added scenes, sound track, process shots, transparencies, trick shots, trailers, changes or foreign versions of the photoplay (hereinafter referred to as "retakes, etc."), in the other field, such performer shall be paid, in addition to his weekly term contract salary, one-fifth (1/5) of the minimum term contract weekly rates, for each day on which he renders services on such retakes, etc.

(3)   If the performer renders services in any week in both a television motion picture and a theatrical motion picture, he shall be paid as in this subsection G provided even though he is also placed on layoff at any time during such week.

(4)   If a performer who is on layoff is recalled for retakes, etc., in either television motion pictures or theatrical motion pictures, or both, he shall be paid one-fifth (1/5) of the minimum term contract weekly rates, for each day in each field on which he renders such services.

PAR000275

(5)   If a performer renders services in either a television motion picture or a theatrical motion picture in any week and also renders services in retakes, etc., in the same week in the other field, and is placed on layoff prior to the end of such week, he shall be paid, in addition to the weekly salary due, an amount equal to one-fifth (1/5) of the minimum term contract weekly rates for each day on which he renders services in such retakes, etc.

(6)   When a performer employed under a combination term contract renders services in any week in both theatrical motion pictures and television motion pictures, for the purpose of determining whether Schedule E or Schedule F applies, and making the computations therein, the performer's weekly salary for such week shall be deemed to be his aggregate weekly salary, as herein provided.

(7)   If the performer received more than $1,500 per week, he may agree to apply any sum he received in excess of $1,500 per week toward such additional compensation provided in this subsection G.

3.   THE PERFORMER'S WORKWEEK: STUDIO 5-DAY WEEK; OVERNIGHT LOCATION WEEK

A.   Definitions-General

(1)   An "overnight location workweek," as used herein, shall be deemed to be a workweek consisting of six (6) overnight location days (excluding Sunday) or six (6) days (excluding Sunday) of any combination of studio and overnight location days, which combination includes a Saturday overnight location day.

Any workweek other than such an overnight location workweek, for the purposes of this Section, shall be deemed to be a studio workweek.

(2)   An "overnight location day" as used herein shall be deemed to mean any of the following days, if the performer is on salary that day, as provided in the Basic Agreement:

(a)   Any day spent or worked by the performer on an overnight location or on an exploitation tour;

(b)   The day of departure for such location (provided the performer does not actually work in the studio on such day);

PAR000276

(c)   The day of return from such location (provided the performer does not actually work in the studio on such day);

(3)   For all purposes, the performer's weekly base rate shall be his weekly rate of salary as specified in his contract.

B.   <u>Studio 5-Day Workweek</u>

(1)   The performer's studio workweek shall be a 5-day workweek.

(2)   Saturday and Sunday Work

The provisions of this paragraph apply to all performers under this Schedule F except to a performer employed for a one-picture engagement at a salary of less than $50,000.   See Section 5 hereof for conditions covering such excepted performers.

If the performer works on a Saturday or Sunday and performer is on a studio workweek, he shall in each case be entitled to premium pay in accordance with the following:

(a)   If the performer works seven days in his workweek, he shall be entitled to his regular weekly salary plus two additional days' pay at the rate of his daily pay or $950 per day, whichever is the lesser, for work beyond 5 days, plus 2 additional days' pay at the rate of his daily salary or $950 per day, whichever is the lesser, as the premium for Saturday and Sunday work.   Performer receives therefor his weekly salary plus 4 additional days' pay at the rate of his daily pay or $3,800, whichever is the lesser, the maximum additional amount being $3,800.

(b)   If the performer works six days in his workweek including both a Saturday and a Sunday, he shall be entitled to an additional day's pay at the rate of his daily salary or $950 whichever is the lesser, for work beyond five days plus a premium of two days' additional pay at the rate of his daily salary or $950 per day, whichever is the lesser, (i.e. 8 days' pay or 5 days' pay plus $2850, whichever is the lesser).

(c)   If the performer works six days in his workweek including work on either a Saturday or a Sunday, but not both, he shall be entitled to an additional day's pay at the rate of his daily salary or $950 whichever is the lesser, for work beyond 5 days plus a premium of one additional days' pay at the rate

SAG 1983                              292

PAR000277

of his daily salary or $950, whichever is the lesser, (i.e. 7 days' pay or 5 days' pay plus $1900, whichever is the lesser).

(d)   If the performer works five days or less in his workweek including both a Saturday and Sunday, he shall be entitled to receive his weekly salary plus a premium of two days' additional pay at the rate of his daily salary or $950 per day, whichever is the lesser, (i.e. 7 days' or 5 days' pay plus $1900, whichever is the lesser).

(e)   If the performer works five days or less in his workweek including a Saturday or a Sunday, but not both, he shall be entitled to his weekly salary plus a premium of an additional day's pay at the rate of his daily salary or $950, whichever is the lesser, (i.e. 6 days' pay or 5 days' pay plus $950, whichever is the lesser).

(f)   If the performer works on a Saturday or Sunday during a fractional workweek at the end of his engagement, the performer shall receive in addition to his pro-rata weekly salary a premium of an additional day's pay for each such Saturday or Sunday so worked at the rate of his daily salary or $950 for each such day, whichever is the lesser.

(g)   With respect to such days over the guaranteed period, the Producer and the performer may freely bargain regarding the premium.

(h)   Notwithstanding the foregoing, a Saturday, as such, worked on an overnight location shall not be a premium day.

(i)   Notwithstanding the foregoing the Producer and the performer may by such performer's contract agree in advance for the performer's performance of any services in the studio on Saturday without additional compensation, except recording and photography made to be used in the motion picture.

(j)   For work time in excess of ten hours on any Saturday or Sunday for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the straight time hourly rate provided therein, including overtime caused by makeup, hairdress, wardrobe and fittings, subject however to the provisions of Section 8D.

SAG 1983                    293

PAR000278

C.   Overnight Location-6-Day Workweek

(1)   The performer's "overnight location workweek" shall be a six day workweek as above defined.

(2)   Sunday Work

The provisions of this paragraph apply to all performers under this Schedule F except performers employed for a one-picture engagement at a salary of less than $50,000.  See Section 5 hereof for conditions covering such excepted performer.

If the performer works on a Sunday and performer is on an overnight location workweek, he shall in each case be entitled to premium pay in accordance with the following:

(a)   If the performer works seven days in his workweek, including work on a Sunday, the performer shall be entitled to his regular weekly salary plus one day's additional pay at the rate of his daily pay or $950, whichever is the lesser, for work beyond six days plus a premium of a days pay at the rate of his daily pay or $950, whichever is the lesser, (i.e. 8 days' pay or 6 days' pay plus $1900, whichever is the lesser).

(b)   If the performer works on only six days or less in his workweek, including work on a Sunday, the performer shall receive a weeks' salary plus a premium of an additional day's pay at the rate of his daily pay or $950, whichever is the lesser, (i.e. 7 days' pay or 6 days' pay plus $950 whichever is the lesser).

(c)   If the performer works on a Sunday during a fractional workweek at the end of his engagement, the performer shall receive in addition to his pro-rata weekly salary a premium of an additional day's pay at his daily rate or $950 whichever is the lesser.

(d)   For work time in excess of ten hours on any Sunday, for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the  straight time hourly rate, provided therein, including overtime caused by makeup, hairdress, wardrobe and fittings, subject however to the provisions of Section 8D.

D.   Time of Call

If the performer's first call on the set on Friday or Saturday is 6:00 P.M. or thereafter, the work past midnight to time of dismissal shall not be counted as work on Saturday or Sunday for the purpose of this Section, even though the performer may have been called earlier than 6:00 P.M. for travel, makeup, wardrobe, hairdress, and the like.

SAG 1983                        294

E.    No Compounding

There shall be no compounding of the foregoing premiums and the penalty or premium prescribed by Section 9, insofar as the same relates to the 36 or 58-hour rest period, or Section 4, entitled "Work on Holiday, Saturday or Sunday;" Section 6 entitled "Work on Holidays and/or Saturdays Before and After - Single Picture Engagement Less Than $50,000," it being understood that, if, for example, a performer works seven days in a studio workweek, he shall be entitled to only nine days' pay or 5 days' pay plus $2,000, whichever is the lesser amount.

F.    Union Branches

Any area in which the Union maintains a Branch shall be deemed a five-day workweek area for performers employed in such area, where principal photography for a picture is substantially photographed in such area.  The scope of such areas is defined in General Provisions, Section 14, entitled "Preference of Employment."

4.    WORK ON HOLIDAY, OR HOLIDAY AND SATURDAY OR SUNDAY

A.    The provisions of this Section apply to all performers under this Schedule F except performers employed for a one-picture engagement at a salary less than $50,000.  See Section 6 hereof for conditions covering such excepted performers.

The nine holidays hereinafter referred to are the following: New Year's Day, Washington's Birthday, Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and Christmas.  Whenever any of said holidays falls on a Sunday, such holiday for all purposes of this Schedule F shall be deemed to fall on the Monday next succeeding.

B.    Studio 5-Day Workweek; Work on Holidays or such Holidays and Saturday or Sunday

If the performer works on any of the nine holidays, he shall in each case be entitled to premium pay, in accordance with the following rules:

(1)   If the performer works on seven days in his workweek, including work on such a holiday and a Saturday and a Sunday and such holiday did not fall on Saturday or Sunday, he shall be entitled to his regular weekly salary plus two additional days' pay at the rate of his daily pay or $950 per day, whichever is the lesser, for work beyond five days, plus one additional days' pay at the rate of his daily salary as premium pay for the holiday worked, and two additional days' pay at the rate of his daily salary or $950

SAG 1983                              295

PAR000280

per day, whichever is the lesser, as the premium for such Saturday and Sunday work. (Performer receives therefor a total of 10 days' pay or 6 days' pay plus $3,800, whichever is the lesser.)

(2)  If the performer works on seven days in his workweek including work on such a holiday (which falls on Saturday) and on Sunday he shall be entitled to his regular weekly salary plus two additional days' pay at the rate of his daily pay or $950 per day, whichever is the lesser, for work beyond 5 days, plus one additional day's pay at the rate of his daily salary as premium for the holiday worked and one additional day's pay at the rate of his daily salary or $950, whichever is the lesser, as the premium for such Sunday work.  (Performer receives therefor a total of 9 days' pay or 6 days' pay plus $2850, whichever is the lesser.)

(3)  If the performer works on six days in his workweek including work on such a holiday and on Saturday and Sunday and such holiday did not fall on such Saturday or Sunday, he shall be entitled to his regular weekly salary plus one additional day's pay at the rate of his daily pay or $950, whichever is the lesser, for work beyond 5 days, plus one additional day's pay at the rate of his daily salary as premium for the holiday worked and two additional days' pay at the rate of his daily salary or $950 per day, whichever is the lesser, as premium for such Saturday and Sunday worked. (Performer receives therefor a total of 9 days' pay or 6 days' pay plus $2850, whichever is the lesser.)

(4)  If performer works on six days in his workweek including work on such a holiday and on Saturday and Sunday but such holiday fell on such Saturday he shall be entitled to his regular weekly salary plus one additional day's pay at the rate of his daily pay or $950, whichever is the lesser, for work beyond 5 days, plus one additional day's pay at the rate of his daily pay as premium for the holiday worked and one additional day's pay at the rate of his daily pay or $950, whichever is the lesser, as premium for such Sunday work.  (Performer receives therefor a total of 8 days' pay or 6 days' pay plus $1,900, whichever is the lesser.)

(5)  If performer works on six days in his workweek including work on such a holiday (which did not fall on Saturday) and on Saturday or Sunday, he shall be entitled to his regular weekly salary plus one additional day's pay at the rate of his daily pay or $950, whichever is the lesser, for work beyond 5 days plus one additional day's pay at the rate of his daily salary as premium for the holiday worked and one additional day's pay at the rate of

SAG 1983                                      296

his daily salary or $950, whichever is the lesser, as premium for such Saturday or Sunday worked.  (Performer receives therefor a total of 8 days' pay or 6 days' pay plus $1900, whichever is the lesser.)

(6)  If the performer works on five days or less in his workweek, he shall be entitled to his regular weekly salary plus one additional day's pay at his daily rate as premium for a day worked which is a holiday, and an additional day's pay at the rate of his daily salary or $950 whichever is the lesser, for each day worked which is a Saturday or Sunday unless such holiday is a Saturday in which case only the premium (i.e. premium for holiday worked) shall be paid.

(7)  In the event of a fractional workweek at the end of the performer's engagement, performer shall receive his pro rata weekly salary plus the respective premium as described above for such holiday, Saturday or Sunday worked occurring in such fractional workweek.

(8)  Notwithstanding the foregoing, a Saturday as such, worked on an overnight location, shall not be a premium day, unless it is a Saturday holiday.

(9)  Notwithstanding the foregoing, the Producer and the performer may by such performer's contract agree in advance for the performer's performance of any services in the studio on Saturday without additional compensation, except recording and photography to be used in the motion picture.

(10) For work time in excess of ten hours on any such Saturday, Sunday or holiday for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the straight time hourly rate provided therein, including overtime caused by makeup, hairdress, wardrobe and fittings, subject however to the provisions of Section 8D hereof.

C.   Overnight Location 6-Day Week; Work on Holidays, or Such Holidays and Sunday

If the performer works on any of the nine holidays, he shall in each case be entitled to premium pay, in accordance with the following rules:

(1)  If the performer works on seven days in his workweek, including work on such holiday and a Sunday he shall be entitled to his regular weekly salary plus an additional day's pay at the rate of his daily pay or

PAR000282

$950, whichever is the lesser, for work beyond 6 days, plus one additional day's pay at the rate of his daily salary as premium pay for the holiday work and an additional day's pay at the rate of his daily salary or $950, whichever is the lesser, as the premium for such Sunday work. (Performer receives therefor a total of 9 days' pay or 7 days' plus $1900, whichever is the lesser.)

(2)  If the performer works on six days or less in his workweek including work on such a holiday and a Sunday, he shall be entitled to his regular weekly salary plus one additional day's pay at his daily rate as premium for a day worked which is a holiday, and an additional day's pay at the rate of his daily salary or $950, whichever is the lesser, as premium for Sunday. (Performer receives therefore a total of 8 days' pay or 7 days' pay plus $950 whichever is the lesser.)

(3)  If performer works on six days or less in his workweek including work on such a holiday but not including a Sunday, he shall be entitled to his regular weekly salary plus one additional day's pay at the rate of his daily pay as premium for the holiday. (Performer receives therefore a total of 7 days' pay.)

(4)  In the event of a fractional workweek at the end of the performer's engagement, performer shall receive his pro-rata weekly salary plus the respective premium as described above for such holiday or Sunday worked occurring in such fractional workweek.

(5)  Notwithstanding the foregoing, a Saturday, as such, worked on an overnight location shall not be a premium day, unless it is a Saturday holiday.

(6)  For work time in excess of ten hours on any such Sunday or holiday for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the straight time hourly rate provided therein, including overtime caused by makeup, hairdress, wardrobe and fittings, subject however to the provisions of Section 8D.

D.  If the performer is not required to work on such a holiday, no deduction shall be made from his weekly pay.

PAR000283

5.   SATURDAY AND SUNDAY WORK – SINGLE PICTURE ENGAGEMENT LESS THAN $50,000

A.   The following rules relating to Saturday and Sunday work shall apply to a performer under this Schedule employed for a single picture engagement at a guaranteed compensation of $30,000 or more per theatrical picture or $25,000 or more per television picture but less than $50,000.

B.   Studio 5-Day Workweek

(1)   The performer's studio workweek shall be a 5-day workweek.

(2)   Saturday and Sunday Work

If the performer works on a Saturday or Sunday and performer is on a studio workweek, he shall in each case be entitled to premium pay in accordance with the following rules:

(a)   If the performer works on seven days in his workweek, he shall be entitled to an additional two days' pay for work beyond 5 days, plus a premium of 2 additional days' pay or $1900, whichever is the lesser sum (i.e. 9 days' pay or 7 days' pay plus $1900, whichever is the lesser);

(b)   If the performer works six days in his workweek including both a Saturday and a Sunday, he shall be entitled to an additional day's pay for work beyond five days plus a premium of two days' additional pay or $1900, whichever is the lesser sum, (i.e. 8 days' pay or 6 days' pay plus $1900, whichever is the lesser);

(c)   If performer works six days in his workweek including work on either a Saturday or a Sunday, but not both, he shall be entitled to an additional day's pay for work beyond 5 days plus a premium of one additional day's pay or $950, whichever is the lesser sum (i.e. 7 days' pay or 6 days' pay plus $950, whichever is the lesser);

(d)   If performer works five days or less in his workweek including both a Saturday and a Sunday, he shall be entitled to receive his weekly salary plus a premium of two days' additional pay or $1900, whichever is the lesser sum (i.e. 7 days' pay or 5 days' pay plus $1900, whichever is the lesser);

SAG 1983                              299

(e)   If performer works five days or less in his workweek including a Saturday or Sunday, but not both, he shall be entitled to his weekly salary plus a premium of an additional day's pay or $950, whichever is the lesser sum (i.e. 6 days' pay or 5 days' pay plus $950, whichever is the lesser);

(f)   If the performer works on a Saturday or Sunday during a fractional workweek at the end of his engagement, the performer shall receive in addition to his pro-rata weekly salary a premium of an additional day's pay for each such Saturday or Sunday or $950 for each such day, whichever is the lesser;

(g)   Notwithstanding the foregoing, a Saturday as such, worked on an overnight location shall not be a premium day.

(h)   For work time in excess of ten hours on any Saturday or Sunday for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the straight time hourly rate provided therein, including overtime caused by makeup, hairdress, wardrobe and fittings, subject however to the provisions of Section 8D.

C.   Overnight Location 6-Day Workweek

(1)   The performer's "overnight location workweek" as above defined, shall be a 6-Day workweek.

(2)   Sunday Work

If the performer works on a Sunday and performer is on an overnight location workweek, he shall in each case be entitled to premium pay in accordance with the following rules:

(a)   If the performer works seven days in his workweek, including a Sunday, he shall receive an additional day's pay for work beyond 6 days plus one day's premium pay or $950, whichever is the lesser sum (i.e. 8 days' pay or 7 days' pay plus $950, whichever is the lesser);

(b)   If the performer works on only six days or less in his workweek, including work on a Sunday, the performer shall receive a weeks' salary plus a premium of an additional day's pay or $950, whichever is the lesser sum (i.e. 7 days' pay or 6 days' pay plus $950 whichever is the lesser);

SAG 1983                                300

(c)   If the performer works on a Sunday during a fractional workweek at the end of his engagement, the performer shall receive in addition to his pro-rata weekly salary a premium of an additional day's pay or $950, whichever is the lesser sum;

(d)   For work time in excess of ten hours on any Sunday, for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the straight time hourly rate provided therein, including overtime caused by makeup, hairdress, wardrobe and fittings, subject however to the provisions of Section 8D.

D.   Recall on Saturday or Sunday

If the performer is recalled on a Saturday or Sunday for retakes, added scenes, etc., the premium for Saturday or Sunday work shall not exceed $950.

E.   No Compounding

There shall be no compounding of any premium provided by this Section, and the penalty or premium prescribed by Section 9 of this Schedule insofar as such Section relates to the 36-hour or 58-hour rest period, or Section 6 of this Schedule.

F.   Union Branches

Any area in which the Union maintains a Branch shall be deemed a five-day workweek area for performers employed in such area, where principal photography for a feature is substantially photographed in such area.   The scope of such areas is defined in General Provisions, Section 14, entitled "Preference of Employment."

G.   Rooms on Overnight Locations

Performers transported to overnight locations shall be provided separate rooms unless such rooms are not available.

6.   WORK ON HOLIDAYS AND/OR SATURDAYS OR SUNDAYS BEFORE AND AFTER-SINGLE PICTURE ENGAGEMENT LESS THAN $50,000

A.   The nine holidays hereinafter referred to are the following:  New Year's Day, Washington's Birthday, Good Friday, Memorial Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and Christmas.   Whenever any of said holidays falls on a Sunday, such holiday for all purposes of this Schedule F shall be deemed to fall on the Monday next succeeding and the Saturday and Sunday preceding shall be deemed a Saturday and Sunday before such holiday.

SAG 1983                          301

B.   Studio 5-Day Workweek

If the performer is on a studio workweek and works on any of the nine holidays and/or Saturday or Sunday before, or Saturday or Sunday after such a holiday, he shall in each case (that is, separately for the holiday and the Saturday or Sunday) be entitled to a premium of an additional day's pay for each such respective day on which he works, in accordance with the following rules:

(1)   If the performer works on seven days in his workweek, including work on such a holiday and on Saturday and Sunday, and such holiday did not fall on such Saturday, he receives three days' premium pay plus two additional days' pay for two days beyond his five-day week or a total of ten days' pay.

(2)   If the performer works on seven days in his workweek including work on such a holiday (which falls on Saturday) and on Sunday, he receives two days' premium pay plus two additional days' pay for two days beyond his 5-day week or a total of nine days' pay.

(3)   If performer works on six days in his workweek including work on such a holiday and on Saturday and Sunday and such holiday did not fall on such Saturday, he receives three premium days' pay plus one additional day's pay for one day's work beyond his 5-day week or a total of nine days' pay.

(4)   If performer works on six days in his workweek including work on such a holiday and on Saturday and Sunday but such holiday fell on such Saturday, he receives two premium days' pay plus one additional days' pay for one day beyond his 5-day week or a total of eight days' pay.

(5)   If performer works on six days in his workweek including work on such a holiday (which did not fall on Saturday) and on Saturday, he receives two premium days' pay plus one additional day's pay for one day beyond his 5-day week or a total of eight days' pay.

(6)   If performer works on five days or less in his workweek, he receives a premium of an extra day's pay for each day worked which is such a holiday, Saturday or Sunday, unless such holiday is a Saturday holiday in which case only one premium day's pay is due for such Saturday holiday worked.

For example, performer works on:

(a)   Holiday (not on Sat.), Sat. & Sun. - 3 days' premium pay

PAR000287

(b)   Sat. Holiday & Sunday - 2 days' premium pay

(c)   Holiday (not on Sat.) & Sun - 2 days' premium pay

(d)   Holiday (not on Sat.) & Sat. - 2 days' premium pay

(e)   Holiday (incl. a Holiday Saturday) - 1 day's premium pay.

(7)   If the performer works on such a holiday, Saturday or Sunday during a fractional week at the end of his engagement, the performer receives a premium of an additional day's pay for each such day, except that work on a holiday on Saturday calls for only one premium day's pay.

(8)   For work time in excess of ten hours on any such holiday, Saturday or Sunday, for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the straight time hourly rate provided therein, including overtime caused by makeup, hairdress, wardrobe, and fittings, subject, however, to the provisions of Section 8D.

(9)   Notwithstanding the foregoing, a Saturday as such, worked on an overnight location shall not be a premium day, unless it is a Saturday holiday.

(10)   As to any performer entitled to additional compensation for services rendered on any of the nine holidays, it is agreed that if any such holidays shall occur prior to the commencement of the term of employment of any such performer, the Saturday or Sunday after such holiday shall not be deemed, as to such performer, a Saturday or Sunday after a holiday; and if a Saturday or Sunday prior to a holiday shall occur during the employment of such performer, but the performer's employment is terminated prior to the holiday and at least one day has intervened between such termination and the holiday, such Saturday or Sunday shall be considered an ordinary Saturday or Sunday under Section 5 above.

C.   <u>Overnight Location Six-Day Workweek; Work on Holiday or on Such Holiday and Sunday - Before and After</u>

If the performer is on an overnight location workweek and works on any of the nine holidays, or on such a holiday and on a Sunday before or Sunday after such holiday he shall in each case (that is, separately for the holiday and for the Sunday) be entitled to a premium of an extra day's pay, in accordance with the following rules:

PAR000288

(1)  If the performer works on seven days in his workweek including such a holiday and a Sunday, he receives two premium days' pay plus one additional day's pay for one day beyond his six-day week or a total of nine days' pay.

(2)  If the performer works seven days in his workweek including such a holiday or a Sunday, he receives one day's premium pay plus one additional day's pay for one day beyond his six-day week or a total of eight days' pay.

(3)  If performer works on only six days or less in his workweek including work on such a holiday and a Sunday, the performer receives two days' premium pay or a total of eight days' pay.

(4)  If the performer works on only six days or less in his workweek, including work on such a holiday or a Sunday, the performer receives a premium day's pay, or a total of seven days' pay for that week.

(5)  If the performer works on such a holiday and a Sunday during a fractional week at the end of the engagement, the performer receives two premium days' pay.

(6)  If the performer works on such a holiday or a Sunday during a fractional week at the end of the engagement, the performer receives a premium of an additional day's pay.

(7)  For work time in excess of ten hours on any such holiday or Sunday for which performer receives a premium as above provided and in the event performer is subject to the overtime provisions of this Schedule F as provided in Section 8, performer shall receive double the straight time hourly rate provided therein, including overtime caused by makeup, hairdress, wardrobe, and fittings, subject, however, to the provisions of Section 8D.

(8)  As to any performer entitled to additional compensation for services rendered on any of the nine holidays, it is agreed that if any such holidays shall occur prior to the commencement of the term of employment of any such performer, the Sunday after such holiday shall not be deemed, as to such performer, a Sunday after a holiday; and if a Sunday prior to a holiday shall occur during the employment of such performer, but the performer's employment is terminated prior to the holiday and at least one day has intervened between such termination and the holiday, such Sunday shall be considered an ordinary Sunday under Section 5 above.

D.   If the performer is not required to work on such a
holiday, no deduction shall be made from his guaranteed weekly
pay.

E.   If performer works on such holiday, Saturday or Sunday,
he shall be entitled to the premiums provided by this paragraph,
but insofar as the holiday Saturday and Sunday premiums are
concerned, there shall be no compounding of such premium and the
penalty or premium prescribed by Section 9 as the same relates to
the 58 or 36-hour rest period, whichever is applicable, or
Section 8; it being understood that if for example a performer on
an overnight location workweek works seven days in his week
including work on such a holiday, he shall be entitled to nine
days' pay plus overtime, if any.

F.   In the event performer works on a Saturday or Sunday
which is not before or after a holiday, see Section 5 of this
Schedule.

7.   <u>PRORATING</u>

A.   <u>Workweek and Payroll Week</u>

Wherever it is necessary to prorate the workweek in order to
determine an additional day's pay, such prorating shall be on the
basis of one fifth (1/5) of the performer's weekly base rate for
either the studio or overnight location workweek; however such
proration shall not in any manner change the performer's weekly
base rate for either the studio or the overnight location
workweek.

With respect to prorating the performer's workweek for the
purpose of paying the performer at the end of a payroll week,
that portion of performer's studio workweek which is part of such
payroll week shall be prorated on the basis of 1/5th of the
weekly base rate for each such day (excluding Saturday and
Sunday) in that payroll week.  This is exclusive of any overtime
or premium pay, if any, due in such performer's workweek.

B.   <u>Prorating Beyond the Guarantee</u>

With respect to performers under deal contracts, multiple
picture contracts or any other employment contracts under which
the performer is guaranteed $30,000 or more per theatrical
picture or $25,000 or more per television picture, such prorating
shall be a matter of individual bargaining with respect to pay
for days over the guaranteed period.  In any event, where a
performer is guaranteed a fixed compensation on a picture or term
contract basis, such fixed amount shall not be exceeded by reason
of the amount of proration accruing in the final payroll week of
the respective period or picture involved.

PAR000290

8.   OVERTIME

A.    Performers employed under deal contracts or otherwise
and multiple picture performers whose guaranteed weekly salary is
more than $3500 per week but who are guaranteed less than $35,000
per picture, and term performers whose guaranteed weekly salary
is over $3500 per week, shall be paid daily overtime at double
time for each hour or portion thereof worked in excess of ten
(10) hours in any day, figured on the maximum basis of $3500.
The overtime money break of $35,000, referred to herein, shall be
increased to $40,000 per picture with respect to performers
employed for theatrical motion pictures under contracts entered
into on and after December 15, 1985.

B.    For purposes of such overtime only, the performers
entitled thereto shall be governed by the provisions of Schedule
C.  See Section 13, Schedule C.  Weekly overtime does not apply
to this Schedule F.

C.    For purposes of this Section, one hour's pay at
straight time shall be $79.55 and at double time $159.10.

D.    Any such performer whose contract for employment in the
motion picture contains a provision giving such performer a
percentage or other participation in the receipts, revenues or
profits of a motion picture shall be paid the required overtime
at the time of employment; provided, however, such performer may
agree in such contract that the overtime payments so made may be
credited against such participations when and if received by the
performer.

9.   REST PERIOD

A.   Twelve-Hour Rest Period

The performer shall be entitled to a twelve-hour
consecutive rest period from the time he is finally dismissed
until his first call thereafter, whether for makeup, wardrobe,
hairdress or any other purpose.

B.   Thirty-Six Hour Rest Period

The performer shall be entitled to one rest period in
each week of thirty-six consecutive hours; provided, however,
that if the performer is not required to work on the twenty-four
hours constituting the first day of any workweek and has not
worked for Producer during the twelve hours immediately preceding
such day, or if the performer is not required to work on the
twenty-four hours constituting the last day of any workweek and
does not work for the Producer during the twelve hours
immediately succeeding such day, then the thirty-six hour rest
period requirement shall be satisfied regardless of the fact that
twelve hours thereof may be in the preceding or succeeding week.
Where the performer works on seven days in any week, and is paid,
in addition to his base pay, an extra day's pay therefor, the
performer need not be given a thirty-six hour rest period for
such week, but must continue to receive his twelve-hour rest periods.

SAG 1983                          306

PAR000291

C.   Fifty-Eight Hour Rest Period

Where the performer is given two consecutive days off during a studio workweek, the 36 consecutive hour rest period shall be increased to 58 consecutive hours.  However, when there is night shooting consisting primarily of exterior photography and the performer's call is not earlier than 3:00 P.M. and he is dismissed in the studio at or before midnight on Friday, such 58-hour rest period, if otherwise applicable, may be reduced to 56 hours.

D.   The above provisions regarding the rest period shall be subject to the following exceptions:

(1)  Where the Producer is photographing on a location other than an overnight location, the twelve-hour rest period may be reduced to ten hours if exterior photography is required on such location on the day before and the day after such reduced rest period.  Where such reduction is allowed on any day by reason of exterior photography on a nearby location it may not be again allowed until after three consecutive days have intervened.

(2)  Where a performer arrives at his place of lodging on an overnight location after 9:00 P.M. and does not work that night, the rest period with respect to the first call following such arrival may be ten hours instead of twelve hours, but the first call must be at the place of lodging.

(3)  Where more than one night's travel (by ordinary means of transportation) is required to reach a location and the performer is given a berth on a boat or train for each night of traveling, the time spent in such traveling, to or from such location, shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

(4)  Where an overnight trip to or from a location is required, and the same takes at least seven hours to reach, and the performer is given a berth on a boat or train, or if the performer elects to travel by first-class plane accommodations, the time spent in such traveling to or from such location shall not be work time or travel time for the purpose of computing the twelve-hour rest period.

(5)  The first call at the lodging for work (including makeup, hairdress, wardrobe, or travel) determines the time of first call for the next day for the purpose of computing the rest period.

E.   The Performer may waive the rest period without the Union's consent, but if he does so, he shall be entitled to an automatic penalty of one day's pay or $950, whichever is the lesser sum.  A performer may be required to waive the rest period

SAG 1983                           307

PAR000292

if the violation, in the case of the twelve-hour rest period, is not over two and one-half hours, or on an overnight location not over two hours.  The performer may in any case be required to waive the 36-hour or 58-hour rest period.  In any case in which the performer waives either rest period, the penalty of one day's pay, not exceeding $950, shall be automatically incurred.  The penalty may not be waived without the consent of the Union.

F.    Wherever it is provided in this Schedule that there shall be no compounding of any premium pay and the penalty for breach of the 36-hour or 58-hour rest period, it is expressly understood that the twelve-hour rest period between calls, and the penalty for violation thereof, remains in effect.

G.    Any performer who is required to travel by air in excess of four (4) scheduled hours to a location may not be called for work without a ten (10) hour rest period.  The ten (10) hour rest period shall commence from the time of arrival at the hotel, provided the performer goes directly to the hotel designated by the Producer.  Failure to provide such ten (10) hours constitutes a rest period violation.

10.  MEAL PERIODS

A.    Allowable meal periods shall not be counted as work time for any purpose.  The performer's first meal period shall commence within six (6) hours following the time of his first call for the day; succeeding meal periods of the same performer shall commence within six hours after the end of the preceding meal period.  A meal period shall not be less than one-half hour nor more than one hour in length.  If upon the expiration of such six-hour period the camera is in the actual course of photography, it shall not be a violation to complete such photography.  If on location or while traveling to or from location the delay is not due to any fault or negligence of the Producer or its agents or persons employed by it to render the catering service by contract, or if delay is caused by common carriers such as railroads, there shall be no penalty for violation of the above provisions.  If the caterer is chosen carefully, and is delayed in reaching the location beyond the required time for commencing a meal period, there shall be no penalty for the violation; but if such delay shall continue beyond one-half hour, work shall cease, and the time intervening between such cessation of work and the meal period shall be work time.

The performer shall be entitled to a non-deductible breakfast of fifteen (15) minutes in duration, not later than 9:00 a.m., during which performer will be freed of all activity.  The first deductible meal period shall commence within six (6) hours thereafter.

PAR000293

Outside the studio, where the crew is provided a meal or a meal allowance (as distinguished from per diem or penalty), the performers (other than those receiving a per diem allowance for meals on overnight locations) will be provided either a meal or a meal allowance where they have satisfied the same terms and conditions for entitlement to such meal or meal allowance as the crew.

B.   The following amounts shall be paid to performers for meal period violations:

| | | |
|---|---|---|
| (1) | For the first half-hour or fraction thereof - | $25.00 per performer |
| (2) | For the second half-hour or fraction thereof - | $35.00 per performer |
| (3) | For the third half-hour and each additional half-hour or fraction thereof - | $50.00 per performer |

## 11.  MAKEUP, HAIRDRESS, WARDROBE

A.   The Producer may require a performer to report made up, with hairdress, and/or in wardrobe, without assistance from the Producer.

B.   If any special hairdress necessitating an expenditure is required by Producer, Producer shall either furnish such hairdress or Producer may designate facilities for the procurement of such hairdress and reimburse performer for amounts expended.

C.   Wardrobe supplied by the performer, which is damaged in the course of employment, shall either be repaired by Producer, or repaired at the expense of Producer at facilities designated by Producer, provided that notice of such damage is given to Producer prior to the termination of the performer's employment.

PAR000294

D.   Effective October 7, 1983, where other than ordinary
make-up, hairdress or wardrobe requires assistance in the removal
thereof, such removal time shall be worktime.

Effective October 7, 1983, where performer is not otherwise
on compensable worktime, performer shall be compensated for up to
15 minutes of time spent in the removal of ordinary make-up,
hairdress or wardrobe at the applicable overtime rate.  Such
compensation shall be based on actual time and shall not trigger
additional hourly increments of pay.  Such removal time shall not
be considered in computing rest period violations or other
premiums or penalties.

## 12.   DRESSING ROOMS

A.   See General Provisions Section 21.

B.   Whenever a performer is required by Producer to make a
change of wardrobe, Producer shall provide suitable facilities
affording privacy for such purpose.  A private canvas dressing
room will be deemed a "suitable facility," and a separate
dressing room need not be furnished for each performer.

## 13.   TOURS AND PERSONAL APPEARANCES

A.   As to all term contract performers under this Schedule
F, if the performer is not working in a picture, he shall receive
a day's pay at straight time for each day including travel days
in which he is engaged in tours or personal appearances.

B.   First-class transportation and reasonable expenses
shall be paid to all performers on tours and personal
appearances.

C.   Producer shall cooperate to ensure that performers on
tour and personal appearances are allowed adequate rest periods.

D.   One personal appearance of any such performer requested
by the Producer in connection with the opening of any picture in
which such performer has performed, one rehearsal in connection
therewith and any period immediately prior thereto which other-
wise would not be worktime, shall not be worktime for any
purpose.  Personal appearances requested of any such performer by
the Producer in connection with any benefit approved by the
Theatre Authority, Inc., so long as the same has the sanction of
the Union, or by any similar agency substituted therefor which at
the time has the sanction of the Union, rehearsal in connection
therewith and any period immediately prior thereto which other-
wise would not be worktime, shall not be worktime for any
purpose.

PAR000295

14. <u>RIGHT TO NAME OR CHARACTER</u>

No Producer shall after the termination of the performer's employment prevent such performer from continuing the use of any stage or screen name used by such performer.  The name of a role owned or created by the Producer, such as Tarzan or Charlie Chan, belongs to the Producer and not to the performer.

15. <u>ILLNESS - CANCELLATION PERIOD</u>

The cancellation period specified in the illness clause of a contract performer's individual contract shall not be less than a period or aggregate of periods of three weeks per year.

16. <u>LENGTH OF LAYOFF</u>

A layoff for a contract performer shall be for at least one consecutive week, subject to recall for retakes and added scenes as more particularly provided in Section 17B of this Schedule. If the unused portion of any layoff shall be less than one week, such unused layoff may be availed of by the Producer at any time but only in one consecutive period.

17. <u>BREAKING THE LAYOFF</u>

A. <u>Services Which Break the Layoff</u>

The rendition by a performer of any of the following services shall break the layoff:  Principal photography, including recording and rehearsals in connection therewith; auditions; tests; story, song, and production conferences which occur at the request of the Producer; publicity stills connected with production which are made at the request of the Producer; fittings; hairdress; makeup; wardrobe; and radio and personal appearances made at the direction of the Producer.  Training or coaching of the performer shall break the layoff unless a waiver is granted therefor; the Union agrees, upon the request of the performer, to freely grant such waivers.

Where the performer has had less than one week's layoff prior to the commencement of such services, the performer shall be deemed not to have been on layoff and his regular salary shall continue to accrue during the intervening period.  Where the performer has had a week or more of layoff before commencing any of such services, then the performer shall be placed on salary at the time of commencing such services unless the Union has agreed to issue a waiver therefor.

SAG 1983                        311

PAR000296

B.   Services Which Do Not Break the Layoff

(1)   A performer may be required to render services in retakes and added scenes while on layoff, and such services shall not be deemed to interrupt or break the layoff; however, the performer shall be entitled to pay at one-sixth his weekly rate for the day or days upon which he renders such services.

(2)   A performer may be requested to render the following services, which shall not break the layoff: Submission of scripts to the performer at the studio or elsewhere; publicity interviews and publicity stills in connection therewith; fashion stills; consultation on proposed hairdress, makeup, and wardrobe; "music voice key;" and radio or personal appearances not made at the direction of the Producer.  The performer shall not be entitled to any compensation for rendering the services enumerated in this subsection (2).

C.   The provisions of this Schedule which relate to breaking the layoff may not be changed to the detriment of the performer by the terms of an individual employment contract without the approval of the Union.


18.  REHEARSAL TIME

A.   The reading of lines, acting, singing, or dancing, in preparation for the performer's performance, in the presence and under the supervision of a representative of Producer, constitutes a rehearsal.  Rehearsals shall be counted as work time, except that as to deal performers this shall be a matter of individual bargaining.

B.   Auditions, tests, interviews, makeup and wardrobe tests do not constitute rehearsals.

C.   The Union agrees to freely grant waivers for the training of a performer in a particular skill such as horseback riding, fencing, etc.  Compensation, if any, shall be agreed to between the performer and the Producer, subject to the approval of the Union.

D.   Neither tests, auditions, fittings, publicity stills, preproduction stills, prerecordings, nor training under subsection C above, after employment but before the starting date of such employment, shall start the employment period of such performer.  Compensation, if any, for any of such services shall be as otherwise provided in this Schedule.

PAR000297

19.  <u>COMMERCIALS</u>

A.   All commercials shall be bargained for separately by the performer and Producer under the terms of the Industry-wide Screen Actors Guild Commercials Contract in effect at the time of such bargaining.

B.   Employment agreements in effect on July 1, 1983 shall be excluded from the foregoing provision and shall be governed by the television agreement in effect when such employment contract was entered into.

20.  <u>TRAVEL ON SUNDAYS OR HOLIDAYS</u>

Travel on Sundays or holidays shall be deemed work time for purpose of premium pay, and, except as to deal performers, shall entitle performer to a day's pay plus a premium of an additional half day's pay; deal performers shall be paid a day's pay, but if the performer's salary is over $50,000, he shall be paid a day's pay, or $950, whichever is less.

21.  <u>APPLICABLE PROVISIONS OF SCHEDULE F INCLUDED IN INDIVIDUAL CONTRACTS</u>

The respective provisions and exceptions of this Schedule shall become a part of the individual contract of the performer to whose classification such provisions and exceptions apply.

W-4's shall be presented to performer no later than the first day of employment.  A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.  It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.

22.  <u>REPLACEMENT OF PERFORMER</u>

In the event that a performer is replaced in the role, the performer, or performer's agent, shall be notified of this fact at the time of the replacement.

PAR000298

SCHEDULE G-I

PROFESSIONAL SINGERS EMPLOYED BY THE DAY

Table of Contents

Section No.

1. Definitions
2. Schedule G-I – Included in Individual Contracts
3. Minimum Wage
4. "Consecutive or Continuous Employment" Not Applicable
5. Phonograph Records and Tape Recordings
6. Five-Minute Breaks
7. Retakes, Added Scenes, Etc.
8. Availability for Recall After Employment

Section No.

9. Specialty Singers - Use of Recording; Use of Photography in Other Photoplays
10. Applicable Provisions of Schedule A
11. Overdubbing (Multiple Tracking)
12. Sweetening
13. Contractors (Theatrical Motion Pictures)

PAR000299

SCHEDULE G-I INDEX

|  | Section No. | Page No. |
|---|---|---|
| Added Scenes.......................................7 | | 320 |
| Applicability of Provisions of this Schedule................................2 | | 317 |
| Applicable Provisions of Schedule A...............................10 | | 322 |
| Auditions, Tests - See Schedule A | | |
| Auditions, Definitions of - See Schedule A | | |
| Availability for Recall After Employment...............................8 | | 320 |
| Cancellation of Employment, Notice of - See Schedule A | | |
| "Consecutive or Continuous Employment" Not Applicable......................4 | | 319 |
| Contract Requirements - See Schedule A | | |
| Contracting.......................................3B | | 318 |
| Contractors......................................13 | | 324 |
| Definitions.......................................1 | | 317 |
| Engagement - See Schedule A | | |
| Exceptions to Work Time - See Schedule A | | |
| Fittings - See Schedule A | | |
| Five-Minute Breaks................................6 | | 319 |
| Hairdress - See Schedule A | | |
| Holidays - See Schedule A | | |
| Hours Per Day - See Schedule A | | |
| Interviews - See Schedule A | | |
| Interviews, Publicity - See Schedule A | | |
| Makeup, Hairdress, Wardrobe - See Schedule A | | |
| Makeup Tests - See Schedule A | | |
| Meal Periods - See Schedule A | | |
| Minimum Wage ....................................3 | | 318 |
| Name, Right to - See Schedule A | | |
| Night Work - See Schedule A | | |
| Overdubbing......................................11 | | 323 |
| Overtime - See Schedule A | | |

PAR000300

Schedule G-I Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Phonograph Records and Tape Recordings | 5 | 319 |
| Photography, Use of in Other Photoplays | 9 | 320 |
| Professional Singer - Definition | 1 | 317 |
| Publicity Interviews - See Schedule A | | |
| Publicity Stills - See Schedule A | | |
| | | |
| Rate Not Specified - See Schedule A | | |
| Recall, Availability After Employment | 8 | 320 |
| Recall for Next Day - See Schedule A | | |
| Recording, Use of; Specialty Singers | 9 | 320 |
| Rehearsal Time - See Schedule A | | |
| Rest Period - See Schedule A | | |
| Retakes, Added Scenes, Etc | 7 | 320 |
| Right to Name or Character - See Schedule A | | |
| | | |
| Schedule G-I Included in Individual Contracts | 2 | 317 |
| Specialty Singer - Definition | 1, 9 | 317, 320 |
| Story, Song, and Production Conferences - See Schedule A | | |
| Study of Lines or Script - See Schedule A | | |
| Submission of Script - See Schedule A | | |
| Sunday Work - See Schedule A | | |
| Sweetening | 12 | 323 |
| | | |
| Tape Recordings | 5 | 319 |
| | | |
| Use of Recording; Use of Photography in Other Photoplays | 9 | 320 |
| | | |
| Wages, Minimum | 3 | 318 |
| Wardrobe - See Schedule A | | |
| Wardrobe Tests - See Schedule A | | |
| Weather Permitting Calls - See Schedule A | | |
| Work on Holidays - See Schedule A | | |
| Work Time - Definition and Exceptions - See Schedule A | | |
| Working at Midnight - See Schedule A | | |

PAR000301

<u>SCHEDULE G-I</u>


PROFESSIONAL SINGERS EMPLOYED BY THE DAY


1.   <u>DEFINITIONS</u>

   A.   <u>Professional Singer</u>

   A professional singer is a person who is employed primarily to sing a set piece of music on a given pitch either as a solo or in a group requiring unison, melody and harmony.  Non-professional singing is excluded from this definition.  A professional singer is herein referred to as a singer.

   B.   The provisions of this Schedule shall not apply to a person who is employed either as a day performer, free-lance performer, contract performer, multiple picture performer, or deal performer.


2.   <u>SCHEDULE G-I INCLUDED IN INDIVIDUAL CONTRACTS</u>

   The provisions of this Schedule shall be deemed incorporated in the individual contract of employment between Producer and each singer covered hereunder; the Producer and the individual singer shall each be bound thereby.

PAR000302

3.   <u>MINIMUM WAGE</u>

A.   The minimum rates per day for singers employed by the day shall be as follows:

|  | On Camera | | Off Camera 4 Hour Session* | |
|---|---|---|---|---|
|  | 7/1/83 through 12/31/84 | 7/1/85 through 6/30/86 | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 |
| Solo & Duo................ | $355.00 | $390.00 | **$355.00 | $390.00 |
| Groups 3-8................. | 312.00 | 343.00 | $188.00 | $207.00 |
| Groups 9 or more.......... | 272.00 | 299.00 | $163.00 | $179.00 |
| Mouthing 1-16............. | 261.00 | 287.00 |  |  |
| Mouthing 17 or more....... | 204.00 | 224.00 |  |  |
| Sweetening with or without an overdubbing additional (per day) | +100% | +100% | +100% | +100% |
| Overdubbing only, an additional.............. | +33-1/3% | +33-1/3% | +33-1/3% | +33-1/3% |

\*   5th to 8th hour prorated at 25% of total session fee per hour.  Overtime beyond 8 hours shall be payable under the daily overtime provisions of this Agreement.

\*\*   Singers guaranteed a daily salary in excess of $750 may bargain for 8 hours employment.

B.   Where a singer is required to perform services as a contractor he shall be entitled to receive the following:

|  | On Camera | | Off Camera 4 Hr. Session* | |
|---|---|---|---|---|
|  | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 |
| 3 to 8 Singers - an additional half check | $156.00 | $171.50 | $ 94.00 | $103.50 |
| 9 or more Singers - an additional full check | $272.00 | $299.00 | $163.00 | $179.00 |

PAR000303

C.   Step-Out Category

(1)   If a solo or duo is called upon to step out of a group to sing up to 15 cumulative bars during a session, they shall be paid an adjustment of 50% of the solo/duo rate in addition to the appropriate group rate for that day.

(2)   If a solo or duo is called upon to step out of a group to sing 16 or more cumulative bars, or remain more than one (1) hour after the group has been released, to perform a solo or duo of any length, they shall be paid the full solo/duo rate in addition to the appropriate group rate for that day.

(3)   Any member of a group who steps out to perform as part of a smaller group to sing over 4 consecutive bars shall be paid at the smaller group fee for that day.  Such re-classification shall not operate to reduce the size of the overall group with respect to fees payable to the remainder of the group.

D.   W-4's shall be presented to performer no later than the first day of employment.  A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.  It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.  W-4 forms shall be attached to day-performer and 3-day-performer contracts.

4.   "CONSECUTIVE OR CONTINUOUS EMPLOYMENT" NOT APPLICABLE

Singers employed by the day shall not be entitled to compensation for days between calls.

5.   PHONOGRAPH RECORDS AND TAPE RECORDINGS

There shall be separate bargaining at the time of employment between a singer and Producer for the use of sound track on phonograph records or tape; otherwise such rights may not be acquired.  Singers' contracts for phonograph records or tape recordings shall contain a separate clause to be initialed at the time of employment providing for the use of sound track on records or tape recordings to be not less than the AFTRA rate.

6.   FIVE-MINUTE BREAKS

Singers shall be given a five-minute rest period in each hour of recording.

SAG 1983                        319

PAR000304

7.   <u>RETAKES, ADDED SCENES, ETC.</u>

A singer employed by the day may be recalled by the Producer and such singer will report for services in connection with retakes, added scenes, changes, sound track, process shots, transparencies, trick shots, trailers, foreign versions, and mouthing to playback.  Compensation shall be paid to the singer only for the day or days on which he is actually so employed.  If such services are commenced within three months after the prior termination of employment, compensation therefor shall be at the daily rate originally agreed upon.

8.   <u>AVAILABILITY FOR RECALL AFTER EMPLOYMENT</u>

The Producer may not agree with any singer that the singer will hold himself available for any day after the termination of an original period of employment (which may be as short as one day) unless the Producer agrees at the same time to employ the singer for such day.  It is agreed, however, that the singer may be recalled by the Producer and will report, at any time prior to the completion of production of the photoplay for which he was originally employed on the same terms and conditions (except as to the original term of employment), provided that he is not then otherwise employed.

9.   <u>SPECIALTY SINGERS–USE OF RECORDING; USE OF PHOTOGRAPHY IN OTHER PHOTOPLAYS</u>

This Section shall apply only to a specialty singer defined as a professional singer employed for a solo or employed as a part of a "name" group.

A.   If any part of the recording by any specialty singer of any individual song or other musical composition be included by the Producer in any photoplay (as finally cut and released) in connection with the production of which such recording was obtained, the Producer shall not thereafter include in any other photoplay or photoplays or make any other use of any part of the photography of such singer accompanying such recording of that particular song or musical composition, or use, in connection with any other photoplay or photoplays, or otherwise, the name of such singer in connection with such recording; but the aforesaid limitations upon the use of such singer's name shall not apply to any other photoplay or photoplays in connection with which such singer is employed to perform additional services, nor shall the aforesaid limitations be deemed to limit the right of the Producer to include all or any part of such recording in any other photoplay or photoplays if no part of the photography of such singer accompanying such recording be included therein and (provided such singer be not employed in connection with such other photoplay) if the name of such singer be not used in

SAG 1983                          320

PAR000305

connection with such recording.  If no part of the recording by any such singer of any individual song or other musical composition be included by the Producer in the photoplay (as finally cut and released) in connection with the production of which such recording was obtained, then in such event the producer shall have either of the following options:

(1)  The Producer may include in any other photoplay all or any part of such recording of that particular song or musical composition together with any photography of the singer accompanying such recording and may use in connection therewith the name of the singer; but in such event the Producer may not include any part of such recording of that particular song or musical composition or any photography accompanying the same in any other photoplay or photoplays, or make any other use thereof; or

(2)  The Producer may use all or any part of the recording of such individual song or other musical composition in any other photoplay or photoplays (but not otherwise), but may not then or thereafter use for any purpose any photography of such singer accompanying the same, and may not use the name of such singer in connection with any such use of the recording or otherwise; but the aforesaid limitation upon the use of the singer's name shall not apply to any other photoplay or photoplays in connection with which such singer is employed to perform additional services.

The Producer's right in and to any such recording and in and to the photography of any such singer accompanying any such recording, and in and to the use of such singer's name and likeness in connection therewith shall not be limited or qualified by this Section, except as expressly provided.  All or any of the aforesaid limitations may be waived by the Union at any time and from time to time.  With respect to the photoplay in which the photography and recording is authorized to be used by the foregoing provisions hereof, the Producer shall have the right to produce, reproduce, transmit, exhibit, distribute and exploit any and all of the singer's acts, poses, plays and appearances of any and all kinds and shall have the right to record, reproduce, transmit, exhibit and exploit in connection with the photoplay the singer's voice and all instrumental, musical and other sound effects produced by the singer in connection with such acts, poses, plays and appearances.  In connection with any photoplay in which the Producer is authorized to use solely the recordings of the singer as above provided, the Producer shall have the right to record, reproduce, transmit, exhibit, distribute and exploit the singer's voice and all instrumental, musical and other sound effects produced by the singer in connection with such recording but without the use of the singer's name or photography except

SAG 1983                              321

PAR000306

with respect to the singer's name where the singer is again employed as above provided.  The term "photoplay" as used above shall be deemed to include motion pictures (not including so-called "slot machine movies") produced and/or exhibited with sound or voice recording, reproducing and/or transmitting devices, radio devices and all other improvements and devices, including television, which are now or hereafter may be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production.  Wherever the Producer under the foregoing has the right to use the singer's name the Producer shall likewise have the right to use and give publicity to the singer's name and likeness, photographic or otherwise, and to recordations and reproductions of the singer's voice and all instrumental, musical and other sound effects produced by the singer in connection with the advertising and exploitation of said photoplay. The rights in this Section granted to the Producer shall inure to the benefit not only of the Producer but also to the benefit of all persons who may hereafter acquire from the Producer any right to distribute, transmit, exhibit, advertise or exploit said photoplay.

B.     Notwithstanding anything to the contrary herein contained the right hereinbefore granted to the Producer to use the photography of any such singer accompanying any recording by such singer of any individual song or other musical composition or his name in a photoplay other than the photoplay in connection with the production of which such recording was obtained, may not be exercised unless there shall be included in or endorsed upon such singer's employment contract or confirmation of employment and separately signed or initialed by such singer, a statement in the following form:

"The singer realizes that as to any individual song or recording not used in the photoplay for which the singer is employed, the Producer may use the recording thereof forever in other photoplays, or may use the recording, name and photography thereof in other photoplays (so long as no part is used twice) without additional compensation to the singer."

10.   APPLICABLE PROVISIONS OF SCHEDULE A

The following Sections of Schedule A are hereby incorporated by reference and shall apply to the employment of singers employed by the day:

PAR000307

SCHEDULE A

Section

| | |
|---|---|
| 4. | ENGAGEMENT - DELIVERY OF CONTRACT |
| 5. | RECALL FOR NEXT DAY |
| 7. | CONVERSION TO WEEKLY BASIS |
| 8. | HOURS PER DAY |
| 9. | OVERTIME |
| 10. | REST PERIOD |
| 11. | MAKEUP, HAIRDRESS AND WARDROBE |
| 12. | WORK TIME - DEFINITIONS AND EXCEPTIONS |
| 13. | MEAL PERIODS |
| 14. | INTERVIEWS |
| 15. | AUDITIONS, TESTS |
| 16. | FITTINGS, WARDROBE TESTS, MAKEUP TESTS |
| 17. | STORY, SONG & PRODUCTION CONFERENCES |
| 18. | STUDY OF LINES OR SCRIPT |
| 19. | PUBLICITY INTERVIEWS |
| 20. | PUBLICITY STILLS |
| 21. | REHEARSAL TIME |
| 22. | NIGHT WORK |
| 23. | SATURDAY & SUNDAY WORK |
| 24. | WORK ON HOLIDAYS; WORK BEFORE & AFTER HOLIDAYS |
| 25. | WEATHER PERMITTING CALLS |
| 26. | SCRIPT LINES |
| 27. | STUNT ADJUSTMENT |
| 29. | OVERLAPPING ENGAGEMENT |
| 32. | TRAVEL TIME - RULES & DEFINITIONS |
| 33. | RIGHT TO NAME OR CHARACTER |
| 34. | RATE NOT SPECIFIED |
| 35. | TIME OF PAYMENT |

## 11. "OVERDUBBING"   (Multiple Tracking)

When a singer re-records over the singer's original track containing the same material as recorded on the original track, the rate for overdubbing alone shall be 33-1/3% of the applicable rate, as provided in Section 3 hereof.  Such overdubbing shall be without limitation as to the number of tracks.

## 12. "SWEETENING"

When a singer makes a new track containing new or variant material, and records such track over the singer's original track, the rate, with or without "overdubbing", shall be 100% of the applicable rate as provided in Section 3 hereof.  Such sweetening shall be without limitations as to the number of tracks.

PAR000308

13.   CONTRACTORS (THEATRICAL MOTION PICTURES)

A contractor shall be required on all engagements of groups consisting of three (3) or more singers.  The contractor shall be present at all times during the session and in all cases shall be a performing member of the group, except in those cases where the sex of the group precludes the utilization of the contractor's singing performance, or in the case of hiring a children's singing group. The contractor shall be considered a member of the vocal group for contract purposes and shall be covered by all terms of the applicable Union contract.

The foregoing shall not be applicable to three (3) or more singers who are an established group or act.

PAR000309

## SCHEDULE G-II

### PROFESSIONAL SINGERS EMPLOYED BY THE WEEK AT $3500 OR LESS PER WEEK

#### Table of Contents

Section No.

1. Definitions
2. Schedule G-II Included in Individual Contracts
3. Minimum Salary Per Week
4. "Consecutive Employment" and " "Right to the Role" Not Applicable
5. One Week Guarantee - Re-Employment
6. Phonograph Records and Tape
7. Five-Minute Breaks
8. Availability for Recall After Employment
9. Retakes, Added Scenes, Etc.

Section No.

10. Specialty Singers - Use of Recording; Use of Photography in Other Photoplays
11. Emergency Suspension or Termination
12. Resumed Production After Termination
13. Applicable Provisions of Schedule B
14. Overdubbing (Multiple Tracking)
15. Sweetening
16. Contractors (Theatrical Motion Pictures)

PAR000310

SCHEDULE G-II INDEX

|  | Section No. | Page No. |
|---|---|---|
| Added Scenes | 9 | 332 |
| Applicable Provisions of Schedule B | 13 | 335 |
| Audition, Definition of - See Schedule B |  |  |
| Auditions, Tests, Etc. - See Schedule B |  |  |
| Availability for Recall after Employment | 8 | 331 |
|  |  |  |
| Computation of Overtime - See Schedule B |  |  |
| Conferences - Story, Song and Production - See Schedule B |  |  |
| "Consecutive Employment" not Applicable | 4 | 331 |
| Contractors | 16, 3A | 337, 329 |
|  |  |  |
| Daily Rate of Compensation - See Schedule B |  |  |
| Damage to Wardrobe - See Schedule B |  |  |
| Date When Overtime Due - See Schedule B |  |  |
| Definitions | 1 | 329 |
|  |  |  |
| Emergency Suspension or Termination | 11 | 334 |
| Error in Computation of Overtime - See Schedule B |  |  |
|  |  |  |
| Fittings, Wardrobe - See Schedule B |  |  |
| Fittings Without Employment - See Schedule B |  |  |
| Five-Day Week Studio - See Schedule B |  |  |
|  |  |  |
| General Right of Termination - See Schedule B |  |  |
| Guarantee, One-Week | 5 | 331 |
| Guarantee not Affected by Overtime - See Schedule B |  |  |
|  |  |  |
| Hairdress - See Schedule B |  |  |
| Holiday - See Schedule B |  |  |
| Hours Per Day and Per Week - See Schedule B |  |  |
|  |  |  |
| Illness of Singer - See Schedule B |  |  |
| Individual Contract - Schedule G Included | 2 | 329 |
| Interviews - See Schedule B |  |  |
| Interviews, Publicity - See Schedule B |  |  |
|  |  |  |
| Lines, Study of - See Schedule B |  |  |
| Locations - See Travel Time Schedule B |  |  |
|  |  |  |
| Makeup, Hairdress, Wardrobe - See Schedule B |  |  |
| Makeup Tests - See Schedule B |  |  |
| Mass Test - See Schedule B |  |  |
| Meal Periods - See Schedule B |  |  |
| Minimum Rate | 3 | 329 |
| Minimum Salary | 3 | 329 |

SAG 1983

PAR000311

Schedule G-II Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Name, Right to - See Schedule B | | |
| Night Work - See Schedule B | | |
| | | |
| One-Week Guarantee | 5 | 331 |
| Overdubbing | 14 | 336 |
| Overtime - See Schedule B | | |
| | | |
| Pay Not Specified - See Schedule B | | |
| Photography, Use of in Other Photoplays | 10 | 332 |
| Prerecordings and Preproduction Stills - See Schedule B | | |
| Process Shots - See Schedule B | | |
| Production Conferences - See Schedule B | | |
| Production, Resumed after Termination | 12 | 335 |
| Professional Singer - Definition | 1A | 329 |
| Prorating Salary - See Schedule B | | |
| Publicity Interviews - See Schedule B | | |
| Publicity Stills - See Schedule B | | |
| | | |
| Rate Not Specified - See Schedule B | | |
| Rate - Overtime - See Schedule B | | |
| Recalls, Availability After Employment | 8 | 331 |
| Recording, Use of | 10 | 332 |
| Re-employment | 5 | 331 |
| Rehearsal Time - See Schedule B | | |
| Reporting Prior to Commencement of Employment - See Schedule B | | |
| Rest Period - See Schedule B | | |
| Resumed Production After Termination | 12 | 335 |
| Retakes, Added Scenes, Etc. | 9 | 331 |
| Right to Name or Character - See Schedule B | | |
| "Right to Role" Not Applicable | 4 | 330 |
| | | |
| Salary - Minimum | 3 | 329 |
| Salary - Prorating - See Schedule B | | |
| Saturday and Sunday Work - See Schedule B | | |
| Schedule G-II Included in Individual Contracts | 2 | 329 |
| Script, Study of - See Schedule B | | |
| Service Before Starting Date - See Schedule B | | |
| Six-Day Week, Overnight Location - See Schedule B | | |
| Specialty Singer - Definition | 1, 10 | 329, 332 |
| Starting Date - See Schedule B | | |
| Stills, Publicity - See Schedule B | | |
| Story, Song, Production Conferences - See Schedule B | | |
| Studio Payroll Week - See Schedule B | | |

PAR000312

Schedule G-II Index
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Studio Rules – See Schedule B | | |
| Study Lines or Script – See Schedule B | | |
| Sunday Work – See Schedule B | | |
| Suspension, Emergency | 11 | 334 |
| Sweetening | 15 | 336 |
| Television ("Photoplay" Includes) | 10 | 332 |
| Termination, Emergency | 11 | 334 |
| Termination, General Right of – See Schedule B | | |
| Termination, Resumed Production After | 12 | 335 |
| Tests, Auditions, Wardrobe Tests, Interviews – See Schedule B | | |
| Time of Payment – See Schedule B | | |
| Transparencies – See Schedule B | | |
| Travel Time – See Schedule B | | |
| Trick Shots – See Schedule B | | |
| Units of Overtime – See Schedule B | | |
| Use of Recording; Use of Photography in Other Photoplays | 10 | 332 |
| Walk-Through – See Schedule B | | |
| Wardrobe – See Schedule B | | |
| Wardrobe, Damage to – See Schedule B | | |
| Wardrobe Fittings – See Schedule B | | |
| Wardrobe Tests – See Schedule B | | |
| Week, Performer's – See Schedule B | | |
| Week, Proration of – See Schedule B | | |
| Work on Holiday – See Schedule B | | |
| Work Past Midnight on Last Day – See Schedule B | | |
| Work Time – See Schedule B | | |
| Working at Midnight – See Schedule B | | |
| Workweek – See Schedule B | | |

PAR000313

SCHEDULE G-II

PROFESSIONAL SINGERS EMPLOYED BY THE WEEK AT
$3500 OR LESS PER WEEK

1.   DEFINITIONS

    A.   Professional Singer

    A professional singer is a person who is employed primarily
to sing a set piece of music on a given pitch either as a solo or
in a group requiring unison, melody and harmony.  Non-professional
singing is excluded from this definition.  A professional singer
is herein referred to as a singer.

    B.   The provisions of this Schedule shall not apply to a
person who is employed either as a day performer, free-lance
performer, contract performer, multiple picture performer, or
deal performer.

2.   SCHEDULE G-II INCLUDED IN INDIVIDUAL CONTRACTS

    The provisions of this Schedule shall be deemed incorporated
in the individual contract of employment between Producer and
each singer covered hereunder employed by the week at $3500 or
less per week and who is guaranteed less than $30,000 per the-
atrical picture or less than $25,000 per television picture; the
Producer and the individual singer shall each be bound thereby.

    W-4's shall be presented to performer no later than the
first day of employment.  A W-4 form may be given to performer on
the set on the first day of employment.

    W-4 forms shall be available on every set.  It shall be the
performer's responsibility to return a completed W-4 form to
Producer in a timely manner.  It is understood that where a
performer fails to do so, there shall be no retroactive adjust-
ments to the withholding required by law.  W-4 forms shall be
attached to 3-day-performer contracts.

3.   MINIMUM SALARY PER WEEK

    A.   The minimum rates for singers employed by the week
shall be as follows:

SAG 1983                          329

PAR000314

|                                                              | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 |
|--------------------------------------------------------------|--------------|--------------|
| Solo & Duo.................................................. | $1142.00     | $1256.00     |
| Groups 3-8................................................   | 1047.00      | 1152.00      |
| Groups 9 or more..........................................   | 953.00       | 1048.00      |
| *"Step Out" (per day) Up to 15 Cumulative Bars.              | 177.00       | 195.00       |
| *"Step Out" (per day) 16 + cumulative bars, or if detained 1 hour + after group released, to perform a solo or duo of any length. | 355.00 | 390.00 |

Sweetening with or without overdubbing (per day) an additional 100% of the pro rata daily rate.

Overdubbing only (per day) an additional 33-1/3% of the pro rata daily rate.

B.   Where a singer is required to perform services as a contractor he shall be entitled to receive the following:

|                                             | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 |
|---------------------------------------------|--------------|--------------|
| 3 to 8 Singers..................            | $524.00      | $576.00      |
| 9 or more Singers...............            | $953.00      | $1048.00     |

C.   A singer called out of a choral group and required to sing five bars or more shall be paid an additional sum of $26 for that day.

D.   Any member of a group who steps out to perform as part of a smaller group to sing over 4 consecutive bars shall be paid at the smaller group fee for that day.  Such re-classification shall not operate to reduce the size of the overall group with respect to fees payable to the remainder of the group.

SAG 1983

330

PAR000315

4.    "CONSECUTIVE EMPLOYMENT"  AND "RIGHT TO THE ROLE" NOT APPLICABLE

Singers employed by the week are not entitled to consecutive employment nor to the right to the role, it being agreed that such singers may be subsequently used in the picture without payment of compensation for intervening time.

5.   ONE-WEEK GUARANTEE - RE-EMPLOYMENT

A.   The initial period of employment will be one week in duration, subject to suspension or earlier termination as provided in Section 11 of this Schedule.  The employment of such singer may be terminated at any time after the initial week.  Any period beyond one week may be prorated on a daily basis.

B.   Any such singer employed by the week may be subsequently employed in the same picture on a weekly basis pursuant to the terms of this Schedule, with an initial period of such re-employment of one week, or on a daily basis pursuant to the provisions of Schedule G-1.

6.   PHONOGRAPH RECORDS AND TAPE

There shall be separate bargaining at the time of employment between a singer and Producer for the use of sound track on phonograph records or tape; otherwise such rights may not be acquired.  Singers' contracts for phonograph records or tape recordings shall contain a separate clause to be initialed at the time of employment providing for the use of sound track on records or tape recordings to be not less than the AFTRA rate.

7.   FIVE-MINUTE BREAKS

Singers shall be given a five-minute rest period in each hour of recording.

8.   AVAILABILITY FOR RECALL AFTER EMPLOYMENT

The Producer may not agree with any specialty singer that the specialty singer will hold himself available for any day after the termination of an original period of employment unless the Producer agrees at the same time to employ the specialty singer for such day.  It is agreed, however, that the specialty singer may be recalled by the Producer and will report, at any time prior to the completion of production of the photoplay for which he was originally employed on the same terms and conditions (except as to the original term of employment), provided that he is not then otherwise employed.

SAG 1983                           331

PAR000316

9.   RETAKES, ADDED SCENES, ETC.

A singer employed by the week may be recalled by the Producer and such singer will report for services in connection with retakes, added scenes, changes, sound track, process shots, transparencies, trick shots, trailers, foreign versions, and mouthing to playback.  Compensation shall be paid to the singer only for the day or days on which he is actually so employed.  If such services are commenced within three months after the prior termination of employment, compensation therefor shall be at the daily rate originally agreed upon.

The performer's contract shall not include guarantees for looping, retakes, added scenes, process transparencies, trick shots, trailers, changes or foreign versions (subject to availability) outside the period of consecutive employment.

10.  SPECIALTY SINGERS—USE OF RECORDING; USE OF PHOTOGRAPHY IN OTHER PHOTOPLAYS

This Section shall apply only to a specialty singer defined as a singer employed for a solo or employed as a part of a "name" group.

A.    If any part of the recording by any specialty singer of any individual song or other musical composition be included by the Producer in any photoplay (as finally cut and released) in connection with the production of which such recording was obtained, the Producer shall not thereafter include in any other photoplay or photoplays or make any other use of any part of the photography of such singer accompanying such recording of that particular song or musical composition, or use, in connection with any other photoplay or photoplays, or otherwise, the name of such singer in connection with such recording; but the aforesaid limitations upon the use of such singer's name shall not apply to any other photoplay or photoplays in connection with which such singer is employed to perform additional services, nor shall the aforesaid limitations be deemed to limit the right of the Producer to include all or any part of such recording in any other photoplay or photoplays if no part of the photography of such singer accompanying such recording be included therein and (provided such singer be not employed in connection with such other photoplay) if the name of such singer be not used in connection with such recording.  If no part of the recording by any such singer of any individual song or other musical composition be included by the Producer in the photoplay (as finally cut and released) in connection with the production of which such recording was obtained, then in such event the Producer shall have either of the following options:

SAG 1983                              332

PAR000317

(1)   The Producer may include in any other photoplay
all or any part of such recording of that particular song or
musical composition together with any photography of the
singer accompanying such recording and may use in connection
therewith the name of the singer; but in such event the
Producer may not include any part of such recording of that
particular song or musical composition or any photography
accompanying the same in any other photoplay or photoplays,
or make any other use thereof; or

(2)   The Producer may use all or any part of the
recording of such individual song or other musical composi-
tion in any other photoplay or photoplays (but not other-
wise), but may not then or thereafter use for any purpose
any photography of such singer accompanying the same, and
may not use the name of such singer in connection with any
such use of the recording or otherwise; but the aforesaid
limitation upon the use of the singer's name shall not apply
to any other photoplay or photoplays in connection with
which such singer is employed to perform additional
services.

The Producer's rights in and to any such recording and
in and to the photography of any such singer accompanying
any such recording, and in and to the use of such singer's
name and likeness in connection therewith shall not be
limited or qualified by this Section nor the Codified Basic
Agreement of 1983 except as expressly provided.  All or any
of the aforesaid limitations may be waived by the Union at
any time and from time to time.  With respect to the
photoplay in which the photography and recording is
authorized to be used by the foregoing provisions hereof,
the Producer shall have the right to produce, reproduce,
transmit, exhibit, distribute and exploit any and all of the
singer's acts, poses, plays and appearances of any and all
kinds and shall have the right to record, reproduce, trans-
mit, exhibit and exploit in connection with the photoplay
the singer's voice and all instrumental, musical and other
sound effects produced by the singer in connection with such
acts, poses, plays and appearances.  In connection with any
photoplay in which the Producer is authorized to use solely
the recordings of the singer as above provided, the Producer
shall have the right to record, reproduce, transmit,
exhibit, distribute and exploit the singer's voice and all
instrumental, musical and other sound effects produced by
the singer in connection with such recording but without the
use of the singer's name or photography except with respect
to the singer's name where the singer is again employed as
above provided.  The term "photoplay" as used above shall be
deemed to include motion pictures (not including so-called
"slot machine movies") produced and/or exhibited with sound
or voice recording, reproducing and/or transmitting devices,
radio devices and all other improvements and devices,

PAR000318

including television, which are now or hereafter may be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production.  Wherever the Producer under the foregoing has the right to use the singer's name, the Producer shall likewise have the right to use and give publicity to the singer's name and likeness, photographic or otherwise, and to recordations and reproductions of the singer's voice and all instrumental, musical and other sound effects produced by the singer in connection with the advertising and exploitation of said photoplay.  The rights in this Section granted to the Producer shall inure to the benefit not only of the Producer but also to the benefit of all persons who may hereafter acquire from the Producer any right to distribute, transmit, exhibit, advertise or exploit said photoplay.

B.    Notwithstanding anything to the contrary herein contained the right hereinbefore granted to the Producer to use the photography of any such singer accompanying any recording by such singer of any individual song or other musical composition or his name in a photoplay other than the photoplay in connection with the production of which such recording was obtained, may not be exercised unless there shall be included in or endorsed upon such singer's employment contract or confirmation of employment, and separately signed or initialed by such singer, a statement in the following form:

"The singer realizes that as to any individual song or recording not used in the photoplay for which the singer is employed, the Producer may use the recording thereof forever in other photoplays, or may use the recording, name and photography thereof in other photoplays (so long as no part is used twice) without additional compensation to the singer."

## 11.    EMERGENCY SUSPENSION OR TERMINATION

Producer may terminate the employment of a singer employed by the week, for any of the following reasons:  If the production of the photoplay specified in the singer's contract be necessarily prevented, suspended, or postponed during the course of production, by reason of fire, accident, strike, riot, act of God or of the public enemy, any executive or judicial order, illness of any other member of the cast or of the director, or the disability, failure, or default of such singer.  In the event that such singer's employment be terminated prior to the expiration of the first week of the singer's term of employment for any of the above-named reasons other than the disability, failure, or default of such singer, such singer shall be entitled to the balance of his first week's compensation.  In the event of termination by reason of the disability, failure, or default of such

SAG 1983                              334

singer, the Producer shall be obligated to pay such singer the balance, if any, that is then unpaid for services theretofore rendered, and the Producer shall be discharged of and from any and all liability whatsoever under said contract.

It shall be the duty of the Producer, during the first week of any such prevention, suspension, or postponement, to notify the singer in writing whether the Producer will entirely discontinue the production or further suspend or postpone it.

12.   RESUMED PRODUCTION AFTER TERMINATION

If the Producer has elected to terminate or suspend a singer's employment under a weekly contract pursuant to its rights under Section 11 of this Schedule, and the Producer shall desire to resume the production of said photoplay, the Producer shall notify the singer of its election to so resume, and in such event the singer agrees to render his services in connection with such resumed production as and when the Producer may request, unless the singer is otherwise employed, but if otherwise employed the singer will cooperate to the fullest extent in trying to make his services available to the Producer in connection with such resumed production.  If production is resumed within six months from the date of termination, the singer's compensation shall be at a daily rate equal to one-sixth of the weekly rate specified in the singer's original employment contract and shall be payable only from the date of the commencement of the singer's services in such resumed production.

13.   APPLICABLE PROVISIONS OF SCHEDULE B

The following Sections of Schedule B are hereby incorporated by reference and shall apply to the employment of singers employed hereunder by the week:

SCHEDULE B

Section

|     |     |
|-----|-----|
| 3. | MINIMUM CONTRACT - REQUIRED PROVISIONS |
| 4. | STARTING DATE |
| 6. | EXECUTION OF AGREEMENT - ENGAGEMENT -  DELIVERY OF CONTRACT |
| 7. | RATE NOT SPECIFIED |
| 8. | STUDIO PAYROLL WEEK - TIME OF PAYMENT |
| 9. | THE PERFORMER'S WORKWEEK: STUDIO 5 DAY WEEK: OVERNIGHT LOCATION WEEK |
| 10. | PERFORMER'S WEEK |
| 11. | HOURS PER DAY; WORK PAST MIDNIGHT |
| 12. | DAILY RATE OF COMPENSATION: PRORATING |
| 13. | OVERTIME |

PAR000320

14.   REST PERIOD
15.   WORKTIME
16.   MAKEUP, HAIRDRESS, WARDROBE
17.   MEAL PERIODS
18.   DRESSING ROOMS
19.   TESTS, AUDITIONS, WARDROBE TESTS, MAKEUP TESTS, INTERVIEWS
20.   WARDROBE FITTINGS
21.   STORY, SONG AND PRODUCTION CONFERENCES
22.   STUDY OF LINES OR SCRIPT
23.   PUBLICITY INTERVIEWS
24.   PUBLICITY STILLS
25.   REHEARSAL TIME
26.   NIGHT WORK
27.   WORK ON HOLIDAY, OR HOLIDAY AND SATURDAYS OR SUNDAYS
28.   WORK PAST MIDNIGHT ON LAST DAY
29.   STUNT ADJUSTMENT
31.   OVERLAPPING ENGAGEMENT
32.   PRERECORDING AND PREPRODUCTION STILLS
33.   REPORTING PRIOR TO COMMENCEMENT OF EMPLOYMENT
34.   DAMAGE TO WARDROBE
37.   RIGHT TO NAME OR CHARACTER
38.   STUDIO RULES
39.   RIGHTS GRANTED TO PRODUCER
40.   GENERAL RIGHT OF TERMINATION
41.   ILLNESS OF PERFORMER (Suspension of Salary and Termination)
44.   TRAVEL TIME
45.   LOOPING

## 14.   "OVERDUBBING"   (Multiple Tracking)

When a singer re-records over the singer's original track containing the same material as recorded on the original track, the rate for overdubbing alone shall be 33-1/3% of the applicable pro rata rate as provided in Section 3 hereof.  Such overdubbing shall be without limitation as to the number of tracks.

## 15.   "SWEETENING"

When a singer makes a new track containing new or variant material, and records such track over the singer's original track, the rate, with or without "overdubbing", shall be 100% of the applicable pro rata rate as provided in Section 3 hereof. Such sweetening shall be without limitations as to the number of tracks.

PAR000321

16.   <u>CONTRACTORS (THEATRICAL MOTION PICTURES)</u>

A contractor shall be required on all engagements of groups consisting of three (3) or more singers.  The contractor shall be present at all times during the session and in all cases shall be a performing member of the group, except in those cases where the sex of the group precludes the utilization of the contractor's singing performance, or in the case of hiring a children's singing group.  The contractor shall be considered a member of the vocal group for contract purposes and shall be covered by all terms of the applicable Union contract.

The foregoing shall not be applicable to three (3) or more singers who are an established group or act.

SAG 1983                            337

PAR000322

## SCHEDULE H

### PART I.   STUNT PERFORMERS EMPLOYED BY THE DAY

Table of Contents

Section
  No.

1.   Schedule H Included in
        Individual Contracts
2.   Minimum Wage
3.   Engagement - Delivery of
        Contract
4.   Financial Agreement
5.   "Consecutive Employment"
        Where Applicable
6.   Hours Per Day
7.   Daily Check for Stunt
        Performers

Section
  No.

8.   Overtime
9.   Non-Script Stunts -
        Adjustment of Extras
10.  Applicable Provisions
        of Schedule A
11.  Additional Stunt Work
12.  Clean Wardrobe
13.  Protection of Stunt
        Performer; Safety
14.  Standard Form Contracts

PAR000323

SCHEDULE H, PART I INDEX

|  | Section No. | Page No. |
|---|---|---|
| Additional Stunt Work | 11 | 346 |
| Adjustment of Extras | 9 | 344 |
| Agreement, Financial | 4 | 342 |
| Applicable Provisions of Schedule A | 10 | 346 |
| Auditions, Tests - See Schedule A | | |
| Cancellation, Notice of | 3A(6) | 341 |
| Conferences, Story, Song and Production - See Schedule A | | |
| Consecutive Employment Where Applicable | 5 | 343 |
| Contract, Delivery of | 3A(2), 3B | 341, 342 |
| Contract, Required Inclusions | 3B | 342 |
| Delivery of Contract | 3 | 341 |
| Engagement | 3 | 341 |
| Extras, Adjustment of | 9 | 344 |
| Financial Agreement | 4 | 342 |
| Fittings - See Schedule A | | |
| Hairdress - See Schedule A | | |
| Holidays - See Schedule A | | |
| Hours Per Day | 6 | 343 |
| Individual Contracts, Schedule H Included | 1 | 341 |
| Interviews - See Schedule A | | |
| Interviews, Publicity - See Schedule A | | |
| Lines, Study of - See Schedule A | | |
| Makeup, Hairdress, Wardrobe - See Schedule A | | |
| Meal Periods - See Schedule A | | |
| Minimum Wage | 2 | 341 |
| Name, Right to - See Schedule A | | |
| Night Work - See Schedule A | | |
| Non-Script Stunts | 9 | 344 |
| Overtime | 8 | 343 |
| Overtime on Saturdays, Sundays, Holidays - See Schedule A | | |
| Overtime for Adjusted Extras | 9D(4) | 345 |
| Protection of Stunt Performer; Safety | 13 | 347 |
| Publicity Interviews - See Schedule A | | |
| Publicity Stills - See Schedule A | | |

PAR000324

Schedule H, Part I Index
(Continued)

|                                                                    | Section No. | Page No. |
|--------------------------------------------------------------------|-------------|----------|
| Recall for Next Day - See Schedule A                               |             |          |
| Rehearsal Time - See Schedule A                                    |             |          |
| Rest Period - See Schedule A                                       |             |          |
| Retakes, Added Scenes, Etc. - See Schedule A                       |             |          |
| Right to Name or Character - See Schedule A                        |             |          |
|                                                                    |             |          |
| Saturday Work - See Schedule A                                     |             |          |
| Schedule H Included in Individual Contracts....                    | 1           | 341      |
| Script, Study of - See Schedule A                                  |             |          |
| Script, Submission of...........................                   | 3A(3)       | 341      |
| Standard Form Contracts.........................                   | 14          | 347      |
| Stills, Publicity - See Schedule A                                |             |          |
| Story, Song, and Production Conferences - See Schedule A           |             |          |
| Study of Lines or Script - See Schedule A                          |             |          |
| Sunday Work - See Schedule A                                       |             |          |
|                                                                    |             |          |
| Tests - See Schedule A                                             |             |          |
| Tests, Wardrobe - See Schedule A                                   |             |          |
| Travel Time - See Schedule A                                       |             |          |
|                                                                    |             |          |
| Violations re Script Stunts....................                    | 9B, 9F      | 344, 345 |
|                                                                    |             |          |
| Wardrobe - See Schedule A                                          |             |          |
| Wardrobe, Clean................................                    | 12          | 347      |
| Wardrobe Fittings - See Schedule A                                |             |          |
| Wardrobe Tests - See Schedule A                                    |             |          |
| Weather Permitting Calls - See Schedule A                          |             |          |
| Work Day - See Schedule A                                          |             |          |
| Work on Holidays - See Schedule A                                  |             |          |
| Work on Sundays, Saturdays - See Schedule A                        |             |          |
| Work Time - Definition and Exceptions - See Schedule A             |             |          |
| Working at Midnight - See Schedule A                               |             |          |

PAR000325

## SCHEDULE H

## PART I STUNT PERFORMERS EMPLOYED BY THE DAY

### 1.   SCHEDULE H INCLUDED IN INDIVIDUAL CONTRACTS

The provisions of this Schedule shall be deemed incorporated in the individual contract of employment between Producer and each stunt performer employed by the day; the Producer and the individual performer shall each be bound thereby.

### 2.   MINIMUM WAGE

The minimum wage for a stunt performer employed by the day shall be $328.00 per day for the period July 1, 1983 through December 31, 1984 and $361.00 thereafter.

### 3.   ENGAGEMENT - DELIVERY OF CONTRACT

A.   A stunt performer shall be considered definitely engaged in any of the following events:

(1)   When the performer is given written notice of acceptance;

(2)   When a form contract signed by Producer is delivered to performer or when an unsigned contract is delivered by Producer to performer and is executed by performer as so delivered and returned to Producer;

(3)   When a script is delivered to the performer by Producer; however, this does not include the delivery of a script for a test, audition or interview nor the submission of a script for the purpose of permitting the performer to determine if he desires the engagement;

(4)   When a performer is fitted for work; this shall not apply to wardrobe tests; and

(5)   When the performer is given a verbal call by Producer or an authorized company representative, which is accepted;

(6)   When the performer is actually called by the Producer and agrees to report on the commencement date for which the call is given; however, until noon of the day preceding such commencement date, either the Producer or the performer may cancel such employment.  If the Producer is unable to reach the performer personally, either by telephone or otherwise, notice of such cancellation may be given to the performer by telegraph, in which event the time when such telegram is given by the Producer to the telegraph company, addressed to the performer at his address last known to the Producer, shall be the time of such cancellation.

SAG 1983                          341

PAR000326

B.   To the extent that the agreement reached between the Producer and the performer can be reflected on the form required by the collective bargaining agreement plus Producer's standard riders to be filed with Union, Producer shall deliver a copy of such contract to the performer not later than the first day of performer's employment.  Where the agreement cannot be so reflected, Producer shall deliver a copy of such contract to the performer not later than the first day of performer's employment or four (4) business days after such agreement has been reached, whichever is later.

Where Producer chooses to deliver a copy of a contract to the performer on the set, an extra copy for retention by the performer shall be provided.

Liquidated damages in the amounts provided in Section 31B of the General Provisions hereof for late payment shall be payable until a written contract is delivered to the performer.

C.   Neither auditions nor interviews shall constitute an engagement.

D.   It is agreed that a stunt performer hired and not used is entitled to one day's pay, or his guarantee, whichever is greater.

E.   W-4's shall be presented to performer no later than the first day of employment.  A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.  It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.  W-4 forms shall be attached to day-performer and 3-day-performer contracts.


4.   **FINANCIAL AGREEMENT**

The stunt performer and the Producer shall agree upon the compensation to be paid to such performer for the stunt before it is performed; except that the foregoing rule shall not apply in those instances where the stunt is performed on a location where no ready means of communication is available between the location and the offices of the Union and the Producer.  In the instance last mentioned, the parties shall agree upon the compensation to be paid before the stunt is performed if they may readily do so; however, it is expressly agreed that production shall not be delayed for the purpose of first determining the compensation for a stunt.

PAR000327

5.   "CONSECUTIVE EMPLOYMENT" WHERE APPLICABLE

If the stunt performer plays a role or has dialogue, he
shall be entitled to continuous employment as provided in Section
6 of Schedule A, Day Performers; otherwise there shall be no
continuous employment.


6.   HOURS PER DAY

The work day shall be an eight-hour day continuous from the
first call whether for makeup, hairdress, wardrobe, or other
work, except for allowable meal periods.

If the performer is working at midnight of any day, then his
hours of work for such day shall be computed until the performer
has been dismissed subsequent to midnight, subject to all
exceptions and deductions provided for in this Schedule.  Hours
of work for the following day shall, except as otherwise provided
in this Schedule, be computed from the time the performer, after
having been so dismissed subsequent to midnight, is required to
and does report.


7.   DAILY CHECK FOR STUNT PERFORMERS

The stunt performer employed by the day shall receive
separate checks for each day of employment.


8.   OVERTIME

A.   A stunt performer shall receive time and one-half for
the ninth and tenth hours of work time, and double time
thereafter, except that stunt performers receiving over $900 per
day shall receive time and one-half instead of double time after
the tenth hour.  For the purposes of such calculations the
maximum daily rate shall be $900.00.

B.   To illustrate the application of the foregoing:

A stunt performer receiving $328.00 (the applicable rate
through 12/31/84) per day is called for makeup, hairdress, or
wardrobe at 7:30 A.M.  He spends one hour in such activities.  He
waits thirty minutes, and his call on the set is 9:00 A.M.  He
works until 1:00 P.M., and is off an hour for lunch.  He works
again from 2:00 to 6:30 P.M.  No time is spent in traveling.  His
overtime pay is calculated as follows:

PAR000328

```
Total continuous day............................... 11 hours
Overtime...........................................  3 hours

Pay for overtime
(a)   Two hours at time and one half...............$123.00
(b)   One hour at double time......................$ 82.00

          Total Overtime..........................$205.00
```

C.   Overtime pay for stunt performers shall be computed on the basis of one-hour units.  Compensation for travel time shall continue to be limited to eight hours in any day (period of 24 hours).  Travel time shall be computed and paid for pursuant to Section 32 of Schedule A. All overtime pay and all premium pay, unless otherwise specifically provided in this Schedule, shall be based upon the stunt performer's aggregate or adjusted compensation.

All time from the time the performer is required to report until the performer is released shall be counted as work time for purposes of overtime and rest periods, except for meal periods.

D.   Whenever a performer receives overtime or an additional day's pay pursuant to the provisions of this Agreement, such overtime or additional day's pay shall not be deemed to reduce such performer's guaranteed employment or compensation.

9.   NON-SCRIPT STUNTS - ADJUSTMENT OF EXTRAS

A.   The Producer agrees that all stunts called for by the script shall be performed by stunt performers hired directly.

B.   No Extra hired as such may be employed for script stunts on location, except for bona fide emergencies not within the contemplation of Producer; and no Extra hired as such may be employed for script stunts at the studio if on that day he was employed as an Extra in the same production.  "Emergency on location," shall be defined as a situation on location in which a member of the cast (stunt performer) cannot perform because of unavailability for any reason.  The Union, in its discretion, may grant waivers in light of other circumstances not expressly covered by such definition.

C.   An Extra hired as such may perform a non-script stunt, in which case the Extra shall be signed off as an Extra and employed as a stunt performer.  The performer so adjusted may be closed and signed off as a stunt performer and be re-employed in the same photoplay to perform extra work.

PAR000329

A non-script stunt is defined as a stunt not called for or contemplated by the action in the script, and which is not pre-planned or preconceived and which is not deliberately omitted for the purpose of evading these provisions.

D.   The compensation due for the day to a performer hired as an Extra, whether by the day or week, and adjusted for performing stunt work, including services as an Extra and as a stunt performer, shall be computed as follows:

(1)   He shall receive his full day's pay as an Extra.

(2)   In addition thereto, he shall receive his full day's pay as a stunt performer;

(3)   The Producer shall be entitled to a credit against the sum payable under (2) of that portion of the sum payable under (1) as represents the part of the day from and after the time the performer is signed off as an Extra, computed in tenths of an hour;

(4)   Overtime, if any, shall commence to accrue after the performer so adjusted has rendered eight hours work as a stunt performer.

To illustrate the application of the foregoing rule:

An Extra starts work at 9:00 A.M. and works until 10:07 A.M.   At 10:07 A.M., he is signed off as an Extra and employed as a stunt performer.   He thereafter works seven and one-half hours as a stunt performer.   Under subsection (1) he receives eight hours' pay as an Extra; under subsection (2) he receives eight hours' pay as a stunt performer; under subsection (3) the Producer is entitled to a credit of six hours and forty-eight minutes pay at his extra rate.   Assume the performer's extra rate is $87.00 per day and his stunt performer rate is $328.00, the performer would receive $341.05.

E.   Upon a written request from the Union, the Producer will submit to the Union a report for the previous sixty (60) day period indicating whether in that period any Extra has been adjusted on one day to the sum of $328.00 or more.   Upon the written request of the Union, the Producer will also furnish a copy of the scripts involved and make the film available to the Union for viewing.

F.   For violations occurring under B of this Section the following liquidated damages shall apply:

(a)   $250.00 for the first violation

(b)   $375.00 for the second and each succeeding violation thereafter.

PAR000330

These penalties shall not apply if there is a <u>bona fide</u> dispute as to whether the work is "hazardous" or "stunt work."

The foregoing Schedule shall be applicable on a per picture basis.  Where several violations occur in a single incident, for example, if six persons are involved in one incident, if each were entitled to damages, each would be entitled to $250.00 only.


10.   <u>APPLICABLE PROVISIONS OF SCHEDULE A</u>

The following Sections of Schedule A are hereby incorporated by reference and shall apply to the employment of stunt performers employed by the day:

SCHEDULE A

Section

| | |
|---|---|
| 5. | RECALL FOR NEXT DAY |
| 7. | CONVERSION TO WEEKLY BASIS |
| 10. | REST PERIOD |
| 11. | MAKEUP, HAIRDRESS AND WARDROBE |
| 12. | WORK TIME – DEFINITION & EXCEPTIONS |
| 13. | MEAL PERIODS |
| 14. | INTERVIEWS |
| 15. | AUDITIONS, TESTS |
| 16. | FITTINGS, WARDROBE TESTS, MAKEUP TESTS |
| 17. | STORY, SONG AND PRODUCTION CONFERENCES |
| 18. | STUDY OF LINES OR SCRIPT |
| 19. | PUBLICITY INTERVIEWS |
| 20. | PUBLICITY STILLS |
| 21. | REHEARSAL TIME |
| 22. | NIGHT WORK |
| 23. | SATURDAY AND SUNDAY WORK |
| 24. | WORK ON HOLIDAYS; WORK BEFORE AND AFTER HOLIDAY |
| 25. | WEATHER PERMITTING CALLS |
| 28. | RETAKES, ADDED SCENES, ETC. |
| 29. | OVERLAPPING ENGAGEMENT |
| 30. | PRERECORDINGS |
| 31. | PREPRODUCTION STILLS |
| 32. | TRAVEL TIME – RULES AND DEFINITIONS |
| 33. | RIGHT TO NAME OR CHARACTER |
| 34. | RATE NOT SPECIFIED |
| 35. | TIME OF PAYMENT |


11.   <u>ADDITIONAL STUNT WORK</u>

In the event stunt work is required by Producer beyond that which was agreed to by the stunt performer, the stunt performer shall have the right to negotiate additional compensation for the additional work required.


SAG 1983                          346

PAR000331

A.   <u>Changes Required Prior to Performance</u>.

If such required change occurs prior to the photography
of the stunt, the stunt performer shall advise the Producer
before the stunt in question is photographed if the performer
wishes to negotiate additional compensation for the additional
work required.  Such negotiation may occur either before or after
performance of the stunt; however, it is expressly agreed that
the production shall not be delayed for the purpose of first
determining the compensation for the stunt.

B.   <u>Changes Required During Performance</u>.

If the Producer requires a change during the photog-
raphy of a stunt, the stunt performer shall advise the Producer
at the earliest reasonable time after completion of such stunt
that he wishes to negotiate additional compensation for the
additional work and shall have the right to so negotiate such
additional compensation after the stunt is photographed.

C.   <u>Applicability to Other Schedules</u>.

The foregoing provisions relating to additional stunt
work shall be applicable to Schedules A and B performers.


12.  <u>STUNT PERFORMERS - SANITARY WARDROBE</u>

For scripted stunts, stunt performers shall not be required
to wear wardrobe that has not been properly cleaned after prior
use by another person.


13.  <u>PROTECTION OF STUNT PERFORMER; SAFETY</u>

A.   All reasonable requests and requirements for safety
equipment in connection with the performance of stunts shall be
complied with by Producer or Producer's representatives on the
set or location.

B.   Equipment provided by Producer, for example, autos,
cycles, wagons, etc., shall be in suitable repair for the safe
and proper performance of the stunt.


14.  <u>STANDARD FORM CONTRACTS</u>

It is the intent of the parties that standard form employ-
ment contracts designated as stunt performer's daily contract
shall be created incorporating appropriate provisions for stunt
performers.  Such contracts shall be drafted by the attorneys for
the Union and Producers.  The initial box (as used in Exhibits B,
C and D of the Television Agreement) authorizing the use of clips
as trailers to promote another episode or the series as a whole,
shall not be included in the standard contract for stunt performers.

SAG 1983                           347

PAR000332

## SCHEDULE H

### PART II.  STUNT PERFORMERS EMPLOYED BY THE WEEK AT $3500 OR LESS PER WEEK

### Table of Contents

Section
  No.

1. Schedule H Included in Individual Contracts
2. Minimum Salary
3. Daily Rate of Compensation - Additional Day's Pay
4. Financial Agreement
5. Rate Not Specified
6. Initial Period of Employment - Prorating Salary

Section
  No.

7. "Consecutive Employment" and "Right to Role" Where Applicable
8. Overtime
9. Applicable Provisions of Schedule B
10. Additional Stunt Work
11. Clean Wardrobe
12. Protection of Stunt Performer; Safety
13. Standard Form Contracts

PAR000333

SCHEDULE H, PART II INDEX

|  | Section No. | Page No. |
|---|---|---|
| Additional Stunt Work | 10 | 355 |
| Agreement, Financial | 4 | 352 |
| Applicable Provisions of Schedule B | 9 | 354 |
| Auditions, Tests, etc. - See Schedule B | | |
| Computation of Overtime | 8 | 354 |
| Conferences, Story, Song and Production - See Schedule B | | |
| Consecutive Employment Where Applicable | 7 | 354 |
| Daily Rate of Compensation | 3 | 352 |
| Damage to Wardrobe - See Schedule B | | |
| Date When Overtime Due - See Schedule B | | |
| Dressing Rooms - See Schedule B | | |
| Emergency Suspension or Termination - See Schedule B | | |
| Error in Computation of Overtime - See Schedule B | | |
| Exceptions to Work Time - See Schedule B | | |
| Financial Agreement | 4 | 352 |
| Fittings,Wardrobe - See Schedule B | | |
| Fittings Without Employment - See Schedule B | | |
| Five-Day Workweek (Studio) - See Schedule B | | |
| Guarantee Not Affected by Overtime - See Schedule B | | |
| Hairdress - See Schedule B | | |
| Holidays, or Holidays & Saturdays or Sundays - See Schedule B | | |
| Hours Per Day and Per Week - See Schedule B | | |
| Illness of Performer - See Schedule B | | |
| Individual Contract - Schedule H Included | 1 | 352 |
| Initial Period of Employment - Prorating Salary | 6 | 353 |
| Interviews - See Schedule B | | |
| Interviews, Publicity - See Schedule B | | |
| Lines, Study of - See Schedule B | | |
| Locations - See Travel Time, Schedule B | | |
| Makeup, Hairdress, Wardrobe - See Schedule B | | |
| Makeup, Hairdress, Wardrobe Fittings - Overtime Caused by - See Schedule B | | |
| Makeup Tests - See Schedule B | | |
| Mass Test - See Schedule B | | |

PAR000334

SCHEDULE H, PART II INDEX
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Meal Periods - See Schedule B | | |
| Minimum Contract - See Schedule B | | |
| Minimum Salary | 2 | 352 |
| Name, Right to - See Schedule B | | |
| Night Work - See Schedule B | | |
| Overnight Location 6-Day Week - See Schedule B | | |
| Overtime | 8 | 354 |
| Overtime on Saturdays, Sundays, Holidays - See Schedule B | | |
| Pay Not Specified | 5 | 353 |
| Payment, Time of - See Schedule B | | |
| Period of Employment, Initial | 6 | 353 |
| Prerecordings and Preproduction Stills - See Schedule B | | |
| Production Conferences - See Schedule B | | |
| Prorating Salary | 6 | 353 |
| Proration of Week | 6 | 353 |
| Protection of Stunt Performer; Safety | 12 | 356 |
| Publicity Interviews - See Schedule B | | |
| Publicity Stills - See Schedule B | | |
| Rate Not Specified | 5 | 353 |
| Rate - Overtime | 8 | 354 |
| Rehearsal Time - See Schedule B | | |
| Reporting Prior to Commencement of Employment - See Schedule B | | |
| Rest Period - See Schedule B | | |
| Resumed Production After Termination - See Schedule B | | |
| Retakes, Added Scenes, Etc. - See Schedule B | | |
| Right of Termination - See Schedule B | | |
| Right to Name or Character - See Schedule B | | |
| "Right to Role" Where Applicable | 7 | 354 |
| Salary, Minimum | 2 | 352 |
| Salary, Prorating | 6 | 353 |
| Saturday & Sunday Work (Studio 5-Day Week) - See Schedule B | | |
| Saturday or Sunday & Holiday (Studio 5-Day Week) - See Schedule B | | |
| Schedule H Included in Individual Contracts | 1 | 352 |

PAR000335

SCHEDULE H INDEX
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Script, Study of - See Schedule B | | |
| Six-Day Week (Overnight Location) - See Schedule B | | |
| Standard Form Contracts | 13 | 356 |
| Starting Date - See Schedule B | | |
| Stills, Publicity - See Schedule B | | |
| Story, Song, and Production Conferences - See Schedule B | | |
| Studio 5-Day Week - See Schedule B | | |
| Studio Payroll Week - See Schedule B | | |
| Study of Lines or Script - See Schedule B | | |
| Sunday Work (Overnight Location 6-Day Week) - See Schedule B | | |
| Sunday Work (Studio 5-Day Week) - See Schedule B | | |
| Sunday & Holidays (Overnight Location 6-Day Week) - See Schedule B | | |
| Sunday & Holidays (Studio 5-Day Week) - See Schedule B | | |
| Tests, Auditions, Wardrobe Tests, Makeup Tests, Interviews - See Schedule B | | |
| Time of Payment - See Schedule B | | |
| Time of Payment, Overtime - See Schedule B | | |
| Travel Time - Overtime Caused by | 8 | 354 |
| Travel Time - Rules and Definitions - See Schedule B | | |
| Units of Overtime and Computation | 8 | 354 |
| Walk-Through - See Schedule B | | |
| Wardrobe - See Schedule B | | |
| Wardrobe, Clean | 11 | 356 |
| Wardrobe Fittings - See Schedule B | | |
| Wardrobe Tests - See Schedule B | | |
| Week, Proration of | 6 | 353 |
| Week, Six-Day - See Schedule B | | |
| Work on Holidays or Holiday & Saturday and Sunday - See Schedule B | | |
| Work on Saturday or Sunday - See Schedule B | | |
| Work Past Midnight on Last Day - See Schedule B | | |
| Work Day - See Schedule B | | |
| Work Time - Definitions and Exceptions - See Schedule B | | |
| Working at Midnight - See Schedule B | | |
| Workweek - See Schedule B | | |

PAR000336

SCHEDULE H


PART II STUNT PERFORMERS EMPLOYED BY THE WEEK AT
$3500 OR LESS PER WEEK

(References herein to this Schedule refer to Part II)


1.   SCHEDULE H INCLUDED IN INDIVIDUAL CONTRACTS

The provisions of this Schedule shall be deemed incorporated
in the individual contract of employment between Producer and
each performer; the Producer and the individual performer each
shall be bound thereby.


2.   MINIMUM SALARY

The minimum salary for a stunt performer employed by the
week shall be: $1225.00 for the period July 1, 1983 through
December 31, 1984 and $1348.00 thereafter.

W-4's shall be presented to performer no later than the
first day of employment.  A W-4 form may be given to performer on
the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the
performer's responsibility to return a completed W-4 form to
Producer in a timely manner.  It is understood that where a
performer fails to do so, there shall be no retroactive
adjustments to the withholding required by law.  W-4 forms shall
be attached to 3-day-performer contracts.


3.   DAILY RATE OF COMPENSATION - ADDITIONAL DAY'S PAY

A.   Except as provided in subsection B hereof in the case
of premium pay, and except for a waiver of twelve-hour rest
period, whenever a weekly stunt performer is entitled to an addi-
tional day's pay, this shall mean one-fifth of his weekly base
rate plus an amount equal to the aggregate of all additional
amounts, if any, payable to him for stunts performed by him
during such day.

B.   Whenever a weekly stunt performer is entitled to premium
pay, such premium pay shall be an amount equal to
one-fifth of his aggregate or adjusted weekly compensation except
in those instances where the amount of premium pay is limited to
a maximum of $500.


4.   FINANCIAL AGREEMENT

The stunt performer and the Producer shall agree upon the
compensation to be paid to such performer for the stunt before it

SAG 1983                        352

PAR000337

is performed; except that the foregoing rule shall not apply in those instances where the stunt is performed on a location where no ready means of communication is available between the location and the offices of the Union and the Producer.  In the instance last mentioned, the parties shall agree upon the compensation to be paid before the stunt is performed if they may readily do so; however, it is expressly agreed that production shall not be delayed for the purpose of first determining the compensation for a stunt.

5.  <u>RATE NOT SPECIFIED</u>

Wherever this Schedule states that a performer shall receive compensation for work done before he is employed, if he is not employed, and no rate is specified in this Schedule, such compensation shall be computed upon the agreed rate of compensation, if there was such an agreed rate of compensation, and if not, upon the performer's established compensation.  Disputes between the performer and the Producer under this provision are subject to conciliation and arbitration.

6.  <u>INITIAL PERIOD OF EMPLOYMENT - PRORATING SALARY</u>

In the case of a stunt performer employed by the week, the initial period of employment must be at least a week in duration. Whenever it is necessary to prorate the workweek in order to determine an additional day's pay, such prorating shall be on the basis of one-fifth (1/5) of the performer's weekly base rate for either a studio or distant location workweek; however, such proration shall not in any manner change the performer's weekly base rate.

With respect to prorating the performer's workweek for the purpose of paying the performer at the end of a payroll week, that portion of performer's studio workweek which is part of such payroll week shall be prorated on the basis of 1/5th of the weekly base rate for each such day (excluding Saturday and Sunday) in that payroll week.  This is exclusive of any overtime or premium pay, if any, due in such performer's workweek.

Weekly overtime shall not be prorated except on a fractional week at the end of the performer's engagement; weekly overtime shall only be computed on the basis of performer's week, as fully set forth in Schedule B, Section 13, Overtime.

PAR000338

7.   "CONSECUTIVE EMPLOYMENT" AND "RIGHT TO ROLE" WHERE APPLICABLE

If the stunt performer plays a role or has dialogue, he shall be entitled to continuous employment and "right to role," otherwise there shall be no continuous employment or "right to role."

8.   OVERTIME

Overtime shall be computed and paid pursuant to the provisions of Section 13, Schedule B which is incorporated herein and made a part hereof except that all overtime pay shall be based upon the stunt performer's aggregate or adjusted compensation, except on a day in which the performer travels only, the performer's compensation shall be computed and paid on his base compensation without any adjustments.  A performer whose gross compensation for his workweek, including base pay and adjustments, exceeds $3500 per week shall not be subject to this Schedule but shall be subject to the provisions of Schedule H, Part III.

9.   APPLICABLE PROVISIONS OF SCHEDULE B

The following Sections of Schedule B are hereby incorporated by reference and shall apply to the employment of stunt performers employed by the week at a salary of $3500 or less per week:

SCHEDULE B
   Section

   3.   MINIMUM CONTRACT - REQUIRED PROVISIONS
   4.   STARTING DATE
   6.   EXECUTION OF AGREEMENT - ENGAGEMENT - DELIVERY OF CONTRACT
   8.   STUDIO PAYROLL WEEK - TIME OF PAYMENT
   9.   PERFORMER'S WORKWEEK; STUDIO 5-DAY WEEK; OVERNIGHT LOCATION WEEK
   10.  PERFORMER'S WEEK
   11.  HOURS PER DAY; WORK PAST MIDNIGHT
   14.  REST PERIOD
   15.  WORK TIME
   16.  MAKEUP, HAIRDRESS, WARDROBE
   17.  MEAL PERIODS
   18.  DRESSING ROOMS
   19.  TESTS, AUDITIONS, WARDROBE TESTS, MAKEUP TESTS, INTERVIEWS
   20.  WARDROBE FITTINGS
   21.  STORY, SONG, AND PRODUCTION CONFERENCES
   22.  STUDY OF LINES OR SCRIPT
   23.  PUBLICITY INTERVIEWS

PAR000339

SCHEDULE B (Applicable Provisions) (Continued)

Section
    24.  PUBLICITY STILLS
    25.  REHEARSAL TIME
    26.  NIGHT WORK
    27.  WORK ON HOLIDAYS, OR HOLIDAYS AND SATURDAYS OR
         SUNDAYS
    28.  WORK PAST MIDNIGHT ON LAST DAY
    30.  RETAKES, ADDED SCENES, ETC.
    32.  PRERECORDINGS AND PREPRODUCTION STILLS
    33.  REPORTING PRIOR TO COMMENCEMENT OF EMPLOYMENT
    34.  DAMAGE TO WARDROBE
    35.  DEFINITION OF ROLE
    36.  USE OF DOUBLE
    37.  RIGHT TO NAME OR CHARACTER
    38.  STUDIO RULES
    39.  RIGHTS GRANTED TO PRODUCER
    40.  GENERAL RIGHT OF TERMINATION
    41.  ILLNESS OF PERFORMER (Suspension of Salary &
                              Termination)
    42.  EMERGENCY SUSPENSION OR TERMINATION
    43.  RESUMED PRODUCTION AFTER TERMINATION
    44.  TRAVEL TIME
    45.  LOOPING


## 10.  ADDITIONAL STUNT WORK

In the event stunt work is required by Producer beyond that which was agreed to by the stunt performer, the stunt performer shall have the right to negotiate additional compensation for the additional work required.

### A.   Changes Required Prior to Performance.

If such required change occurs prior to the photography of the stunt, the stunt performer shall advise the Producer before the stunt in question is photographed if the performer wishes to negotiate additional compensation for the additional work required.  Such negotiation may occur either before or after performance of the stunt; however, it is expressly agreed that the production shall not be delayed for the purpose of first determining the compensation for the stunt.

### B.   Changes Required During Performance.

If the Producer requires a change during the photography of a stunt, the stunt performer shall advise the Producer at the earliest reasonable time after completion of such stunt that he wishes to negotiate additional compensation for the additional work and shall have the right to so negotiate such additional compensation after the stunt is photographed.

SAG 1983                          355

PAR000340

C.    <u>Applicability to Other Schedules</u>.

The foregoing provisions relating to additional stunt work shall be applicable to Schedules A and B performers.

## 11.  <u>STUNT PERFORMERS - SANITARY WARDROBE</u>

For scripted stunts, stunt performers shall not be required to wear wardrobe that has not been properly cleaned after prior use by another person.

## 12.  <u>PROTECTION OF STUNT PERFORMER; SAFETY</u>

A.    All reasonable requests and requirements for safety equipment in connection with the performance of stunts shall be complied with by Producer or Producer's representatives on the set or location.

B.    Equipment provided by Producer, for example, autos, cycles, wagons, etc., shall be in suitable repair for the safe and proper performance of the stunt.

## 13.  <u>STANDARD FORM CONTRACTS</u>

It is the intent of the parties that standard form employment contracts designated as stunt performer's weekly contract shall be created incorporating appropriate provisions for stunt performers.  Such contracts shall be drafted by the attorneys for the Union and Producers.  The initial box (as used in Exhibits B, C and D of the Television Agreement) authorizing the use of clips as trailers to promote another episode or the series as a whole, shall not be included in the standard contract for stunt performers.

PAR000341

## SCHEDULE H

### PART III.   STUNT PERFORMERS EMPLOYED BY THE WEEK AT MORE
### THAN $3500 PER WEEK

#### Table of Contents

Section
No.

1.   Schedule H Included in
     Individual Contracts
2.   Daily Rate of Compensation -
     Additional Day's Pay
3.   Financial Agreement
4.   Rate Not Specified
5.   Initial Period of Employ-
     ment - Prorating Salary

Section
No.

6.   "Consecutive Employment"
     and "Right to Role"
     Where Applicable
7.   Applicable Provisions of
     Schedule C
8.   Additional Stunt Work
9.   Clean Wardrobe
10.  Protection of Stunt
     Performer - Safety
11.  Standard Form Contracts

PAR000342

SCHEDULE H, PART III INDEX

|  | Section No. | Page No. |
|---|---|---|
| Added Scenes - See Schedule C | | |
| Additional Stunt Work | 8 | 364 |
| Agreement, Execution of - See Schedule C | | |
| Applicable Provisions of Schedule C | 7 | 363 |
| Arbitration - See General Provisions | | |
| | | |
| Closeups - See Schedule C | | |
| Commencement at Distant Location - See Schedule C | | |
| Commencement at Near Location - See Schedule C | | |
| Consecutive Employment Where Applicable | 6 | 362 |
| Contract - Minimum Free-Lance Form - See Schedule C | | |
| Contract - Minimum Requirements - See Schedule C | | |
| | | |
| Daily Rate of Compensation | 2 | 361 |
| Damage to Wardrobe - See Schedule C | | |
| Definition of Role - See Schedule C | | |
| Definition of Week (Minimum Contract) - See Schedule C | | |
| Double, Use of - See Schedule C | | |
| | | |
| Emergency Suspension or Termination - See Schedule C | | |
| Engagement, Overlapping - See Schedule C | | |
| Execution of Agreement - See Schedule C | | |
| | | |
| Financial Agreement | 3 | 361 |
| Fittings, Wardrobe - See Schedule C | | |
| Fittings Without Employment - See Schedule C | | |
| Five-Day Workweek, Studio - See Schedule C | | |
| Free-Lance Performer - Definition - See Schedule C | | |
| | | |
| General Right of Termination - See Schedule C | | |
| Guarantee - See Schedule C | | |
| Guarantee Not Affected by Additional Day's Pay - See Schedule C | | |
| | | |
| Holidays and Saturdays or Sundays Before and After - See Schedule C | | |
| | | |
| Illness of Performer - See Schedule C | | |
| Individual Contract - Schedule H Included | 1 | 361 |
| Initial Period of Employment - Prorating Salary | 5 | 362 |
| Interviews, Publicity - See Schedule C | | |

SAG 1983                          358

SCHEDULE H PART III INDEX
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Location Expenses - See Schedule C | | |
| Maximum Travel Time - See Schedule C | | |
| Meal Periods - See Schedule C | | |
| Minimum Contract-Required Provisions - See Schedule C | | |
| Name, Right to - See Schedule C | | |
| Notices-Performer's Address and Telephone Number - See Schedule C | | |
| "On or About" Clause - See Schedule C | | |
| Overlapping Engagement - See Schedule C | | |
| Overnight Location Six-Day Week - See Schedule C | | |
| Pay Not Specified | 4 | 362 |
| Payment, Time of - See Schedule C | | |
| Performer's Workweek - See Schedule C | | |
| Preproduction Stills - See Schedule C | | |
| Prerecordings - See Schedule C | | |
| Process Shots - See Schedule C | | |
| Production, Resumed After Termination - See Schedule C | | |
| Prorating Salary | 5 | 362 |
| Protection of Stunt Performer; Safety | 10 | 364 |
| Publicity Interviews - See Schedule C | | |
| Publicity Stills - See Schedule C | | |
| Rate Not Specified | 4 | 362 |
| Recall for Retakes, Added Scenes, Etc. - See Schedule C | | |
| Rehearsal Time - See Schedule C | | |
| Reporting Prior to Commencement of Employment - See Schedule C | | |
| Rest Period - See Schedule C | | |
| Resumed Production after Termination - See Schedule C | | |
| Retakes, Added Scenes, Etc. - See Schedule C | | |
| Rights Granted to Producer - See Schedule C | | |
| Right to Name or Character - See Schedule C | | |
| Right to Role (Where Applicable) | 6 | 362 |
| Role, Definition of - See Schedule C | | |
| Salary - Prorating | 5 | 362 |
| Saturday and Sunday Work (Studio 5-Day Week) - See Schedule C | | |

PAR000344

SCHEDULE H PART III INDEX
(Continued)

|  | Section No. | Page No. |
|---|---|---|
| Saturday or Sunday Before and After Holidays (Studio 5-Day Week) - See Schedule C | | |
| Schedule H Included in Individual Contracts | 1 | 361 |
| Six-Day Week, Overnight Location - See Schedule C | | |
| Standard Form Contracts | 11 | 365 |
| Starting Date - See Schedule C | | |
| Stills, Publicity - See Schedule C | | |
| Studio Five-Day Week - See Schedule C | | |
| Studio Payroll Week - See Schedule C | | |
| Studio Rules - See Schedule C | | |
| Sunday Before and After Holiday (Overnight Location 6-Day Week) - See Schedule C | | |
| Sunday Before and After Holiday - (Studio 5-Day Week) - See Schedule C | | |
| Sunday Work (Overnight Location 6-Day Week) - See Schedule C | | |
| Sunday Work (Studio 5-Day Week) - See Schedule C | | |
| Suspension, Emergency - See Schedule C | | |
| | | |
| Termination, Emergency - See Schedule C | | |
| Termination, General Right of - See Schedule C | | |
| Termination, Resumed Production after - See Schedule C | | |
| Time of Payment - See Schedule C | | |
| Transparencies - See Schedule C | | |
| Travel Time - See Schedule C | | |
| Trick Shots - See Schedule C | | |
| | | |
| Use of "Double" - See Schedule C | | |
| | | |
| Waivers re Starting Date - See Schedule C | | |
| Wardrobe, Clean | 9 | 364 |
| Wardrobe, Damage to - See Schedule C | | |
| Wardrobe Fittings - See Schedule C | | |
| Week, Definition of (Minimum Contract) - See Schedule C | | |
| Week, 6-Day Overnight Location - See Schedule C | | |
| Week, Studio 5-Day - See Schedule C | | |
| Week, Studio Payroll - See Schedule C | | |
| Work on Holidays and Saturdays and Sundays Before and After - See Schedule C | | |
| Work Past Midnight on Last Day - See Schedule C | | |

PAR000345

SCHEDULE H


PART III. STUNT PERFORMERS EMPLOYED BY THE WEEK AT MORE THAN $3500 PER WEEK

(References herein to this Schedule refer to Part III)


1.   SCHEDULE H INCLUDED IN INDIVIDUAL CONTRACTS

The provisions of this Schedule shall be deemed incorporated in the individual contract of employment between Producer and each performer; the Producer and the individual performer shall each be bound thereby.


2.   DAILY RATE OF COMPENSATION - ADDITIONAL DAY'S PAY

A.   Except as provided in subsection B hereof in the case of premium pay, and except for a waiver of the twelve-hour rest period, whenever a weekly stunt performer is entitled to an additional day's pay, this shall mean one-fifth of his weekly base rate plus an amount equal to the aggregate of all additional amounts, if any, payable to him for stunts performed by him during such day.

B.   Whenever a weekly stunt performer is entitled to premium pay, such premium pay shall be an amount equal to one-fifth of his aggregate or adjusted weekly compensation in the event performer is on a studio workweek or one-sixth of his aggregate or adjusted weekly compensation in the event performer is on an overnight location workweek, except in those instances where the amount of premium pay is limited to a maximum of $500.

W-4's shall be presented to performer no later than the first day of employment.  A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.  It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.  W-4 forms shall be attached to 3-day-performer contracts.


3.   FINANCIAL AGREEMENT

The stunt performer and the Producer shall agree upon the compensation to be paid to such performer for the stunt before it is performed; except that the foregoing rule shall not apply in those instances where the stunt is performed on a location where no ready means of communication is available between the location

PAR000346

and the offices of the Union and the Producer.  In the instance last mentioned, the parties shall agree upon the compensation to be paid before the stunt is performed if they may readily do so; however, it is expressly agreed that production shall not be delayed for the purpose of first determining the compensation for a stunt.

4.   <u>RATE NOT SPECIFIED</u>

Wherever this Schedule states that a performer shall receive compensation for work done before he is employed, if he is not employed, and no rate is specified in this Schedule, such compensation shall be computed upon the agreed rate of compensation, if there was such an agreed rate of compensation, and if not, upon the performer's established compensation. Disputes between the performer and the Producer under this provision are subject to conciliation and arbitration.

5.   <u>INITIAL PERIOD OF EMPLOYMENT - PRORATING SALARY</u>

A.   In the case of a stunt performer employed by the week, the initial period of employment must be at least a week in duration.  Whenever it is necessary to prorate the workweek in order to determine an additional day's pay, such prorating shall be on the basis of one-fifth (1/5) of the performer's weekly base rate, for either the studio or overnight location workweek; however such proration shall not in any manner change the performer's weekly base rate for either the studio or the overnight location workweek.

With respect to prorating the performer's workweek for the purpose of paying the performer at the end of a payroll week, that portion of performer's studio workweek which is part of such payroll week shall be prorated on the basis of 1/5th of the weekly base rate for each such day (excluding Saturday and Sunday) in that payroll week.  This is exclusive of any overtime or premium pay, if any, due in such performer's workweek.

6.   <u>"CONSECUTIVE EMPLOYMENT" AND "RIGHT TO ROLE" WHERE APPLICABLE</u>

If the stunt performer plays a role or has dialogue, he shall be entitled to continuous employment and "right to role," otherwise there shall be no continuous employment or "right to role."

PAR000347

## 7.   APPLICABLE PROVISIONS OF SCHEDULE C

The following Sections of Schedule C are hereby incorporated by reference and shall apply to the employment of stunt performers employed by the week at a salary of more than $3500 per week:

SCHEDULE C

Section

| | |
|---|---|
| 3. | MINIMUM CONTRACT - REQUIRED PROVISIONS |
| 4. | STARTING DATE |
| 6. | EXECUTION OF AGREEMENT - ENGAGEMENT - DELIVERY OF CONTRACT |
| 8. | STUDIO PAYROLL WEEK - TIME OF PAYMENT |
| 9. | THE PERFORMER'S WORKWEEK; STUDIO 5-DAY WEEK; OVERNIGHT LOCATION WEEK |
| 10. | PERFORMER'S WEEK |
| 11. | HOURS PER DAY; WORK PAST MIDNIGHT |
| 13. | OVERTIME |
| 14. | REST PERIOD |
| 15. | WORK TIME FOR PURPOSES OF OVERTIME |
| 16. | MAKEUP, HAIRDRESS & WARDROBE |
| 17. | MEAL PERIODS |
| 18. | DRESSING ROOMS |
| 19. | WARDROBE FITTINGS |
| 20. | STORY, SONG & PRODUCTION CONFERENCES |
| 21. | STUDY OF LINES OR SCRIPT |
| 22. | PUBLICITY INTERVIEWS |
| 23. | PUBLICITY STILLS |
| 24. | REHEARSAL TIME |
| 25. | WORK ON HOLIDAYS AND SATURDAYS OR SUNDAYS BEFORE AND AFTER |
| 26. | WORK PAST MIDNIGHT ON LAST DAY |
| 27. | RETAKES, ADDED SCENES, ETC. |
| 28. | OVERLAPPING ENGAGEMENT |
| 29. | PRERECORDINGS AND PREPRODUCTION STILLS |
| 30. | REPORTING PRIOR TO COMMENCEMENT OF EMPLOYMENT |
| 31. | DAMAGE TO WARDROBE |
| 32. | DEFINITION OF ROLE |
| 33. | USE OF DOUBLE |
| 34. | RIGHT TO NAME OR CHARACTER |
| 35. | STUDIO RULES |
| 36. | RIGHTS GRANTED PRODUCER |
| 37. | GENERAL RIGHT OF TERMINATION |
| 38. | ILLNESS OF PERFORMER (Suspension of Salary and Termination) |
| 39. | EMERGENCY SUSPENSION OR TERMINATION |
| 40. | RESUMED PRODUCTION AFTER TERMINATION |
| 41. | TRAVEL TIME |

PAR000348

8. ADDITIONAL STUNT WORK

In the event stunt work is required by Producer beyond that which was agreed to by the stunt performer, the stunt performer shall have the right to negotiate additional compensation for the additional work required.

A. Changes Required Prior to Performance

If such required change occurs prior to the photography of the stunt, the stunt performer shall advise the Producer before the stunt in question is photographed if the Performer wishes to negotiate additional compensation for the additional work required.  Such negotiation may occur either before or after performance of the stunt; however, it is expressly agreed that the production shall not be delayed for the purpose of first determining the compensation for the stunt.

B. Changes Required During Performance

If the Producer requires a change during the photography of a stunt, the stunt performer shall advise the Producer at the earliest reasonable time after completion of such stunt that he wishes to negotiate additional compensation for the additional work and shall have the right to so negotiate such additional compensation after the stunt is photographed.

C. Applicability to Other Schedules

The foregoing provisions relating to additional stunt work shall be applicable to Schedules A and B performers.

9. STUNT PERFORMERS - SANITARY WARDROBE

For scripted stunts, stunt performers shall not be requried to wear wardrobe that has not been properly cleaned after prior use by another person.

10. PROTECTION OF STUNT PERFORMER; SAFETY

A. All reasonable requests and requirements for safety equipment in connection with the performance of stunts shall be complied with by Producer or Producer's representatives on the set or location.

B. Equipment provided by Producer, for example, autos, cycles, wagons, etc., shall be in suitable repair for the safe and proper performance of the stunt.

PAR000349

11. <u>STANDARD FORM CONTRACTS</u>

It is the intent of the parties that standard form employ-
ment contracts designated as stunt performer's weekly contract
shall be created incorporating appropriate provisions for stunt
performers.  Such contracts shall be drafted by the attorneys for
the Union and Producers.  The initial box (as used in Exhibits B,
C and D of the Television Agreement) authorizing the use of clips
as trailers to promote another episode or the series as a whole,
shall not be included in the standard contract for stunt
performers.

PAR000350

# SCHEDULE H

## PART IV. STUNT PERFORMERS EMPLOYED UNDER TERM CONTRACTS

### Table of Contents

Section
  No.

Section
  No.

1.  Schedule H Included in
       Individual Contracts
2.  Minimum Salary
3.  Overtime, Premium Pay,
       and Travel Time

4.  Other Provisions
5.  Combination Contracts
6.  Additional Stunt Work
7.  Clean Wardrobe
8.  Protection of Stunt
       Performer; Safety

-----------

### INDEX

For Index see applicable Schedule (E or F).

-----------

PAR000351

SCHEDULE H

PART IV.  STUNT PERFORMERS EMPLOYED UNDER TERM CONTRACTS

1.  SCHEDULE H INCLUDED IN INDIVIDUAL CONTRACTS

The provisions of this Schedule shall be deemed incorporated in the individual term contract between Producer and the stunt performer; the Producer and the individual performer shall each be bound thereby.

2.  MINIMUM SALARY

The minimum salary rate for a stunt performer employed under a term contract shall be as follows:

|  | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 |
|---|---|---|
| If performer is guaranteed 10 but no more than 19 weeks --------- | $979.00 per week | $1077.00 per week |
| If performer is guaranteed 20 or more weeks------------------- | $815.00 per week | $896.00 per week |

W-4's shall be presented to performer no later than the first day of employment.  A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set.  It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner.  It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law.

3.  OVERTIME, PREMIUM PAY, AND TRAVEL TIME

All overtime pay and all premium pay for stunt performers employed under a term contract, unless otherwise specifically provided in Schedule E or F as may be applicable shall be based upon the stunt performer's aggregate or adjusted compensation, except for travel time, which shall be based upon his base compensation.

4.  OTHER PROVISIONS

A stunt performer employed under a term contract shall be subject to the provisions of Schedule E or Schedule F, depending upon the weekly compensation of such performer.

PAR000352

5.   COMBINATION CONTRACTS

Stunt performers term contracts may not include employment in television under so-called "combination contracts."

6.   ADDITIONAL STUNT WORK

In the event stunt work is required by Producer beyond that which was agreed to by the stunt performer, the stunt performer shall have the right to negotiate additional compensation for the additional work required.

A.   Changes Required Prior to Performance

If such required change occurs prior to the photography of the stunt, the stunt performer shall advise the Producer before the stunt in question is photographed if the performer wishes to negotiate additional compensation for the additional work required.  Such negotiation may occur either before or after performance of the stunt; however, it is expressly agreed that the production shall not be delayed for the purpose of first determining the compensation for the stunt.

B.   Changes Required During Performance

If the Producer requires a change during the photography of a stunt, the stunt performer shall advise the Producer at the earliest reasonable time after completion of such stunt that he wishes to negotiate additional compensation for the additional work and shall have the right to so negotiate such additional compensation after the stunt is photographed.

C.   Applicability to Other Schedules

The foregoing provisions relating to additional stunt work shall be applicable to Schedules A and B performers.

7.   STUNT PERFORMERS - SANITARY WARDROBE

For scripted stunts, stunt performers shall not be requried to wear wardrobe that has not been properly cleaned after prior use by another person.

8.   PROTECTION OF STUNT PERFORMER; SAFETY

A.   All reasonable requests and requirements for safety equipment in connection with the performance of stunts shall be complied with by Producer or Producer's representatives on the set or location.

SAG 1983                        368

PAR000353

B.    Equipment provided by Producer, for example, autos, cycles, wagons, etc., shall be in suitable repair for the safe and proper performance of the stunt.

PAR000354

SCHEDULE I

AIRPLANE PILOTS

Table of Contents

Section
No.

Section
No.

1.  Definition
2.  Schedule I Included in
      Individual Contracts
3.  Minimum Rates
4.  Rate Not Specified – Ex-
      tremely Hazardous Flying
5.  Overtime

6.  Sundays and Holidays
      and Studio Saturday
7.  Commercial Airliners,
      Military Aircraft,
      Etc. – Waivers
8.  Union Security
9.  Other Provisions

PAR000355

SCHEDULE I INDEX

|                                                          | Section No. | Page No.  |
|----------------------------------------------------------|-------------|-----------|
| Airplane Pilot - Definition                              | 1A          | 372       |
| Applicable Stunt Men's Conditions                        | 9           | 374       |
| Commercial Airliners                                     | 7           | 374       |
| Definition of Airplane Pilot                             | 1A          | 372       |
| Definition of Location                                   | 3B          | 372       |
| Extras, Provisions of this Schedule Not Applicable       | 1B          | 372       |
| Extremely Hazardous Flying                               | 4, 5B       | 373, 374  |
| Hazardous Flying                                         | 4, 5B       | 373, 374  |
| Holidays                                                 | 6           | 374       |
| Individual Contract - Schedule I Included                | 2           | 372       |
| Jurisdiction of Union                                    | 1B          | 372       |
| Location - Definition of                                 | 3B          | 372       |
| Military Aircraft                                        | 7           | 374       |
| Minimum Rates                                            | 3           | 372       |
| Other Applicable Provisions                              | 9           | 374       |
| Overtime                                                 | 5           | 373       |
| Rate Not Specified                                       | 4           | 373       |
| Rates, Minimum                                           | 3           | 372       |
| Saturdays, Sundays & Holidays                            | 6           | 374       |
| Schedule I Included in Individual Contracts              | 2           | 372       |
| Standby Checks, Payment to be Avoided                    | 7           | 374       |
| Studio Rates                                             | 3A          | 372       |
| Sundays and Holidays                                     | 6           | 374       |
| Union Security                                           | 8           | 374       |
| Waivers                                                  | 7           | 374       |

PAR000356

SCHEDULE I

AIRPLANE PILOTS

1.   DEFINITION

A.   An airplane pilot is a licensed aircraft pilot who is employed to fly or taxi aircraft (including helicopters) before the camera in the photographing of motion pictures.

B.   The Union recognizes that it does not have jurisdiction over extra work except in the New York area, and the provisions of this Schedule shall only be construed as relating to acting work, and shall not apply to the use of Extras in aircraft, whether simulating the pilot or otherwise.

2.   SCHEDULE I INCLUDED IN INDIVIDUAL CONTRACTS

An individual airplane pilot's employment shall include the applicable terms, conditions, and exceptions of this Schedule.

3.   MINIMUM RATES

The wage scale of airplane pilots shall be as follows:

A.   Studio Rates

|  | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 |
|---|---|---|
| Daily Rate ------ | $439.00 per day | $483.00 per day |
| Weekly Rate ----- | $1225.00 per week | $1348.00 per week |

The foregoing rates shall include taxiing an airplane within the studio.

B.   Location Rates

|  | 7/1/83 through 12/31/84 | 1/1/85 through 6/30/86 |
|---|---|---|
| Daily Rate (includes taxiing and flying) --- | $572.00 per day | $629.00 per day |
| Weekly Rate ----------- | $1225.00 per week | $1348.00 per week |

PAR000357

In the event a pilot employed by the week shall fly or taxi an airplane, he shall be entitled to an additional sum for that day in the amount of $377.00 for the period July 1, 1983 through December 31, 1984 and $415.00 thereafter.

W-4's shall be presented to performer no later than the first day of employment. A W-4 form may be given to performer on the set on the first day of employment.

W-4 forms shall be available on every set. It shall be the performer's responsibility to return a completed W-4 form to Producer in a timely manner. It is understood that where a performer fails to do so, there shall be no retroactive adjustments to the withholding required by law. W-4 forms shall be attached to day-performer and 3-day-performer contracts.

The word "location," as used herein, shall mean any airport or air field where flying may actually be performed.

4.   RATE NOT SPECIFIED - EXTREMELY HAZARDOUS FLYING

The compensation hereinabove provided shall include all types of flying excepting only that which has customarily been classified in the motion picture Industry as extremely hazardous. For extremely hazardous flying, the pilot and the Producer shall agree upon the compensation to be paid to such pilot before the work is performed, if they may readily do so; however, it is expressly agreed that production shall not be delayed for the purpose of first determining the compensation for such work. In the event that the parties have not agreed upon the particular compensation to be paid for the work before the same has been performed, then the matter shall be settled by conciliation between the Producer and the Union by determining the compensation which has theretofore been customarily paid in the Industry for such work. In the event that the matter cannot be settled by conciliation, the compensation will be determined by arbitration in the manner provided by Section 9 of the General Provisions hereof.

5.   OVERTIME

A.   All such pilots, whether employed by the day or the week, shall be paid overtime on a daily basis of one and one-half times the hourly rate for all work on that day beyond eight hours. For example: pilot is employed at the rate of $1225.00 per week; he flies on a given day in a studio workweek; he works a total of ten hours. His compensation for the first eight hours is $622.00 (1/5 of $1225.00, plus $377.00); his base rate per hour is $77.75, his compensation for overtime work is at the rate of $116.62 an hour; total overtime compensation is $233.24, or a gross payment for the day in the example given of $855.24.

SAG 1983                            373

B.   Where a pilot performs extremely hazardous work and is paid an additional sum therefor, such additional sum shall be included with his other compensation for the day for the purpose of computing the daily overtime.  This provision is included for the reason that pilots do not customarily expect or receive additional compensation over their standby and flight pay except in those unusual situations where the flying is extremely hazardous.

6.   SUNDAYS AND HOLIDAYS AND STUDIO SATURDAY

Compensation for Sundays and holidays and studio Saturdays shall be at the rate of double time based upon the pilot's hourly rate for such day.

7.   COMMERCIAL AIRLINERS, MILITARY AIRCRAFT, ETC. - WAIVERS

Producer has requested the inclusion of a general exception in this Agreement which would automatically waive the foregoing provisions for the photographing of pilots operating commercial airliners, military aircraft, etc.  The Union has refused to include such a broad and general provision; however, the Union does agree to issue waivers at the request of the Producer whenever it would be unreasonable to require the Producer to hire pilots who are members of the Union.  It is further agreed that the payment of standby checks is to be avoided.

8.   UNION SECURITY

Licensed aircraft pilots who are employed to fly or taxi aircraft before the camera in the photographing of motion pictures shall be members of the Union as provided by Section 2 of the General Provisions hereof, subject to the limitations set forth in this Schedule.

9.   OTHER PROVISIONS

Other than as herein provided, stunt performer's conditions shall apply to the employment of airplane pilots.

PAR000359

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, California  90046

Re:   Identification of Parties

Dear Mr. Orsatti:

    This letter will confirm that in the 1983 negotiations, the parties agreed that the terms "player," "actor," or "actress" shall be replaced by the term "performer" throughout the Agreement and the word "Union" shall be used to refer to SAG.  It is understood between the parties that these changes are not intended nor should they be deemed to have any substantive impact.

                    Sincerely,


                    J. Nicholas Counter III


ACCEPTED AND AGREED


By:_____
        Kendall Orsatti
    National Executive Secretary



JNC:jj

PAR000360

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, California  90046

                    Re:  Contract Interpretations

Dear Mr. Orsatti:

        This letter will confirm that during the 1983 negotiations, the parties agreed upon the following contract interpretations:

        1.   Airport-type lockers satisfy the requirements provided under Section 21.C of the Basic Agreement and Section 33(c) of the Television Agreement.

        2.   "Normal personal belongings," as used in Section 21.C of the Basic Agreement and Section 33(c) of the Television Agreement, includes normal valuables such as a watch.

        3.   The last sentence of Section 22.C and 36(c) of the Basic Agreement and Television Agreement, respectively, also applies where an individual and the Producer negotiate under said Section 22.C or 36(c), whichever is applicable, and fail to reach agreement for any reason other than the amount of compensation.

                            Sincerely,


                            J. Nicholas Counter III


ACCEPTED AND AGREED

By:_____
        Kendall Orsatti
    National Executive Secretary


JNC:jj

PAR000361

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, CA  90046

Re:  Employment of Minors

Dear Mr. Orsatti:

This letter will confirm our understanding with respect to the new provision in Section 50 of the Basic Agreement, added in the 1983 negotiations, dealing with transportation, lodging and meals for a parent or guardian who is required to travel with a minor to an overnight location.  The Producers' proposal on this subject was limited to minors employed under the "minimum terms" of the Agreement, but the word "minimum" was deleted at the request of the Union.  It is understood that this change does not require a separate negotiation with a parent or guardian in the case where the Producer's agreement for the minor's services includes the manner of travel expenses for the parent or guardian in such a manner that such expenditures do not operate to reduce the minor's compensation below scale.

Sincerely,

J. Nicholas Counter III

ACCEPTED AND AGREED

By:_____
     Kendall Orsatti
     National Executive Secretary

JNC:jj

PAR000362

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, CA   90046

Re:  Affirmative Action - Non-Discrimination

Dear Mr. Orsatti:

This letter will confirm that in the 1983 negotiations, the Producers agreed to SAG's proposal to change the term "physical handicap" to "physical disability" based on SAG's representation that the former term has become objectionable to part of its membership.  It is understood that this change is not substantive and the term "physical disability" is not intended to have any broader meaning than the term "physical handicap" as used in the prior Agreement.

Sincerely,

J. Nicholas Counter III

ACCEPTED AND AGREED:

By:_____
        Kendall Orsatti
   National Executive Secretary

JNC:jj

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, CA  90046

            Re:  Other-Than-Network-Prime-Time-Dramatic Programs

Dear Mr. Orsatti:

     This letter will confirm that in the 1983 negotiations the
parties agreed that with respect to non-Exhibit A shows under the
Television Agreement, SAG will freely grant waivers to SAG
signatories to produce non-Exhibit A-type programs under AFTRA
terms and conditions.

                              Sincerely,


                              J. Nicholas Counter III


AGREED AND ACCEPTED


By:_____
          Kendall Orsatti
     National Executive Secretary



JNC:jj

PAR000364

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, CA  90046

Re:  Product Made for Pay Television, Video-
disc/Videocassette Markets

Dear Mr. Orsatti:

This letter will confirm that in the 1983 negotiations, the
parties agreed in concept to have a new separate agreement for
performers employed in product made for pay television, videodisc
and videocassette markets, which performers shall be represented
by a joint SAG-AFTRA Committee, provided the parties mutually
agree on a resolution of the issues as to premiums for Saturday,
Sunday and holiday work with respect to programs of the multiple-
time-per-week tape-television-drama type done for non-primetime
television, and as to trust fund pension and health contri-
butions.

Sincerely,

J. Nicholas Counter III

AGREED AND ACCEPTED:

By:_____
        Kendall Orsatti
    National Executive Secretary

JNC:jj

PAR000365

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild
7750 Sunset Boulevard
Hollywood, CA  90046

                    Re:  Stunt Coordinators and Insurance

Dear Mr. Orsatti:

     During the 1983 negotiations SAG raised the issue of whether
stunt coordinators are covered employees under the SAG Television
and Basic Agreements.  The Producers maintain that stunt coordin-
ators are not covered employees under said Agreements.  The
parties have agreed to reserve their respective positions on this
issue.

     Notwithstanding the foregoing, this letter will confirm that
the category of stunt coordinator is insured under the Producer's
general liability policy and as provided thereunder, will be held
harmless for any accidents or injuries arising within the scope
of such employment.  Producer's certificate of insurance in this
regard shall be available for inspection upon request by the
Union.

                              Sincerely,


                              J. Nicholas Counter III


AGREED AND ACCEPTED:

By:_____
        Kendall Orsatti
    National Executive Secretary


JNC:jj

                                          Revised 8-19-85

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, CA  90046

Re:  Payroll Data

Dear Mr. Orsatti:

This letter will confirm that in the 1983 negotiations, the
parties agreed that the Screen Actors Guild, Inc., and the
Alliance of Motion Picture & Television Producers will mutually
cooperate to develop a procedure for providing the following
information to performers expeditiously as needed:

1. Breakdown of payment as to base pay, overtime,
   premiums, allowance, reimbursements, and other
   deductions;

2. Actual day(s) worked; whether check is for
   supplemental, residual or foreign use;

3. Employer's name, address, and state identification
   number, where required for unemployment insurance
   purposes;

4. State(s) in which unemployment insurance is filed,
   where required for unemployment insurance purposes.

Sincerely,

J. Nicholas Counter III

ACDEPTED AND AGREED

By:_____
       Kendall Orsatti
    National Executive Secretary

JNC:jj

PAR000367

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**
14144 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91423
(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, CA  90046

Re:  National Safety Board

Dear Mr. Orsatti:

This letter will confirm that in the 1983 negotiations, the parties agreed in concept to form a National Safety Board to attempt to establish guidelines and criteria for determining how stunt performers may be evaluated as to their qualifications with due regard for safety.  The number of representatives from SAG, AFTRA, and the AMPTP shall be agreed upon by the parties.

Sincerely,

J. Nicholas Counter III

AGREED AND ACCEPTED

By:_____
        Kendall Orsatti
   National Executive Secretary

JNC:jj

PAR000368

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**

14144 VENTURA BOULEVARD

SHERMAN OAKS, CALIFORNIA 91423

(818) 995-3600

J. NICHOLAS COUNTER III
PRESIDENT

Kendall Orsatti
National Executive Secretary
Screen Actors Guild, Inc.
7750 Sunset Boulevard
Hollywood, CA  90046

      Re:  Trust Fund For Payment of Residuals

Dear Mr. Orsatti:

    This letter will confirm that in the 1983 negotiations, the parties agreed to the following approach to distributing residuals in sections 4, 5.1, 5.2 and 5.3 of the Basic Agreement, and Sections 18, 19, 20 and 20.1 of the Television Agreement:

A.   Establish Study Committee--Producers and SAG:

    Examine feasibility of establishing Administrator-type Fund or 302(c) Fund for receipt of residual payments and payment of benefits.  SAG will pay for any outside consulting, actuary, legal fees.

B.   Ground Rules:

   (1)   Must secure all necessary legal clearances-e.g., U.S. Department of Labor, IRS, applicable state agencies, ERISA, etc., regarding operation of Fund, tax questions, Social Security, withholding, etc.

   (2)   Must determine that monies placed in Fund will not escheat.

   (3)   Establishment and administrative costs of the Fund will be derived from investment income of the Fund-e.g., no additional costs to Producers or pension and health funds.

   (4)   Establishment of a periodic payment and reporting procedure.

   (5)   Compliance with Section 29, Basic Agreement, with respect to loanouts.

PAR000369

   (6)   No adverse effect on Producers' current procedures on pre-payment of residuals.

   (7)   Prior to the establishment of the new Fund, SAG will be soley responsible for communicating and explaining to its members the proposed changes.

C.  If ground rules met, and any unanticipated legal or administrative problems can be resolved to mutual satisfaction of Producers and SAG, agree to establish Fund, effective January 1, 1985, or mutually agreeable earlier or later date within contract term.

Sincerely,

J. Nicholas Counter III

AGREED AND ACCEPTED:

By:_____
     Kendall Orsatti
  National Executive Secretary

JNC:jj

2

PAR000370